IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

THE HOLY LAND FOUNDATION FOR          )
RELIEF AND DEVELOPMENT                )
Last Address:                         )
525 International Parkway             )
Richardson, Texas  75081             )
                                      )
            Plaintiff,                )
                                      )
        v.                            )        No. 1:02CV00442(GK)
                                      )
JOHN ASHCROFT, in his official        )
capacity as Attorney General of       )
the United States, <u>et al.</u>,     )
                                      )
            Defendants.               )
_____)

**FILED**

MAY – 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## OPPOSITION OF PLAINTIFF HOLY LAND TO GOVERNMENT'S MOTION TO SUBMIT CLASSIFIED EVIDENCE <u>IN CAMERA</u> AND <u>EX PARTE</u>

The government has seized Holy Land's assets without notice, without a hearing, without probable cause, and without any factual basis.  It has shut the Foundation's offices, frozen its bank accounts, and carted off its documents and equipment.  It has put Holy Land's employees on the street and cut the aid that the Foundation provided to poor and needy people around the world.  Now, contrary to fundamental tenets of due process, the government seeks to uphold its violation of Holy Land's rights through evidence that it refuses to expose to adversarial testing.[1]  It seeks, in short, to sustain its unlawful seizure of

---

[1] Defendants' Motion to Submit Classified Evidence <u>In Camera</u> and <u>Ex Parte</u> (filed May 1, 2002).  We will cite the memorandum in support of the motion as "Mem."

12

Holy Land's assets through the unlawful use of secret evidence. The Court should deny the government's motion.

**ARGUMENT**

I.    **COURTS PERMIT THE USE OF SECRET EVIDENCE ONLY IN "THE MOST EXTRAORDINARY CIRCUMSTANCES."**

We note at the outset the extraordinary relief the government seeks.  Unlike the vast majority of cases on which the government relies, it does not seek merely to prevent Holy Land from obtaining classified information through discovery,[2] or (as in the FISA context) to use ex parte procedures to determine the legality of the means by which information was obtained.[3] Instead, the government "seeks to use secret information as a sword" to defeat Holy Land's constitutional and statutory claims. American-Arab Anti-Discrimination Committee v. Reno, 70 F.3d 1045, 1070 (9th Cir. 1995).

The District of Columbia Circuit has declared that "[o]nly in the most extraordinary circumstances does our precedent countenance court reliance upon ex parte evidence to decide the merits of a dispute." Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986), aff'd by an equally divided Court, 484 U.S. 1

---

[2] See, e.g., United States v. Rezaq, 134 F.3d 1121, 1143 (D.C. Cir. 1998); United States v. Yunis, 924 F.2d 1086, 1095 (D.C. Cir. 1991); Ellsberg v. Mitchell, 709 F.2d 51, 55-56 (D.C. Cir. 1983).

[3] See, e.g., ACLU Foundation v. Barr, 952 F.2d 457, 465 (D.C. Cir. 1991); United States v. Belfield, 692 F.2d 141, 147 (D.C. Cir. 1982).

(1987).  Courts enforce this principle because "[i]t is a
hallmark of our adversary system that we safeguard party access
to the evidence tendered in support of a requested court
judgment.  The openness of judicial proceedings serves to
preserve both the appearance and the reality of fairness in the
adjudications of United States courts.  It is therefore the
firmly held main rule that a court may not dispose of the merits
of a case on the basis of ex parte, in camera submissions."  Id.
at 1060-61; see, e.g., Greene v. McElroy, 360 U.S. 474, 496
(1959) ("Certain principles have remained relatively immutable in
our jurisprudence.  One of these is that where governmental
action seriously injures an individual, and the reasonableness of
the action depends on fact findings, the evidence used to prove
the Government's case must be disclosed to the individual so that
he has an opportunity to show that it is untrue."); States Marine
Lines, Inc. v. Federal Maritime Commission, 376 F.2d 230, 238
(D.C. Cir. 1967) (same); see also, Haddam v. Reno, 54 F. Supp. 2d
588, 598 (E.D. Va. 1999) ("The use of secret evidence against a
party . . . is an obnoxious practice, so unfair that in any
ordinary litigation context, its unconstitutionality is
manifest."). Ensuring both "the appearance and the reality of
fairness," Abourezk, 785 F.2d at 1060, is particularly critical
in a case such as this, which raises fundamental questions about
the government's power to take summary action against private

individuals and entities, without judicial sanction, in the name of national security.

Applying the basic principle that both parties must have access to the "evidence tendered in support of a requested court judgment," courts have repeatedly barred the government from using secret evidence to take away important rights. See, e.g., Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 300-05 (1937) (use of secret evidence in telephone rate proceeding violated due process; Court notes that, in light of vast power afforded regulatory agencies, "[a]ll the more insistent the need, when power has been bestowed so freely, that the inexorable safeguard of a fair and open hearing be maintained in its integrity"); United States v. Atkins, 323 F.2d 733, 743 (5th Cir. 1963) (holding that a county election board "could not deprive a person of the right to register to vote on the basis of secret evidence without affording notice and an opportunity for hearing"); Kiareldeen v. Reno, 71 F. Supp. 2d 402, 413-14 (D.N.J. 1999) (use of secret evidence at alien's removal proceeding violated due process); United States v. Rafeedie, 795 F. Supp. 13, 18-20 (D.D.C. 1992) (criticizing the use of secret evidence in exclusion proceeding against permanent resident alien); United States v. Taylor, 403 F. Supp. 747, 751-53 (S.D.N.Y. 1975) (use of secret evidence at parole revocation proceeding violated due process); Kinoy v. Mitchell, 67 F.R.D. 1, 15 (S.D.N.Y. 1975)

(government's attempt to use secret evidence in support of summary judgment motion "wholly unacceptable"); <u>Alexiou</u> v. <u>McGrath</u>, 101 F. Supp. 421, 424-25 (D.D.C. 1951) (government's use of secret evidence at suspension of removal proceeding violated due process).

This long line of authority counsels strongly against permitting the government to support its actions against Holy Land on the basis of secret evidence.  As the following part demonstrates, such use of <u>ex parte</u> proceedings would violate Holy Land's Fifth Amendment right to due process.

## II. UNDER THE <u>MATHEWS</u> v. <u>ELDRIDGE</u> TEST, THE USE OF SECRET EVIDENCE WOULD VIOLATE HOLY LAND'S RIGHT TO DUE PROCESS.

To determine whether the government's proposed use of secret evidence would violate Holy Land's right to due process, the Court must consider the three factors set forth in <u>Mathews</u> v. <u>Eldridge</u>, 424 U.S. 319 (1976):  (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used" and "the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."  <u>Id</u>. at 335; <u>see</u>, <u>e.g.</u>, <u>American-Arab Anti-Discrimination Committee</u>, 70 F.3d at 1068-71 (applying <u>Mathews</u> test to determine whether use of secret

evidence violates due process); <u>Rafeedie</u> v. <u>INS</u>, 880 F.2d 506,
524-25 (D.C. Cir. 1989) (<u>Mathews</u> balancing test governs process
due alien in exclusion proceeding, including use of secret
evidence); <u>Kiareldeen</u>, 71 F. Supp. 2d at 413-14 (same).
Application of the <u>Mathews</u> test confirms that permitting the
government to use secret evidence would violate Holy Land's right
to due process.[4]

A.    The "Private Interest."

The "private interests" at stake here are extremely weighty.
The designation of Holy Land effectively put the Foundation out
of business.  Holy Land immediately had to cease its charitable
works.  Its employees lost their jobs, including even benefits
such as health insurance.  The recipients of Holy Land's charity-
-poor and needy persons and entities in Palestine and elsewhere--
lost essential humanitarian aid.  And the designation of Holy
Land and the seizure of its assets substantially burdened the
right of the Foundation and its donors to exercise their religion
and their First Amendment rights of speech and association.
These property and liberty interests carry great weight.[5]  <u>See</u>,

_____

[4] The government's reliance on <u>Global Relief Foundation</u> v.
<u>O'Neill</u>, No. 02. C 674, Memorandum Opinion and Order (N.D. Ill.
Apr. 5, 2002), is misplaced.  The court in <u>Global Relief
Foundation</u> did not even consider the test from <u>Mathews</u> v.
<u>Eldridge</u>, 424 U.S. 319 (1976).

[5] We detailed the harm that the government's actions have
caused at pages 66-69 of the memorandum in support of our motion
for preliminary injunction.

e.g., United States v. James Daniel Good Real Property, 510 U.S.
43, 54-55 (1993) (the private interests at stake in the seizure
of real property "weigh heavily in the Mathews balance");
Wisconsin v. Constantineau, 400 U.S. 433 (1971) (predeprivation
hearing required because of seriousness of stigma associated with
being publicly branded as having a drinking problem); Goldberg v.
Kelly, 397 U.S. 254, 264 (1970) (termination of welfare benefits
involves deprivation of important rights).[6]

In Bridges v. Wixon, 326 U.S. 135 (1945), the Court
recognized the importance of some of the interests at stake in
this case.  Bridges dealt with deportation.  It noted that
although deportation is not "criminal punishment" as such, "it
may visit as great a hardship as the deprivation of the right to
pursue a vocation or calling.  As stated by Mr. Justice Brandeis
speaking for the Court in Ng Fung Ho v. White, 259 U.S. 276
[1922], deportation may result in the loss 'of all that makes
life worth living.'"  Id. at 147.  In this case, the evidence
establishes that the government's blocking order has prevented
HLF's former employees from making a living not just because they
have lost their jobs, but because of the stigma associated with

---

[6] The Court emphasized in Constantineau that due process
protections  are particularly important "where a person's good
name, reputation, honor or integrity is at stake because of what
the government is doing to him."  400 U.S. at 437.  Here, the
government has branded HLF and, by implication, its staff as
supporters of terrorism, a stigma far beyond the stigma found to
be so weighty in Constantineau.

the designation of HLF as an organization that supports
terrorists.  Moreover, the charitable work of HLF is what made
"life worth living" for Holy Land's principal founder.  As he
stated in his declaration in support of the motion for a
preliminary injunction, it is his "life's work."

The weight of these private interests distinguishes this
case from National Council of Resistance v. Department of State,
251 F.3d 192 (D.C. Cir. 2001), and People's Mojahedin
Organization of Iran v. Department of State, 182 F.3d 17 (D.C.
Cir. 1999), cert. denied, 529 U.S. 1104 (2000), on which the
government relies heavily.  In NCRI, the private interest
considered in the court's Mathews analysis was the affected
organizations' interest in a single bank account in the United
States.  See NCRI, 251 F.3d at 204-06.  That property interest,
although important, cannot compare to the property and liberty
interests at stake here, including not only Holy Land's interest
in its property, but the Foundation's very existence, the
livelihood of its employees, and the fundamental constitutional
and statutory rights of the organization and its donors.  In
PMOI, no private interests were at stake.  Because the designated
organizations lacked "property or presence in this country," they
had "no constitutional rights, under the due process clause or
otherwise."  182 F.3d at 22.  Thus, PMOI has no bearing on this

8

case, where the private interests at stake are indisputably weighty, and the due process clause plainly applies.[7]

### B.    The Risk of Erroneous Deprivation and the Value of Additional Procedures.

Turning to the second _Mathews_ factor, the procedure that the government asks this Court to adopt--the submission of secret, _ex parte_, evidence that Holy Land will have no opportunity to challenge--carries a notoriously significant "risk of an erroneous deprivation" of the liberty and property interests at issue, and "additional . . . procedural safeguards" --access to the secret evidence and an opportunity to challenge it--carry substantial "probable value." _Mathews_, 424 U.S. at 335. The Supreme Court has declared that "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" _James Daniel Good_, 510 U.S. at 55 (quoting _Joint Anti-Fascist Refugee Committee_ v. _McGrath_, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)). As the Ninth Circuit observed in a secret evidence case, "'One would be hard pressed to design a procedure more likely to result in erroneous deprivations.' . . .

---

[7] Similarly, in _Molerio_ v. _FBI_, 749 F.2d 815 (D.C. Cir. 1984), the plaintiff had neither a liberty or a property interest that entitled him to due process. _See id._ at 823-24.

[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." American-Arab Anti-Discrimination Committee, 70 F.3d at 1069 (quoting district court); see, e.g., id. at 1070 (noting "enormous risk of error" in use of secret evidence); Kiareldeen, 71 F. Supp. 2d at 412-14 (same).

The proceedings to date in this case demonstrate the value of adversarial--rather than ex parte--proceedings. The designation of Holy Land rests on the November 5, 2001 Watson memorandum and its underlying exhibits. As the memorandum in support of Holy Land's motion for preliminary injunction demonstrates, the Watson memorandum is riddled with factual errors and false assumptions. So egregious are the memorandum's flaws that the government now seeks to redesignate Holy Land using a substantially revised and "corrected" administrative record, including secret evidence that Holy Land will not have an opportunity to refute (as it has refuted the unclassified evidence). See Ex. A.[8] Without the benefits of the adversarial process, the Watson memorandum's errors (all of which, it bears

_____

[8] To cite just one example of the government's efforts to correct its errors, it now seeks to substitute a Government of Israel "summary" of Muhammad Anati's statements for the actual statement that previously appeared as Ex. 50 to the Watson memorandum. Ex. A at 2. As we demonstrated at pages 27-29 of the memorandum in support of Holy Land's motion for preliminary injunction, the Anati statement provided no support for (and in some respects contradicted) the conclusions in the Watson memorandum.

mentioning, were to Holy Land's disadvantage) would never have come to light.[9]

The government downplays the dangers of its proposed procedure; it asserts that "the Court's review [of the secret evidence] itself gives plaintiff a measure of protection." Mem. 10. The Supreme Court dismissed a similar argument in Alderman v. United States, 394 U.S. 165 (1969). In Alderman, the Court addressed the procedures to be followed in determining whether government eavesdropping in violation of the Fourth Amendment contributed to its case against the defendants. The Court rejected the government's suggestion that the district court make that determination ex parte and in camera. The Court observed that

> [a]n apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

------------------------------------------------

[9] In this respect, among others, Molerio v. FBI, 749 F.2d 815 (D.C. Cir. 1984), is distinguishable. The secret evidence that the courts considered in that case appears to have involved a simple and (the court's opinion suggests) incontrovertible fact: the reason for which the FBI refused to hire the plaintiff as a special agent. See id. at 825. Here, the facts are far more complex, and Holy Land disputes any evidence the government proffers purporting to show that the Foundation provides funding to Hamas.

Id. at 182.   In ordering disclosure of improperly recorded
conversations, the Court declared:

> Adversary proceedings will not magically
> eliminate all error, but they will
> substantially reduce its incidence by
> guarding against the possibility that the
> trial judge, through lack of time or
> unfamiliarity with the information contained
> in and suggested by the materials, will be
> unable to provide the scrutiny that the
> Fourth Amendment exclusionary rule demands.

Id. at 184.   Precisely the same considerations militate against
ex parte procedures here.   Although we have no doubt that the
Court would scrutinize the government's secret evidence
rigorously, the Court lacks both counsel's familiarity with the
underlying facts and the resources available to counsel to
investigate the government's allegations.

> C.   **The Government's Interest.**

Finally, the Court must consider the government's purported
interest in using secret evidence.   Predictably, the government
asserts its interest in avoiding damage to "national security,"
without any effort to demonstrate either that exclusion of the
specific evidence at issue here or the disclosure of that
evidence would cause such damage.   Courts have previously
rejected such diffuse claims of national security.   See, e.g.,
Arab-American Anti-Discrimination Committee, 70 F.3d at 1070 ("We
cannot in good conscience find that the President's broad
generalization regarding a distant foreign policy concern and a

related national security threat suffices to support a process that is inherently unfair because of the enormous risk of error and the substantial personal interests involved."); <u>Kiareldeen</u>, 71 F. Supp. 2d at 414 (same); <u>Rafeedie</u>, 795 F. Supp. at 19 (same).

The government implies that the Court must take its word for the national security significance of the secret evidence.  But the very D.C. Circuit decisions on which the government relies contemplate judicial inquiry into the government's purported national security interest.  In <u>Molerio</u> v. <u>FBI</u>, 749 F.2d 815 (D.C. Cir. 1984), for example, the court noted that "[t]o some degree, at least, the validity of the government's assertion [of the state secrets privilege] must be judicially assessed." <u>Id.</u> at 822; <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Reynolds</u>, 345 U.S. 1, 8 (1953) ("The court itself must determine whether the circum-stances are appropriate for the claim of privilege . . . .").  In <u>Molerio</u>, the district court and the court of appeals examined the government's rationale for withholding the evidence at issue and concluded that the privilege had a sound basis.[10]  <u>Molerio</u>

--------

[10] Contrary to the government's implication, <u>Molerio</u> did not approve the use of secret evidence to support the government's position in litigation.  In that case, the court of appeals upheld the government's assertion of the state secrets privilege to prevent disclosure of certain information--the basis for the FBI's refusal to hire the plaintiff--and then held that in the absence of that information the government could not fairly defend itself against plaintiff's First Amendment claim.  <u>See</u> 749 F.2d at 825-26.  Although <u>Molerio</u> reached the same result as

plainly recognizes a court's power, under appropriate circumstances, to reject the government's claim that disclosing or foregoing the use of certain evidence will damage national security. Similarly, in <u>Abourezk</u>, the court acknowledged the possibility, in "extraordinary circumstances," of considering secret evidence, but only where (among other things) the government "demonstrat[es] . . . compelling national security concerns." 785 F.2d at 1061.

The Court should require the "demonstration" that <u>Abourezk</u> contemplates before it assigns any weight to the government's interest for purposes of the <u>Mathews</u> analysis. In assessing the government's showing, the Court should consider the potential use of protective measures that will permit access to the secret evidence while reducing to a minimum the government's purported national security concerns. For example, if the Court is satisfied that national security will be harmed if the government discloses or foregoes the use of the secret evidence, it can consider permitting the government to redact particularly sensitive "sources and methods" information, and it can order disclosure only to defense counsel. <u>Cf</u>. <u>Al Najjar</u> v. <u>Reno</u>, 97 F. Supp. 2d 1329, 1358-59 (S.D. Fla. 2000) (proposing procedures for

---

permitting the government to use secret evidence, it pursued a different mode of analysis than the government advocates here.

handling classified evidence in deportation context), <u>vacated as moot</u>, 273 F.3d 1330 (11th Cir. 2001).

Evidently anticipating the latter possibility, the government asserts in a footnote that disclosure only to counsel would endanger national security and place strains on the attorney-client relationship between Holy Land and its counsel. Mem. 10-11 n.11.  Whatever the weight of these considerations in other contexts, they have no significance here.  Lead counsel for Holy Land (John Cline) currently holds a "Top Secret" security clearance, has previously held a Department of Energy "Q" clearance, and, over the past sixteen years, has been granted access to a variety of highly sensitive information, particularly in connection with the <u>United States</u> v. <u>Oliver L. North</u> and <u>United States</u> v. <u>Wen Ho Lee</u> prosecutions.  Another of Holy Land's counsel (Nancy Hollander) held "Top Secret" and "Q" clearances in connection with the <u>Lee</u> case.[11]  In light of counsel's previous access to classified information, the government cannot plausibly claim that disclosure to counsel only would threaten national security.[12]  Nor should the government's purported concern about

_____

[11] Holy Land's other counsel will submit to the security clearance procedure and will forego access to the secret evidence unless and until the necessary clearance is granted.

[12] There is no indication in <u>Ellsberg</u> v. <u>Mitchell</u>, 709 F.2d 51 (D.C. Cir. 1983), <u>Salisbury</u> v. <u>United States</u>, 690 F.2d 966 (D.C. Cir. 1982), and <u>Weberman</u> v. <u>NSA</u>, 668 F.2d 676 (2d Cir. 1982), on which the government relies, that the private counsel in those cases held (or had held) security clearances.  Moreover,

a "strain" on the attorney-client relationship justify the use of secret evidence. Holy Land and its counsel are in the best position to determine whether the benefits of access by counsel to the secret evidence and an opportunity to rebut it outweigh any restrictions on communication between attorney and client. After detailed consultation, both Holy Land and undersigned counsel believe that access by counsel alone to the secret evidence--if deemed necessary by the Court to accommodate the government's national security concerns--would better serve Holy Land's interests than ex parte submission of that evidence by the government.

We urge the Court to view the government's claimed need for secrecy--and to evaluate the third Mathews factor--in light of previous, similar claims that have proven exaggerated, if not outright false. To cite a few famous examples, the government argued in 1971 that disclosure of the Pentagon Papers would cause grave damage national security. See New York Times Co. v. United States, 403 U.S. 713 (1971) (per curiam). The New York Times published the Papers, and there is no evidence that national security suffered in the slightest. In 1979, the government sought to suppress Howard Morland's article, The H-Bomb Secret, claiming that publication would cause immediate and irreparable

_____

the private interests and risks of erroneous deprivation at issue in those cases were substantially less than in this case.

16

harm to national security.  See United States v. Progressive,
Inc., 486 F. Supp. 5 (D. Wis.), dismissed as moot, 610 F.2d 819
(7th Cir. 1979).  The Progressive published Morland's article in
November 1979, and--again--there is no evidence of any harm to
national security.  In December 1999, the government made
strident national security claims to convince a federal court to
detain Dr. Wen Ho Lee under extraordinarily strict conditions for
nine months.  See United States v. Lee, 79 F. Supp. 2d 1280
(D.N.M. 1999), aff'd mem., 208 F.3d 228 (10th Cir. 2000).  One
government witness even testified that the court faced a "you bet
your country" decision in determining whether to release Dr. Lee.
In September 2000, following a plea bargain, Dr. Lee regained his
freedom.  There is no evidence that his release has caused any
damage to the national security.

These examples share several common features:  in each case,
the government invoked national security to convince a court to
depart from constitutional standards; in each case, courts
initially acceded to the government's national security claims;
and in each case, when the "doomsday" event actually occurred,
the government's purported concerns proved to be unfounded.  As
the Fourth Circuit has observed in the First Amendment context:

> History teaches us how easily the spectre of
> a threat to "national security" may be used
> to justify a wide variety of repressive
> government actions.  A blind acceptance by
> the courts of the government's insistence on
> the need for secrecy, without notice to

17

> others, without argument, and without a
> statement of reasons, would impermissibly
> compromise the independence of the judiciary
> and open the door to possible abuse.

In re Washington Post Co., 807 F.2d 383, 391-92 (4th Cir. 1986).

In accordance with Washington Post, we ask the Court, when applying the third Mathews factor, to scrutinize with a skeptical eye the government's claim that disclosure (or foregoing the use) of the secret evidence will damage national security.  Upon an objective and independent assessment of that claim, the Court should find that the first and second Mathews factors substantially outweigh the government's professed need to present its evidence ex parte.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to use secret evidence.

Respectfully submitted,

FREEDMAN BOYD DANIELS HOLLANDER
GOLDBERG & CLINE P.A.

By: _____
John D. Cline
(D.C. Bar No. 403824)
John W. Boyd
Nancy Hollander
Zachary A. Ives

20 First Plaza, Suite 700
Albuquerque, NM 87125
(505) 842-9960 (phone)
(505) 842-0761 (fax)

Counsel for the Holy Land
Foundation for Relief
and Development

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May, 2002, a copy of the foregoing was served by Federal Express upon:

Sandra Schraibman, Esquire
Elizabeth J. Shapiro, Esquire
United States Department of Justice
901 E. Street, N.W., Room 988
Washington, D.C.  20004

John D. Cline

BY LIAISON

Date:       February 28, 2002

To:         Mr. R. Richard Newcomb, Director
            Office of Foreign Assets Control
            Department of Treasury

From:       Mr. Stephen Jennings, Jr.
            Acting Section Chief
            International Terrorism Operations Section
            Counterterrorism Division

Subject:    HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
            INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

            ACTION MEMORANDUM

     The following is an unclassified supplement to the
Action Memorandum (Memo), dated 11/05/01, from the FBI to
Mr. R. Richard Newcomb.

     1. According to financial records obtained (Exhibit A),
the following wire transfers originated from the Holy Land
Foundation for Relief and Development's (HLFRD's) Richardson,
Texas headquarters:

| Beneficiary | Dates | Amount |
|---|---|---|
| HLFRD-Hebron | 3/07/00-05/09/01 | $3,540,127.00 |
| Sanabil | 3/01/00-09/07/01 | $919,853.00 |
| HLFRD-Ramallah | 9/28/01-12/03/01 | $938,605.00 |
| HLFRD-Gaza | 6/14/01-06/22/01 | $240,538.00 |
| Human Appeal Int'l | 3/21/00-10/25/00 | $104,921.00 |
| Dar El Salam Hospital | 3/23/00-05/16/01 | $139,150.00 |



FILED

MAY - 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

02-442

EXHIBIT

A

While certain transactions in this summary, list the beneficiary as "BUSINESS UNKNOWN," the attached wire transmittal forms reflect that the HLFRD offices in the Middle East were the beneficiaries in those cases.

2. The following list of Exhibits (originally containing handwritten Hebrew police reports) have been replaced with one inclusive unclassified Government of Israel (GOI) report number 10/4390/01 (Exhibit B):

| | |
|---|---|
| Exhibit 58 | Abdallah Najar |
| Exhibit 59 | Ibrahim Abd-El Fatah Shubaka |
| Exhibit 60 | Sheikh Ahmad Yassin |
| Exhibit 61 | Yahya Arshad |
| Exhibit 62 | Mun Wazuz |
| Exhibit 63 | Assad Heimuni |
| Exhibit 64 | Izzam Naaman Abd-El Rahman Salhab |
| Exhibit 65 | Fuad Tabish |
| Exhibit 66 | Adel Badrin |
| Exhibit 68 | Ahamd Sati |
| Exhibit 69 | Omar Quasma |
| Exhibit 71 | Ahmed Salim Ahmed Saltana |
| Exhibit 72 | Nazia Abu Aoun |
| Exhibit 73 | Iyyad Braham |
| Exhibit 74 | Hathi Katit |
| Exhibit 75 | Muhammad Radwan |
| Exhibit 76 | Ibrahim Hasan Ali Jaber |
| Exhibit 82 | Abd Al-Rahman 'Ashur |
| Exhibit 83 | Musbah Daher |

3. Separately, the GOI has provided an unclassified report on Muhammad Otman Abd-El Rahman Anati, which will replace Exhibit 50 (Exhibit C).

Anati, the self-admitted head of the HLFRD-Jerusalem office, until it was closed by the GOI, provided an in-depth account of how the HLFRD's Chief Executive Officer, Shukri Abu Baker, recruited him to run the HLFRD-Jerusalem office. In addition, the records obtained in the search of the HLFRD-Jerusalem office clearing connect that office with the Richardson, Texas headquarters, through facsimiles.

However, as a measure of Abu Baker's veracity, a Dallas Morning News (DMN) article, dated 4/18/98, quotes Abu Baker on this relationship. The article describes that Anati was being held on charges that he had channeled money through the HLFRD-Jerusalem office in East Jerusalem to jailed HAMAS activists and families of suicide bombers.

Abu Baker was interviewed by the DMN in 3/98 and stated that he knew Anati and that the Holy Land Foundation in Israel was not connected with the Richardson-based foundation. "That's another organization carrying a similar name," Abu Baker stated. "I have no idea about his link [to Hamas] or any evidence that links us to that group" (Exhibit D).

According to the DMN, HLFRD's own lobbyist, John Bryant contradicted Abu Baker. According to the article, "Mr. Bryant said that though Mr. Anati worked for a separate corporate entity in Israel, his Jerusalem-based organization has "a direct relationship" with the Holy Land Foundation in Richardson. "That [Jerusalem] entity would have no reason to be there if it did not have a role in how money from Holy Land Foundation was being spent," he said.

4. In addition, the following translations of Hebrew documents should be added to the existing unclassified record (Exhibit E):

| | |
|---|---|
| Exhibit 45 | Letter of Response on Behalf of The State Attorney's Office, regarding the closure of the HLFRD-Jerusalem office; |
| Exhibit 46 | Israeli Supreme Court decision regarding the 1992 deportations to Lebanon; |
| Exhibit 49 | Israeli pronouncement of organizations as disallowed associations, including the HLFRD and Interpal; |
| Exhibit 53 | Expert Opinion: Islamic Charitable Associations in the "Territories" and Their Connection to "HAMAS"; |
| Exhibit 67 | Akhram Haroubi interviews; |

3

Exhibit 84       <u>Statement on Behalf of The State Attorney's
                 Office</u>, regarding The Islamic Rescue
                 Committee;

5. A typed version of the declassified Foreign
Intelligence Surveillance Act (FISA) summaries from the
Philadelphia meeting should replace Exhibit 28 (Exhibit F).

6. A typed version of the declassified Foreign
Intelligence Surveillance Act (FISA) summaries involving the
Oxford, Mississippi meeting should replace Exhibit 29
(Exhibit G).

7. <u>Correction</u>:  On page 11 of the Memo, the FBI quoted
HLFRD-2, "al-Hanooti collected over six million U.S. dollars
for support of HAMAS in Israel."  In fact, HLFRD-2 stated that
the Islamic Center of Passiac County had collected over six
million U.S. dollars for support of HAMAS in Israel.  Al-
Hanooti, at the time, was the second Imam of that Center,
under Mohammad El-Mezain, the first Imam.

8. <u>Correction</u>: On page 47 of the Memo, the FBI quoted
HLFRD-4, "At that conference, El-Mezain reportedly stated that
during 1994 he (El-Mezain) raised $1,800,000 inside the United
States for HAMAS.  El-Mezain and Abu Baker stated that funds
raised by the HLFRD were strictly dollars for HAMAS."  It was
represented that this statement was made at the December 1994
Muslim Arab Youth Association conference.  In fact, HLFRD-4
reported that El-Mezain made this exact statement at the
November 1994 conference in Culver City.

9. Source documents for FBI asset reporting were
intentionally omitted from the Exhibits to the Memo, due to
their sensitive nature.  Those Exhibits are numbered: 19, 42,
and 91-101.

10. Exhibit numbers ultimately not used in the Memo,
include: 27, 44, 48, 70, 77, 79-81, and 86.  These numbers
originally contained source documents, but the underlying
portions of the Memo were ultimately not used.

4