EXHIBIT

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

THE HOLY LAND FOUNDATION FOR
RELIEF AND DEVELOPMENT
Last Address:
525 International Parkway
Richardson, Texas 75081

        Plaintiff,

    v.

JOHN ASHCROFT, in his official
capacity as Attorney General of
the United States, <u>et al.</u>,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)


**FILED**
APR - 5 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

No. 1:02CV00442(GK)

**FILED**
JUN 2 8 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MOTION OF THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT FOR A PRELIMINARY INJUNCTION

Plaintiff Holy Land Foundation for Relief and Development ("Holy Land") moves the Court under Fed. R. Civ. P. 65 for a preliminary injunction enjoining the defendants, pending the outcome of this litigation, from continuing to block or otherwise interfere with Holy Land's access to and disposition of its assets. The grounds for the motion are set forth in the accompanying memorandum.

Because no counsel has yet entered an appearance for the defendants, the discussion that LCvR 7.1(m) contemplates has not occurred. In light of the relief that the motion requests, however, undersigned counsel believes that the defendants will oppose the motion.

29

Respectfully submitted,

FREEDMAN BOYD DANIELS HOLLANDER
    GOLDBERG & CLINE P.A.

By: _____

John D. Cline
(D.C. Bar No. 403824)
John W. Boyd
Nancy Hollander
Zachary A. Ives

20 First Plaza, Suite 700
Albuquerque, NM 87125
(505) 842-9960 (phone)
(505) 842-0761 (fax)

Counsel for the Holy Land
Foundation for Relief
and Development

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April, 2002,

copies of the foregoing were served by Federal Express upon:

John Ashcroft, Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Room B-103
Washington, DC 20530-0001

The United States Department
        of Justice
Attn: The Office of Attorney
General
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Paul H. O'Neill
Secretary of the Treasury
US Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C. 20220

The United States Department of
Treasury
Attn: The Office of General
Counsel
1500 Pennsylvania Avenue NW
Washington, D.C. 20220

Colin L. Powell
Secretary of State
US Department of State
2201 C Street N.W.
Washington, DC 20520

The United States Department of
State
Attn: The Office of Legal
Advisor
2201 C Street NW
Washington, D.C. 20520

Roscoe C. Howard, Jr.
United States Attorney
US Attorney's Office, District
of Columbia
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C. 20530

John D. Cline

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

THE HOLY LAND FOUNDATION FOR    )
RELIEF AND DEVELOPMENT,         )
                                )
             Plaintiff,         )
                                )
    v.                          )        No. 1:02CV00442(GK)
                                )
JOHN ASHCROFT, in his official  )        FILED
capacity as Attorney General of )        JUN 28 2002
the United States, et al.,      )
                                )        NANCY MAYER WHITTINGTON, CLERK
             Defendants.        )        U.S. DISTRICT COURT
                                )

MEMORANDUM IN SUPPORT OF MOTION
OF THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
FOR A PRELIMINARY INJUNCTION

FREEDMAN BOYD DANIELS HOLLANDER
    GOLDBERG & CLINE P.A.
John D. Cline
(D.C. Bar No. 403824)
John W. Boyd
Nancy Hollander
Zachary A. Ives
20 First Plaza, Suite 700
Albuquerque, NM 87125
(505) 842-9960 (phone)
(505) 842-0761 (fax)


Counsel for the Holy Land
Foundation for Relief
and Development

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    HOLY LAND. . . . . . . . . . . . . . . . . . . . . . . . 2

    II.   THE DESIGNATION OF HOLY LAND AS A TERRORIST
          ORGANIZATION AND THE SEIZURE OF HOLY LAND'S
          ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . 5

    III.  THE WATSON MEMORANDUM. . . . . . . . . . . . . . . . . . 9

          A.    The Recipients of Holy Land Funds. . . . 10

              1.    Support for Orphans and Families. . 11

              2.    Zakat Committees, Hospitals, and
                    Schools . . . . . . . . . . . . . . 15

              3.    Support for Other Charitable
                    Organizations . . . . . . . . . . . 18

          B.    The 1993 and 1994 Meetings . . . . . . . 20

          C.    The Marzook and Alkhatib Contributions . 22

          D.    GOI "Interviews" with Alleged Hamas
             Members . . . . . . . . . . . . . . . . . 23

              1.    The GOI Torture of Palestinian
                    Detainees . . . . . . . . . . . . . 23

              2.    The Anati Statement . . . . . . . . 27

          E.    Unnamed FBI Informants . . . . . . . . . 30

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    I.    HOLY LAND HAS A SUBSTANTIAL LIKELIHOOD
          OF SUCCESS ON THE MERITS. . . . . . . . . . . 31

          A.    The Defendants' Actions Exceeded Their
             Statutory Authority Under IEEPA. . . . . 32

              1.    Hamas Does Not Have an Interest
                    in Holy Land's Blocked Assets. . . . 33

i

2.    Defendants Have No Power Under IEEPA to Prohibit Holy Land's Donations of Humanitarian Aid. . . .    37

B.    The Searches of Holy Land's Offices and the Seizure of Its Records, Office Equipment, and Bank Accounts Violates the Foundation's Fourth Amendment Rights. . .    41

C.    The Designation of Holy Land as an SDT and an SDGT, Without Prior Notice and an Opportunity to Be Heard, Violated Its Right to Due Process. . . . . . . . . . .    45

D.    The Designation of Holy Land and the Seizure of Its Assets Violated the Rights of the Foundation, Its Donors, and Its Employees Under RFRA. . . . . . .    52

1.    The Provisions of RFRA.  . . . . . .    52

2.    Contributions of Humanitarian Aid to the Needy Constitute a Protected "Exercise of Religion."  .    54

3.    The Designation of Holy Land as a Terrorist and the Seizure of Its Assets Imposes a Substantial Burden on the Exercise of Religion. . . . .    55

4.    The Government Must Prove That It Has a Compelling Interest in Prohibiting Holy Land's Humanitarian Contributions and That It Has Adopted the Least Restrictive Means to Secure Its Asserted Interest. . .    56

E.    The Designation of Holy Land and the Seizure of Its Assets Violate Its First Amendment Freedom of Speech and Association.  . . . . . . . . . . . .    59

1.    Freedom of Association.  . . . . . .    61

2.    Freedom of Speech. . . . . . . . . .    65

ii

II.   THE DESIGNATION OF HOLY LAND AND THE SEIZURE
      OF ITS ASSETS IS CAUSING HOLY LAND, ITS
      EMPLOYEES, ITS DONORS, AND ITS BENEFICIARIES
      IRREPARABLE HARM. . . . . . . . . . . . . . . .  66

III.  AN INJUNCTION WILL NOT SUBSTANTIALLY INJURE
      DEFENDANTS . . . . . . . . . . . . . . . . . .  69

IV.   AN INJUNCTION WILL FURTHER THE PUBLIC
      INTEREST . . . . . . . . . . . . . . . . . . .  69

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . .  70

## TABLE OF AUTHORITIES

### FEDERAL CASES

American-Arab Anti-Discrimination Committee v. Reno,
    70 F.3d 1045 (9th Cir. 1995) . . . . . . . . . . . . 63

American-Arab Anti-Discrimination Committee v. Reno,
    119 F.3d 1367 (9th Cir. 1997), vacated,
    525 U.S. 471 (1999) . . . . . . . . . . . . . . . . 63

American Civil Liberties Union v. Johnson,
    194 F.3d 1149 (10th Cir. 1999) . . . . . . . . . . . 65

American International Group, Inc. v. Islamic Republic of
    Iran, 657 F.2d 430 (D.C. Cir. 1981) . . . . . . . . . 33

Application of Kingsley, 614 F. Supp. 219
    (D. Mass. 1985), appeal dism'd,
    802 F.2d 571 (1st Cir. 1986) . . . . . . . . . . . . 42

In re Asbestos School Litigation,
    46 F.3d 1284 (3d Cir. 1994) . . . . . . . . . . . . 60

Behring International, Inc. v. Miller,
    504 F. Supp. 552 (D.N.J. 1980) . . . . . . . . . . . 35

*  Board of Regents v. Roth,
    408 U.S. 564 (1972) . . . . . . . . . . . . . . . . 34

Boim v. Quranic Literacy Institute,
    127 F. Supp. 2d 1002 (N.D. Ill. 2001) . . . . . . . . 62

Bradford v. Johnson,
    354 F. Supp. 1331 (E.D. Mich. 1972), aff'd mem.,
    476 F.2d 66 (6th Cir. 1973) . . . . . . . . . . . . 26

Brown v. Mississippi,
    297 U.S. 278 (1936) . . . . . . . . . . . . . . . . 26

*  Buckley v. Valeo,
    424 U.S. 1 (1976) . . . . . . . . . . . 58, 59, 60, 63, 64

Burgin v. OPM,
    120 F.3d 494 (4th Cir. 1997) . . . . . . . . . . . . 36

In re Carlson,
    263 F.3d 748 (7th Cir. 2001) . . . . . . . . . . . . 33

Chambers v. Florida,
    309 U.S. 227 (1940) . . . . . . . . . . . . . . . . 26

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . 36

CityFed Financial Corp. v. OTS,
    58 F.3d 738 (D.C. Cir. 1995) . . . . . . . . . . . . 30

City of Boerne v. Flores,
    521 U.S. 507 (1997) . . . . . . . . . . . . . . . . 52

Cohen v. Coahoma County,
    805 F. Supp. 398 (N.D. Miss. 1992) . . . . . . . . . 66

Consarc v. Iraqi Ministry,
    27 F.3d 695 (D.C. Cir. 1994) . . . . . . . . . . . . 34

Consarc v. OFAC,
    71 F.3d 909 (D.C. Cir. 1995) . . . . . . . . . . . . 34

Covino v. Patrissi,
    967 F.2d 73 (2d Cir. 1992) . . . . . . . . . . . . . 66

*  Dames & Moore v. Regan,
    453 U.S. 654 (1981) . . . . . . . . . . . . . . . . 33

Doran v. Salem Inn, Inc.,
    422 U.S. 922 (1975) . . . . . . . . . . . . . . . . 66

Elam Construction, Inc. v. Regional Transportation. District,
    129 F.3d 1343 (10th Cir. 1997) . . . . . . . . . . . 68

Elfbrandt v. Russell,
    384 U.S. 11 (1966) . . . . . . . . . . . . . . . . . 61

Elrod v. Burns,
    427 U.S. 347 (1976) . . . . . . . . . . . . . . . . 65

Employment Division v. Smith,
    494 U.S. 872 (1990) . . . . . . . . . . . . . . . . 51

*  FEC v. Colorado Republican Federal Campaign Committee,
    533 U.S. 431 (2001) . . . . . . . . . . . . . . 58, 65

FW/PBS, Inc. v. City of Dallas,
    493 U.S. 215 (1990) . . . . . . . . . . . . . . . . 59

Federal Leasing, Inc. v. Underwriters at Lloyd's,
    650 F.2d 495 (4th Cir. 1981) . . . . . . . . . . . . 66

*  Flippo v. West Virginia,
    528 U.S. 11 (1999) . . . . . . . . . . . . . . . . . 41

Florida v. White,
    526 U.S. 559 (1999) . . . . . . . . . . . . . . . 42, 43

Forsyth County v. Nationalist Movement,
    505 U.S. 123 (1992) . . . . . . . . . . . . . . . 59

* G.M. Leasing Corp. v. United States,
    429 U.S. 338 (1977) . . . . . . . . . . . . . . . 40, 41

Healy v. James,
    408 U.S. 169 (1972) . . . . . . . . . . . . . . . 61

Henderson v. Kennedy,
    265 F.3d 1072 (D.C. Cir. 2001) . . . . . . . . . 52, 53

Hobbie v. Unemployment Appeals Commission,
    480 U.S. 136 (1987) . . . . . . . . . . . . . . . 54

Humanitarian Law Project v. Reno,
    205 F.3d 1130 (9th Cir. 2000), cert. denied,
    532 U.S. 904 (2001) . . . . . . . . . . . . . . . 63

Independent U.S. Tanker Owners Committee v. Lewis,
    690 F.2d 908 (D.C. Cir. 1982) . . . . . . . . . . 36

Itek Corp. v. First National Bank of Boston,
    704 F.2d 1 (1st Cir. 1983) . . . . . . . . . . . 35

Kikumura v. Hurley,
    242 F.3d 950 (10th Cir. 2001) . . . . . . . . . . 52, 53

* Lust v. Miller,
    4 F.2d 293 (D.C. App. 1925) . . . . . . . . . . . 36

* Marine Midland Bank, N.A. v. United States,
    11 F.3d 1119 (2d Cir. 1993) . . . . . . . . . . . 40, 43

* Mathews v. Eldridge,
    424 U.S. 319 (1976) . . . . . . . . . . 45, 46, 47, 48

Milena Ship Management Co. v. Newcomb,
    995 F.2d 620 (5th Cir. 1993) . . . . . . . . . . 34

Miller v. Crystal Lake Park District,
    47 F.3d 865 (7th Cir. 1995) . . . . . . . . . . . 34

NAACP Legal Defense and Educational Fund,
     636 F. Supp. 762 (D.D.C.), vacated as moot,
     795 F.2d 215 (D.C. Cir. 1986) . . . . . . . . . . . 65, 67

NAACP v. Alabama,
     357 U.S. 449 (1958) . . . . . . . . . . . . . . . 60

NAACP v. Button,
     371 U.S. 415 (1963) . . . . . . . . . . . . . . . 60

*   NAACP v. Claiborne Hardware Co.,
     458 U.S. 886 (1982) . . . . . . . . . . . 61, 62, 63, 64

*   National Council of Resistance of Iran v. Department
     of State, 251 F.3d 192
     (D.C. Cir. 2001) . . . . . . . . . 45, 46, 47, 48, 49, 51

*   Nixon v. Shrink Missouri Government PAC,
     528 U.S. 377 (2000) . . . . . . . . . . . . . 59, 63, 64

Optimist Club of North Raleigh v. Riley,
     563 F. Supp. 847 (E.D.N.C. 1982) . . . . . . . . . . 65

Organizacion JD LTDA v. U.S. Department of Justice,
     18 F.3d 91 (2d Cir. 1994) . . . . . . . . . . . . . 49

Planned Parenthood v. Citizens for Community Action,
     558 F.2d 861 (8th Cir. 1977) . . . . . . . . . . . . 66

Planned Parenthood v. Horner,
     691 F. Supp. 449 (D.D.C. 1988) . . . . . . . . . . . 67

Rigdon v. Perry,
     962 F. Supp. 150 (D.D.C. 1997) . . . . . . . . . . . 57

Schoeneman v. United States,
     317 F.2d 173 (D.C. Cir. 1963) . . . . . . . . . . . 44

Serono Laboratories v. Shalala,
     158 F.3d 1313 (D.C. Cir. 1998) . . . . . . . . . . . 30

Sherbert v. Verner,
     374 U.S. 398 (1963) . . . . . . . . . . . . . . 51, 56

In re Singh,
     170 F. Supp. 2d 982 (E.D. Cal. 2001) . . . . . . . . 26

Soldal v. Cook County,
     506 U.S. 56 (1992) . . . . . . . . . . . . . . . . 41

Thomas v. Chicago Park District,
    122 S. Ct. 775 (2002) . . . . . . . . . . . . . . . . 59

United States v. 129,727.00 U.S. Currency,
    129 F.3d 486 (9th Cir. 1997) . . . . . . . . . . . . 49

United States v. $639,558 in U.S. Currency,
    955 F.2d 712 (D.C. Cir. 1992) . . . . . . . . . . . 41

United States v. All Funds,
    813 F. Supp. 180 (E.D.N.Y. 1993) . . . . . . . . . . 40

United States v. Bryant,
    951 F. Supp. 674 (E.D. Mich. 1997) . . . . . . . . . 30

*  United States v. Daccarett,
    6 F.3d 37 (2d Cir. 1993) . . . . . . . . . . 41, 42, 43

United States v. Dawkins,
    17 F.3d 399 (D.C. Cir. 1994) . . . . . . . . 41, 42, 43

*  United States v. James Daniel Good Real Property,
    510 U.S. 43 (1993) . . . . . . . . . . . . . . . 48, 50

United States v. Kin-Hong,
    110 F.3d 103 (1st Cir. 1997) . . . . . . . . . . . . 26

United States v. Robel,
    389 U.S. 258 (1967) . . . . . . . . . . . . . . . . 59

United States v. Weaver,
    99 F.3d 1372 (6th Cir. 1998) . . . . . . . . . . . . 30

United States v. Webb,
    255 F.3d 890 (D.C. Cir. 2001) . . . . . . . . . . . 44

United States v. Zimmerman,
    277 F.3d 426 (3d Cir. 2002) . . . . . . . . . . . . 44

Veterans Peace Convoy, Inc. v. Schultz,
    722 F. Supp. 1425 (S.D. Tex. 1988) . . . . . . . 37, 38

*  WMATA v. Holiday Tours, Inc.,
    559 F.2d 841 (D.C. Cir. 1977) . . . . . . . . . . 30, 66

*  Western Presbyterian Church v. Board of Zoning Adjustment,
    849 F. Supp. 77 (D.D.C. 1994) . . . . . 1, 30, 57, 67, 68

*  Western Presbyterian Church v. Board of Zoning Adjustment,
    862 F. Supp. 538 (D.D.C. 1994) . . . . . . . . . 56, 57

\* <u>Wisconsin</u> v. <u>Yoder,</u>
    406 U.S. 205 (1972) . . . . . . . . . . . . . 56, 57

<u>In re Young,</u>
    82 F.3d 1407 (8th Cir. 1996) . . . . . . . . 53, 54

<u>In re Young,</u>
    141 F.3d 854 (8th Cir. 1998) . . . . . . . . . 52

\* <u>Youngstown Sheet & Tube Co.</u> v. <u>Sawyer,</u>
    343 U.S. 579 (1952) . . . . . . . . . . . . . . 33

## STATE CASES

<u>Grimsley</u> v. <u>Grimsley,</u>
    632 S.W.2d 174 (Tex. App. 1982) . . . . . . . . 35

<u>Hodgins</u> v. <u>Zabel,</u>
    166 N.Y.S.2d 135 (N.Y. Sup. 1957) . . . . . . . 36

<u>Horen</u> v. <u>Commonwealth,</u>
    479 S.E.2d 553 (Va. App. 1997) . . . . . . . . . 54

<u>Sinclair</u> v. <u>Fleischman,</u>
    773 P.2d 101 (Wash. App. 1989) . . . . . . . . . 35

<u>Smith</u> v. <u>Smith,</u>
    313 S.W.2d 753 (Mo. Ct. App. 1958) . . . . . . . 35

## CONSTITUTION, STATUTES, RULES, AND REGULATIONS

U.S. Const. Art. III, § 3 . . . . . . . . . . . . . . . 13

U.S. Const. Art. IV . . . . . . . . . . . . . . 40, 41, 44

U.S. Const. Art. V . . . . . . . . . . . . . . . . . . 44

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . 36

8 U.S.C. § 1189 . . . . . . . . . . . . . . . . . . 45, 46

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . 63

26 U.S.C. § 501(c)(3) . . . . . . . . . . . . . . . . . 2

42 U.S.C. §§ 2000bb . . . . . . . . . . . . . . 51, 52, 56

42 U.S.C. § 2000bb-1(b) . . . . . . . . . . . . 52, 55, 56

42 U.S.C. § 2000bb-2 . . . . . . . . . . . . . . . 53, 56

42 U.S.C. § 2000bb-3 . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 2000cc-5 . . . . . . . . . . . . . . . . . . . 53

50 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . 6, 32

50 U.S.C. § 1702(a)(1)(B) . . . . . . . . . 32, 33, 34, 50

50 U.S.C. § 1702(b)(2) . . . . . . . . 32, 37, 38, 39, 40

31 C.F.R. § 500.312 . . . . . . . . . . . . . . . . . . . 34

Fed. R. Crim. P. 41(e) . . . . . . . . . . . . . . . 40, 44

## OTHER AUTHORITIES

123 Cong. Rec. 38,165 (Nov. 30, 1977) . . . . . . . . . . 37

123 Cong. Rec. 38,166 (Nov. 30, 1977) . . . . . . . . . . 37

E.O. 12947, 60 Fed. Reg. 5079
    (Jan. 23, 1995) . . . . . . . . . . . 5, 7, 9, 15, 44

E.O. 13224, 66 Fed. Reg. 49079
    (Sept. 23, 2001) . . . . . . . 5, 6, 7, 39, 42, 49, 50, 58

Joseph Story, <u>A Familiar Exposition of the Constitution of the United States</u> (1840) . . . . . . . . . . . . . . . . . 13

Michael W. McConnell, <u>Free Exercise Revisionism and the Smith Decision</u>, 57 U. Chi. L. Rev. 1109 (1990) . . . . . . . . . 55

## INTRODUCTION

On December 4, 2001, the United States government designated Holy Land Foundation for Relief and Development a terrorist organization and seized its assets, including millions of dollars in charitable donations. The government made the designation and executed the seizure without notice, without a hearing, without a warrant, without probable cause, without statutory authority, and without any factual basis for its claim that Holy Land supports the Hamas terrorist organization. The government's designation of Holy Land and its seizure of the Foundation's assets violated Holy Land's constitutional and statutory rights in the respects detailed below and in Holy Land's complaint. Those actions have caused, and will continue to cause, irreparable harm to Holy Land, its employees, its donors, and the thousands of Palestinians and other needy persons throughout the world who have had their lifeline abruptly severed. The Court should enjoin the government, pending the outcome of this litigation, from continuing to block or otherwise interfere with Holy Land's access to and disposition of its assets. See, e.g., Western Presbyterian Church v. Board of Zoning Adjustment, 849 F. Supp. 77, 78-79 (D.D.C. 1994) (preliminarily enjoining zoning board decision shutting down church program to feed the hungry).

1

**FACTUAL DISCUSSION**

I.    **HOLY LAND.**

        Holy Land is a non-profit charitable corporation
organized in 1989 under the laws of California, with its
headquarters in Richardson, Texas.  Until recently, Holy Land
enjoyed tax-exempt status under § 501(c)(3) of the Internal
Revenue Code and derived its revenue from charitable, tax-
deductible donations from individuals and institutions.  Most
donors to Holy Land are Muslims who give in accordance with their
religious beliefs.  Contrary to the government's claims, Holy
Land has never donated funds or provided services to Hamas.
Hamas neither controls nor has an interest in the Foundation or
any of its assets.  See Declaration of Shukri Abu Baker ¶¶ 3, 7,
8, 20, 22, 23, 25, 31 ["Baker Dec."] (attached as Exhibit 1);
Declaration of Dalell D. Mohmed ¶¶ 32, 51, 54 ["Mohmed Dec."]
(attached as Exhibit 2); Declaration of Mohammed Abumoharram ¶¶
5, 7, 9, 12 ["Abumoharram Dec."] (attached as Exhibit 3).

        Until the seizure of its assets on December 4, 2001,
Holy Land provided charitable and humanitarian aid to refugees,
orphans, victims of human and natural disasters, and other poor
and needy persons and entities throughout the world.  Among its
other charitable and humanitarian work, Holy Land has organized
aid to victims of the September 11, 2001 terrorist attacks; it
has provided assistance to victims and relief workers at the
Oklahoma City bombing site; to victims of flooding in Oklahoma
and Iowa; to victims of riots in Los Angeles; to tornado victims

2

in Fort Worth; to the needy in Paterson, New Jersey; to
earthquake victims in Turkey and India; to victims of the Bosnian
and Kosovo conflicts; to victims of the conflict in Chechnya; to
victims of flooding in Mozambique; and to refugees, orphans, and
other persons and families in need in the West Bank, Gaza,
Lebanon, and Jordan.  Baker Dec. ¶¶ 12, 13, 18-21, 23, 24, 30;
Mohmed Dec. ¶¶ 5-51.

Holy Land has often undertaken its charitable and
humanitarian work in conjunction with governmental and non-
governmental international relief organizations, including the
International Red Cross, the International Red Crescent, the
United Nations High Commission for Refugees, the United Nations
World Food Program, the North Atlantic Treaty Organization, the
Royal Dutch Army, the Government of Turkey, the Salvation Army,
the United Nations Relief and Works Agency for Palestinian
Refugees in the Near East ("UNRWA"), and the United Nations
International Children's Emergency Fund.  Baker Dec. ¶ 30; Mohmed
Dec. ¶¶ 7-9, 11, 14, 16, 18, 20, 21, 26-27, 29, 31, 38, 40, 42,
48-50; Abumoharram Dec. ¶¶ 6(I), 7.

Holy Land has played a particularly important role in
providing humanitarian aid in the West Bank and Gaza.  Baker Dec.
¶¶ 11, 13, 16-21, 23, 24, 29; Mohmed Dec. ¶¶ 28-40; Abumoharram
Dec. ¶¶ 6, 7.  As Dr. Rashid Khalidi, professor of Middle Eastern
history at the University of Chicago, explains, the Government of
Israel ("GOI") and (since 1995) the Palestinian Authority ("PA")
have provided grossly inadequate social and educational services

3

to the Palestinian population.  Declaration of Rashid Khalidi ¶¶
5-8 ["Khalidi Dec."] (attached as Exhibit 4).  These problems
have arisen in part from the debilitating economic effect of GOI
"closures" of the West Bank and Gaza.  Khalidi Dec. ¶ 6.  Dr.
Khalidi adds:

> Beyond these suffocating external
> constraints, the PA has proven to be highly
> inefficient in delivering services,
> concentrating instead on utilizing most of
> its resources in the heavy-handed policing of
> its own population insistently demanded by
> Israel, and supported by the United States
> government.  It was furthermore tainted by
> well-founded accusations of corruption,
> cronyism and favouritism in the provision of
> patronage, and a lack of concern for a range
> of pressing social and economic problems.
> The combined result of the lack of resources,
> the Israeli-imposed focus on providing
> security for Israel as it continued its
> occupation and settlement policy, and the
> debilitating effects of corruption was an
> absence of many basic social services.

Khalidi Dec. ¶ 7.

A number of governmental and non-governmental charities
have filled the gaps in social services left by the GOI and the
PA.  As Dr. Khalidi observes, "Among those carrying out some of
the most effective social and relief work are several Islamic
charities.  Notable among these has been the Holy Land Found-
ation."  Khalidi Dec. ¶ 8.  Dr. Khalidi notes:  "Islamic
charities in particular have a good reputation, both in the
United States and in Palestine, for probity and transparency in
their financial dealings, often have low overhead costs (partly
because they employ few foreign aid workers whose high salaries

4

and expenses inflate costs), and have a good track record in the
delivery of services to the needy."  Khalidi Dec. ¶ 9.

Almost from the beginning of Holy Land's existence, the
GOI has alleged that the Foundation funded Hamas.  To counter
these false allegations, Holy Land has repeatedly sought meetings
with the defendant agencies.  In most instances, the agencies
ignored these requests.  When meetings did occur, government
representatives expressed no concerns about Holy Land's
operations.  At all times, Holy Land has offered to, and has been
prepared to, make available every aspect of its operations for
review by the federal government.  Baker Dec. ¶¶ 19, 31(J);
Mohmed Dec. ¶¶ 52, 53; Declaration of George R. Salem ¶ 4
(attached as Exhibit 5).

## II.    THE DESIGNATION OF HOLY LAND AS A TERRORIST ORGANIZATION AND THE SEIZURE OF HOLY LAND'S ASSETS.

On January 23, 1995, President Bill Clinton designated
Hamas as a "specially designated terrorist" ("SDT") under
Executive Order 12947.  E.O. 12947, 60 Fed. Reg. 5079 (Jan. 23,
1995).  Before President Clinton issued Executive Order 12947,
the United States government had not formally designated Hamas as
a terrorist organization, and no United States law prohibited
United States persons from associating with or providing
financial support to Hamas.

On September 23, 2001, in response to the events of
September 11, President George W. Bush issued Executive Order
13224.  E.O. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001).  The

Executive Order rests on the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706.  The Order blocks the United States assets of certain "foreign persons" and delegates to the Secretaries of State and Treasury and to the Attorney General the authority to designate certain other persons whose assets may be blocked, including:

> (c)  persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order . . . .

> (d)  [with exceptions not relevant here] and after such consultation, if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of Treasury and the Attorney General, deems appropriate in the exercise of his discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

> > (i)  to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

> > (ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to [other subsections] of this order.

E.O. 13224, § 1, 66 Fed. Reg. at 49079-80.

On October 31, 2001, the government designated Hamas as a "specially designated global terrorist" ("SDGT"), thus making Hamas subject to Executive Order 13224.

On December 3, 2001, under the purported authority of Executive Order 13224, Executive Order 12947, and the IEEPA, the government designated Holy Land as an SDT and an SDGT.  On December 4, the Office of Foreign Assets Control ("OFAC") issued a blocking notice for Holy Land's assets.  See Exhibit 6.  The OFAC blocking notice provides in part:

> [A]ll real and personal property of Holy Land, including but not limited to all offices, furnishings, equipment and vehicles, as well as all funds and accounts in which Holy Land has any interest, are blocked.  All assets of Holy Land, including but not limited to bank, charge and investment accounts, securities, and safe deposit boxes at any financial institution located in the United States or organized under the laws of the United States, including their overseas branches, are blocked.  Blocked property may not be transferred, withdrawn, exported, paid, or otherwise dealt in without prior authorization from OFAC.
>
> All transactions involving property in which Holy Land has any interest, including any property of third parties in the possession or control of Holy Land, are prohibited without specific authorization from OFAC.  As a consequence of this action, activities in, use of, and occupation of Holy Land offices, including [the Richardson] facility and each Holy Land office subject to United States jurisdiction, are hereby prohibited. . . . No property may be removed from the premises other than property that is clearly the personal property of the individual requesting to remove the property from the premises.

Exhibit 6.  The blocking notice adds that any willful violation
of the notice is punishable by criminal and civil penalties.

On December 4, 2001, agents of the Department of the
Treasury and the FBI seized Holy Land's assets.  The agents
seized and removed from the Holy Land headquarters in Richardson,
Texas all documents, computers, furniture, and other items.  The
agents ignored a request from Holy Land's counsel to delay
seizure of the documents and office equipment until Holy Land
could petition a United States District Court to temporarily stay
enforcement of the blocking notice.  Declaration of Mark J.
MacDougall ¶¶ 4, 5 ["MacDougall Dec."] (attached as Exhibit 7).
The seized items remain in a warehouse in the custody of the
defendant agencies.  In addition, the government closed Holy
Land's offices in Illinois, California, and New Jersey, seizing
all items from the Illinois and California offices and a number
of items from the New Jersey office.

The government also seized Holy Land's bank accounts.
At the time of the seizures, Holy Land's accounts contained
millions of dollars that Muslims throughout the United States had
contributed for charitable purposes in the exercise of their
religion.  Because the seizures occurred during the holy month of
Ramadan, religious contributions to Holy Land had been
particularly heavy in the period immediately preceding the
seizures.  Those funds, intended by the donors and by Holy Land
to alleviate suffering throughout the world, remain frozen by the
government.

These searches of Holy Land's offices and seizures of its assets occurred solely under the purported authority of the OFAC blocking notice.  The government has conceded that it did not obtain a warrant before conducting the searches and seizures. No court approved the searches and seizures in advance.  The government did not provide Holy Land with notice of its intent to designate Holy Land a terrorist or to seize Holy Land's assets. It did not provide Holy Land with an opportunity to be heard before the designation was made and the seizures occurred.

**III. THE WATSON MEMORANDUM.**

The designation of Holy Land as a terrorist organization and the resulting OFAC blocking notice rest on a memorandum dated November 5, 2001 from Dale L. Watson, Assistant Director of the Counterterrorism Division of the FBI, to R. Richard Newcomb, Director of OFAC (the "Watson memorandum").  The Watson memorandum (attached as Exhibit 8) asserts that Holy Land "acts for or on behalf of HAMAS" and thus falls within the prohibitions of Executive Order 12947.  Exhibit 8 at 3.  The memorandum concludes that "[Holy Land] is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by [Holy Land] are clearly being used by the HAMAS organization."  Id. at 49.  But the purported "evidence" on which the Watson memorandum relies undercuts and in some instances contradicts these assertions.  We discuss below the principal components of the Watson memorandum.

**A.    The Recipients of Holy Land Funds.**

          Neither the Watson memorandum nor the underlying
exhibits allege (much less prove) that a single penny of Holy
Land money has gone to the Hamas organization itself or has been
used for the purchase of weapons, explosives, or for any purpose
directly connected with terrorism.[1]  To the contrary, Holy Land's
aid in the West Bank and Gaza has gone exclusively for charitable
purposes--to support orphans, families in need, hospitals,
schools, and other humanitarian causes--without regard to the
political affiliation of the recipient.  Baker Dec. ¶¶ 8, 12, 13,
18, 19, 20, 22, 23, 31(E); Mohmed Dec. ¶¶ 28-40, 51, 54;
Abumoharram Dec. ¶¶ 6, 7.  As Shukri Abu Baker, the president of
the Foundation, declares:  "[T]he Holy Land Foundation assists
the impoverished and disadvantaged without regard to politics or
other partisan considerations.  We distribute aid to Christians
in Palestine as well as to Muslims.  We also distribute aid to
the families of people who have been assassinated for allegedly
collaborating with Israel.  Certainly if we were supporting
Hamas, we would do neither of these things."  Baker Dec. ¶ 8.

---

[1] Although the Watson memorandum relies heavily on comments
that newspaper articles attribute to Hamas officials it omits the
one article we have found in which the head of Hamas, Sheikh
Ahmad Yassin, comments directly on the alleged link between Hamas
and Holy Land.  According to the article, Sheikh Yassin
commented, "We have no relations with such group, such
foundation. . . .  I've never heard they supported financially
any project, any Islamic project for Hamas."  Steve McGonigle,
Fostering Unrest or Helping the Poor, Dallas Morning News, June
11, 2000, at 4 (attached as Exhibit 9).

The Watson memorandum objects to three aspects of Holy
Land's humanitarian donations:  stipends to certain orphans and
families in the West Bank and Gaza, transfers to "zakat
committees," hospitals, and a library, and transfers to other
charitable organizations in the Middle East.  We address these
issues in turn.

1.   **Support for Orphans and Families.**

The FBI contends that because a tiny fraction of the
Holy Land funds allegedly have gone to orphans and families of
persons whom the GOI claims are associated with Hamas, Holy Land
funds Hamas.  According to the FBI, "by providing these annuities
to families of HAMAS members, [Holy Land] assists HAMAS by
providing a constant flow of suicide volunteers and buttresses a
terrorist infrastructure heavily reliant on the moral support of
the Palestinian populace."  Exhibit 8 at 18.  The FBI implies
that Holy Land should have investigated the political affiliation
of its potential aid recipients and excluded those few orphans
and families who (according to the GOI) have family members
associated with Hamas.

This makes no sense.  By the FBI's standard, the United
Nations and virtually every international relief organization
would be a Hamas supporter, because those organizations--like
Holy Land--provide relief in the West Bank and Gaza without
discriminating between needy persons and humanitarian entities
that the GOI claims are Hamas-related and those that are not.
For example, UNRWA specifically targets for aid Palestinian

11

families whose homes have been destroyed by the GOI--the very
population that the GOI claims to be associated with terrorism.
In its recent Fourth Emergency Appeal, UNRWA described the toll
that the occupying GOI forces had taken on the civilian
Palestinian population and added:  "[G]rowing numbers of
households are in acute crisis, whether through the loss of
breadwinners or because of events such as the loss of homes or
the destruction of crops. . . .  UNRWA therefore seeks to extend
other forms of relief, including selective cash assistance on the
basis of needs arising. . . .  Under the Agency's previous
emergency appeals cash assistance has been extended to households
in deep crisis following events such as the destruction of
housing or injury to a principal breadwinner."  Exhibit 10 at
13.[2]  Unless the United States government considers UNRWA (and
many similar groups) a terrorist organization, for helping those
whom the GOI has targeted, its theory for designating Holy Land
collapses.[3]

---

[2] To underscore the crisis that Palestinian refugees endure,
the UNRWA emergency appeal (written before the most recent
violence) states:  "More than half of the 843 Palestinians killed
by the middle of January 2002 were refugees registered with
UNRWA.  By then, in the Gaza Strip alone, over 2,600 refugees
were without shelter, after Israeli Defence Forces had completely
demolished or damaged 336 refugee dwellings beyond repair.  More
troubling, since the start of the Intifada 25 students enrolled
in UNRWA's schools in the Gaza Strip and four in the West Bank
have been killed, 11 of them between the ages of six and 12.
An[o]ther 545 students in the Gaza Strip and 245 in the West Bank
have been injured."  Exhibit 10 at 4.

[3] At least as of September 11, 2001, the GOI itself provided
state support to the widows and children of Israeli Arab suicide
bombers.  See Nina Gilbert, NII Must Support Nahariya Suicide

12

The FBI's rationale would have far-reaching consequences. It would, for example, require aid organizations in Afghanistan to determine whether hungry and injured women and children had any relation to Taliban fighters and to deny aid to those who did. (The United States itself dropped food packages indiscriminately to refugees on the ground in Afghanistan, Taliban and non-Taliban alike.) Taken to its logical conclusion, the FBI's position would require that welfare and other benefits be denied to the families of persons convicted of crimes in this country, on the theory that providing such benefits to the families of criminals encourages others to commit crimes.

This FBI and GOI approach--punishing women and children for the crimes of their husbands and fathers--violates deeply held American values. It was precisely to prevent visiting the sins of the father on the son that, even for conviction of treason, our Constitution prohibits "Corruption of Blood, or Forfeiture except during the Life of the person Attainted." U.S. Const. Art. III, § 3. As Joseph Story observed more than 150 years ago, this provision abolished the common law rule that the blood of a person convicted of treason was "corrupted, that is, it loses all inheritable qualities." Under the common law rule,

---

Bomber's 2 Widows, 10 Orphans, The Internet Jerusalem Post, Sept. 11, 2001 (attached as Exhibit 11). The GOI official responsible for the benefits noted that "the law is 'liberal and ensures equality among widows and children' and does not discriminate against relatives of those who have committed crimes against the state." Id. Apparently the same non-discriminatory approach constitutes terrorism when practiced by Holy Land in the West Bank and Gaza.

"innocent persons are made the victims of the misdeeds of their
ancestors; and are punished, even to the remotest generations, by
incapacities derived through them.  The Constitution has
abolished this corruption of blood, and general forfeiture; and
confined the punishment exclusively to the offenders; thus
adopting a rule, founded in sound policy, and as humane, as it is
just."  Joseph Story, A Familiar Exposition of the Constitution
of the United States 135 (1840).  The United States government,
echoing the GOI, refuses to extend this "humane" and "just" rule
to the orphans and widows of the West Bank and Gaza.

        Perhaps recognizing the unfairness of its position, the
FBI repeats the GOI claim that Holy Land favors the families of
Hamas activists.  Exhibit 8 at 19-21.  This claim is totally
false.  E.g., Baker Dec. ¶¶ 8, 12, 13, 18, 19, 20, 22, 23, 31(E);
Abumoharram Dec. ¶¶ 5, 9.  It rests entirely on GOI analysis of
partial lists of Holy Land beneficiaries seized by the GOI on May
7, 1995 from a Holy Land office near Jerusalem.  But the lists
and accompanying "analysis" do not support the claim of
favoritism toward Hamas.  For example, a GOI report dated June 5,
1995 asserts (without any supporting evidence) that "some hundred
orphans receiving support have been checked," and "the families
of several orphans are directly connected with Hamas."  Exhibit
12 [45] at 9 (emphasis added).[4]  This conclusion--that "several"
orphans out of "some hundred" that had been checked had families

---

        [4] An exhibit number in brackets represents the number
assigned to the exhibit by the Watson memorandum.

connected in some unspecified way to Hamas--shows the opposite of the government's theory:  that Holy Land did not favor Hamas. Indeed, out of "some 700 orphans in the West Bank" that Holy Land supported as of May 1995, Exhibit 12 [45] at 11, the GOI could claim that only a handful had families connected with Hamas.

The GOI "analysis" is suspect for another reason.  The documents that support the analysis, although seized in May 1995, all reflect contributions that pre-date January 23, 1995--the date on which President Clinton banned financial transactions with Hamas under Executive Order 12947.  Thus, even if Holy Land had specifically targeted Hamas families for aid in the early 1990s--which it did not--no United States law prohibited that conduct.  Remarkably, with all the investigative tools available to the GOI--including, as discussed below, torture and other forms of coercion--and with all the resources available to the United States government--including, it appears, eavesdropping and an exhaustive analysis of Holy Land's financial records--the Watson memorandum and the underlying exhibits do not identify a single Hamas-associated orphan or family that received Holy Land funds after January 23, 1995.  We do not doubt that some such disbursements may have occurred after Executive Order 12947 took effect; as an organization, Holy Land does not attempt systematically to exclude the orphans and families of Hamas members from its charitable giving.  But if Holy Land actually favored Hamas orphans and families, and continued to do so after January 23, 1995 and up to December 4, 2001, as the GOI and the

15

FBI falsely claim, one would expect to find substantial evidence proving the point.  There is none.

    2.   **Zakat Committees, Hospitals, and Schools.**

      The Watson memorandum repeats GOI complaints about certain entities that have received Holy Land contributions.  The FBI asserts, for example, that "zakat committees," through which Holy Land (like many other aid organizations) formerly distributed funds in the West Bank and Gaza, have Hamas ties.  Exhibit 8 at 26-43.  The Watson memorandum states:  "FBI analysis has determined that HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for their movement. . . .  These charity committees receive funds from such organizations as [Holy Land] and manage social services, such as hospitals and schools, and distribute food and clothing."  Id. at 27.

      It is hard to discern the fault that the FBI finds with the contribution of funds through the zakat committees.  By the FBI's own admission, those committees provide "needed social services for the Palestinian population."  The FBI does not contend that the committees secretly diverted the funds for a non-humanitarian purpose.  Nor could it make such a claim; Holy Land designated the funds given to the zakat committees for specific purposes--sponsorship of an orphan or a needy family, for example--and followed up to make sure that the committees sent the aid to its intended recipients.  Exhibit 12 [45] at 10; Baker Dec. ¶¶ 13, 19.  The FBI also acknowledges that other

16

organizations, besides Holy Land, have used the zakat committees
as the necessary infrastructure for humanitarian aid in the West
Bank and Gaza.  Indeed, the PA--which, as a creature of the 1993
Oslo accords, the United States government presumably supports--
uses the zakat committees to distribute social services in
conjunction with its Ministry of Waqf and Religious Affairs.
Abumoharram Dec. ¶ 8.   As Dr. Khalidi observes, "Also
instrumental in the distribution of aid have been the zakat
committees, which are utilized by UNRWA, foreign NGO's, and the
PA's own Ministry of Waqf and Religious Affairs, as conduits for
their assistance, since these committees have a grassroots
infrastructure among the poorest sectors of society.  Like
Islamic charities, they tend to focus on those most in need,
particularly residents of refugee camps, and the families of
those suffering from acts of Israeli occupation."  Khalidi Dec. ¶
9; see Baker Dec. ¶¶ 13, 16 (describing Holy Land's use of zakat
committees); Abumoharram Dec. ¶¶ 6(A), 8 (describing role of
zakat committees in Gaza).[5]

The FBI also complains about Holy Land's contributions
to the Al Razi Hospital in Jenin, the Dar Es Salaam Hospital in
Gaza, and the Al Anwar el Ibrahimi Library in Hebron.  Exhibit 8
at 24, 31-32, 35-36, 41-42.  In each case, the FBI objects to

---

[5] The zakat committees have been founded since the Israeli
occupation began in 1967.  During the entire period of their
existence, the GOI has exercised complete or near-complete
control over the West Bank and Gaza.  If the zakat committees
were really mere fronts for Hamas--as the FBI and the GOI now
claim--the GOI surely would have eradicated them many years ago.

Holy Land's support for these indisputably humanitarian institutions because, according to the GOI, some officials associated with them have ties to Hamas.   Apart from the absence of evidence supporting the GOI accusations, _e.g._, Abumoharram Dec. ¶ 6(K), the FBI makes no claim that Hamas controls the institutions, or that the institutions provide services only (or on a favorable basis) to Hamas members, or that the institutions divert funds to Hamas coffers.   Nor does the FBI dispute that these institutions provide valuable health care and educational functions in the West Bank and Gaza.

       In any event, most humanitarian institutions in the West Bank and Gaza "employ personnel regardless of sectarian or political affiliation and offer services on a similar basis." Khalidi Dec. ¶ 10.   Dr. Khalidi adds:

> Thus, UNRWA, NGO-run and public hospitals and clinics, for example, employ members of different political groups such as Fatah, the PFLP, Hamas and Islamic Jihad, without reference to their belonging to a specific group.   It would be impossible to do otherwise in the case of a group like Hamas, since it has the support of from 15-20% of the Palestinian population in the most reliable independent polling over the past 6-7 years, when regular polling began. Similarly, these and other humanitarian institutions, whether run by Muslim or Christian groups, offer their services to all those in need of them, with Palestinian Christians, for example, taking advantage of the Maqassed Islamic Hospital in Jerusalem, and Palestinian Muslims using clinics run by Christian aid groups.

Khalidi Dec. ¶ 10; _see_ Abumoharram Dec. ¶ 6(K).   Thus, Holy Land's support for the two hospitals and the library cannot

rationally be viewed as evidence that Holy Land acts "for or on behalf of" Hamas.

       3.    **Support for Other Charitable Organizations.**

      Finally, the FBI objects to transfers from Holy Land to three other charitable organizations in the Middle East, which the Watson memorandum concedes are "not controlled by HAMAS, but believed to be supporting HAMAS." Exhibit 8 at 18. As to the first such organization--Sanabil Association for Relief and Development--the FBI offers no evidence of ties to Hamas; it merely asserts that the organization has ties to a second organization--the Palestine Relief Fund, also known as Interpal-- that, according to the GOI, supports Hamas. Id. at 43-44. Apart from this unsubstantiated claim by the GOI, however, the Watson memorandum offers no evidence of any link between Interpal and Hamas. The FBI also faults Holy Land's support for Human Appeal International-Jordan, even though it concedes that "there is no evidence that HAI is a HAMAS organization." Id. at 45; see id. at 46 (acknowledging that HAI "is not controlled by HAMAS"). Again, it is hard to discern how support for these entities--all of which indisputably perform charitable and humanitarian work-- constitutes support for Hamas or for terrorism.

      The Watson memorandum omits an instance where Holy Land declined to support an institution because it had ties with Hamas. According to the report of a GOI interrogation of Akram Haroubi in 1999, Haroubi "proposed that [Holy Land] help fund the Nun Institute [for Koran Studies] but [Holy Land] refused since

Bassam Jap Ar, one of the founders of the Institute published
fundamentalist publications and is identified with Hamas."
Exhibit 12 [18] at 7.  This point--omitted from the Watson
memorandum--undermines the FBI's claim that Hamas controls Holy
Land and that Holy Land acts for or on behalf of Hamas.

    **B.**    **The 1993 and 1994 Meetings.**

        The Watson memorandum relies in part on an October 1993
meeting in Philadelphia that included Holy Land officers and
alleged Hamas officials and a 1994 Oxford, Mississippi meeting
among alleged Hamas members.  Exhibit 8 at 9-14.  The meetings
afford no evidence that Holy Land acts for or on behalf of Hamas;
to the contrary, the FBI surveillance of the 1993 meeting
suggests the opposite.

        Several points bear noting about the meetings.  First,
they both occurred before January 23, 1995, the date on which
President Clinton first designated Hamas as an SDT.  Despite the
FBI's implication, therefore, the meetings were entirely legal
under American law.  Second, we have seen no evidence that either
meeting involved discussion of suicide bombings, attacks on
civilians, or other terrorist activity.  See Baker Dec. ¶ 31(F)
(describing the 1993 meeting).  Indeed, those present at the 1993
meeting (the only one for which FBI audio surveillance apparently
exists and the only one in which Holy Land officials
participated) repeatedly emphasized the importance of complying
with American law.  As Abdelhaleem Hasan Ashqar--one of the
alleged Hamas members present--stated, according to the FBI

surveillance, "[E]verything we do should be legal."  Exhibit 13
[28], 10/2/93 tape 4, at 8.

      Third, at the 1993 meeting, FBI surveillance indicates
that Shukri Abu Baker, the president of Holy Land, made a
presentation concerning charitable organizations in which he
repeatedly rejected ties between Holy Land and any particular
faction in Palestine and insisted on the legality of its
operations.  Abu Baker stated in part, for example, "I have to
keep good relations with all sides in Palestine.  And as an
organization registered in America we shouldn't be associated
with this party or that . . . should not be the charitable arm of
this or that."  Exhibit 13 [28], 10/2/93 tape 6, at 8.  He
concluded:  "We [Holy Land] have to be cautious with spending.
We can't get involved in transaction[s] that can violate our
status.  We are an organization that has to look after its own
interests--not to spend any money on any project before carefully
studying it.  We shouldn't do anything that is contrary to the
law."  Exhibit 13 [28], 10/2/93 tape 6, at 9.  Abu Baker added,
according to the FBI surveillance, "The only thing which we
shouldn't do is illegal transactions.  This we shouldn't do.  If
anyone framed you, it will become a disaster.  We shouldn't
participate in any illegal transactions."  Exhibit 13 [28],
10/2/93 tape 7, at 1; see also, e.g., id., 10/2/93 tape 7, at 13
(Abu Baker notes that Holy Land can join efforts with another
United States organization "as long as this is done within the
boundaries of the American laws").  Abu Baker's repeated emphasis

on compliance with American law belies the claim of the FBI and the GOI that, after President Clinton outlawed transactions with Hamas in 1995, Holy Land acted "for or on behalf of" the terrorist organization.

Fourth, the FBI knew about the 1993 and 1994 meetings (and most of the other information in the Watson memorandum) for many years without taking action against Holy Land. At all times, Holy Land has stood ready to make every detail of its operations available to scrutiny by the federal government. It is hard to imagine that on December 4, 2001--more than eight years after the 1993 Philadelphia meeting--Holy Land's charitable work suddenly became terrorism, and did so with such swiftness that the government had to designate the Foundation and seize its assets without notice and without a hearing.

C. **The Marzook and Alkhatib Contributions.**

The Watson memorandum notes that in 1992, Mousa Abu Marzook and Nasser Alkhatib--both of whom are now known to be connected with Hamas--contributed a total of approximately $235,000 to Holy Land. Although the memorandum asserts that "FBI investigation has revealed" this information, no such investigation was necessary; Holy Land reported the contributions, including the names of the contributors, on its 1993 federal tax return. Exhibit 14 [37], at 4, 13. This is hardly the conduct of a terrorist organization engaged in nefarious activity.

22

Nor did Holy Land have any reason to conceal the Marzook and Alkhatib contributions. President Clinton did not designate Hamas as a terrorist organization until January 23, 1995, more than two years after the contributions were made, and the government did not designate Marzook as an SDT until August 25, 1995, three years after the contributions. At the time of the contributions, therefore, they were entirely legal--as evidenced by the fact that the government took no action in 1993 when Holy Land reported the contributions, in January 1995 when it designated Hamas an SDT, in August 1995 when it designated Marzook an SDT, or for more than six years thereafter.[6]

D.   **GOI "Interviews" with Alleged Hamas Members.**

The Watson memorandum relies heavily on so-called "interviews" of Palestinians and Palestinian-Americans conducted by Israeli security and police officials. E.g., Exhibit 8 at 23-24, 36-37 (describing "interview" of Muhammad Anati, former head of Holy Land's Jerusalem office). But these were no "interviews"; they were brutal interrogations, some lasting weeks or months, conducted by the GOI security service. As the attached declarations and exhibits amply document, the GOI routinely used torture to extract "confessions" from Palestinians. Moreover, at least as to the Anati interrogation, it appears that the most inculpatory statements attributed to him

---

[6] Moreover, the Watson memorandum and the underlying exhibits contain no evidence that Holy Land knew Marzook and Alkhatib were associated with Hamas in 1992, when they made their contributions to the Foundation.

in the Watson memorandum do not appear in the underlying
interview record, which the government provided to us in Hebrew
without translation.

### 1.    The GOI Torture of Palestinian Detainees.

The GOI tortured Palestinian detainees throughout the
1990s, until the Israeli Supreme Court, sitting as the High Court
of Justice, outlawed the practice on September 6, 1999.[7] Allegra
Pacheco--an American and Israeli attorney who has visited or
represented over 200 Palestinians detained under interrogation by
the GOI and who participated in the Supreme Court case--estimates
that 95% of her clients reported being tortured.  Declaration of
Allegra Pacheco ¶ 6 ["Pacheco Dec."] (attached as Exhibit 15).[8]

The Israeli court's opinion, attached as Exhibit 16,
provides a chilling catalog of GOI interrogation tactics.  There
is, for example, "shaking," defined as "the forceful shaking of
the suspect's upper torso, back and forth, repeatedly, in a
manner which causes the neck and head to dangle and vacillate

---

[7] It should come as no surprise that every one of the GOI
"interviews" cited in the Watson memorandum occurred <u>before</u> the
Israeli Supreme Court issued its decision outlawing official
torture.

[8] The United States government, including the Department of
State, has long been aware of the GOI interrogation practices.
The annual Department of State reports on human rights practices
in Israel and the Occupied Territories are replete with
references to the torture techniques described in this part.  In
addition, a number of detainees with American citizenship
reported their torture directly to American representatives in
Israel, generally without obtaining any relief.  <u>E.g.</u>,
Declaration of Anwar Mohamed ¶¶ 31, 52, 55, 57 (describing
contacts with American officials during detention and torture)
(attached as Exhibit 17).

rapidly." Id. at 6.  According to one expert cited in the
Supreme Court opinion, "the shaking method is likely to cause
serious brain damage, harm the spinal cord, cause the suspect to
lose consciousness, vomit and urinate uncontrollably and suffer
serious headaches."  Id.  The GOI interrogators also used the
"Shabach" position, described by the Israeli Supreme Court as
follows:

> He [the Palestinian] is seated on a small and
> low chair, whose seat is tilted forward,
> towards the ground.  One hand is tied behind
> the suspect, and placed inside the gap
> between the chair's seat and back support.
> His second hand is tied behind the chair,
> against its back support.  The suspect's head
> is covered by an opaque sack, falling down to
> his shoulders.  Powerfully loud music is
> played in the room.  According to the
> affidavits submitted, suspects are detained
> in this position for a prolonged period of
> time, awaiting interrogation at consecutive
> intervals.

Id. at 7.  If shaking and "Shabach" did not produce the desired
"confession," the GOI interrogators might turn to the "frog
crouch" position.  "This refers to consecutive, periodical
crouches on the tips of one's toes, each lasting for five minute
intervals."  Id.  And the interrogators employed excessively
tight handcuffs and sleep deprivation.  See id. at 7-8; see also
Pacheco Dec. ¶ 4 (GOI torture techniques included "painful and
prolonged shackling to low, slanting chairs in contorted
positions; hanging by hands from pipes; exposure to unbearably
loud music; hooding with thick, rancid sacks; forced squatting on
toes; and sleep deprivation"); Declaration of Anwar Mohamed ¶¶

20-29, 34-35, 42-47, 49 (describing torture by GOI during
interrogation, which included questions about donations to Holy
Land) (attached as Exhibit 17). As Pacheco notes, human rights
organizations within and outside Israel have confirmed and
condemned the GOI's use of these forms of torture. Pacheco Dec.
¶¶ 10-13.

      These tactics are not calculated to obtain the truth;
they serve only to degrade and humiliate and break the spirit.
Statements obtained in this manner cannot be considered reliable
and provide no basis for the deprivation of fundamental
constitutional rights. See, e.g., Chambers v. Florida, 309 U.S.
227, 237-41 (1940); Brown v. Mississippi, 297 U.S. 278, 286-87
(1936); Bradford v. Johnson, 354 F. Supp. 1331, 1334-38 (E.D.
Mich. 1972), aff'd mem., 476 F.2d 66 (6th Cir. 1973). Even in
the context of determining probable cause, courts have recognized
that "a confession obtained by duress is inherently unreliable
and would be given little weight even if the confession were
authenticated." United States v. Kin-Hong, 110 F.3d 103, 121
(1st Cir. 1997); see, e.g., In re Singh, 170 F. Supp. 2d 982,
1029 (E.D. Cal. 2001) ("Probable cause cannot be based on
evidence procured by torture, which is incompetent if obtained by
unlawful means."); see also Pacheco Dec. ¶ 19 ("In my opinion and
experience and in light of the consistent and irrefutable
evidence of torture, statements made by Palestinian detainees
during their interrogation by GSS until September 1999, are not
reliable sources of information since they were most likely

26

issued after rounds of torture and ill-treatment and under
extreme duress, coercion, pain and suffering.").[9]  It is no small
irony that the United States government relies upon statements
elicited through the torture of Palestinian men to prevent Holy
Land from providing humanitarian aid to Palestinian widows and
orphans.

## 2.    The Anati Statement.

Apart from using statements known to have been obtained
through torture, the Watson memorandum misrepresents the content
of an Anati statement on which it purports to rely (cited in the
memorandum as Exhibit 50).  See Exhibit 8 at 23-24; Exhibit 18
[50].  We have obtained a certified translation of that
statement.  See Exhibit 19.  According to the certified
translation, the Anati statement does not contain a number of the
inculpatory allegations that the Watson memorandum attributes to
it.  For example:

> --    The Watson memorandum states:  "Anati
>        stated [Holy Land] provided aid to the
>        needy, but some of the aid was channeled
>        to HAMAS."  Exhibit 8 at 23, ¶ 2
>        (emphasis added).  According to the
>        certified translation, the Anati
>        statement does not contain the
>        underscored language or anything
>        resembling that language.  Exhibit 19.

---

[9] Pacheco adds:  "[I]n my opinion, accepting the validity of
Palestinian statements made under GSS interrogations would
condone Israeli torture practices and legitimize what has now
been condemned by the United Nations, international and Israeli
human rights organizations, and even banned by the Israeli
Supreme Court itself."  Pacheco Dec. ¶ 23.

-- The Watson memorandum states:  "Anati enabled
every branch to allocate the money freely, <u>and
since some of the heads of the branches were
connected with or supporters of HAMAS, some of the
money served HAMAS</u>."  Exhibit 8 at 23, ¶ 3
(emphasis added).  According to the certified
translation, the Anati statement does not contain
the underscored language or anything resembling
that language.  Exhibit 19.

-- The Watson memorandum states:  "While
working for [Holy Land], <u>Anati also
secretly promoted HAMAS interests.  For
example, when he helped build an Islamic
clinic in a certain area, everyone
around knew that it was the HAMAS
organization behind the clinic.  When
food was distributed during holidays,
the population knew that HAMAS was
behind this</u>."  Exhibit 8 at 24, ¶ 4
(emphasis added).  According to the
certified translation, the Anati
statement does not contain the
underscored language or anything
resembling that language.  Exhibit 19.

-- The Watson memorandum states:
"<u>According to Anati, [Holy Land] is
connected with HAMAS.  When he visited
the United States in 1994, he understood
that they were pro-HAMAS</u> and engaged in
helping the needy.  He also stated that
he was told by [Holy Land] members
visiting Israel <u>that during parties and
conventions held by [Holy Land] abroad,
it was maintained that they were pro-
HAMAS and they sang HAMAS songs</u>."
Exhibit 8 at 24, ¶ 8 (emphasis added).
According to the certified translation,
the Anati statement does not contain the
underscored language or anything
resembling that language.  Exhibit 19.

The certified translation makes clear that the Watson memorandum attributed the inculpatory Anati statements to a record in which they do not appear.[10]

We understand that the GOI detained Anati for months after his arrest in December 1997 and tortured him during that period.  E.g., Baker Dec. ¶¶ 27, 28.  Under torture, he may well have made the statements that the Watson memorandum attributes to him.  But those statements do not appear in the interview record for Anati that exists in the record as it has been provided to us.[11]  And the inaccuracy of the Watson memorandum's summary of Anati's statement calls into question its summaries of the numerous other statements and documents provided to us only in Hebrew.  Watson memorandum, Exhibits 46, 53, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 71, 72, 73, 74, 75, 81, 82.

---

[10] The Watson memorandum also omits two important aspects of Anati's statement.  First, when asked "Who are the families that you paid this money to?," Anati responds, "We paid the money to any family that sent us a request for assistance.  After checking that they needed the money, we paid the family."  Exhibit 19 at 2.  Second, when asked "Who are these orhans [whom Holy Land helps]?," Anati responds, "Sons of people who died in every way, including the Antifada, Hamas, Fatah, 'Meshishi,' and also sons of those who cooperate with Israel."  Exhibit 20 at 3.  These statements, omitted from the Watson memorandum, confirm that Holy Land gives on the basis of need, without regard to political affiliation.

[11] The record contains the report of another "interview" with Anati, conducted in 1995 and provided to us in English. Exhibit 12 [45].  None of the inculpatory statements attributed to Anati appear in the record of that interview.

**E.    Unnamed FBI Informants.**

The Watson memorandum relies in part on unnamed FBI informants, who make various claims concerning Holy Land and its officers.  Exhibit 8 at 46-48.  As to one such unnamed informant, the memorandum states that he has provided "both reliable and unreliable information in the past."  Exhibit 8 at 47.  As to the other such unnamed informants, the Watson memorandum asserts that they "have been found to be reliable in the past," without providing any factual basis from which to assess that claim.  Id. at 46-47.[12]  The Watson memorandum does not provide corroboration for any of the informants' alleged assertions, nor does it describe the basis of their purported knowledge (first-hand knowledge, hearsay, rumor, speculation).  Many of the informants' allegations are false.  E.g., Baker Dec. ¶ 31(A)-(E) (denying allegations that Baker was introduced as Senior Vice-President of Hamas and that he stated that Holy Land money was for Hamas terrorists); Declaration of Ammar Imreish ¶¶ 4, 5 ["Imreish Dec."] (disputing informant's account of Baker's alleged statements at 1997 fundraising event) (attached as Exhibit 20). The courts of this country condemn the use of such unnamed informants, without some corroborating information, even to obtain a search warrant.  See, e.g., United States v. Weaver, 99 F.3d 1372, 1376-79 (6th Cir. 1998); United States v. Bryant, 951

_____

[12] The government has thus far declined to provide us with the memoranda reflecting the informants' statements, thus rendering it difficult to refute what they allegedly have said.

F. Supp. 674, 676-79 (E.D. Mich. 1997).  Their use to deprive
Holy Land and its donors of their basic constitutional rights is
even more clearly prohibited.

**ARGUMENT**

A court deciding a motion for preliminary injunction
must "examine whether: (1) there is a substantial likelihood
plaintiff will succeed on the merits; (2) plaintiff will be
irreparably injured if an injunction is not granted; (3) an
injunction will substantially injure the other party; and (4) the
public interest will be furthered by the injunction."  Serono
Laboratories v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998);
see, e.g., WMATA v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C.
Cir. 1977); Western Presbyterian Church, 849 F. Supp. at 78-79.
"If the arguments for one factor are particularly strong, an
injunction may issue even if the arguments in other areas are
rather weak."  CityFed Financial Corp. v. OTS, 58 F.3d 738, 747
(D.C. Cir. 1995).  Here, all four factors weigh overwhelmingly in
favor of granting an injunction.

**I.    HOLY LAND HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
       MERITS.**

Holy Land has a substantial likelihood of success on
its claims.  First, the defendants' actions clearly exceeded the
scope of the power that Congress delegated to the executive
branch under IEEPA.  Second, the search of Holy Land's offices
and the seizure of its assets, without a warrant and without
probable cause, violated Holy Land's Fourth Amendment rights.

31

Third, the designation of Holy Land as a terrorist without prior
notice and a hearing violated the Foundation's Fifth Amendment
right to due process.   Fourth, the seizure of Holy Land's assets
violates the Religious Freedom Restoration Act ("RFRA").   The
seizure prevents the Foundation and its donors from fulfilling
their religious duty as Muslims to help the poor and needy.   No
compelling government interest justifies this burden on the
exercise of religion, and the government has not adopted the
least restrictive means of furthering any interest it may assert.
Fifth, the seizure of Holy Land's assets violates the
Foundation's First Amendment rights to free association and free
speech.   We discuss these claims in turn below.

A.    The Defendants' Actions Exceeded Their Statutory
      Authority Under IEEPA.

        For two reasons, the defendants' designation of Holy
Land as an SDT and an SDGT and their seizure of Holy Land's
assets under the OFAC blocking notice exceeded their statutory
authority under IEEPA.   First, IEEPA only authorizes blocking of
"property in which any foreign country or a national thereof has
any interest."   50 U.S.C. § 1702(a)(1)(B).   No foreign person or
entity has any "interest" in Holy Land's blocked assets, with the
exception of approximately $225,000 owed to foreign vendors for
services and supplies provided to Holy Land for humanitarian use
before the OFAC blocking notice was issued on December 4, 2001.
In particular, Hamas has no such interest.

Second, Congress specifically excluded from the executive's power under IEEPA "the authority to regulate or prohibit, directly or indirectly . . . donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering," unless the President determines that "such donations" would "seriously impair his ability to deal with any national emergency declared under [50 U.S.C. § 1701]," or would "endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances."  50 U.S.C. § 1702(b)(2)(A), (C).[13]  The President has not (and could not) make those determinations with respect to Holy Land's donations of humanitarian aid.

### 1.   Hamas Does Not Have an Interest in Holy Land's Blocked Assets.

The executive branch may seize property in this country only under power vested in it either by the Constitution or by statute.  <u>See</u>, <u>e.g.</u>, <u>Dames & Moore</u> v. <u>Regan</u>, 453 U.S. 654, 668-69 (1981); <u>American International Group, Inc.</u> v. <u>Islamic Republic of Iran</u>, 657 F.2d 430, 437-39 (D.C. Cir. 1981).  The Supreme Court held fifty years ago that the executive lacks the inherent

---

[13] The statute also permits the President to regulate or prohibit donations of humanitarian aid if he determines that the donations "are in response to coercion against the proposed recipient or donor."  50 U.S.C. § 1702(b)(2)(B).  That provision does not even arguably apply here.

constitutional power to seize or block assets of an American
corporation.   See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S.
579, 585-86 (1952); id. at 640-41 (Jackson, J., concurring).
Absent a statutory delegation of authority, therefore, the
government's seizure of Holy Land's assets "cannot stand."   Id.
at 589 (majority opinion).

  The defendants designated Holy Land as a terrorist and
seized its assets under the purported authority of IEEPA.   That
statute gives the executive branch the power, under specified
circumstances, to block "any property in which any foreign
country or a national thereof has any interest."   50 U.S.C. §
1702(a)(1)(B).   According to the government, Holy Land acts "for
or on behalf of" Hamas, Exhibit 8 at 3, and Hamas therefore has
an "interest" in Holy Land's assets for purposes of §
1702(a)(1)(B).

  IEEPA does not define the term "interest."[14]   In other
contexts, courts have held that, for a person to have an interest
in property, he "must have more than a unilateral expectation of
it.   He must, instead, have a legitimate claim of entitlement to
it," Board of Regents v. Roth, 408 U.S. 564, 577 (1972)
(Fourteenth Amendment due process clause), meaning a claim that
is "legally enforceable," Miller v. Crystal Lake Park District,
47 F.3d 865, 867 (7th Cir. 1995) (same); see, e.g., In re
Carlson, 263 F.3d 748, 750 (7th Cir. 2001) (phrase "'all legal or

---

  [14] OFAC defines the term circularly as "an interest of any
nature whatsoever, direct or indirect."   31 C.F.R. § 500.312.

equitable interests . . . in property'" in the Bankruptcy Code
"has been broadly interpreted to include any legally enforceable
right").

Courts applying IEEPA have interpreted the term
"interest" in § 1702(a)(1)(B) in accordance with this principle.
In each case where courts have found that a foreign nation or
national had an interest in property for purposes of IEEPA, the
foreign nation or national had a "legally enforceable" claim to
the property at issue.  See, e.g., Consarc v. OFAC, 71 F.3d 909,
914 (D.C. Cir. 1995) (Iraq had an interest in a furnace for which
it had paid and thus OFAC could freeze either the furnace or the
down payment Iraq had made for the furnace); Consarc v. Iraqi
Ministry, 27 F.3d 695, 701-02 (D.C. Cir. 1994) (Iraqi-owned bank
had "contingent reversionary interest" in funds it had pledged to
secure a confirmed reimbursement credit); Milena Ship Management
Co. v. Newcomb, 995 F.2d 620, 624-25 (5th Cir. 1993) (under
Yugoslavian law, the Yugoslavian government had a proprietary
interest in vessels owned by Yugoslavian companies); Itek Corp.
v. First National Bank of Boston, 704 F.2d 1, 8 (1st Cir. 1983)
(foreign owned bank had a "beneficial interest" in standby
letters of credit issued by American bank, where the American
bank had "a binding and irrevocable obligation . . . akin to a
cashier's check or other negotiable instrument, to pay the value
of the letters of credit on receipt of demand letters from [the
foreign owned bank]"); Behring International, Inc. v. Miller, 504
F. Supp. 552, 557-58 (D.N.J. 1980) (Iran had an interest in a

35

trust account created in settlement of a suit between the Iranian air force and an American company, where Iran was entitled under the settlement agreement to receive any residual amount remaining after the American company had been paid).

By contrast to these cases, Hamas lacks even a "unilateral expectation" that it can claim Holy Land's blocked assets, much less a "legally enforceable" right to that property. E.g., Baker Dec. ¶¶ 3, 7, 8, 20, 22, 23, 25, 31; Mohmed Dec. ¶¶ 32, 51, 54; Abumoharram Dec. ¶¶ 5, 7, 9, 12.  Even if--flatly contrary to the actual facts--Hamas could show that Holy Land intended to donate the blocked funds for its benefit, that would not create a right to the assets.  Decades of case law establish that "[a]n incomplete or unexecuted gift confers no right upon the donee; it is unenforceable at law or equity." Sinclair v. Fleischman, 773 P.2d 101, 103 (Wash. App. 1989); see, e.g., Grimsley v. Grimsley, 632 S.W.2d 174, 177-78 (Tex. App. 1982); Smith v. Smith, 313 S.W.2d 753, 756 (Mo. Ct. App. 1958); Hodgins v. Zabel, 166 N.Y.S.2d 135, 137-38 (N.Y. Sup. 1957); Lust v. Miller, 4 F.2d 293, 295 (D.C. App. 1925).  As the District of Columbia Court of Appeals declared three-quarters of a century ago, "Until there is delivery and acceptance, the donor parts with neither equitable nor legal title, and the power of absolute revocation rests with him, with no intervening right in favor of the donee." Id. (emphasis added).  Holy Land has not "deliver[ed]" the blocked assets to Hamas, and Hamas has not "accept[ed]" those assets.  Any claim Hamas might make to those

assets is "unenforceable at law or equity."  Sinclair, 773 P.2d
at 103.  Hamas therefore has no "interest" in the blocked assets-
-even if the Court credits the false assumption that Holy Land
intended to donate the blocked funds for Hamas' benefit--and
OFAC's apparent conclusion to the contrary must be set aside as
arbitrary, capricious, and an abuse of discretion.  5 U.S.C. §
706(2)(A), (E); see, e.g., Citizens to Preserve Overton Park v.
Volpe, 401 U.S. 402, 416 (1971) ("searching and careful" review
of informal agency factfinding); Burgin v. OPM, 120 F.3d 494,
498-99 (4th Cir. 1997) (same); Independent U.S. Tanker Owners
Committee v. Lewis, 690 F.2d 908, 922 (D.C. Cir. 1982) (same).

> **2.    Defendants Have No Power Under IEEPA to Prohibit
>         Holy Land's Donations of Humanitarian Aid.**

Apart from the absence of any foreign interest in the
blocked assets, IEEPA specifically forbids executive interference
with donations of humanitarian aid, except in circumstances
inapplicable here.  IEEPA provides in part:

> The authority granted to the President by [§
> 1702] does not include the authority to
> regulate or prohibit, directly or indirectly
>
> . . .
>
> (2) donations, by persons subject to the
> jurisdiction of the United States, of
> articles, such as food, clothing, and
> medicine, intended to be used to relieve
> human suffering, except to the extent that
> the President determines that such donations
> (A) would seriously impair his ability to
> deal with any national emergency declared
> under section 1701 of this title . . . or (C)
> would endanger Armed Forces of the United
> States which are engaged in hostilities or
> are in a situation where imminent involvement

37

in hostilities is clearly indicated by the
circumstances.

50 U.S.C. § 1702(b)(2); see Veterans Peace Convoy, Inc. v.

Schultz, 722 F. Supp. 1425, 1429-32 (S.D. Tex. 1988).

Congress drafted § 1702(b)(2) to ensure that the
executive branch could not block humanitarian aid during national
emergencies except under limited circumstances.  First, to
prevent the executive from blocking such aid on the ground that
it might have non-humanitarian uses, Congress deleted the word
"solely," which had appeared in an early version of the bill
before the phrase "to relieve human suffering."  See Veterans
Peace Convoy, 722 F. Supp. at 1432; 123 Cong. Rec. 38,165-66
(Nov. 30, 1977) (Rep. Bingham notes that the bill, as amended,
"would eliminate the word 'solely' since, in almost every case,
items of that character would have some benefit other than a
purely humanitarian one.  The test would be an impossible one to
meet if it were limited by the word 'solely.'  Most donations
would have some economic value and impact, in addition to
relieving human suffering, and such economic value or impact
should not preclude a donation from coming within the Senate's
proposed 'humanitarian exemption.'").  Second, to ensure that the
protections of § 1702(b)(2) extend to all forms of humanitarian
aid, Congress changed the phrase "including food, clothing, and
medicine" to "such as food, clothing, and medicine."  See
Veterans Peace Convoy, 722 F. Supp. at 1432; 123 Cong. Rec. at
38,166 (Nov. 30, 1977) (Rep. Bingham: "[T]o make clearer that the

38

Senate's mention of 'food, clothing, and medicine' is meant only to be illustrative of donations covered by the exemption, and that such mention should not be regarded as excluding other donated things of value from the exemption, it was suggested that the term 'including' that appears before 'food, clothing, and medicine' be changed to 'such as.'"). <u>Third</u>, Congress made clear that courts must construe the exceptions in § 1702(b)(2) narrowly and should resolve doubts in favor of those who seek to transfer humanitarian aid. <u>See</u> <u>Veterans Peace Convoy</u>, 722 F. Supp. at 1431 (citing H. Rep. No. 459, 95th Cong., 1st Sess. 12 (1977)) ("It is the intent of the committee that these exceptions be narrowly construed, and that any doubt be resolved in favor of permitting such transfers to occur.").

E.O. 13224 attempts to invoke two of the exceptions in § 1702(b)(2) as to certain donations. The Executive Order declares that "the making of donations of the type specified in [§ 1702(b)(2)] by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order." E.O. 13224, § 4, 66 Fed. Reg. at 49080.

By its terms, the exception invoked in E.O. 13224 extends only to donations "to persons determined to be subject to

this order."  Thus, the exception might bar donations to Holy
Land,[15] and it bars donations to Hamas, but it does not bar
donations by Holy Land to orphans, families, and humanitarian
institutions in the West Bank and Gaza--none of whom is a
"person[] determined to be subject to this order."  To our
knowledge, the President has not made the determinations in §
1702(b)(2) with respect to those donations.  Nor could such
determinations properly be made.  The President could not
rationally conclude that Holy Land's donations of humanitarian
aid "seriously impair" his ability to deal with the national
emergency identified in E.O. 13224, relating to the September 11
attacks on the United States.  E.O. 13224, 66 Fed. Reg. at 49079.
Nor could the President rationally find that Holy Land's
humanitarian donations "would endanger Armed Forces of the United
States."

    Because the President has not made the determinations
in § 1702(b)(2)(A)-(C) with respect to Holy Land's humanitarian
donations, and because he could not rationally do so in any
event, § 1702(b) bars the defendant agencies from regulating or
prohibiting those donations, directly or indirectly.  For these
reasons, Holy Land has a substantial likelihood of prevailing on

---

    [15] We do not, of course, concede that the executive branch
has the power to block donations to Holy Land.  But the blocking
of donations to Holy Land is not at issue in this motion.
Instead, Holy Land seeks to unblock the donations it has already
received.

its claim that the defendants' actions exceeded their statutory authority under IEEPA.

**B.    The Searches of Holy Land's Offices and the Seizure of Its Records, Office Equipment, and Bank Accounts Violates the Foundation's Fourth Amendment Rights.**

The government's search of Holy Land's offices and seizure of its assets without a warrant and without probable cause violated its rights under the Fourth Amendment.  In light of that violation, the Court should order the assets released pending the final decision in this case.  See, e.g., Marine Midland Bank, N.A. v. United States, 11 F.3d 1119, 1125 (2d Cir. 1993); United States v. All Funds, 813 F. Supp. 180, 187 (E.D.N.Y. 1993); Fed. R. Crim. P. 41(e).

The physical entries into Holy Land's offices in Texas, Illinois, New Jersey, and California constituted "searches" that implicate the protections of the Fourth Amendment.  See, e.g., G.M. Leasing Corp. v. United States, 429 U.S. 338, 353-59 (1977). Similarly, the removal of Holy Land's records, computers, and equipment and the blocking of Holy Land's bank accounts constituted "'meaningful interference with [Holy Land's] possessory interests in that property'" and therefore amounted to "seizures" under the Fourth Amendment.  Soldal v. Cook County, 506 U.S. 56, 63 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)); see, e.g., United States v. Daccarett, 6 F.3d 37, 49 (2d Cir. 1993) (restraint of electronic funds transfers pending forfeiture trial constitutes Fourth Amendment seizure).

41

The searches of Holy Land's offices and the seizures of their contents plainly required either a warrant or an exception to the warrant requirement. See G.M. Leasing, 429 U.S. at 353-59. The government has confirmed that it acted solely under the authority of the OFAC blocking notice and did not obtain a warrant for any of the searches and seizures.[16] "A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." Flippo v. West Virginia, 528 U.S. 11, 13 (1999) (per curiam); see, e.g., United States v. Dawkins, 17 F.3d 399, 405 (D.C. Cir. 1994); United States v. $639,558 in U.S. Currency, 955 F.2d 712, 715 (D.C. Cir. 1992). No exception to the warrant requirement applies to the search of Holy Land's offices; certainly no exigency existed with respect to the offices which justified dispensing with that requirement. See, e.g., Dawkins, 17 F.3d at 405-07 (discussing "exigent circumstances" exception to warrant requirement).

Similarly, the government could not lawfully seize Holy Land's bank accounts without either a warrant or an exception to the warrant requirement. See, e.g., Daccarett, 6 F.3d at 49; Application of Kingsley, 614 F. Supp. 219, 223 (D. Mass. 1985), appeal dism'd, 802 F.2d 571 (1st Cir. 1986). Although the

---

[16] In fact, as the MacDougall Declaration reflects, the government ignored Holy Land's request for an opportunity to obtain a ruling from a federal court on whether the blocking notice should be temporarily stayed with respect to the documents and office equipment. MacDougall Dec. ¶¶ 4, 5.

Supreme Court has held that the government may seize contraband
in a public location without a warrant, see Florida v. White, 526
U.S. 559 (1999), the funds at issue are not contraband and were
not located in a public place.  Nor can the government establish
exigent circumstances (or any other "narrow and well-delineated"
exception) sufficient to dispense with the warrant requirement
under the circumstances of this case.  Funds held in a bank
account are mobile, but the government cannot show any realistic
possibility that Holy Land would have transferred the funds at
issue in the few hours necessary to seek a warrant.  Any claim of
exigency rings especially hollow in light of the fact that the
government had all of the information contained in the Watson
memorandum at least since 1999 and waited until December 2001--
more than two months after President Bush issued E.O. 13224--to
act.  See, e.g., G.M. Leasing, 429 U.S. at 358-59 (government's
delay in acting undermines claim of exigent circumstances).

        Even when an exception to the warrant requirement
exists, the Fourth Amendment requires that the government have
probable cause to justify a search and a seizure.  See, e.g.,
White, 526 U.S. at 565-66; Dawkins, 17 F.3d at 403; Marine
Midland Bank, 11 F.3d at 1124-25; Daccarett, 6 F.3d at 49-50.
For the reasons detailed at length above in the discussion of the
Watson memorandum, the government lacked probable cause to
believe that Holy Land acted for or on behalf of Hamas or that
Hamas had an interest in Holy Land's assets.

In addition to the deficiencies addressed above, the purported evidence supporting the Watson memorandum is stale. The evidence that allegedly links Holy Land to Hamas consists principally of information obtained during, or relating to, the early 1990s.[17] For two reasons, that information does not support a finding of probable cause to search Holy Land's premises and seize its assets in December 2001. First, courts have repeatedly recognized that years-old information cannot be relied upon to find probable cause. As courts have observed in the context of probable cause to support a warrant, the facts must be "'so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" United States v. Webb, 255 F.3d 890, 904 (D.C. Cir. 2001) (quoting Sgro v. United States, 287 U.S. 206, 210 (1932)); see, e.g., United States v. Zimmerman, 277 F.3d 426, 433-34 (3d Cir. 2002); Schoeneman v. United States, 317 F.2d 173, 177 (D.C. Cir. 1963). The purported evidence on which the Watson memorandum relies--much of it eight years old or more--plainly is not

---

[17] For example, the two meetings that the Watson memorandum discusses at length occurred in 1993 and 1994. Exhibit 8 at 8-14. The Marzook and Alkhatib contributions to Holy Land occurred in 1992. Exhibit 8 at 14-15. The contributions to the families of alleged Hamas members, found during the GOI search of Holy Land's Jerusalem office in May 1995, all appear to have been made before 1995. Exhibit 8 at 19-21; Exhibit 13 [45]. Many of the alleged events that Muhammad Anati purportedly described under torture by the GOI occurred before 1995. Exhibit 8 at 23-25. And virtually all of the alleged Hamas activities of persons associated with the zakat committees and other humanitarian organizations occurred before 1995. Exhibit 8 at 25, 29-43.

"closely related to the time" of the searches of Holy Land's offices and the seizure of its assets.

Second, and more specifically, evidence of alleged ties to Hamas that pre-dates President Clinton's issuance of E.O. 12947 on January 23, 1995 has little or no significance, because such ties did not become illegal until the Executive Order took effect.  Only evidence of connections between Holy Land and Hamas after January 23, 1995--evidence that the Watson memorandum lacks--could support a finding of probable cause to believe that Holy Land acts for or on behalf of Hamas.

Because the government searched Holy Land's offices and seized its assets without a warrant and without probable cause, the searches and seizures violated Holy Land's rights under the Fourth Amendment.  Under Fed. R. Crim. P. 41(e), the Court should order return of Holy Land's assets pending trial.

C.    **The Designation of Holy Land as an SDT and an SDGT, Without Prior Notice and an Opportunity to Be Heard, Violated Its Right to Due Process.**

The defendants' designation of Holy Land as an SDT and an SDGT, without prior notice and an opportunity to be heard, violated Holy Land's Fifth Amendment right to due process.  As the D.C. Circuit noted recently in striking down a designation as a foreign terrorist organization, "[T]he fundamental norm of due process clause jurisprudence requires that before the government can constitutionally deprive a person of the protected liberty or property interest, it must afford him notice and hearing."

45

<u>National Council of Resistance of Iran</u> v. <u>Department of State</u>,
251 F.3d 192, 205 (D.C. Cir. 2001).

In <u>National Council of Resistance</u>, the D.C. Circuit
considered a due process challenge to the Secretary of State's
designation of the National Council of Resistance of Iran and the
People's Mojahedin of Iran as foreign terrorist organizations
under 8 U.S.C. § 1189.  In that case, as here, the Secretary of
State had afforded the affected organizations neither pre-
designation notice nor an opportunity to comment on the evidence
against them and to offer contrary evidence.  To determine what
(and when) process was due to those entities, the court
considered the three factors set forth in <u>Mathews</u> v. <u>Eldridge</u>,
424 U.S. 319 (1976):  (1) "the private interest that will be
affected by the official action," (2) "the risk of an erroneous
deprivation of such interest through the procedures used" and
"the probable value, if any, of additional or substitute
procedural safeguards," and (3) "the Government's interest,
including the function involved and the fiscal and administrative
burdens that the additional or substitute procedural requirements
would entail."  <u>Id</u>. at 335; see <u>National Council of Resistance</u>,
251 F.3d at 206-08.

Upon considering the <u>Mathews</u> factors, the <u>National
Council of Resistance</u> court concluded (1) "[t]he Secretary must
afford to the entities under consideration [for designation]
notice that the designation is impending," except that "[u]pon an
adequate showing to the court, the Secretary may provide this

46

notice after the designation where earlier notification would impinge upon the security and other foreign policy goals of the United States," id. at 208; and (2) the Secretary must "afford to entities considered for imminent designation the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations," id. at 209.  Given the October 2001 deadline for redesignating the organizations under § 1189, the court "remand[ed] the questions to the Secretary with instructions that the petitioners be afforded the opportunity to file responses to the nonclassified evidence against them, to file evidence in support of their allegations that they are not terrorist organizations, and that they be afforded an opportunity to be meaningfully heard by the Secretary upon the relevant findings."  Id.  And the court expressed its "expect[ation] that the Secretary will afford due process rights to these and other similarly situated entities in the course of future designations."  Id.

    The Mathews factors make clear that even greater process is due here than in National Council of Resistance.  Most significantly, "the private interests that will be affected by the official action" are far weightier than the relatively minor property and reputational interests at issue in National Council of Resistance.  See id. at 204, 206.  The designation of Holy Land effectively put the Foundation out of business.  Holy Land

had to cease immediately its charitable works.  All of its employees lost their jobs, including even benefits such as health insurance.  E.g., Baker Dec. ¶¶ 21, 31(K); Mohmed Dec. ¶ 55; Abumoharram Dec. ¶¶ 3, 4, 11.  And (as discussed below), the designation of Holy Land and the seizure of its assets substantially burdened the right of the Foundation and its donors to exercise their religion and their First Amendment rights of speech and association.  Those liberty interests carry great weight.

       As in National Council of Resistance, the remaining Mathews factors also weigh in favor of providing notice and a hearing.  The "procedure used" by the defendants to designate Holy Land an SDT and an SDGT--a secret, ex parte, non-adversarial proceeding conducted without notice and based on unreliable evidence, followed by the summary seizure of all of Holy Land's assets--carries a notoriously significant "risk of an erroneous deprivation" of the liberty and property interests at issue, and "additional . . . procedural safeguards"--including notice and a hearing, the usual accoutrements of due process--carry substantial "probable value."  Mathews, 424 U.S. at 335.  The Supreme Court has declared that "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . .  No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'"  United States v. James Daniel Good Real Property, 510 U.S. 43, 55 (1993)

(quoting <u>Joint Anti-Fascist Refugee Committee</u> v. <u>McGrath</u>, 341
U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)).  Finally,
as the <u>National Council of Resistance</u> court recognized, "the
Government's interest" in avoiding additional procedures cannot
outweigh the other <u>Mathews</u> factors.   251 F.3d at 207-08.

The defendant agencies flouted the due process
requirements set forth in <u>National Council of Resistance</u>.  The
government did not give Holy Land "notice that the designation
[as an SDT and an SDGT] [wa]s impending."  And the government did
not "afford to [Holy Land] the opportunity to present, at least
in written form, such evidence as [it] may [have been] able to
produce to rebut the administrative record or otherwise negate
the proposition" that it is an SDT or an SDGT.  In fact, the
government ignored a request from Holy Land's counsel on the
morning of the seizure that it "delay removal of the furniture,
records and equipment from the Foundation's offices to permit the
Foundation to petition a U.S. District Court to temporarily stay
enforcement of the blocking order."  MacDougall Dec. ¶ 5.

The government attempted to circumvent <u>National Council
of Resistance</u> by including the following statement in E.O. 13224:

> For those persons listed in the Annex to
> this order or determined to be subject to
> this order who might have a constitutional
> presence in the United States, I find that
> because of the ability to transfer funds or
> assets instantaneously, prior notice to such
> persons of measures to be taken pursuant to
> this order would render these measures
> ineffectual.  I therefore determine that for
> these measures to be effective in addressing
> the national emergency declared in this

49

> order, there need be no prior notice of a
> listing or determination made pursuant to
> this order.

E.O. 13224, § 10, 66 Fed. Reg. at 49081.  But this blanket

"determination" does not satisfy due process.  National Council

of Resistance requires pre-designation notice and hearing unless

the government "can make a showing of particularized need" to

dispense with prior notice.  251 F.3d at 208; see id. ("Upon an

adequate showing to the court, the Secretary may provide this

notice after the designation where earlier notification would

impinge upon the security and other foreign policy goals of the

United States.").  The government has made no showing of

"particularized need" with respect to Holy Land.  It has made

(and can make) no showing, for example, that Holy Land--which

maintained regular contact with the defendant agencies right up

until the seizures of its assets and which never gave any

indication that it would try to move funds quickly out of the

country--would have attempted to evade a potential blocking order

if it had received prior notice of the impending designation.[18]

---

[18] In other settings, courts have held that the mobility of
funds permits the government to seize money and bank accounts
without prior notice.  See, e.g., United States v. 129,727.00
U.S. Currency, 129 F.3d 486, 493 (9th Cir. 1997); Organizacion JD
LTDA v. U.S. Department of Justice, 18 F.3d 91, 94 (2d Cir.
1994).  Those cases, however, typically involve forfeitable funds
derived from drug dealing or some other illegal activity.  By
contrast, the funds at issue here were lawfully donated to Holy
Land, an entirely legitimate and (at that time) tax-exempt
organization which intended to use the funds for humanitarian
purposes.  Moreover, Holy Land--unlike the fund-owners in the
above cases--had a fixed and legitimate presence in this country
and maintained regular contact with the defendant agencies.
Thus, even if the forfeitable funds of a drug dealer can be

The "determination" in E.O. 13224 fails to cure the due process violation for another reason.  As amended by the so-called USA-PATRIOT Act, IEEPA permits the executive to block assets "during the pendency of an investigation."  50 U.S.C. § 1702(a)(1)(B).  The government has used this provision to block the assets of at least two other Muslim charities without designating them as terrorist organizations and without completely shutting them down.  If the government had legitimate, particularized concerns that Holy Land would transfer its funds if given pre-designation notice, it could have blocked those funds (but not Holy Land's other assets, including, for example, its records, offices, and office equipment) "during the pendency of [the] investigation."  Such a step could not possibly have jeopardized the "measures" taken in E.O. 13224.  See James Daniel Good Real Property, 510 U.S. at 58-59 (noting the existence of less intrusive means, short of outright seizure, available to accomplish legitimate governmental objectives).  The government did not take this step, and it ignored the request by Holy Land's counsel on the morning of the seizure that it leave the documents and office equipment in place while Holy Land sought temporary relief in federal court.  MacDougall Dec. ¶¶ 4, 5.  Under National Council of Resistance, the designation of Holy Land and

---

seized without prior notice, the legitimately-obtained funds of a tax-exempt charity cannot be, at least without some evidence (totally lacking here) that the charity would attempt to transfer the funds after receiving notice.

the resulting seizure of its assets violated the Foundation's
right to due process.

**D.    The Designation of Holy Land and the Seizure of Its
        Assets Violated the Rights of the Foundation, Its
        Donors, and Its Employees Under RFRA.**

The designation of Holy Land as an SDT and an SDGT and
the seizure of its assets violated RFRA, 42 U.S.C. §§ 2000bb to
2000bb-4.  Those actions substantially burden the ability of Holy
Land, its employees, and its donors to practice a central tenet
of the Muslim religion:  the provision of charitable aid to the
needy, known as zakat.  The government cannot establish either
that it has a compelling interest in prohibiting Holy Land's
humanitarian support or that the designation of Holy Land as a
terrorist and the seizure of its assets represents the least
restrictive means of furthering that asserted interest.

**1.    The Provisions of RFRA.**

Congress enacted RFRA following <u>Employment Division</u> v.
<u>Smith</u>, 494 U.S. 872 (1990), in which the Supreme Court held that
a law imposing a substantial burden on religion need not be
justified by a compelling governmental interest if it is neutral
and of general applicability.  In reaction to <u>Smith</u>, Congress
affirmed its commitment to religious freedom through RFRA.  The
Act's purposes are:

> (1)  to restore the compelling interest test
>      as set forth in <u>Sherbert</u> v. <u>Verner</u>, 374
>      U.S. 398 (1963) and <u>Wisconsin</u> v. <u>Yoder</u>,
>      406 U.S. 205 (1972) and to guarantee its
>      application in all cases where free
>      exercise of religion is substantially
>      burdened; and

> (2)   to provide a claim or defense to persons
>        whose religious exercise is
>        substantially burdened by government.

42 U.S.C. § 2000bb(b).[19]

Section 2000bb-1 of the Act, titled "Free exercise of religion protected," provides in subsection (a):  "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section."  Id. § 2000bb-1(a).  Subsection (b) of 2000bb-1, titled "Exception," provides:

> Government may substantially burden a
> person's exercise of religion only if it
> demonstrates that application of the burden
> to the person --
>
> (1)   is in furtherance of a compelling
>        governmental interest; and
>
> (2)   is the least restrictive means of
>        furthering that compelling governmental
>        interest.

Id. § 2000bb-1(b).  RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise . . . ."  Id. § 2000bb-3(a).  The statute provides that "[a] person whose religious exercise has been burdened in violation of

---

[19] Although the Supreme Court in City of Boerne v. Flores, 521 U.S. 507 (1997), held that RFRA is unconstitutional as applied to the states, RFRA's constitutionality as applied to the federal government was not at issue and was not decided.  Since Boerne, the D.C. Circuit has concluded that RFRA may be applied constitutionally to the federal government.  See Henderson v. Kennedy, 265 F.3d 1072, 1073 (D.C. Cir. 2001); see also Kikumura v. Hurley, 242 F.3d 950, 959-60 (10th Cir. 2001) (same); In re Young, 141 F.3d 854, 857-63 (8th Cir. 1998) (same).

this section may assert that violation as a claim or defense in a
judicial proceeding and obtain appropriate relief against a
government." Id. § 2000bb-1(c). As the following sections
demonstrate, the government's designation of Holy Land as a
terrorist and its seizure of Holy Land's assets violated the
rights of the Foundation and its donors under RFRA.

2.    Contributions of Humanitarian Aid to the Needy
      Constitute a Protected "Exercise of Religion."

RFRA provides that the phrase "exercise of religion"
means "religious exercise, as defined in section 2000cc-5 of this
title." Id. § 2000bb-2(4). Section 2000cc-5 defines "religious
exercise" as "any exercise of religion, whether or not compelled
by, or central to, a system of religious belief." Id. § 2000cc-
5(7)(A); see Henderson v. Kennedy, 265 F.3d 1072, 1073 (D.C. Cir.
2001). Under this definition, "a religious exercise need not be
mandatory for it to be protected under RFRA." Kikumura v.
Hurley, 242 F.3d 950, 960 (10th Cir. 2001).

This Court has recognized that "one of the five Pillars
of Islam--the fundamental ritual requirements of worship,
including ritual prayer--requires Muslims of sufficient means to
give alms to the poor and other classes of recipients." Western
Presbyterian Church v. Board of Zoning Adjustment, 862 F. Supp.
538, 544 (D.D.C. 1994); see, e.g., In re Young, 82 F.3d 1407,
1418-19 (8th Cir. 1996) (practice of "tithing" constitutes an
exercise of religion under RFRA), vacated and remanded for

54

reconsideration, 521 U.S. 1114 (1997), reaffirmed, 141 F.3d 854

(8th Cir. 1998).  As Dr. Khalidi explains,

> The obligation to give zakat (meaning
> charity or alms) is one of the five pillars
> of Islam, and is thus incumbent on all
> believers.  This important religious duty is
> rooted in all the basic texts of Islamic
> jurisprudence, including the Qur'an and the
> sayings of the Prophet Muhammad.  Giving
> zakat is considered particularly meritorious
> if it is carried out during the holy month of
> Ramadan, when believers abstain from eating
> or drinking during the day. . . .  There is
> no divergence . . . as to the absolute
> necessity of giving zakat to those in need as
> one of the central obligations of the Islamic
> faith, one that is faithfully observed by all
> believers.

Khalidi Dec. ¶ 2; see id. ¶¶ 3-4 (explaining zakat).  Holy Land's

contributions to needy widows, orphans, and institutions in the

West Bank and Gaza fall squarely within the zakat principle and

thus constitute the "exercise of religion" for purposes of RFRA.

E.g., Baker Dec. ¶¶ 5, 11; Abumoharram Dec. ¶¶ 6(D), 6(E);

Imreish Dec. ¶ 2.

> 3. **The Designation of Holy Land as a Terrorist and
>    the Seizure of Its Assets Imposes a Substantial
>    Burden on the Exercise of Religion.**

Compelling a person to forego a religious practice

imposes a substantial burden on his exercise of religion.  See,

e.g., Hobbie v. Unemployment Appeals Commission, 480 U.S. 136,

140-41 (1987); Horen v. Commonwealth, 479 S.E.2d 553, 558-59 (Va.

App. 1997).  "There can be no more 'direct' burden on free

exercise than an absolute criminal prohibition."  Michael W.

McConnell, <u>Free Exercise Revisionism and the Smith Decision</u>, 57
U. Chi. L. Rev. 1109, 1125 n.80 (1990).

      The designation of Holy Land and the seizure of its
assets have forced Holy Land and the donors whose contributions
have been frozen to forego their fundamental religious practice
of zakat on pain of criminal prosecution.  This "absolute
criminal prohibition" on contributions to the poor and needy
places a substantial burden on the exercise of religion by Holy
Land and its donors.  <u>See</u> <u>Western Presbyterian Church</u>, 862 F.
Supp. at 545-47 (zoning laws that prohibit a church program to
feed the hungry substantially burden the exercise of religion);
Khalidi Dec. ¶ 4 ("It is clearly the case that blocking zakat
donations--as by the seizure of the Holy Land Foundation's
accounts--interferes with this [zakat] process, and substantially
burdens the exercise of their religion by donors, and by the Holy
Land Foundation itself.").

      **4.    The Government Must Prove That It Has a Compelling
Interest in Prohibiting Holy Land's Humanitarian
Contributions and That It Has Adopted the Least
Restrictive Means to Secure Its Asserted Interest.**

      RFRA provides that "Government may substantially burden
a person's exercise of religion only if it demonstrates that
application of the burden to the person . . . (1) is in
furtherance of a compelling governmental interest; and (2) is the
least restrictive means of furthering that compelling
governmental interest."  42 U.S.C. § 2000bb-1(b).  RFRA places
the burden of making this showing squarely on the government:

"[T]he term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion." Id. § 2000bb-2(3). The compelling interest test that the government must satisfy under RFRA is "the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) . . . ." 42 U.S.C. § 2000bb(b)(1); see Western Presbyterian Church, 862 F. Supp. at 544-47.

        In Yoder--involving the Amish religious objection to compulsory education--the Supreme Court made clear that the test is not whether the government has a compelling interest in a general objective (e.g., educating its citizenry or, as in this case, preventing terrorism), but whether it has a compelling interest in substantially burdening the specific religious practice of the particular individual or group at issue. The Court rejected "the State's broader contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way." Yoder, 406 U.S. at 221. It declared that, "despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote by its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed Amish exemption." Id. (emphasis added). The Court held that "it was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish." Id.

at 236 (emphasis added).  The Court found that "Wisconsin's
interest in compelling the school attendance of Amish children to
age 16 emerges as somewhat less substantial than requiring such
attendance for children generally." Id. at 228-29 (emphasis
added).

Similarly here, in conducting the compelling interest
analysis the Court must focus on the particular facts concerning
Holy Land's humanitarian aid to needy orphans, families, and
institutions in the West Bank and Gaza and assess "the impediment
to [the] objectives [of the government in preventing
international terrorism] that would flow from" setting aside the
prohibition on such aid.  Id. at 221; see Rigdon v. Perry, 962 F.
Supp. 150, 161-62 (D.D.C. 1997) (restriction on political speech
of military chaplains does not further government's compelling
interest in a politically-disinterested military, good order, and
discipline); Western Presbyterian Church, 862 F. Supp. at 545
(noting that the District of Columbia had conceded that "it has
no compelling governmental interest in prohibiting Western
Presbyterian from conducting its feeding program at 2401 Virginia
Avenue, N.W., so long as appropriate controls are in place").

The government cannot prove (as RFRA requires it to do)
that the designation of Holy Land and the seizure of its assets
furthers the compelling interest in preventing international
terrorism.  To the contrary, as the attached declarations
establish, Holy Land has nothing to do with terrorism; it works
solely to alleviate human suffering.  Nor can the government

58

prove that the designation and seizure--and the resulting
cessation of Holy Land's charitable work--represents "the least
restrictive means of furthering" whatever interest the government
may assert. 42 U.S.C. § 2000bb-1(b)(2). Accordingly, Holy Land
has a substantial likelihood of success on its RFRA claim. <u>See</u>,
<u>e.g.</u>, <u>Western Presbyterian Church</u>, 849 F. Supp. at 79.

    **E.    The Designation of Holy Land and the Seizure of Its
        Assets Violate Its First Amendment Freedom of Speech
        and Association.**

    By designating Holy Land a terrorist and seizing its
assets, thus prohibiting the Foundation from making humanitarian
contributions, E.O. 13224 and the OFAC blocking notice violate
Holy Land's First Amendment rights to freedom of association and
freedom of speech. The Supreme Court has repeatedly held that
contributions of money "fall within the First Amendment's
protection of speech and political association." <u>FEC</u> v. <u>Colorado
Republican Federal Campaign Committee</u>, 533 U.S. 431, 440 (2001);
<u>see</u>, <u>e.g.</u>, <u>Buckley</u> v. <u>Valeo</u>, 424 U.S. 1, 14 (1976) (per curiam)
(noting that restrictions on political contributions and
expenditures "operate in an area of the most fundamental First
Amendment activities").

    Although <u>Buckley</u> and its progeny make clear that
contributions may constitute associational and speech activity
that the First Amendment protects, those cases involve
contribution <u>limits</u>, rather than an outright <u>ban</u> on
contributions. The <u>Buckley</u> Court clearly viewed a limit on
contributions as less intrusive on First Amendment freedoms than

a ban on contributions; as the Court noted, "The quantity of communication does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing."  424 U.S. at 21; see Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 386-88 (2000).  Because E.O. 13224 and the OFAC blocking order completely prohibit Holy Land from making contributions, and do not merely limit such support, those actions entirely suppress the "symbolic act of contributing" and thus require a more compelling and narrowly drawn justification than the contribution limits at issue in Buckley and Shrink Missouri.[20]  As the Supreme Court has observed, "[P]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  United States v. Robel, 389 U.S. 258, 265 (1967) (quotation omitted).  Such "precision" is utterly lacking here; E.O. 13224 and the OFAC blocking order "cast[] [their] net across a broad range of associational activities, indiscriminately

---

[20] The theoretical availability of "licenses" from OFAC authorizing payments from the blocked funds does not change the First Amendment analysis.  In light of the Watson memorandum, on which the blocking notice rests, it is unreasonable to assume that OFAC would license Holy Land's humanitarian aid to Palestine or elsewhere in the world.  And the licensing scheme itself-- completely standardless, vesting unfettered discretion in OFAC, and with no requirement that OFAC make decisions within a brief, specified period or obtain prompt judicial review of its license denials--amounts to an unconstitutional prior restraint on speech.  See, e.g., Thomas v. Chicago Park District, 122 S. Ct. 775, 778-81 (2002); Forsyth County v. Nationalist Movement, 505 U.S. 123, 131-34 (1992); FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 223-230 (1990) (plurality opinion); id. at 238-41 (Brennan, J., joined by Marshall and Blackmun, JJ., concurring in the judgment).

trapping [contributions] which can be constitutionally punished
and [contributions] which cannot be so proscribed." Id. at 265-
66 (footnotes omitted).

1.    **Freedom of Association.**

The Supreme Court has held that "[t]he First Amendment
protects political association as well as political expression."
Buckley, 424 U.S. at 15.  "Effective advocacy of both public and
private points of view, particularly controversial ones, is
undeniably enhanced by group association, as this Court has more
than once recognized by remarking upon the close nexus between
the freedoms of speech and assembly."  NAACP v. Alabama, 357 U.S.
449, 460 (1958); see NAACP v. Button, 371 U.S. 415, 429-38
(1963).  "Of course, it is immaterial whether the beliefs sought
to be advanced by association pertain to political, economic,
religious or cultural matters, and state action which may have
the effect of curtailing the freedom to associate is subject to
the closest scrutiny."  Alabama, 357 U.S. at 460-61.

The Court has recognized that contributions of money
may represent protected associational activity:  "Making a
contribution, like joining a political party, serves to affiliate
a person with a candidate.  In addition, it enables like-minded
persons to pool their resources in furtherance of common
political goals."  Buckley, 424 U.S. at 22; see, e.g., In re
Asbestos School Litigation, 46 F.3d 1284, 1294 (3d Cir. 1994)
("Joining organizations that participate in public debate, making
contributions to them, and attending their meetings are

61

activities that enjoy substantial First Amendment protection.")
(emphasis added).

      E.O. 13224 and the OFAC blocking order completely
prohibit Holy Land from making contributions, and thus bar the
Foundation from engaging in a critical form of associational
activity.  The Supreme Court has repeatedly "disapproved
governmental action imposing criminal sanctions or denying rights
and privileges solely because of a citizen's association with an
unpopular organization."  Healy v. James, 408 U.S. 169, 185-86
(1972).  In such a case, "[t]he government has the burden of
establishing a knowing affiliation with an organization
possessing unlawful aims and goals, and a specific intent to
further those illegal aims."  Id. at 186 (emphasis added); see,
e.g., Elfbrandt v. Russell, 384 U.S. 11, 15-16 (1966) (striking
down Arizona statute that punished knowing association with
organization which had as one of its purposes the violent
overthrow of the government, without requiring proof that the
defendant specifically intended to further the unlawful goals of
the organization).  The Court has explained that "this intent
must be judged 'according to the strictest law,' for 'otherwise
there is a danger that one in sympathy with the legitimate aims
of such an organization, but not specifically intending to
accomplish them by resort to violence, might be punished for his
adherence to lawful and constitutionally protected purposes,
because of other and unprotected purposes which he does not
necessarily share.'"  NAACP v. Claiborne Hardware Co., 458 U.S.

886, 919 (1982) (quoting <u>Noto</u> v. <u>United States</u>, 367 U.S. 290, 299-300 (1961)).

      <u>Claiborne Hardware</u> illustrates this principle.  In that case, business owners in Mississippi sued the NAACP and its members for business losses allegedly suffered during an NAACP-led boycott.  The boycott involved protected activities--including, for example, picketing, demonstrating, and marching. <u>See</u> <u>id</u>. at 903, 907-10.  But the boycott also involved acts of violence, which, the Court made clear, the First Amendment does not protect.  <u>See</u> <u>id</u>. at 916.  Although the Court acknowledged that NAACP members who "engaged in violence or threats of violence" could be held liable for "the injuries that they caused," <u>id</u>. at 926, it refused to extend liability to members who did not perpetrate the violence absent proof of "a specific intent to further an unlawful aim embraced by that group," <u>id</u>. at 925.

      The United States District Court for the Northern District of Illinois applied the principles of <u>Claiborne Hardware</u> to a civil suit brought against Holy Land and other American organizations that allegedly contributed funds to Hamas.  <u>See</u> <u>Boim</u> v. <u>Quranic Literacy Institute</u>, 127 F. Supp. 2d 1002, 1020 (N.D. Ill. 2001).  The suit sought damages for Hamas' killing of an American.  In support of a motion to dismiss, an amicus argued that the complaint did not adequately allege that the defendants specifically intended to carry out Hamas' unlawful (as opposed to its lawful) purposes.  The court agreed with the legal principle

63

on which amicus relied:  "As the Coalition points out, the
Supreme Court has held that neither civil nor criminal liability
may be imposed when support is provided to a political
organization, such as Hamas, that is engaged in a wide range of
both lawful and unlawful activities, <u>in the absence of a showing
of specific intent to further the organization's unlawful ends</u>."
<u>Id</u>. (emphasis in original) (citing <u>Claiborne Hardware</u>, 458 U.S.
at 920).  The court found, however, that plaintiffs had
sufficiently alleged such an intent in their complaint, and
denied the motion to dismiss.  <u>See id</u>. at 1020-21.[21]

---

[21] The Ninth Circuit has held that the <u>Claiborne Hardware</u>
"specific intent" principle does not apply to the prohibition on
fundraising and other material support in 18 U.S.C. § 2339B.  <u>See
Humanitarian Law Project</u> v. <u>Reno</u>, 205 F.3d 1130, 1133-34 (9th
Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 904 (2001).  But the court's
reasoning is flawed in several respects.  For example, the court
relied on a purported distinction between  "speech" and "conduct"
aspects of fundraising.  Because fundraising has both aspects,
according to the court, a lower standard of scrutiny applies to
contributions of money, and the <u>Claiborne Hardware</u> rule has no
bearing.  <u>See id</u>.  But the Supreme Court has specifically
rejected this analysis with respect to political contributions
and expenditures, <u>see Nixon</u> v. <u>Shrink Missouri Government PAC</u>,
528 U.S. 377, 386 (2000); <u>Buckley</u>, 424 U.S. at 15-17, and
<u>Claiborne Hardware</u> itself involved conduct--picketing,
demonstrating, and marching--that included non-speech elements.
<u>See</u> 458 U.S. at 903, 907-10.  It is hard to imagine that
<u>Claiborne Hardware</u> would have applied a different analysis (or
reached a different result) if, instead of seeking to impose tort
liability on the NAACP and its members, Mississippi had
prohibited members from contributing to the organization.
Moreover, two earlier opinions of the Ninth Circuit applied the
<u>Claiborne Hardware</u> "specific intent" requirement to fundraising
and other associational activities in support of an alleged
foreign terrorist organization, the Popular Front for the
Liberation of Palestine.  <u>See American-Arab Anti-Discrimination
Committee</u> v. <u>Reno</u>, 119 F.3d 1367, 1376 (9th Cir. 1997), <u>vacated
for lack of jurisdiction</u>, 525 U.S. 471 (1999); <u>American-Arab
Anti-Discrimination Committee</u> v. <u>Reno</u>, 70 F.3d 1045, 1063 (9th
Cir. 1995).  For these reasons, this Court should not follow the

Under <u>Claiborne Hardware</u>, <u>Boim</u>, and the other cases cited above, the designation of Holy Land and the seizure of its assets must be set aside.  As the <u>Boim</u> court recognized (and as the Watson memorandum confirms) Hamas, like the NAACP in <u>Claiborne Hardware</u>, "is engaged in a wide range of both lawful and [according to the government] unlawful activities."  <u>Boim</u>, 127 F. Supp. 2d at 1020.  Even assuming--contrary to the actual facts--that Holy Land's contributions somehow served the interests of Hamas by, for example, enhancing its stature among the Palestinian population, there is no evidence that Holy Land had a "knowing affiliation" with Hamas and "held a specific intent to further [Hamas'] illegal aims."  <u>Claiborne Hardware</u>, 458 U.S. at 920.  In the absence of such evidence, the designation of Holy Land and the seizure of its assets violate the Foundation's First Amendment right to freedom of association.

**2.    Freedom of Speech.**

<u>Buckley</u> and its progeny establish that contributions of money implicate the First Amendment freedom of speech.  <u>See</u>, <u>e.g.</u>, <u>Shrink Missouri</u>, 528 U.S. at 385-88; <u>Buckley</u>, 424 U.S. at 14-18.  As noted above, the intrusion on First Amendment freedoms is even greater here than in <u>Shrink Missouri</u> and <u>Buckley</u> because E.O. 13224 and the OFAC blocking notice completely prohibit Holy Land from contributing humanitarian aid, rather than merely limiting those contributions.

---

<u>Humanitarian Law Project</u> decision.

65

The government may attempt to prove that the restrictions on speech that the designation of Holy Land and the seizure of its assets impose are "closely drawn" to serve a "sufficiently important" government interest.  Colorado, 533 U.S. at 456.  The government cannot meet this burden, for the reasons discussed above in connection with RFRA.  See, e.g., Optimist Club of North Raleigh v. Riley, 563 F. Supp. 847, 849-50 (E.D.N.C. 1982) (total ban on charitable solicitations by telephone violates First Amendment less restrictive means available to further state's interest in preventing fraud).

**II.  THE DESIGNATION OF HOLY LAND AND THE SEIZURE OF ITS ASSETS IS CAUSING HOLY LAND, ITS EMPLOYEES, ITS DONORS, AND ITS BENEFICIARIES IRREPARABLE HARM.**

As a direct result of the designation of Holy Land as a terrorist and the seizure of its assets, Holy Land has been shut down and its charitable and humanitarian activities completely stopped.  Baker Dec. ¶¶ 21, 31(K); Abumoharram Dec. ¶ 4.  Four distinct forms of irreparable harm will result if the Court does not grant preliminary relief.  First, the continued loss of Holy Land's constitutional rights "unquestionably" constitutes irreparable harm.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976); NAACP Legal Defense and Educational Fund, 636 F. Supp. 762, 766 (D.D.C.), vacated as moot, 795 F.2d 215 (D.C. Cir. 1986); see also American Civil Liberties Union v. Johnson, 194 F.3d 1149, 1163 (10th Cir. 1999) (curtailment of First Amendment rights constitutes irreparable injury); Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992) (Fourth Amendment violations found to

66

constitute irreparable injury); <u>Cohen</u> v. <u>Coahoma County</u>, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").

Second, continued blockage of Holy Land's assets--and its resulting inability to function as a going concern--creates a significant risk of the Foundation's "destruction in its current form as a provider of" humanitarian aid. <u>Holiday Tours</u>, 559 F.2d at 843 (finding irreparable harm in tour company's potential destruction); <u>see</u>, <u>e.g.</u>, <u>Doran</u> v. <u>Salem Inn, Inc.</u>, 422 U.S. 922, 932 (1975) (potential bankruptcy of business "[c]ertainly . . . meets the standards for granting interim relief"); <u>Federal Leasing, Inc.</u> v. <u>Underwriters at Lloyd's</u>, 650 F.2d 495, 500 (4th Cir. 1981) (threat to movant's "existence and its business," including "its relations with customers and investors [and] the good will built up by a heretofore successful enterprise" constitutes irreparable harm); <u>Planned Parenthood</u> v. <u>Citizens for Community Action</u>, 558 F.2d 861, 866-67 (8th Cir. 1977) ("adverse effect on [movant's] business, coupled with the incalculable loss of revenue, provides a basis for finding irreparable injury"). As donors, employees, and service providers resign themselves to Holy Land's disappearance, the chances that the Foundation can resurrect itself steadily diminish. Baker Dec. ¶ 31(K).

Third, the recipients of Holy Land's aid--the poor and innocent orphans, families, and institutions in the West Bank,

67

Gaza, and elsewhere in the world's trouble spots--must now seek
other means of surviving.  Some have been reduced to begging.
Orphans and families go hungry.  University students have been
forced to drop out because Holy Land can no longer pay their
tuition.  Baker Dec. ¶ 21; Abumoharram Dec. ¶ 11.  As the <u>Western
Presbyterian Church</u> court found in another case involving the
abrupt cessation of critical humanitarian services, "requiring
the Church to peremptorily discontinue an important social
welfare and religious program that has been in existence for over
10 years constitutes irreparable injury."  849 F. Supp. at 79;
<u>see</u>, <u>e.g.</u>, <u>Planned Parenthood</u> v. <u>Horner</u>, 691 F. Supp. 449, 457
(D.D.C. 1988) (irreparable harm from OPM restriction on
contributions to Planned Parenthood, because implementation of
the restriction would force the organization to curtail its
medical and educational services to the poor and thus would
"adversely affect the Planned Parenthood affiliates and the
individuals they serve"); <u>NAACP Legal Defense and Educational
Fund</u>, 636 F. Supp. at 765-66 (irreparable harm where cutoff of
federal funds "would force plaintiffs to curtail immediately the
health and welfare services they provide to their clients").

Fourth, Holy Land's employees have lost their
livelihood.  They are now forced to look for other jobs, unsure
whether the Foundation will be permitted to resume operations.
Employees with health problems have been forced to the brink of
despair because of the cancellation of their insurance and
inability to pay medical costs.  Baker Dec. ¶ 31(K); Mohmed Dec.

¶ 55; Abumoharram Dec. ¶ 3.  This continuing, unfair burden on
the Holy Land employees represents another dimension of the
irreparable injury that the government's actions have caused.

**III. AN INJUNCTION WILL NOT SUBSTANTIALLY INJURE DEFENDANTS.**

        The government cannot plausibly argue that a
preliminary injunction will cause it any harm.  As discussed
above, Holy Land provides purely humanitarian aid.  It gives no
support to Hamas.  Permitting Holy Land to continue its
charitable programs--under any reasonable monitoring program the
defendant agencies request--cannot possibly damage the war on
terrorism or any other government effort.  The government's
several-year delay in acting against Holy Land, after receiving
virtually all of the information in the Watson memorandum, belies
any claim of harm to the government from a preliminary
injunction.

**IV.  AN INJUNCTION WILL FURTHER THE PUBLIC INTEREST.**

        For several reasons, granting a preliminary injunction
will further the public interest.  First, the vindication of Holy
Land's constitutional rights serves the public interest.  Elam
Construction, Inc. v. Regional Transportation. District, 129 F.3d
1343, 1347 (10th Cir. 1997) ("The public interest . . . favors
plaintiffs' assertion of their First Amendment rights.").
Second, as in Western Presbyterian Church, Holy Land has
conducted an "exemplary program" for many years, and its
charitable efforts "respond[] to a crying need" for humanitarian
aid in Palestine and elsewhere in the world.  849 F. Supp. at 79.

69

Third, and most fundamentally, an injunction may begin to restore the faith of Americans, and especially Muslim-Americans, that the rule of law prevails in this country even after the terrible events of September 11, 2001, and that, whatever political winds may sweep the executive and legislative branches, the federal courts will hold true to their duty to enforce the constitutional rights of all citizens.

**CONCLUSION**

For the foregoing reasons, the Court should enjoin the government, pending the outcome of this litigation, from continuing to block or otherwise interfere with Holy Land's access to and disposition of its assets.

Respectfully submitted,

FREEDMAN BOYD DANIELS HOLLANDER
    GOLDBERG & CLINE P.A.

By: _____
    John D. Cline
    (D.C. Bar No. 403824)
    John W. Boyd
    Nancy Hollander
    Zachary A. Ives

20 First Plaza, Suite 700
Albuquerque, NM 87125
(505) 842-9960 (phone)
(505) 842-0761 (fax)

Counsel for the Holy Land
Foundation for Relief
and Development

70

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

THE HOLY LAND FOUNDATION FOR      )
RELIEF AND DEVELOPMENT,           )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      No. 1:02CV00442(GK)
                                  )
JOHN ASHCROFT, in his official    )
capacity as Attorney General of   )
the United States, et al.,        )
                                  )
            Defendants.           )
_____)

**EXHIBITS TO THE MEMORANDUM IN SUPPORT OF MOTION
OF THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
FOR A PRELIMINARY INJUNCTION**

FREEDMAN BOYD DANIELS HOLLANDER
    GOLDBERG & CLINE P.A.
John D. Cline
(D.C. Bar No. 403824)
John W. Boyd
Nancy Hollander
Zachary A. Ives
20 First Plaza, Suite 700
Albuquerque, NM 87125
(505) 842-9960 (phone)
(505) 842-0761 (fax)


Counsel for the Holy Land
Foundation for Relief
and Development

**INDEX OF EXHIBITS TO MEMORANDUM IN SUPPORT OF
MOTION OF HOLY LAND FOUNDATION FOR RELIEF AND
DEVELOPMENT FOR PRELIMINARY INJUNCTION**

| TAB | DESCRIPTION |
|---|---|
| 1. | Declaration of Shukri Abu Baker |
| 2. | Declaration of Dalell D. Mohmed |
| 3. | Declaration of Mohammed Abumoharram |
| 4. | Declaration of Rashid Khalidi |
| 5. | Declaration of George R. Salem |
| 6. | Blocking Notice issued by OFAC on12/04/01 |
| 7. | Declaration of Mark J. MacDougall |
| 8. | Watson Memorandum |
| 9. | Dallas Morning News Article of 06/11/00, <u>Fostering Unrest or Helping the Poor?</u> |
| 10. | UNRWA Emergency Appeal |
| 11. | Internet Jerusalem Post Article of 09/11/2001, <u>NII Must Support Nahariya Suicide Bomber's 2 Widows, 10 Orphans</u>. |
| 12. | Government of Israel Report, 06/05/95 [Exhibit 45 to Watson Memorandum] |
| 13. | Transcript of Tape 4 or FBI Surveillance on 10/02/93 [Exhibit 28 to Watson Memorandum] |
| 14. | Holy Land Foundation 1993 Tax Return [Exhibit 37 to Watson Memorandum] |
| 15. | Declaration of Allegra Pacheco |
| 16. | Supreme Court of Israel's Opinion in <u>Public Committee Against Torture in Israel</u> v. <u>State of Israel</u> |
| 17. | Declaration of Anwar Mohamed |
| 18. | Anati Statement in Hebrew as attached to Watson Memorandum [Exhibit 50 to Watson Memorandum] |

19.     Certified Translation of Anati Statement by
        Certified Languages International

20.     Declaration of Ammar Imreish