

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

THE HOLY LAND FOUNDATION FOR        )
RELIEF AND DEVELOPMENT,             )
                                    )
          Plaintiff,              )
                                    )
          v.                      )        No. 1:02CV00442
                                    )        (Judge Kessler)
JOHN ASHCROFT, in his official      )
capacity as Attorney General of     )
the United States, et al.,          )
                                    )
          Defendants.             )
_____ )

**DECLARATION OF SHUKRI ABU BAKER**

    1.      My name is Shukri Abu Baker. I am also known as Shukri A. Baker. I live at

2917 Fair Meadow Dr., Garland, Texas. I have lived in Texas for ten years and at this address

for four. I am the Chief Executive Officer of the Holy Land Foundation ("HLF").

    2.      I am 43 years old and have been an American citizen since 1989. I am married to

Wejdan O. Baker and we have been married since 1982. We have four children, Zaira, Sanabel,

Nida'a and Shurook. Also living with me is my father Ahmad Abu-Baker, 72, and my mother

Zaira, 64. I was born in Sao Paolo, Brazil. My father is from Ramallah, West Bank, Palestine

and my mother, a convert to Islam, is from Brazil. I have lived in the United States since

January 1980. I have a bachelor's degree in Business Administration from Orlando College in

Orlando, Florida (1984).

    3.      My desire for Palestine and Israel is that there be a single nation, populated by

Muslims, Jews and others. I categorically reject the idea that Jews should be killed or driven out

<div align="center">1</div>



of Israel.  I reject and abhor Hamas, its goals and its methods.  I reject terrorism by anyone.  I do not believe that it accomplishes anything and I believe it to be morally wrong.  The organization that I helped found, the Holy Land Foundation, is dedicated to the alleviation of the suffering of people who have been caught and injured in conflicts and disasters around the world, particularly in Palestine, where the suffering by the Palestinians is staggering.  As I explain in more detail below, however, our efforts have not been limited to Palestine.  We have provided essential aid in Palestine, Lebanon, Bosnia, New York City, Oklahoma City, and elsewhere.

4.    I was one of the founders, in 1989, of the Holy Land Foundation.  For me, the inspiration for starting the Holy Land Foundation stemmed from one thing: the birth of our third child and second daughter, Sanabel.  My wife and I were living in Indianapolis, Indiana, in 1987.  Sanabel, was born on March 25, 1987, suffering from two catastrophic genetic diseases, cystic fibrosis and thalassemia major (a disease of the blood that requires transfusions every month).  Cystic fibrosis is associated with persons of European descent (thus from my mother, whose ancestors are Italian) while thalassemia major is associated with Mediterranean (Semitic) peoples.  It was as though Sanabel had been struck by lightning twice at the same instant.

My wife and I had little income and no insurance.  Sanabel's medical problems were first diagnosed eight months after her birth, through the federal "WIC" clinic (a project of the "Women, Infants and Children" program).  Sanabel's medical problems were such that she was not expected to survive. However, WIC arranged for treatment of Sanabel at Indianapolis Children's Medical Center and over many weeks after she began her treatment there, her condition stabilized and she survived.  Although she continues to have enormous medical problems that make her life difficult in many ways, she is now fifteen years old, bright, succeeding in school, happy and a delight to me, my wife and her siblings.

2

During Sanabel's treatment in Indianapolis in 1987 through January 1990, my life changed. I saw how incredibly lucky she was and we were that she was born in the United States. I firmly believe that she would not have survived had she been born anywhere else in the world. I was overwhelmed by the kindness of the doctors and staff at the Children's Hospital, and by the kindness and devotion of the members of the support groups that helped us and Sanabel through her infancy. I saw clearly, for the first time in my life, what could be done for someone who was suffering, by private groups and government funds dedicated to alleviating that suffering. It was the private funds that the Children's Medical Center received that allowed it to provide the incredible help that it did. My sense of gratitude overwhelmed me and it somehow "clicked" in my mind that I could do the same in some small way and could in some way pay back to others what had been done for me, my family and Sanabel by the people in this country. Perhaps most of all, the treatment my daughter received made me understand and appreciate what a gift it was to be American.

I have always loved this country, but I have particularly strong feelings for America whenever I look at my daughter, Sanabel. I know that she would be dead if she had been born anywhere else. I have always raised my children to think of themselves as Americans, just as I think of myself as an American. I feel so grateful to this country and I have taught my daughters to feel the same way.

I decided during the first two weeks of my daughter's treatment that I wanted to devote myself to alleviating suffering in the way my family's suffering had been alleviated. My desire to somehow pay back the debt that my family, my daughter and I owe to the goodness of others is not driven in any sense by politics. At that time of my daughter's birth, the first "intifada" was occurring in Palestine. My father is Palestinian and I felt an affinity for the Palestinians who

3

were injured and suffering as a result of this clash. I knew from what I read in the news that there were dire shortages of medical care, food, clothing, shelter, and other essentials.

5.     It was at this time that I began to discuss with a few other friends an idea for forming a charitable organization built around the obligation of Muslims to participate in "zakat," which is one of the "five pillars" of Islam. The closest term in English is "almsgiving," although it can also be compared with charitable tithing. This pillar of Islam requires people who are able to give alms to give them freely as best they can to alleviate the suffering of the unfortunate.

6.     The organization we formed was first called the "Occupied Land Fund." We later changed it to the Holy Land's Foundation for Relief and Development, because our idea was to try to alleviate the suffering of people in the Palestinian territories occupied by Israel at that time. The people who worked with me to found the organization were Ghassan Elashi, a marketing executive for an internet company, Mohammed Elmizain, an Imam of the Passaic County Mosque in Patterson, N.J., Mace Abdullah, a lawyer in Los Angeles, and Ahmed Agha, a doctor in Oklahoma.

7.     Neither I nor, to my knowledge, any of the other founders of this charity have had any connection whatever to Hamas, or to any terrorist groups or to terrorism. I do not believe that suicide bombing is countenanced by the Islamic religion. I have always opposed radicalism. I have always been for dialog and for peace and I am firm in these convictions. I am confident that the other founders of the Holy Land Foundation feel the same way. Our objective was and has always been simply to alleviate suffering in Palestine and elsewhere.

8.     As I explain in more detail below, the Holy Land Foundation assists the impoverished and disadvantaged without regard to politics or other partisan considerations. We

4

distribute aid to Christians in Palestine as well as to Muslims.  We also distribute aid to the families of people who have been assassinated for allegedly collaborating with Israel. Certainly if we were supporting Hamas, we would do neither of these things.

9.      Since we founded the Holy Land Foundation, I have devoted my life to building this charity. I have come to feel that it is my life's work to try to alleviate suffering, particularly the suffering of children.  Between the time I began working for our foundation in 1990 and the moment that our funds were blocked by the United States in late 2001, I have taken only one week's vacation.

10.      I and the other founders began raising money in late 1989 and early 1990 and were successful.  We had a board consisting mostly of the founders, and we have had various board members since that time that have guided our charity.  To my knowledge, we have never had a board member who was connected with Hamas.  We have had doctors, lawyers, professors, engineers and other professional and business people serve on our board. No board member has ever suggested that we should devote any funds to the support of Hamas or any other terrorist organization.

11.      I started work for HLF as a full-time, salaried employee in February, 1990.  We sought funds from members of the Islamic community because we knew many people in the Islamic community and because our initial goal was to provide aid to poor children in Palestine. We were successful because the members of the Islamic community, in addition to wanting to help the people of Palestine, also have the religious obligations that I referred to earlier.  First, there is the Islamic obligation of "zakat" which, as I explain above, is an obligation to give alms to the needy.  In addition, helping orphans is central to the Islamic religion.  To a Muslim, an orphan is any child whose father is dead.  These are religious tenets regarding the

5

need to share with the less fortunate that people of the Islamic faith take very seriously because they are an integral part of our religion. For example, Islamic people are required to participate in "Zakat Al Fitr" which is a particular alms-giving that occurs during Ramadan. During the month of Ramadan, Muslims fast all day until sundown. At sundown, they break the fast. "Zakat Al Fitr" requires that Muslims who are not impoverished give an amount of alms equal to one meal for each member of their family. Thus, if a family has a husband, wife and three children, that family must give, during Ramadan, enough alms to pay for five meals for the poor. That means that, by religious decree in the United States, an Islamic family of five must give $7 - $10 for each member, or $35 - $50. One of the purposes of the Holy Land Foundation was to provide a mechanism for American Muslims to fulfill their religious "Zakat" obligations.

12.    Although the Holy Land Foundation is generally organized as an Islamic, "faith-based" organization, it does not limit its solicitations to Muslims, nor are the recipients of its charity limited to Muslim people. As I will explain in more detail later, HLF provides charity in Palestine and elsewhere not only to Muslims, but also to impoverished Christians and people of other faiths. We make it clear that our charitable efforts are not confined to members or our faith. We publicly say we "give aid based on need, not on creed."

13.    Because O.F.A.C. has taken our records, I am providing many of the financial and other details from memory. During our first year of fund-raising, ending in 1990, we raised approximately $700,000. Because the intifada was going on in Palestine, we focused our charity on orphans, food and aid to hospitals. We did not have an office in Palestine, so we worked with charity organizations that already existed. We knew that the situation in Palestine was devastating to the people there, so we were anxious to help as much as we could. We sent money only to institutions that we knew were legal, registered and doing an excellent job.. We

sent money to "Zakat Committees" in Palestine because those committees were really the only reliable way to get money to the poor. We disbursed money only for discrete projects and programs. For example, we might allocate money for a particular group of orphans whose names were on a list provided to us by a zakat committee. At this time, in the early 1990's, the zakat committees were operating under the mandate of the Israeli occupation and were operating with the approval of the Israeli government. The fund transfers, in virtually every instance, went through Israeli banks. These committees would account to us for the money they received. They would provide pictures of many of the orphans and they would provide pictures of the food packages that were purchased with our funds. We had no reason then, nor do we have any reason now, to believe that any of the zakat committees functioning in Palestine at that time were under the influence or control of Hamas. Had they been under Hamas's control, however, it would not have been particularly significant, since I believe Hamas at that time was not a banned organization, by either the Israeli or United States governments.

14.     In 1991, I believe that we raised about $1,000,000. In 1992, I believe we raised about $2 million and in 1993 and 1994 about the same amounts. Over the years, the amount we have been able to raise per year has risen to about thirteen million in the year 2000. As a result of the blocking order, about five million dollars in HLF funds was frozen. In my opinion, the blocking order had the effect of preventing HLF from raising an additional two or three million dollars for charity.

15.     In 1993, I hired Mohammed Anati to open an HLF office in Jerusalem. We hired him right out of college. Before HLF hired him, I made him swear that he was not affiliated with any group, and he swore to me that he was not. We asked him to form a board for the organization in Palestine and our instructions to him were to avoid board members with

organizational affiliations. The office operated under Israeli law because an Israeli lawyer told us that the most expedient way to accomplish opening an office was to start it as an Israeli corporation and make it HLF's agent in Israel. I believe that there was no one on the board who was associated with Hamas or any other terrorist organization.

16.     As a result of having a physical presence in Jerusalem, our organization changed the way it delivered charity. We hired social workers to monitor the stipends to the orphans. In many cases, we no longer needed to work through zakat committees. One advantage of this, we felt, was that by undertaking the task of distributing the charity, we would be able to enforce our policy of eliminating any chance of political manipulation. We understood the politically polarized situation and we wanted to supervise and evaluate the distribution of our funds. If we got a request for money, Anati was there to make sure it was a legitimate request and, if legitimate, that it was utilized properly. In doing this, our overriding motives were two-fold: stay outside Palestinian politics, and make our money more productive. This was not because we had found anything unsavory in the distribution through the zakat committees or any other organizations with which we had dealt. But the new political development was a peace accord with Israel and the situation was, we thought, going to become stable. The Palestinian Authority, formerly the PLO, was to be officially in charge of Palestine and we needed and wanted to move to a more professional stage as the previously chaotic situation in Palestine came to an end, or so we thought at the time. The peace accord was signed in 1993. However, the treaty that allowed the PA to move into Gaza and Jericho was signed between the Palestinians and Israel in Cairo in March 1994.

17.     We started an office in the Gaza Strip in late 1993. At that time, Gaza was under the Israeli mandate, so when the Palestinian Authority took over Gaza in 1994, HLF was already

there and functioning.

18.     In 1993, we began institutionalizing some of the basic programs to which we devote much of our money: Food packages for Ramadan, orphan assistance, zakat to the needy. While the Ramadan food packages necessarily go almost entirely to Muslims, the support of orphans and zakat to the needy goes, and has always gone, to people of any faith, including a number of Christians living in Palestine. These programs are the same, and operated in similar fashion, in the West Bank, Gaza, and refugee camps in Lebanon and Jordan. We have also begun other programs over the years, including providing school uniforms, clothing for the poor, support for poor families, scholarships, etc. I have read the affidavit of Mohammed Abumoharram, the manager of our Gaza office, and it fairly and accurately reflects the type of programs we operate throughout Palestine and in the refugee camps. It also fairly and accurately reflects the way our funds tend to be distributed. A rough division of the funds HLF raised for Palestine is that about 60% of our fund distribution in the Holy Land itself goes to Gaza and West Bank, 25% to Lebanon, 15% to Jordan. So far as we know, none of our funds goes to Hamas or to any terrorist organization and I do not see how it could.

19.     In the receipt and expenditure of our funds, we have always maintained transparency. Our books (until they were seized) have been open for inspection and every dollar accounted for. In this regard, it is important to know that a high percentage of the money we give to the needy is earmarked by the donor, for a particular needy orphan or family. For example, our staff in Gaza, West Bank or the refugee camps gathers the names of orphans who are not sponsored by other organizations and who are genuinely needy. These orphans are for the most part Muslims, simply because most of the people who live in Palestine are Muslim. But some are Christians. What they have in common is that all of them are from families whose

father is dead and all are desperately poor.  Some of these orphans have lost their fathers because Hamas or some other group decided that their fathers were spies or collaborators with the Israelis.  This is of no matter to HLF if the orphans' families have no other sponsorship and are genuinely needy.   After an application is made to us for assistance, our social workers will visit the family to determine its need and will check with other aid organizations to confirm that the family has no other sources of charitable assistance.  Then the social workers will prepare a profile of the orphan and his or her family, will take a picture of the orphan and forward the profile and picture to HLF offices in Texas.  HLF will then circulate the picture and profile, with others, among potential sponsors.  We have maintained a web site on which we publish a list of orphans who need sponsorship.  People are able to look through these lists and select an orphan to sponsor. Sponsors will select particular orphans to support and, when we have a total of $50 pledged per month in support for a particular orphan, we will begin the sponsorship of that orphan by collecting the funds monthly from the sponsors and passing it along to the orphan after deducting $5 for administrative fees, resulting in a $45/month payment directly to the sponsored orphan's family. We have been careful to make sure that earmarked contributions go exactly where the donor intends.

20.     Sometimes donors will suggest particular orphans for support and we will follow up on the suggestion by contacting the orphan and his or her family and evaluating the need, but we do not devote any funds to any orphans, based on suggestions, without making such an evaluation.  In this regard, I know that there is a suspicion that HLF in some way favors or singles out for assistance the orphans of suicide bombers.  I have read the declaration of Mohammed Abumoharram, our manager of the Gaza office.  Based on my experience in Palestine, which has been extensive over the last ten years, I agree with him that it is unlikely

10

that there are any orphans of suicide bombers among the orphans we sponsor. While I obviously cannot state categorically that there are none, I can say that I am unaware of any and I agree with Moharram that it would be unlikely that there are any, since Hamas and other such organizations make a point, I believe, of providing more support to the families of suicide bombers than we are able to supply to the orphans our donors sponsor. For this reason, and because the typical suicide bomber is young and single, I believe it is unlikely that there are orphans of suicide bombers among our sponsored orphans. In my opinion, it is far more likely that our list of sponsored orphans includes the orphans of fathers who have been killed by Hamas or other terrorist groups because of the father's alleged complicity with Israel.

21.     One of the most painful things for me and, I know for the rest of the staff of HLF, is the knowledge that the meager amount of $45/month that was formerly going to the orphans on our list has been cut off and that those children and their families are without this support. The need of such children and their remaining families in Palestine is very great. It is very hard for an American to imagine the extent of the suffering that exists in Palestine and in the refugee camps, but I have seen it with my own eyes. For this reason, I am familiar with what it certainly means for these children and families to be without this small assistance. There is desperate poverty in Palestine and the refugee camps. With very few exceptions there are no jobs to be had and the small amounts of money we supply make an enormous difference in the lives of the children and their families to whom our support goes. It is a certainty that many of these families have little or no other support and that, as a result of the blocking order, those families are desperate. I should note that a pledge of $50/month is the minimum amount of support that HLF will provide to the families of orphans. In some cases, sponsors of orphans give more than $50/month and we pass that higher level of support along to the designated orphan. I have no

11

reason to believe that this higher level of support has ever been used as a mechanism to pass along funds to the families of terrorists on a preferential basis.

22.     I am aware that HLF is accused of some sort of systematic support for the families of suicide bombers. For the reasons described earlier, I believe it is unlikely that we have supplied any support to the families of suicide bombers. HLF does not seek out the families of suicide bombers to support, nor do we, or would we, accept any direction from Hamas or any other terrorist organization regarding what families or orphans to support. In this regard, I believe there has been some confusion arising from my use of the term "shaheed" which has been roughly translated into English as "martyr." I have used this term in the past in urging donors to support the orphans of the "shaheed" or to support the families of "shaheed." The idea that this term is limited to (or, from my perspective, even applies to) suicide bombers is completely wrong. "Shaheed," to me and, I believe, to most Muslims, means an innocent victim who has died. For example, a person killed by a bomb or a bullet would be a shaheed if he or she were an innocent victim of that violence. A mother who died in childbirth might be considered "shaheed." Anyone who died an "innocent" death could be considered a shaheed. In my speeches, therefore, I have spoken of the need to help the orphans of shaheed. By using this term, I have not intended it as a solicitation of support for suicide bombers, even if they needed HLF's support, which they apparently do not. I have always meant it to refer to any orphans whose fathers have died innocently. As far as I'm concerned, it is hard to imagine a person who has died in Palestine other than by natural causes, that I would not consider to be "shaheed." I know that other people take narrower views of the meaning of this term. Some people believe it is limited to people who have died in defense of the Islamic faith. I believe these people are in the minority and I do not take it to be limited this way. I referred to the victims of the Hebron

Massacre as "shaheed." These were people who were massacred inside a mosque, during prayers, by an Israeli civilian who entered the mosque with a machine gun and started firing. Certainly their poor children and families were entitled to support and I believe most Muslims would have referred to them as "shaheed."

23.     By early 1994, we established our offices in Jerusalem and Gaza. Before that time, we had delivered charity through organizations licensed and authorized by the Israeli government which, up until that time, occupied Palestine and exercised authority over all charitable and other agencies operating anywhere in Palestine or Gaza. In other words, although HLF provided funds to zakat committees and other organizations before 1994, the existence and activities of every one of those organizations had been approved by the Israeli government. It is important to note that HLF, even before Hamas was banned by the Israeli government, did not provide any funds to Hamas or devote any of its funds to support Hamas. It was my view then, and it continues to be my view, that connections with political organizations, including any organization that engages in any sort of terrorist activities, would compromise our ability to provide charity.

24.     After late 1993/early 1994, because we had established our own presence in Palestine and the refugee camps, we began to cut back on distributing charity through other organizations and began distributing it entirely ourselves. Our offices in Gaza and Jerusalem functioned without incident until May of 1996, when the Israeli Ministry of Defense issued an order banning five charities, including ours, for a period of one year. According to the Defense Ministry, the reason for the order was that the Ministry believed HLF was a front for Hamas, based on allegations that we had provided aid to the families of Hamas activists and that we had provided funds to zakat committees that were allegedly controlled by Hamas. We hired an

13

Israeli lawyer, Lea Tsemmel, to attempt to find out the basis for the ban and to try to get it lifted. At this time, we were able to continue functioning through our offices in Gaza and Hebron, which in 1994 had come under the jurisdiction of the Palestinian Authority.

25.     Our lawyer provided us with the specifics of the charges, which I have summarized above. My understanding of these events can be summarized as follows: The Ministry of Defense claimed that out of the thousands of people to whom we had provided assistance, a handful (25 or so) were supposedly connected to Hamas, which had recently been banned. In addition, the Ministry alleged that some members of the zakat committees with which we had dealt, were Hamas activists.  As to the charge that we gave financial support to the families of Hamas activists, we reviewed our list of recipients and were unable to find anyone who had received our money who had committed an act of terrorism.  In Palestine at that time (and now), there would be no way for a charitable organization to eliminate the possibility that a needy family it was helping might have a member whom the Israeli government might consider to be a "Hamas activist."  The nature of our charity was such, however, that the families to whom we provided support were not connected with Hamas, at least as far as we could tell and as far as the Israeli government could tell.  As to the families of "Hamas activists" that we supposedly supported, I recall one or two specifics.  One was an elderly woman who had no source of income, whose son the Israeli government alleged to be a "Hamas activist" or "Hamas fugitive."  There was no allegation that the mother was in any way responsible for her son's conduct, whatever it was, and there was no question that she was in desperate need.  I continue not to understand why the Israeli government could object to our providing assistance to this woman, but they apparently did.  Their objection is particularly difficult to understand given the news reports that I have read over the years regarding the requirement of Israeli law that the

14

Israeli government provide support to the families of actual suicide bombers who happen to be Israeli citizens.

Another example that I recall from the list was the brother of someone who was a "Hamas activist." The brother and his family were impoverished, and qualified for our assistance, and there was no allegation that this man or his children had been involved with Hamas. Nor was there any allegation that HLF knew or should have known of the brother's Hamas activities, whatever they were. Yet the Israeli government used HLF's small support for the non-activist brother as an example of our organization having done something wrong.

As to the allegation regarding the zakat committees, the people on those committees whom the Israeli government identified as "Hamas activists" were, first of all, not known to HLF to be connected to Hamas. Second of all, so far as I know, the zakat committees with whom we dealt had been approved and permitted to function by the Israeli government when we were dealing with them.

We understood that the Minister of Defense's decision to ban HLF as "non-permissible" was his decision and not a cabinet decision. My understanding is that our Israeli lawyer appealed his decision to the Israeli Military Court. After reviewing the evidence, the Court reversed his decision, holding that the amount of funds that the Minister claimed was in some way being used to support Hamas was so negligible, in comparison with the magnitude of HLF's activities as to be insufficient to justify the ban.

After this decision by the Military Court, an Israeli civilian court reversed the decision of the military court and upheld the Minister's decision. I don't know on what basis they did so. I learned about it from an article, years later, in the Dallas Morning News. Whatever the history of these events, the result was that our office in Jerusalem was required to remain closed for one

15

year.

26.     Our charitable work continued, but only through our offices in Gaza and Hebron, which were by then outside the jurisdiction of the Israeli government.  The ban had no application in Gaza and Hebron, and was applicable only to Israeli-controlled territory.

27.     When the year expired in May, 1997, our manager, Anati, rented an office on the outskirts of Jerusalem and we began operating our charity again.  We did so openly, with a sign on the door, phone line, fax, employees, etc.  I was informed by Anati that Israeli security visited the office, discussed HLF's activities and raised no question about HLF's recommencement of its Jerusalem operation.  Because the year was over and because of the visits by Israeli security, we had no reason to believe that we shouldn't be operating, and HLF operated in Jerusalem without incident for some months. When Anati traveled to Jordan to visit family and returned, however, the Israeli police arrested him at the border and charged him with operating a "banned organization."  Officials identified him on the news as a "Hamas financier."

28.     Anati was detained in prison for between eight months and one year.  As far as I know, there was neither a trial or a conviction.  I believe this was under the Israeli law that allows renewable "administrative" detentions of up to six months without charges.  During this time, we closed our office in Jerusalem and have not reopened it.   My understanding is that Mohammed Anati was banned for two years from contacting us or working for us.   I have been told that he suffered a great deal in prison, and that he was tortured, although I have not spoken to Anati personally about it.

29.     After these events, HLF functioned only through its offices in Hebron and Gaza. We later opened an office in Ramallah and Jeneen, staffed by some of our social workers.  The activities of these offices have been accurately summarized by Mohammed Abumorram, who

has knowledge of the activities of our Gaza office, which are similar to our operations in the West Bank.

30.    In addition to HLF's work in Palestine, HLF has engaged in charitable relief work in other parts of the world.  From my memory (we do not have our documents), I recall the following:  In 1992, we made a donation to the victims of the Los Angeles riots to help them rebuild.  In 1993 or 1994, there were floods in Idaho, and we worked with the Islamic Association of North Texas to send truckloads of supplies to the victims of those floods. In 1994-95, we raised money for relief in Bosnia.  I went there and helped to deliver the truckloads of clothing and medical supplies, working through a German relief organization.  In 1995, we raised funds for the victims of the Oklahoma City bombing.  We also held a blood drive in Dallas for the Oklahoma City bombing.  We sent fifty volunteers to work in Oklahoma City, to relieve the members of the Oklahoma church groups who had been working on site.  We sent representatives to the memorial services conducted by President Clinton.  In the same year, HLF co-founded a Dallas coalition of relief organizations called Volunteer Organizations Acting in Disasters ("VOAID").  HLF served as vice-president of this coalition.  The coalition included local Red Cross chapters, the local Salvation Army and other Dallas charities.  Its purpose was to coordinate volunteer relief efforts in the event of a disaster in the Dallas area.  Shortly thereafter, HLF started a homeless food program in the Dallas area and a food pantry in Patterson, New Jersey among other community outreach programs.  The food pantry program in Patterson had been serving over 400 families in the Patterson area.  As a result of the blocking order, these programs do not functions.

In 1997, there was enormous suffering in Kosovo.  We raised money in this country to help, finally raising enough money to purchase two mobile clinics, and worked with local groups

(ultimately in Albania) to staff them. We also purchased and delivered a mobile bakery unit and hired a baker to run the bakery, that produced 8000 loaves of bread per day for the Kosovo refugees in Albania. We also purchased one thousand tons of flour from Turkey and worked with the Dutch Army to unload the flour for delivery to the bakery and to the World Food Program of the U.N., working through United Nations High Commissioner for Refugees. We also worked through an Islamic relief charity, were appointed to the NO Coalition of charities working in Albania to provide relief, and worked through a prominent American, faith-based charity.

In 1997, we sent volunteers and supplies to Dover City, Oklahoma where a tornado had struck. Twenty-five volunteers, with three u-haul trucks loaded with supplies made the journey. We recruited many teenagers for this project because HLF feels that it is important to introduce young people to the idea of helping others.

From 1994 through 2000, we provided college scholarships in the amount of about $1,500-$2,000 annually to the DFW/ABC (an association for Black communicators). We have provided support to the Africa Care Academy in Dallas, Texas (1998-2001). We have given funds to Islamic community schools throughout the United States for scholarships and support. We have given funds to educational and civil rights advocacy groups in the U.S. such as the Brighter Horizons Academy TX, Mothers against Drunk Driving, TX, the Arab Anti-Discrimination Committee, American Muslim Trust and other groups. These funds are all now cut off to these organizations and potential scholarship recipients as a result of the blocking order.

When the Chechnia situation worsened in 1998 or 1999, we provided emergency relief to refugees in Georgia, principally food distribution. The efforts in Chechnia and in Eastern

18

Europe have been headed by Dalell Mohmed, our Emergency Relief Coordinator.

In 1999, a devastating earthquake occurred in Turkey. HLF supplied hot meals to hundreds of people every day, three meals per day. We worked closely through International Blue Crescent, a prominent Turkish relief organization which had also worked with us in Kosovo and Chechnia. We also worked with the Turkish foreign ministry and received an award from the Turkish government as a result of having been the only non-governmental organization providing this type of relief service.

In 2000, there was an earthquake in India, and we raised money which we sent to an Islamic group in India to assist with relief. We also provided money for relief in Mozambique following floods there. I do not recall what agency or organization we worked through.

In 2000, there was a disastrous tornado in the Ft. Worth area, and we presented a check to the Red Cross ($10,000, as I recall) for use in the relief effort there. We presented the check to the Ft. Worth City Council.

In 2001, we raised money for the victims of the 9/11 disaster (about $30,000). Our check for a partial payment of $10,000 was ready to be delivered to the Red Cross, but is now in the possession of the FBI after they swept our office on Dec. 4, 2001. We also had raised funds for victims of hate crimes, and for vandalized mosques. In this connection, we gave about $2,500 to the family of a Pakistani man who was shot dead following the 9/11 events, and we gave $5,000 to repair a mosque that had been the target of gunfire following those events. We also set aside a $1,000,000 endowment fund for college scholarships for Arab and Muslim- American college students. We planned to provide scholarships for 15 students per year with these funds (13 undergraduate and 2 graduate), starting summer 2002. These funds are subject to the blocking order.

19

31.    **The Watson Memorandum.**

I have reviewed the "Watson Memo" that contains a series of factual allegations that purport to show that HLF is essentially a fund-raising organization for Hamas, a terrorist organization. The memo also identifies me as a member of Hamas and contains a series of points that purportedly demonstrate a connection between HLF and Hamas. It would take many more pages to systematically rebut the allegations in the memorandum. I am prepared to testify about any of them. Since the memorandum does not, as far as I can tell, rely on any sworn testimony by anyone, I will respond to it only with the following general statements:

A. I am not now, nor have I ever been a member of, much less an official, of Hamas. As far as I know, no one has ever identified me as an official of Hamas. As I stated earlier in this declaration, I reject Hamas's goals and tactics. It is my belief that Arabs and Jews will ultimately be able to live peacefully, side-by-side in the Holy Land.

The blocked funds are all owned by HLF, a California corporation. Hamas has no interest in the funds that OFAC has blocked and HLF does not now act on behalf of Hamas and has never acted on behalf of Hamas. No foreign national or foreign government has an interest in HLF's blocked funds.

B. To my knowledge, no employee of HLF supports Hamas or is a member of Hamas.

C. I do not recall attending any meeting at which anyone suggested that HLF be used to raise funds for Hamas.

D. No HLF money has been paid to Hamas or to anyone or any entity purporting to be an agent or branch of Hamas. I have not stated at any meeting that the monies raised by HLF were for Hamas' terrorists or that the funds raised by HLF were "dollars for Hamas" as the

20

Watson memo alleges at pages 46-47.

   E.  To my knowledge, no HLF money has been channeled preferentially to the families of Hamas activists, to the families of terrorists or to the families of suicide bombers.  I cannot deny that HLF's policy of distributing charity to the needy without regard to politics, race or religion may have  resulted in incidental support to a needy family that may have a member who has supported Hamas or may even have committed a terrorist act.  Such a connection would not be known to HLF, however.  Furthermore, it is HLF's approach to charity that results in HLF's provision of support to Christian families in Palestine and to the families of persons murdered by Hamas as a result of allegations that those persons were spies for the Israeli government.

   F.  The 1993 "Philadelphia" meeting was a meeting of Islamic intellectuals, academicians, community leaders and representatives of American Islamic organizations, such as ours.  It was not a meeting of any organization.  No decisions were made by any organization about anything.  Everyone there spoke their minds.

  The Watson memo makes an issue out of some people's use of the word "Samah" at this meeting.  This word, translated into phonetic English, is "Hamas" spelled backward.  Some people at the meeting spoke of Hamas openly and there was no reason for them not to, since Hamas' role in Palestine was a natural subject of discussion, and Hamas was not a banned organization at that time.  The use of the word "Samah" was a whimsical and ironic play on words.  "Samah" means "forgiveness" in Arabic, and, in my opinion, those who used the term were making ironic fun of Hamas, not adopting a secret term to disguise their references to the organization.  Some people at the meeting also referred to the "The Movement."  I do not believe that anyone who used this term was referring to Hamas.  Rather, I understood them to refer to

the general effort by Palestinian and Muslim intellectuals to support the Palestinian cause.

G. **Support for Exiles to Lebanon:** In December, 1992, Israel deported over 400 Palestinian activists, from West Bank and Gaza into Lebanon. These people were not accused of being terrorists, they were accused of being "Hamas activists," but they were doctors, lawyers, professors, imams and the like and we were aware, from news reports, that these were educated Palestinians who had objected to Israel's conduct toward Palestine. Israel simply physically rounded them up and dropped them, en masse, in Marj ElZahour, a no-man's land between northern Israel and Lebanon and left there with orders not to return. It was winter. They were left there with no shelter, no clothing, no belongings and no food. The United Nations and a number of charities rushed in to provide aid to these people. The Holy Land Foundation provided relief also, and was one of about twenty international charities, along with the United Nations, providing relief to these people. The United Nations called upon Israel to immediately allow these people to return home. After a year in this no-man's land, in December, 1993, Israel acceded to the international pressure and allowed these people to return. To my knowledge, none of them was ever charged with any crime. To say that HLF's small role in sustaining these peoples' lives demonstrates support for Hamas or for terrorism is not credible. As to the families of the deportees, we provided our assistance through the Islamic Relief Agency ("IRA") which, at the time (and for years thereafter) was the leading Israeli-Palestinian charity, which was the only charity, so far as I know, that was licensed by the Israeli government to deliver aid under any circumstances. Some of the families of the exiles were in desperate financial straits and some were not. We provided support, through sponsorship by American Muslims, to those families of the exiles that were in a really bad way.

H. I was not aware, nor am I aware now, that Dr. Akram Harubi holds some sort

22

of position in Hamas.   I understood him to be an academician, had no idea that he had any connection with Hamas, and find it hard to believe now.

I. It is correct that the Palestinian Authority closed NGO in Gaza in September, 1997 and that HLF was one of them.  Some of them were accused by the P/A of being connected with Hamas through their boards.  Within a few weeks, the P/A told us that we could reopen because its representatives had satisfied themselves that HLF was "transparent" and "non-allied."  Since then, we have had a completely smooth relationship with the Palestinian Authority.   I cannot help but note that the Watson memorandum refers to the Israeli government's version of this event, and does not include the Palestinian Authority documents relating to this incident, which explain it fully.

J. HLF has repeatedly sought meetings with U.S. government agencies to assure them that HLF was not doing anything improper and to answer any concerns they might have.  In most instances, the agencies ignored these requests.  When meetings did occur, the government agencies expressed no concerns about HLF's operations.  At all times, HLF has offered to and has been prepared to make available every aspect of its operations for review by the federal government.

K. In my opinion, if HLF continues to be shut down much longer its ability to revive and again carry out its charitable work will be at least severely compromised and probably destroyed.  In addition to depriving the HLF employees in Palestine of their livelihoods, the OFAC's blocking order has deprived me and other American employees of HLF of our livelihoods.  My medical insurance has lapsed and this has compromised my ability to care for my family, including my daughter Sanabel, whose medical problems I have described above.  Until last week, for about a month, Sanabel has been without her needed medication for

23

treatment of salesthemia.  She is now receiving it through the C.H.I.P.S. program.  Coverage under this program did not begin until recently and I therefore am now saddled with all of the medical bills that we had to incur after the insurance lapsed and before the CHIPS program began.  My creditors call me every day.  I used to have impeccable credit and it is now subject to be destroyed.  I know that HLF's employees have been unable to obtain employment in the Dallas area because of the notoriety about HLF's legal problems.  I have become so frantic about the situation that I face as a result of the notoriety about the blocking order and the Watson memo that I have even contemplated changing my name.  In short, the blocking order has put me and all other HLF employees in a state of severe personal and financial crisis.  Our retirement funds are blocked and so even this "safety net" has been eliminated.  I recently advertised my living room and dining room furniture for sale, along with one of my cars.  So far, I have had no buyers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 4th day of April, 2002.

Shukri Abu-Baker



IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) ) | No. 1:02CV00442 (Judge Kessler) |
| JOHN ASHCROFT, in his official capacity as Attorney General of the United States, <u>et al</u>., ) ) ) ) | |
| Defendants. ) ) | |

DECLARATION OF DALELL D. MOHMED

    1. My name is Dalell D. Mohmed.  I hold a Bachelor of Arts degree in Political Science and a Master of Arts degree in International Relations.  I first became aware of the Holy Land Foundation for Relief and Development (HLF) in 1996 after reading an article in the local newspaper in Dallas, Texas, about HLF and its work with the Palestinian refugees.  I investigated its work and learned that HLF was doing much needed work around the world.  From that day I became a donor.

    2. I went to work for the HLF in April, 1999,  at the height of the war in Kosovo. The HLF was conducting a campaign to bring emergency relief to the victims who had been cleansed from their land in Kosovo.  At that time, the President of HLF, Shukri Abu Baker, asked me if I wanted to go to Albania for the foundation and implement a relief program.  This experience was a turning point in my life. I am deeply grateful to Shukri and the donors for giving me this opportunity.

FILED
JUN 2 8 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EXHIBIT
2

1

1:02CV00442(GK)

3. My primary work for HLF was in the capacity of Emergency Relief Coordinator. I also held a number of other positions, including Director of Communications, and legal liaison. HLF was, and remains, a place I was most proud to work for. This Foundation, as represented by Shukri Abu Baker, the President, gave me the gift of a lifetime: the ability to give of myself to those in need.

4. On December 4, 2001, that gift was stripped away from me along with the very foundations of my life and those of the thousands of beneficiaries we cared for daily. To this day, a void has been left in my life both emotionally and financially.

**Albania:**

5. The HLF raised close to $1million for the relief of the Kosovars, and in April, 1999, I was given the task of distributing relief to these victims. What began as a two-week assignment, turned into three months. It was the most rewarding experience of my life to date.

6. I purchased two mobile clinics in Germany, a mobile bakery and 1,000 tons of wheat flour in Turkey. Logistically, it was a feat in itself getting these items to Albania where 800,000 Kosovars had fled to escape the horrors of rape, murder, and pillage of their land. In every country I visited to purchase these items, people were very generous knowing that I represented American Muslims who were concerned with the plight of these victims of ethnic cleansing. In the spirit of humanitarianism, what would normally be a business transaction became a mission of mercy to these businessmen.

7. Upon arrival, I first met with acting Ambassador Robert Cekuta at the U. S. embassy in Tirana, Albania. He was most courteous and prepared to help in any way. Ambassador Cekuta introduced me to Ronald Libby who was the representative of

USAID for disaster assistance.  He offered me any help I would need, provided me with the current situation on the ground and told me how best to work unimpeded.

8. From there I went to NATO headquarters for logistical assistance.  I was put in contact with a Major from the Royal Dutch Army logistical unit, as well as the Royal Dutch Marines.  For the next three months they were at my disposal.  They assisted me in transporting a bakery from a warehouse to a refugee camp and transporting 1,000 tons of flour from the ship to warehouses and refugee camps.

9. Much of the work of the HLF in Albania consisted of my traveling to the various camps throughout Albania learning what was needed and making spot decisions to fulfill requests.  The United Nations World Food Program (UNWFP) as represented by John Murray, Senior Emergency Coordinator for Albania, knowing that we were a foundation without a bureaucracy and I was capable of making decisions on my own, requested that the HLF place the mobile bakery in what was termed the American Refugee camp to service the needs of 10,000 refugees.  Working alongside Catholic Charities, Samaritan's Purse, and the Salvation Army, HLF was given the task of providing bread for 10,000 refugees daily.

10. HLF donors, through me, hired a Turkish baker in Istanbul and transported him to Albania to work the bakery and ensure its continuance.  This individual knew we were an American Muslim charity and was so proud to be a part of this mission that his only request was a tent near the bakery so he could make sure no harm would come to the operation.

11. HLF became known as the foundation that could get the job done.  Therefore, when the United Nations High Commissioner for Refugees (UNHCR) or UNWFP was in

need of something such as juice in a camp, they frequently called me. We all worked with the vision of caring for these victims and doing all within our power to make this horrendous time in history less so for them, if possible.

12. After the signing of the peace accord, the Kosovars were repatriated and HLF continued its work in Kosovo, repositioning the bakery in the city center of Pristina in the hands of local Kosovars who could make a modest income while at the same time providing bread at a reduced cost, and in some instances no cost at all. One of the mobile clinics was positioned at the only hospital in the city of Vitia, near Camp Bondsteel, the American base. It was due to this base that HLF chose the location because the clinic clearly indicated "U.S.A." on the vehicle. We hoped this would make our troops feel proud that an American NGO had donated this vehicle.

**Turkey:**

13. When the earthquake struck in Turkey in August of 1999, with loss of life estimated at 18,000, HLF was the first American NGO on the ground within two days. Before our departure, OEC Medical Equipment heard of our appeal and donated four mobile x-ray units to the HLF for the victims, along with forty tons of medical equipment and supplies. Broadline Medical Supplies donated ten tons of disposable surgical items knowing that we were on the ground. As is the American nature, truck drivers from across the country volunteered to transport the medical equipment across country to airports in New York and Miami where Turkish Airways provided free freight service.

14. Upon arrival, again, knowing we were an American Muslim charity, all the Turkish people were so thankful for our work. Dr. Fatih Evren, President, and Dr. Ertan Gonen, Vice President, of the Turkish Red Crescent, held a special meeting in the

presence of the media to personally thank the HLF, with various members of parliament present. The chairman of the Democratic Party in Turkey stayed by my side to ensure my work was unimpeded.

15. On behalf of HLF, I assessed and determined the immediate need was food. Because entire cities were reduced to rubble, people were living in the streets while the weather was wet and cold without any of the necessities for cooking. HLF set up four mobile hot food kitchens, feeding approximately 6,000-8,000 people a day within four days of my being on the ground. As Turkey is a Muslim country, it was especially important that HLF was an American Muslim foundation. Numerous Turkish nationals volunteered and worked alongside me sometimes in excess of 18-hour days.

16. HLF worked alongside the Turkish Red Crescent and the International Federation of the Red Cross, Red Crescent Societies (IFRC) setting up mobile x-ray units in camps that begin to spring up around the devastated areas. To ensure correct and efficient use of the machines, HLF sponsored a technician to travel from Utah for the initial set up of the machines and brief instruction for the attending physicians. Additionally, the medical equipment was distributed throughout the disaster areas where makeshift hospitals sprung up on street corners and in the parking lots of universities.

17. The outpouring from our donors was tremendous. Not only the traditional HLF donors came forward, but also numerous non-Muslim donors concerned with the tragedy that continued to increase the number of missing and dead daily. Being the first US NGO on the ground we witnessed an outpouring from the non-Muslim American populace that created a unity common in our country at that time.

18. During the month of Ramadan that followed right after the earthquake, HLF continued working with those victims who remained homeless, providing hot meals throughout the entire month of fasting. Also, for the schools that suffered total destruction, HLF, with the United Nations International Children's Emergency Fund (UNICEF), built computer labs for the students to continue their studies in makeshift labs.

**Oklahoma:**

19. In August of 1999, while I was in Turkey working with the victims of the earthquake, a tornado ripped through Oklahoma leaving devastation in its path. I learned that HLF employees, along with a group of volunteers, loaded up a U-haul truck and traveled to the region to lend a hand with the clean up effort. The governor of Oklahoma sent a letter of gratitude thanking the foundation for its work and its commitment to caring. This was HLF's second time to Oklahoma, as the foundation traveled to Oklahoma City to render assistance during the Murrah Federal Building tragedy, as was evidenced by a Certificate of Appreciation and a letter from the governor thanking the Foundation. This certificate is now in the possession of OFAC.

**New Jersey:**

20. HLF operated a food pantry in Patterson, New Jersey that served over 300 families. This food pantry provided clothing and food. The indigent families in that community had a place where they could feed their families, often based on religiously mandated diets. HLF worked in cooperation with the Passaic County Food Bank, filling a void for needy Americans.

**Fort Worth, TX:**

21.  As a member of Voluntary Organizations Active in Disaster (VOAID) in North Texas, when a tornado ripped through our neighboring city of Fort Worth in March 2000, HLF responded through a donation to the local chapter of the Red Cross.  The Red Cross came to the HLF offices and presented Shukri, the President, with a plaque for his contribution and humanitarianism.  This is now in the possession of OFAC, as are all letters of appreciation and certificates of humanitarianism that the HLF has received for its work as a result of the floods in Iowa and the riots in Los Angeles.  The Foundation has also received letters of appreciation for its scholarship assistance for minority Americans.

**Chechnya:**

22. As the war ravaged Chechnya in April, 2000, and 400,000 people fled into neighboring Ingushetia, numerous NGOs traveled there to provide assistance.  Our operations focused on the region of Ahmeti consisting of the villages of Duisi, Omalo, and Jokolo in the Pankisi Valley in neighboring Georgia.  These three villages combined have a displaced Chechen population of 1700 families or approximately 10,500 refugees consisting of approximately 85% women, children and elderly.

23. The Ahmeti region is historically a Chechen region with a sparse population of Chechens who actually live there amongst deserted barracks from the former Soviet times.  The State of Georgia allowed the Chechens who fled the war in Chechnya to enter this region and occupy the vacant buildings that have no electricity or running water, but are being currently rehabilitated by the refugees themselves with the help of UNHCR.

24. The refugees in the Ahmeti region arrived with only the clothing on their backs, similar to the Kosovars in Albania. One elderly woman told me that a gold Quran pendent she was wearing around her neck was ripped off because she refused to part with it. She told me she was beaten and insisted on showing me the swelling and marking. I will not forget her, because when she found out I was American, she cried and held me so close repeating Allah has finally sent the Americans. The situation in Ahmeti was far worse than Albania in that no relief agencies or NGOs were in the region providing support other than UNHCR and IFRC. The Chechens were operating two medical clinics with support from Medecins Sans Frontieres (MSF) and Medecins du Monde (MDM). These clinics were in dire need of almost everything, from examination equipment to medicines, but were staffed entirely by the Chechens, mostly women.

25. Almost everyone I spoke with had lost one or more family members, with others still trapped in Chechnya, mostly the elderly who remained hidden in cellars in Grozny. Many of the Chechens were trapped in the mountains trying to enter the Georgian side, but due to the fighting they were unable to make the complete journey.

26. HLF focused on these people along with those in the Ahmeti region. Working alongside UNHCR, HLF provided food and hygiene products to over 1000 families. Purchasing the food in Tbilisi proper provided economic enhancement to a very poverty-stricken Georgian society prompting many of the vendors to offer their services to HLF and volunteer to transport the goods at reduced rates.

27. UNHCR Georgia also requested our help during the month of Ramadan that same year, and HLF fed some 7,000 refugees there for the entire month.

**Palestine:**

28. Although the HLF had ongoing programs and projects in the occupied territories, as well as the refugee camps in Jordan and Lebanon, it was not until December 2000 and January 2001 that I took my first trip to the region. Prior to this trip, the Intifada 2000 began and HLF responded to the humanitarian crisis providing food, medical care, and household items for those victims whose homes were demolished by the Government of Israel (GOI).

29. For my first trip to the region, an American NGO, Wheel Chair Foundation, accompanied me, along with ten American volunteer physical therapists and occupational therapists, all on board to distribute 700 wheel chairs to the indigent handicapped in Gaza.

30. Based on need and the roster of the handicapped society as headed by Dr. Sameer Abu Jayyab, handicapped adults literally crawled to the distribution center to receive their first wheel chair in life. The elderly carried their handicapped adult children in their arms to receive their first wheel chair in life. Just as in all the countries I had the opportunity to work in the people in Gazaq expressed overwhelming gratitude towards us as Americans. The custom of the region is to bring a gift in gratitude for our work. As these people are refugees, they could only bring what they grew with their hands--fruits and vegetables.

31. HLF had offices in Gaza and the West Bank fully staffed with social workers and relief coordinators. Our work was well known and respected throughout the region, having worked alongside United Nations Relief and Works Agency for the Palestinian Refugees (UNRWA), UNWFP, and various NGOs in the region. Because they knew of our work on behalf of the families in Palestine, members of the Palestine National

Authority (PNA) welcomed me to their offices and homes for dinner and showered me with gifts.

32. The HLF is not connected with Hamas in any way. I personally do not condone any terrorist acts and would not have worked for HLF if I thought the Foundation supported terrorist acts. Moreover, at no juncture did the PNA or the GOI accuse me or question me about being a party to Hamas activities. All of our employees in Gaza and the West Bank were concerned with the welfare of the beneficiaries and how best to meet their needs. I witnessed how our operations were conducted in regards to orphan and needy family sponsorship. I considered this work to be highly efficient and worthy of praise due to the transparency of the program.

33. In the Gaza Strip, perhaps the most critical need is that of aid to the children. While our children here in the US play with Barney and watch Sesame Street, the children of Gaza play with spent bullets in the sand and watch armored vehicles destroy their homes. The work of the HLF was instrumental in providing hope for these children and thereby preventing them from repeating a brutal cycle of violence that has claimed the lives of their family and friends.

34. I had the opportunity to meet many of the orphans we cared for in Gaza and what was evident was that our sponsorship program motivated these children to stay in school and make good grades. Even through the misery and suffering that surrounded their daily lives, human dignity, innocence and compassion shined through the eyes of these little souls. I saw that our sponsored children remained optimistic because they knew someone cared about their existence. Someone in "America" wanted them to beat the odds and they lived each day accordingly.

35.  In Hebron, HLF built a state of the art library with funds provided by a donor in the name of his deceased wife.  This library was one of several planned in the coming years throughout the West Bank.  Equipped with a computer lab, language lab, and several librarians and instructors, both students and adults utilized the facilities for school and personal growth.  Many of the young students I spoke with while there emphasized the tremendous void this facility filled so they could maintain their studies.  They expressed their sincere gratitude to the "Americans" who helped fund this facility.

36.  When I returned to Palestine in May of 2001, I was assigned to deliver ten ambulances to the West Bank and Gaza. The beneficiaries were chosen based on need, as many hospitals were unprepared for the thousands of injuries and deaths that had occurred since the start of the Intifada.  The ambulances were purchased the year before in October of 2000, after a fund-raising campaign across the United States one month after the Intifada had begun.

37.  It was not until May that our ambulances were released from customs, which is controlled by the GOI, as is movement of all humanitarian goods. What was critical about these new vehicles was the fact that many of the existing ambulances had been destroyed, along with the drivers, and in some cases doctors, since the start of the Intifada.  I personally gave the keys of the vehicles to the recipients:  directors of hospitals, mayors of cities, and deputy ministers of health.  The mayor of Tulkarem told me with tears in his eyes how grateful he was to know that America had not abandoned him; it was only the day before that his town lost the only ambulance it had, along with the driver, who was killed.

38.  In addition to delivering ambulances in the West Bank, I traveled to Gaza to assist in the distribution of household items to people whose homes had been demolished. The UN and the International Federation of the Red Cross and Red Crescent Society (IFRC) provided tents for these people, while we, HLF, built toilets, water tanks, provided blankets, mattresses, stoves, pots, pans, and household items.  This is the void the HLF filled.  It was our mission to do all within our power to provide for these children and families and work towards a future of peace for them.

39.  In October of 2001, I returned to Gaza and the West Bank to deliver 500 more wheel chairs.  It had been almost a year since my last distribution of wheel chairs. The head of the handicapped society, Dr. Sameer Abu Jayyab, told me that with the 750 wheel chairs delivered at the beginning of the year, along with these 500, he would need another 4,000 just to meet the new generation of handicapped as a result of the Intifada. Our beneficiaries were chosen based on Dr. Abu Jayyab's records of handicapped and their needs, as in the previous distribution.  The number of children in need of chairs was very disturbing.  It was our job to cheer them up while teaching them how to use their new feet with a sense of dignity.

40.  Again on this trip, I visited the victims of demolished homes.  Our work with the demolitions was based on the work of the UN and IFRC.  The same scenario applied whereby those organizations would provide the tents and HLF would provide everything else. The situation deteriorated with each visit.  Our work in the region was greatly needed and provided that glimmer of hope so lacking in the lives of so many in the refugee camps.

**Mozambique:**

41. When the floods in Mozambique struck in February, 2001, HLF responded with monetary donations to UNWFP. Having worked with UNWEP in Albania, the Board of Directors of HLF believed UNWEP were best equipped to distribute the food as needed. UNWFP responded with pictures of the distribution as well as a letter of gratitude to our continued humanitarianism.

**Sarajevo:**

42. In April of 2001, I arranged for the delivery of 250 wheel chairs to the victims of the Bosnian war. In conjunction with NATO, the Wheel Chair Foundation, and the IFRC, HLF selected the recipients based on the minister of war, Sead Gajevic's, roster as well as the handicapped society in Sarajevo Canton. HLF also delivered wheel chairs to the Sarajevo emergency centers, working directly with the Chief Operating Officer, Dr. Mullahmovic. At the distribution, Ambassador Kline with the US embassy was present and thanked the HLF for its work of bringing mobility to the Bosnians and building a future based on cooperation.

**Lebanon:**

43. In June of 2001, on behalf of HLF, I traveled to Lebanon to distribute 500 wheel chairs to the indigent handicapped, including orphaned Lebanese and refugees in the camps. Our beneficiaries were chosen based on need, working with the various handicapped societies in the country. Our first distribution was held in Beirut with the presence of the First Lady Lahoud and various members of Parliament who thanked us for coming to the aid of the indigent handicapped, mostly children.

44. I learned that many of these children had never had proper wheel chairs and were developing spinal curvatures due to the lack of adequate seating. In each region of

Lebanon to which we traveled we discovered that we needed many more chairs and determined that we would return to the region the following year.

45.  While in Lebanon, I had the opportunity to visit the clinic HLF built in the Ein el-Hilwa refugee camp, the largest in the refugee world.  This clinic was fully equipped with doctors and nurses, all from the camp, who saw patients daily.  Everyone wanted to meet me and thank me for the work our Foundation has done for these people.

46.  I visited with orphans who we sponsored in Lebanon, with one group standing out particularly.  It was a family of four children whose mother had deserted them and their father was deceased.  HLF provided a home for them, paid for a woman to cook their meals and care for them, and tuition to attend school.  I met the oldest girl who was a teenager.  She cried when she met me and was so thankful for our work.

47.  HLF operates a grocery store in Lebanon that is self-sufficient.  The refugees can purchase their goods at the store for a reduced amount.  The refugees also produce some of the food sold in the store so it operates as a micro-enterprise, providing much needed income.

**India:**

48.  When the earthquake struck the Gujaret region of India in January, 2001, I coordinated HLF's response with International Blue Crescent, a Turkish NGO.  Through a contract with them, HLF donated $100,000 in relief to the victims.  Distributing food and water, we chose our recipients in the far off areas where the victims were considered of a lower caste and therefore not top priority.  Our implementation team from Turkey reported back with pictures and text with the unbelievable story of how these people had

never even seen packaged bread and rather than eat it, stored it as a novelty.   This project served 3000 victims a day for 28 days.

**September 11, 2001:**

49.  After the horrendous tragedy that struck our nation, HLF organized its donors and gave blood at the local Red Cross.  In addition, HLF raised funds for the victims of 9/11 and prepared a check in the amount of $10,000 that now sits in the custody of OFAC, rather than in the hands of the victims.  Finally, HLF worked in coordination with Dr. Healey of the Red Cross and numerous other organizations to counter the intolerance that was sweeping the nation.  Well-known actors volunteered their time to HLF to help make a Public Service Announcement decrying the hate crimes and calling for understanding.  These videos never made it to the airwaves and now sit in the custody of OFAC.

**Afghanistan:**

50.  As our President called on Americans to aid the Afghans in this time of war, HLF mobilized $90,000 for relief that was implemented by our Turkish partners, International Blue Crescent, in the northern sector of Afghanistan.  Even as our assets were being frozen here, our humanitarian work continued, feeding and providing heating devices to the refugees in the northern region of Afghanistan.

51. The HLF only did the work of humanitarians and was never affiliated with Hamas or any organization interested in the destruction of life.  With so many accusations, however, I did my own research to be certain that these allegations were false, as I am first and foremost a humanitarian and would never condone violence against another person.

52. I tried on numerous occasions to discuss the allegations with members of the government. By telephone, I personally contacted the offices of the Counter-terrorism Ambassador Michael Sheehan and Richard Hull with the State Department, requesting a meeting to discuss their removing HLF from the USAID listing. Although I called both offices on several occasions, no one from either office ever returned my calls.

53. Our attorney, Mark MacDougall, and I met with Jim Jacks, an Assistant U.S. Attorney for the Northern District of Texas in August 2001. At the meeting, Mark told him that HLF had nothing to hide and would cooperate in any investigation. Mr. Jacks did not raise any concerns about the Foundation.

54. I will repeat this over and over again: the HLF does not now nor has it ever had ties to any organization that would cause harm to any living being either directly or indirectly. We were in the business of preserving life, not destroying it. So many people relied on our work for their daily sustenance, education, medical care, and development. The freezing of the Foundation's assets prevents these families and children from eating, attending school, and receiving proper medical attention.

55. This action has also completely disrupted the lives of many Americans. The employees of the Foundation, myself included, have been rendered unemployed and unemployable, and have had our savings frozen, along with our last paycheck. No one will hire me or the other HLF employees. As a result I have had to borrow money from my family to pay my bills and I will have to file bankruptcy. Our health insurance was cancelled and we were denied COBRA; therefore, none of the employees or their families has any health insurance at this time. I know that some of the employees have had to sell household furnishings and automobiles to live and support their families. At this time we

do not know whether we will ever get the profit sharing we have voluntarily contributed to during our employment at HLF.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 3/28, 2002.

Dalell D. Mohmed



IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

THE HOLY LAND FOUNDATION FOR )
RELIEF AND DEVELOPMENT, )
)
Plaintiff, )
)
v. )                    No.  1:02CV00442
)                    (Judge Kessler)
JOHN ASHCROFT, in his official )
capacity as Attorney General of )
the United States, et al., )
)
Defendants )
)

## DECLARATION OF MOHAMMED ABUMOHARRAM

1.      My name is Mohammed Abumoharram.  I live in Shakhradwan,
Gaza, Palestine.  I am 46 years old and married.  My wife and I have four
daughters and two sons.  I was born in Gaza, Palestine and received a degree in
nursing in 1978 from the Baptist Hospital in Gaza.  I pursued a career in nursing
and received an advanced, baccalaureate degree in nursing from the Islamic
University in Palestine in 1994.  I am fluent in English.

2.      Since 1998, I have been employed by the Holy Land Foundation
("HLF") in Gaza.  I went to work for the HLF in 1998 as a social worker.  At that
time, I worked part time for HLF and part-time for the Ministry of Health of the
Palestinian Authority, the governing authority of Palestine.  In 1999, HLF
offered me the position of office manager of the HLF office in Gaza and I hold
that position today, although I currently receive no salary as a result of the



1

1:02CV00442(GK)

EXHIBIT

3

blocking of HLF funds in the United States.  The HLF office in Gaza is one of

four that HLF maintains in Palestine.  The others are located in Hebron, Ramalla

and Jenin.

3.    Including me, HLF has had seven employees in Gaza, all of whom

were headquartered at HLF's office.  Besides me, HLF's employees have

consisted of two social workers, one secretary, two program coordinators and

one assistant/driver.  Since December, 2001, because of the U.S. blocking order,

none of us has been receiving any salary.   All of us are unemployed.  HLF's

seven employees all have families and their HLF salaries provided principal or

sole support for approximately thirty family members in addition to the

employees themselves. The other six employees must all seek work elsewhere,

which they are doing, because they need to support their families. I and, I

believe, all of the other employees would much prefer to continue our work for

HLF than find work elsewhere, but we do not know when, if ever, HLF's funds

will be freed.   None of HLF's employees has been successful in finding other

work, however, because any job in Gaza is very difficult to find, particularly in

the present situation, which includes frequent military action by the Israeli army

within Gaza.

4.    In addition to being unable to pay its employees, HLF is also unable

to continue its charitable work as a result of the blocking order.  Before the

blocking order, and while the office was still functioning, my over-all

responsibility as HLF's office manager in Gaza was to supervise the charitable

work and programs of the HLF in Gaza, to supervise the six other employees and to supervise the day-to-day functioning of our office

5.    <u>Alleged Connection Between HLF and Hamas</u>.   I am aware that the blocking order is the result of a belief on the part of the United States government that HLF is somehow connected with the terrorist organization Hamas and that HLF in some way provides funds or support to Hamas.  This is simply untrue.   First, speaking for myself, I oppose terrorist activities of any sort, including Hamas' promotion of suicide bombings in Israel.  I believe that HLF's other employees feel the same way that I do, based on my conversations with them over the years of our work together.  I would not work for an organization that supports Hamas and I do not believe any of the HLF employees that I know would do so either.

Second, I know and I believe every employee of HLF knows, that HLF support for  Hamas would be catastrophic for HLF and its charitable activities. In addition to opposing Hamas' activities on moral grounds, I am fully aware of the attitude of both the Israeli and American governments toward Hamas and I consequently know that an association between this organization and Hamas would have the effect of destroying HLF and eliminating its extremely important charitable work in Palestine.   I believe that all of the other HLF employees I have worked with feel the same way and have the same knowledge.   We all now know that even a false allegation of support for Hamas would be catastrophic.

Third, HLF in my experience has been vigilant in avoiding support for Hamas, for the very reasons described above. I believe that as I describe HLF's charitable activities in Gaza (which are the ones I am personally familiar with), this will become clear.

6.    <u>HLF's Charitable Activities</u>. HLF provides charitable assistance to people in Gaza and elsewhere.  I work in Gaza.  I know that HLF provides assistance to the poor based on need and without regard to religion or politics.  I know that HLF provides charitable assistance to impoverished Christian families in Gaza as well as to Islamic families.  I also know, for example, that among the people to whom HLF provides aid are families who have become fatherless because their fathers were suspected of acting as spies for Israel and were murdered by organizations such as Hamas.  While I cannot be absolutely certain that HLF has never provided assistance to the families of "suicide bombers," assistance to such families by HLF would be highly unlikely because the families of suicide bombers are, I believe, quite well taken care of by Hamas and do not need any help from HLF.

The following are descriptions of HLF's principal charitable activities in Gaza and how each is administered.  I am able to describe these activities in detail because I have been personally involved in their administration over the last three years.

A.    <u>School Uniforms and Supplies</u>.  Children wear uniforms to the schools in Palestine.  Many families cannot afford to buy them.  HLF provides

4

school uniforms to children who cannot afford them, along with some stationery supplies and book bags. HLF does this because it is an important element in HLF's effort to encourage children to stay in school and become educated. HLF believes that this is not only important for the children, but for the future of the Palestinian people and important to the goal of peace.

The determination of which families should receive this assistance is made by a committee consisting of one representative from the HLF, one from a local "Zakat Committee" of the Palestinian Authority's Ministry of Waqf and Religious Affairs and one representative from the Palestinian Authority's Ministry of Social Welfare. The list of potential recipients is supplied by the local Zakat Committee and other social service institutions. We rely on these organizations to supply the names of potential recipients because these are the organizations whose function includes knowing which families are needy, which families have school-age children, etc.

Once a list of needy, school-age children is approved by the HLF committee, HLF generates a coupon for each such child, with the child's name, family name and other identifying information included. The family then presents the coupon at a store to purchase the uniform and school supplies, and the store then obtains reimbursement from HLF by presenting the coupons to HLF.

In order to make sure that the recipients are genuinely needy, HLF's social workers conduct random checks of the families and children on the list of

5

recipients to verify that they are needy and are not receiving similar support from any other organizations.   It is HLF's policy to look in on, and verify the need of, approximately 20% of all recipients of this and the other aid it supplies to the needy in Palestine.

      B.   <u>Assistance to Orphans</u>.  The Islamic religion calls any child without a father an orphan.  There are many thousands of orphans in Palestine.  In my opinion, about 90% of them are "sponsored" by one organization or another.  The reason for this sponsorship of orphans is because charity to orphans is a religious tenet of the Islamic faith called "Kafalah" (which means "sponsorship").  HLF sponsors approximately 500 orphans in Gaza and many more than that in the West Bank.  This sponsorship takes the form of $45/month stipends, delivered every two-to-three months, to the orphan and what is left of his or her family. HLF is able to identify orphans for sponsorship because members of their families come to our office to apply for this assistance.  After they apply, we send a social worker to visit the family and prepare a report on the family.  We then send that report to HLF's office in Texas and the HLF office then tries to pair a donor with the particular orphan.   Although we know that some Palestinian orphans are sponsored by more than one agency, we will not sponsor orphans who have obtained sponsorship from any other organization.   I should add, in this connection, that any orphans who have obtained that status as a result of a "suicide bomber" do not need our assistance, for the reasons I described above.  To my knowledge, HLF has never been asked to sponsor the orphan of a

6

suicide bomber, and given the usual nature of suicide bombers (typically young, single men), it is unlikely that they would leave orphans.

In my experience, the extent and depth of poverty in Gaza is such that these small stipends to the 500 needy families that receive them are enormously important and are frequently the difference between a family's eating and not eating.   It is a small thing in a way, but it is absolutely critical to the families who receive the benefit.  The average income of families in Palestine is approximately $1200/year.  Our recipients are families that make significantly less than that.

C.    Eid Program:   The "Eid Feast" is a feast that takes place after the end of the month of Ramadan.  This feast, pronounced "Eed", lasts three days. Because of the poverty of many people in Gaza, many families are unable to buy clothes for their children that will enable the children to look "presentable."   It is very important emotionally for the children not to have to attend the Eid Feasts in ragged clothing.  HLF in Gaza has a committee of four members of HLF that has included me, two of our social workers and one other, who develop a list of needy children who need clothes for this occasion.  Of course, after the occasion, they still have the clothes that HLF purchases for them, so the clothes serve more than this limited purpose.  As with the coupons for the school uniforms, these purchases are facilitated by coupons (of $50 each) that HLF gives to the families, made out in the family's name, for the purchase of the childrens' clothes from local stores, which HLF then redeems from the shop owners.

7

D.     Food Parcels For Ramadan ("Zakat al Fitr"): During the month of Ramadan, Muslims are obliged to pay out Zakat Al Fitr, which is a form of religiously mandated charity to provide meals to the poor when they break their fasts at sundown on every day of Ramadan. This type of Zakat charity is a religious obligation of Muslims, mandated presently at the rate of $7-$10 per person in the United States ("the equivalent of one full meal" per person in the family of the giver) and it must be given by the last day of Ramadan. HLF collects Zakat Al Fitr contributions and purchases food packets with the money, to be distributed directly to the poor. These packets of food are intended to enable impoverished families to have a decent meal when they break their fast at sunset at the end of each day of the month of Ramadan, during which Muslims fast between sunrise and sunset. HLF gives out about 9000 such parcels each year in Gaza. The parcels consist of rice, lentils, cheese, jams, tinned meat, dried foods, cooking oil, tea, dates, traditional sweets, etc. The approval of the list of recipients, the approval of suppliers, selection of contents, etc. is decided by a committee. The committee is composed of the following: One member from HLF; one from United Nations Relief and Works Agency; one from the United Nations World Food Program; one from WAFA, a Palestinian Authority organization devoted to rehabilitation of disabled people, and one from the Social Welfare Ministry of the Palestinian Authority.

        This year, the cost of this project, in Gaza alone, was about $300,000, including administrative expenses. The company that we retained to

8

assemble the food packets, Abu Aker, provided them for Ramadan in 2001, but HLF only paid this company about half the amount owed.  Before HLF could pay the rest, HLF's funds were blocked.  As a result, Abu Aker has suffered a severe financial shortfall.  He needs to pay his suppliers for the contents of the packages, and he calls me every day, desperate to be paid, so he can pay the suppliers who provided the food for the packets.

      E.    <u>Udhia (or Zabiha) Program</u>: Seventy days after Ramadan, the season of Hadj begins and lasts for five days, after which Muslims celebrate another "Eid" (feast), the Eid Ul Adha (the Eid of Sacrifice).  During this feast, Muslims who can afford to, are required to sacrifice an animal such as a lamb, sheep or cow and are required to share the meat with the poor.  In recent times, Muslims who are not poor contribute money for someone else to purchase the animal, sacrifice it and share it with the poor.   HLF's contributors give HLF the dollar equivalent of a sheep (a little over $100) and HLF then buys the animal in Palestine, arranges its sacrifice and shares the meat with the poor.  No money is given to the poor.  It is given to poor families in the form of two kilos of meat per family.

      F.    <u>Assistance to University Students</u>.  HLF provides financial assistance to 100 university students in the West Bank and Gaza.  HLF was able to pay the stipends for the first semester, but has been unable to pay for the second semester as a result of the blocking order.  I am told that many of these

students have dropped out of university as a result.  They go to local universities, whose tuition is typically $500/semester.

G.   Family Sponsorship Program.  HLF sponsors 100 particularly impoverished families in Gaza. This program operates in the same way the orphan sponsorship program operates.  The stipend is $90/month ($100/month minus $10 administrative expenses of HLF).

H.   Student Sponsorship Program.   HLF sponsors 120 primary and secondary school students in Gaza. We say that this program is for "the poor and the smart."  HLF tries to identify gifted students and pays them a stipend of $35/month.  The students are required to maintain high grades in order to keep the stipend.  It gives a goal to many children to achieve high grades and to take their studies seriously in order to be rewarded.   Given the poverty of their families, they become highly motivated to excel in school and not to drop out.

I.   Miscellaneous Activities.  HLF has worked with the local offices of the United Nations and the Red Cross to supply aid to families whose homes have been demolished in the current intifada.  HLF has purchased furniture, appliances, kerosene heaters, mattresses, blankets, food, pots, cooking utensils, and other household items (up to $1000 per families).  HLF purchased one ambulance for Shifa Hospital in Gaza, for about $47,000.  That money was paid by HLF's West Bank office to a supplier in Jerusalem, Girrish Company, owned by an Israeli national.   I know that HLF purchased ambulances for Christian

10

hospitals in West Bank, Palestine. HLF has to my knowledge purchased eight ambulances in total from this same company.

J.    <u>Wheelchairs</u>.   Over the period of the nine or ten months before the blocking order, HLF purchased 700 wheelchairs for cripples in Gaza, working together with the Wheelchair Foundation, a United States-based organization that supplies wheelchairs to cripples all over the world.

K.    <u>Dar Es Salaam ("House of Peace") Hospital</u>: I understand that HLF contributed over $500,000, over a period of years, to establish the Dar Es Salaam Hospital in Gaza, beginning in the 1994-95 period. The hospital is currently fully functioning, having been brought to its current status in phases, over four or five years. I have no reason to believe that there is any connection between this hospital and Hamas or any other terrorist organization. It is certified by the Health Ministry and it is open to the public. It provides medical care to all, regardless of religion.

7.    Almost all of HLF's expenditures in Gaza go directly to the needy in the form of coupons of one sort or another which cannot be redeemed for cash and in direct payments to the orphans and the needy families. During my association with HLF, I have never known HLF to give money to a Zakat Committee. To the extent that HLF has provided funds to any institution during my tenure, HLF has done so in small amounts, on an emergency basis with the use of funds verified by HLF, such as donations to hospitals that are running out of medical supplies. We donated $10,000 to Emergency Account of the Ministry

11

of Health of the Palestinian Authority for an emergency purchase of medicine and medical supplies.  We donated $5000 to the El Ahli Hospital, which is a Christian Hospital in Gaza.  We donated $7000 to El Awda Hospital in Gaza, a hospital that is a Non-Governmental Organization that relies on charitable contributions from many sources, particularly European countries and various organizations.  We donated $10,000 to the International Red Crescent, which is similar to the Red Cross, for health services.  We donated $5000 to the Khanyounis Hospital in Gaza for medical supplies.  We gave $5000 to The Medical Relief Committee, operated by Dr. Mostafa Barghouti, who is well-known for his involvement in medical humanitarian work.  HLF granted a request from the P/A Ministry of Health for $10,000 needed in an emergency, to purchase medical supplies. HLF principally provides financial support to impoverished individuals with direct assistance, as described above.  HLF takes care to monitor, by random sampling of a significant percentage of its recipients, that its charitable funds are going to people who are genuinely needy.  HLF, its staff, and the members of the committees I have described above have no connection with Hamas as far as I know and I believe that I would know if there were any such connection.

    During the time I have been manager of the HLF Gaza office, I have had responsibility for paying out all of the money that comprises the charity that I described above, and I have absolutely no reason to believe that it did not go to the purpose intended.  For example, when the hospitals asked us to buy medical

supplies for them, we gave the hospital representatives our check when they presented the invoices for the supplies and the invoices were made out to HLF from the supplier.  The money HLF has paid out to orphans, to needy families, to merchants who redeem the coupons and the other activities described above goes directly to the beneficiary and not to any other organization.   HLF paid out no money to Hamas, to anyone for the support of Hamas, to any terrorist organization, to anyone for support of a terrorist organization, to support terror or anything of the sort.   Any accusations to the contrary are false.

8.     Gaza is divided into five Provinces.  Each province has "Zakat Committees." "Zakat," literally, is "poor-due."  It means something like "alms-giving" or "tithing."  Islamic people have a religious duty to pay 2.5% of their assets during a year to help the poor.  This is "Zakat." The Zakat Committees perform the oversight of charitable activities in their areas.  While HLF does not give money to Zakat Committees to distribute, HLF includes Zakat committee members on our committees from time to time and relies on Zakat committees to identify people who are genuinely impoverished and genuinely in need of HLF's help.  Most of the Zakat committees are administered by the Ministry of Waqf and Religious Affairs.  "Waqf" means money or property left by will, endowment or pledge to help the poor.  In Gaza, there is one Zakat that is not controlled by the Ministry of Waqf and Religious Affairs, but is instead controlled by the Ministry of Interior and the Security Department of the Palestinian Authority. There is no Zakat Committee in Gaza, to my knowledge, that is controlled or

13

influenced by Hamas.   I understand that HLF sent money to Zakat Committees

for charitable use before HLF opened its own office in Jerusalem in 1993, at

which time those Zakat Committees were under the direct supervision of the

government of Israel.

9.    I understand and I believe that every other HLF employee and

committee member understands that any connection with Hamas or any other

terrorist group would be devastating to HLF and would be contrary to HLF's

goal, which is to help the poor without regard to political or religious affiliation.

We always apply these principles, with one possible exception:  If I learned

that a list of people proposed to receive assistance from HLF included the family

of a suicide bomber or other type of terrorist, I would consider removing his

name from the list.  I would do so not because I believe that a poor ten-year-old

who has the misfortune to be the son of a terrorist does not need or deserve our

charity if he is hungry, but because I recognize that providing such aid would be

controversial and might compromise our charity.  However, I would also know

that if this orphan or poor family was the family of a suicide bomber, that family

would not need our help in particular and that assistance could be put to good

use by a poor family that was not controversial and that would not jeopardize our

programs. To my knowledge, this situation has never arisen.

10.    There are a number of other "NGOs" that operate in Gaza.  These are

"non-government organizations."  The Palestinian Authority frequently directs

new organizations to our offices to see how we conduct our affairs so that the

new organizations can understand how to spend and account for money in a way that is transparent and above reproach.

11.    The effect of the blocking of HLF's funds has been devastating to HLF because its ability to function and to maintain a staff and an active presence in Gaza (and elsewhere, I presume) has been destroyed.  More than that, however, the blocking of its funds has had a crushing effect on the people who have come to depend on HLF for food, for clothes, for education and for the necessities of their already impoverished lives.  I cannot possibly find the words to convey the level of poverty and suffering that exists in Palestine in general and in Gaza in particular.  HLF in the past has been able to significantly alleviate the suffering of thousands of people in Palestine, giving them some hope for a better life, and the effect of the blocking order has consequently been to significantly increase the suffering here and to lessen that hope.

I could give many examples of the effect this has had, but I know of three or four who are good examples. A man named Hamid El Hindy is paralyzed as a result of a stroke and is confined to a wheel chair.  He has one boy at University (whom HLF sponsors) and two more in school.  He has three girls in school. They now have no source of income whatever and are completely destitute without the assistance of HLF.  I saw the father recently.  He was going from charitable organization to charitable organization begging.  I have no idea whether he has been successful in his search, but I can safely say this: There are many more people here in dire need than there are "sponsorships" available from

15

the charitable organizations that operate here.   The loss of HLF's sponsorships, to the families that were receiving them, will be disastrous in many, many cases.

Another family that comes to mind is the family of Tuhfa Elkhouri.  Her husband died of natural causes some time ago. She has three daughters and two sons.  All are in school.  She has no income except from HLF.  HLF sponsors one of the boys and one of the girls as orphans, and one of the girls as a student. I believe that they receive no funds from any other charity.  Because this family is Christian, I believe it would be difficult for them to find help from many of the other charities that operate in Palestine and Gaza.  HLF is one of the few charities that seeks out Christian families because of our belief that everyone is entitled to help if they are suffering and that poor Christians may have a difficult time obtaining help.  The reason we go out to seek poor families (of any religion) is because many of the people in Palestine and Gaza are embarrassed by their poverty and reluctant to seek help.  They simply stay in their homes and suffer.

Another family that I know of is the family of Samira Mgat, who is divorced and is the mother of five children.  She apparently gets no support from her ex-husband and she and many of her children suffer from severe asthma.  As a result, they need medication regularly.  They get a "family sponsorship" that gives them $90/month on which to live. Without HLF help, I have no doubt that they are in a state of extreme misery.

The family of Inzihar Youssef also receives a family sponsorship.  The father, Inzihar Youssef, has grand mal epilepsy.  There are a total of 15 members

16

of the family, including 13 children.  They have been surviving on HLF's
$90/month family sponsorship.  I have no idea how they are surviving now.

12.     My family's home in Gaza is close to the police station.  It presently
has no windows because of the attacks on the police station by the Israeli army
whose stray bullets have riddled the houses nearby, including mine.  Similar
situations prevail all over Gaza. Given this situation, it is difficult for me to
travel anywhere or to communicate except by telephone or via the internet or
fax.  I would be prepared, however, to come to the United States to testify if that
can be arranged, or to give testimony, under oath, over the telephone.  I am
anxious to testify because the allegation that HLF is connected to Hamas is not
just false and a slander to our organization, the effect of that allegation has been
to demoralize us and to destroy, at least temporarily, our organization and the
work to which we have all dedicated ourselves over the years.  In my opinion, if
the blocking order is not lifted soon, we will be unable to resurrect our
organization, and many of the people who rely on the charity we have been able
to provide will be completely destitute.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 2 8 day of _____ March _____, 2002.

_____
Mohammed Abumoharram

28/3



Case 1:02-cv-00442-GK    Document 29-1    Filed 06/28/02    Page 65 of 359

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 1:02CV0044? (Judge Kessler) |
| JOHN ASHCROFT, in his official capacity as Attorney General of the United States, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF RASHID KHALIDI

1.      My name is Rashid I. Khalidi. I am Professor of Middle Eastern History and Director of the Center for International Studies at the University of Chicago, where I have taught since 1987. I received my B.A. in history from Yale University in 1970 and my D.Phil. in modern Middle Eastern history from Oxford University in 1974. I have travelled, taught and done research all over the Middle East, living in the region for over fifteen years, residing for varying times in Lebanon, Israel/Palestine, Egypt, Syria, Libya and Saudi Arabia. I lived in Lebanon from 1972 until 1983, teaching at the Lebanese University from 1974 until 976, and at the American University of Beirut from 1976 until 1983. I have also lived for extended periods in Jerusalem and the West Bank, and travel regularly to Egypt, Lebanon, Turkey and Israel. I am the author or co-editor of five books on aspects of modern Middle Eastern history and politics. I was an advisor to the Palestinian delegation to the Palestinian-Israeli peace negotiations of 1991-1993 in Madrid and Washington, D.C. I have served as an expert witness or provided affidavits in immigration cases involving individuals from various areas of the Middle East on several occasions, and I appear regularly in the media commenting on current events in the Middle East. My curriculum vita is attached as Exhibit 1 to this statement.

1:02CV00442(GK)

FILED
JUN 28 2002
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**EXHIBIT**

4

2.      The obligation to give zakat (meaning charity or alms) is one of the five pillars of Islam, and is thus incumbent on all believers. This important religious duty is rooted  n all the basic texts of Islamic jurisprudence, including the Qur'an and the sayings of the Prophet Muhammad. Giving zakat is considered particularly meritorious if it is carried out during the holy month of Ramadan, when believers abstain from eating or drinking during the day. Zakat is sometimes taken as a fixed proportion of a believer's salary, analogous to a tithe, but there are differing views on this practice among different commentators and trends within Islam. There is no divergence, however, as to the absolute necessity of giving zakat to those in need as one of the central obligations of the Islamic faith, one that is faithfully observed by all believers.

3.      Charities that include or focus on Muslims as potential donors, including overtly secular charities, consider this absolute obligation to give zakat an important element in their appeal. This is particularly the case during Ramadan, when contributions can be expected to increase significantly, as there is a renewed emphasis on personal and communal piety, with those who are especially religious joining in groups to read a portion of the Qur'an each night of the holy month. The giving of zakat during this period being considered particularly meritorious. zakat committees are set up in many mosques and by other religious groups, in order to organize the collection and distribution of zakat. Such donations can go to any charitable end, but the neediness of the recipients is considered particularly important in this regard, as the whole point of zakat is to help those in society who are most in need.

4.      In traditional Islamic communities, and even in many modern ones where the state's provision of services is fragmentary, support of charitable institutions via zakat is essential to the social well being of the community. This has always historically been the case, and continues to be a vital part of the social safety net in many poorer Islamic societies. The fact that most Muslim-Americans come from such societies – countries like Pakistan, Egypt and

Palestine – and are largely first-generation immigrants, means that they retain strong family and social links to their homelands. They are often concerned with trying to share the good fortune they have found in America as a result of the wealth of opportunities it offers with those back home who are less fortunate. Zakat plays a vital part in transmitting charitable funds to those who may be in need in these immigrants' countries of origin. It is clearly the case that blocking zakat donations – as by the seizure of the Holy Land Foundation's accounts – interferes with this process, and substantially burdens the exercise of their religion by donors, and by the Holy Land Foundation itself.

5.      In the case of Palestinian-Americans, the situation of their country of origin is gravely exacerbated by the ongoing Israeli military occupation, now in its 35th year, and with no end in sight. This leads to a situation where there are serious social needs that remain unmet, and where charity plays a vital role in maintaining the social fabric. For nearly 30 years, the Israeli military occupation's "Civil Administration" provided grossly inadequate social and educational services for the Palestinian society under its control. These were supplemented in the case of refugees (perhaps 40% of the 3 million Palestinians in the West Bank and Gaza Strip have refugee status, as a result of their expulsion from their homes in what is now Israel during the 1948 war) by the very basic health and education services provided by the United Nations Relief and Works Agency (UNRWA). The Palestinian Authority (PA), established by the 1993 Oslo accords, took over responsibility for most of the economic and social needs of the Arab population of the West Bank and Gaza Strip from the "Civil Administration" in 1995, although Israel maintained its military control of over 80% of the former territory and nearly 40% of the latter.

6.      In the nearly seven years of its existence, the PA has faced insurmountable obstacles in meeting the extensive economic and social needs of a population suffering from many decades of under-investment, the absence of basic infrastructure, and a deliberate policy of

de-development carried out by the Israeli occupation, to encourage the dependency of the occupied territories on the Israeli economy. Before the further deterioration of the situation over the past two years, annual per capita income in the West Bank and Gaza Strip remained well under $1700, unemployment hovered at around 30%, with high under-employment, and poverty was widespread. Much of this economic stagnation was attributable to the "closures" of the West Bank and Gaza Strip imposed by the Israeli occupation authorities (ostensibly for security reasons), starting sporadically in 1991, and growing hermetically tighter over time, until they have become nearly total since late in 2000. These closures blocked access for residents of these territories to Israel, to Jerusalem, to neighbouring Arab countries, and even to adjacent Palestinian towns and cities. The closures have had a devastating economic effect, denying access to employment and driving away desperately needed external investment, and further increasing unemployment and poverty, which today probably affect a majority of Palestinian society in the West Bank and Gaza Strip.

7.    Beyond these suffocating external constraints, the PA has proven to be highly inefficient in delivering services, concentrating instead on utilizing most of its resources in the heavy-handed policing of its own population insistently demanded by Israel, and supported by the United States government. It was furthermore tainted by well-founded accusations of corruption, cronyism and favouritism in the provision of patronage, and of a lack of concern for a range of pressing social and economic problems. The combined result of the lack of resources, the Israeli-imposed focus on providing security for Israel as it continued its occupation and settlement policy, and the debilitating effects of corruption was an absence of many basic social services. This was notable in the realms of health, special education, childcare, the rehabilitation of the disabled (notably of the thousands of people disabled by Israeli shootings, beatings, and torture under interrogation over the past 35 years of occupation) and support of widows and orphans.

8.     Among the groups filling the numerous gaps in the social safety net left by the PA and UNRWA have been Palestinian and international Non-Governmental Organizations (NGO's), and multi-lateral and individual international aid agencies. These NGO's include a broad range of Palestinian organizations working for respect of human and civil rights both by the PA and the Israeli occupation authorities, and responding to the pressing social needs laid out in paragraph 7, above. Among those carrying out some of the most effective social and relief work are several Islamic charities. Notable among these has been the Holy Land Foundation.

9.     Islamic charities in particular have a good reputation, both in the United States and in Palestine, for probity and transparency in their financial dealings, often have low overhead costs (partly because they employ few foreign aid workers whose high salaries and expenses inflate costs), and have a good track record in the delivery of services to the needy. Also instrumental in the distribution of aid have been the zakat committees, which are utilized by UNRWA, foreign NGO's, and the PA's own Ministry of Waqf and Religious Affairs, as conduits for their assistance, since these committees have a grassroots infrastructure among the poorest sectors of society. Like Islamic charities, they tend to focus on those most in need, particularly residents of refugee camps, and the families of those suffering from acts of the Israeli occupation. These acts include the killings by the Israeli military of demonstrators and other unarmed Palestinians, of which there have been over 1200 cases over the past 18 months, nearly 300 of them children 16 years old or younger (thousands of Palestinians have also been wounded, and many of them temporarily or permanently disabled, in the same period); so-called "extra-judicial killings," which in fact are assassinations by the Israeli security forces, of which there have been about 80 over the past year alone, in which over 20 innocent bystanders have been killed; detention without charge or trial (so-called "administrative detention)"; other forms of detention and incarceration; expulsion from Israel and the occupied territories to neighbouring countries; the demolition of homes of those

suspected of anti-occupation activities – or sometimes of the relatives of suspects; or other home demolitions carried out either as part of land seizures to enable the building of settlements or of settler-only roads, or ostensibly for "security reasons."

10.     Humanitarian and charitable institutions throughout Palestine employ personnel regardless of sectarian or political affiliation and offer services on a similar basis. Thus, UNRWA, NGO-run and public hospitals and clinics, for example, employ members of different political groups such as Fatah, the PFLP, Hamas and Islamic Jihad, without reference to their belonging to a specific group. It would be impossible to do otherwise in the case of a group like Hamas, since it has the support of from 15-20% of the Palestinian population in the most reliable independent polling over the past 6-7 years, when regular polling began. Similarly, these and other humanitarian institutions, whether run by Muslim or Christian groups, offer their services to all those in need of them, with Palestinian Christians, for example, taking advantage of the Maqassed Islamic Hospital in Jerusalem, and Palestinian Muslims using clinics run by Christian aid groups.

11.     Palestinians killed by the Israeli occupation forces have for many decades been considered "martyrs" by the Palestinian national movement, including both its secular and religious wings. This traditional term is rooted in Islamic belief, whereby those who die in defense of the faith are considered martyrs. It has long been applied to all Palestinians and other Arabs killed by the occupation forces, whether they were engaged in combat or not, and whether they were Muslim or Christian, and does not necessarily have religious overtones, although in some cases it definitely does.

12.     Suicide is strictly forbidden in Islam, and there exist around it prohibitions akin to those in Catholicism. This is an absolute ban, for which there can be no exceptions, and it has recently been reaffirmed by a number of the highest Islamic religious authorities, including the Grand Mufti of Egypt and the Rector of the ancient and prestigious al-Azhar University in

. 03/20/2002 08:26 FAX 505 842 6761    Case 1:02-cv-00442-GK    Document 29-1    FREED-BOYD DANIELS    Filed 06/28/02    Page 71 of 359    ☑ 008

20-03-02  11:55  De-MMSH      +0442524366      T-663  P.08/09  F-291

Cairo, two of the most authoritative voices in all of Islam. They were specifically referring to the new phenomenon of suicide attacks, generally involving the attacker blowing himself, or herself, up, along with the victims.

13.    Suicide attacks are virtually unheard of in Islamic history, aside from a few isolated examples in the 12th century (when they were carried out by heretical groups). Among the first instances in which such attacks were carried out in modern times was when they were employed by the Lebanese Shiite group Hizballah against Israeli occupation forces in South Lebanon, beginning in 1983. Thereafter, Hizballah discontinued these attacks, focusing instead on more conventional military operations against Israeli occupation forces, until the liberation of South Lebanon from Israeli occupation in May 2000, whereafter it ceased its military activities against Israeli forces, except in the disputed Chab'a farms border area.

14.    Palestinian suicide attacks against civilians inside Israel were first carried out by radical Islamic groups such as Hamas and Islamic Jihad during the mid-1990s. At that time they were the subject of strong disapproval by large majorities among Palestinians (as was shown consistently in polling during this period), and of fierce repression by the security apparatuses of the PA, in coordination with the Israeli security services. This was particularly the case after a series of devastating suicide bomb attacks in major Israeli cities in February and March 1996, which followed Israeli assassinations of leading figures in both Hamas and Islamic Jihad. This repression led to the virtual cessation of such attacks for about four years.

15.    In the wake of the outbreak of a new mass revolt against the Israeli military occupation and its continuing expansion of Israeli settlements in September 2000, the so-called 'al-Aqsa intifada," suicide attacks have resumed over the past 18 months. Two new features are that they are directed against both civilian and military targets, and are now carried out by a wider range of Palestinian groups, including both Islamic and secular organizations.

16.    In the last few months, some Palestinian militant groups have shifted to carefully planned, coordinated attacks on Israeli military positions, convoys, and armoured vehicles. While attacks on armed Israeli settlers in the West Bank and Gaza Strip, and on Israeli civilians in Jerusalem have continued, suicide attacks on civilians inside Israel have diminished somewhat, although they have not ceased entirely.

17.    I have always resolutely opposed Hamas in the context of Palestinian politics, and in the Palestinian-American arena. I am opposed to, and have always opposed, such religiously based groups, as I disagree fundamentally with their blueprint for a future Palestine, and with their methods for achieving their aims. Although I am a Muslim, I believe that Hamas's interpretation of Islam constitutes a distorted perversion of its content, and that Hamas cynically exploits religion for political purposes. I am strongly opposed to any attacks on unarmed civilians, Israelis or others, for both moral and political reasons (and am on record as having voiced these views), and I believe that suicide attacks are abhorrent, immoral and fundamentally wrong.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this ___ day of March, 2002.

_____
                              Rashid Khalidi



## DECLARATION OF GEORGE R. SALEM

1.    I am a resident of the Commonwealth of Virginia, over the age of eighteen years, and otherwise competent to make this declaration.

2.    I am admitted to practice law in the State of Georgia, the State of Florida and the District of Columbia and, at all times relevant to this declaration, have practiced law as a partner in the labor section of the law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin Gump") in Washington, D.C.

3.    Since in or about the month of March 2001, Akin Gump has represented the Holy Land Foundation for Relief and Development (the "Foundation") in connection with civil litigation in the United States District Court for the Northern District of Illinois and the United States Court of Appeals for the Seventh Circuit.

4.    In or about late August and early September 2001, I contacted officials at the U.S. Department of State, on behalf of the Foundation, to request a meeting to discuss the Foundation's status with respect to ongoing programs sponsored by the U.S. Agency for International Development.  The U.S. Department of State declined the request.

5.    On September 24, 2001, the United States Court of Appeals for the Seventh Circuit invited the United States to file an *amicus curiae* brief in *Boim v. Quranic Literacy Institute*, Nos. 01-1969 and 01-1970.  Shortly thereafter, I contacted officials at the U.S. Department of Justice, on behalf of the Foundation, to arrange a meeting in order to discuss the relevant issues on appeal.  The meeting took place in or about early October 2001.  No one from the government mentioned a potential blocking notice or raised any concern about the Foundation's operations at that meeting.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 2nd day of April, 2002.

_____
GEORGE R. SALEM



FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**EXHIBIT**

5

DECLARATION OF GEORGE R. SALEM                1:02CV00442(GK)





# DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

<u>BLOCKING NOTICE</u>

DEC - 4 2001

FAC No. SDGT-197443

Holy Land Foundation for Relief and Development
525 International Parkway
Richardson, Texas 75081



EXHIBIT

tabbies

6

Gentlemen:

You are hereby notified that Holy Land Foundation for Relief and Development ("Holy Land") has been designated pursuant to Presidential Executive Orders No. 13224 (66FR49079), issued on September 23, 2001, and No. 12947, issued on January 23, 1995 (60FR5079) (the "Orders"), and under the authorities granted by the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA").

This notice is also to inform you that pursuant to the Orders, all real and personal property of Holy Land, including but not limited to all offices, furnishings, equipment and vehicles, as well as all funds and accounts in which Holy Land has any interest, are blocked.  All assets of Holy Land, including but not limited to bank, charge and investment accounts, securities, and safe deposit boxes at any financial institution located in the United States or organized under the laws of the United States, including their overseas branches, are blocked.  Blocked property may not be transferred, withdrawn, exported, paid, or otherwise dealt in without prior authorization from OFAC.

All transactions involving property in which Holy Land has any interest, including any property of third parties in the possession or control of Holy Land, are prohibited without specific authorization from OFAC.  As a consequence of this action, activities in, use of, and occupation of Holy Land offices, including this facility and each Holy Land office subject to United States jurisdiction, are hereby prohibited. All persons on these premises are directed to terminate all activities for or on behalf of Holy Land, and to leave the premises.  No property may be removed from the premises other than property that is clearly the personal property of the individual requesting to remove such property from the premises. Persons who are unable to remove their personal belongings at this time must contact OFAC in writing at the following address to make arrangements to secure their belongings at a later date: U.S. Department of the Treasury, Office of Foreign Assets

FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2

Control, Attn:  Chief of Enforcement, 1500 Pennsylvania Avenue, N.W. (Annex), Washington, D.C. 20220.  Letters may be sent via facsimile to (202) 622-1657.  Requests for specific licenses for payment of outstanding financial obligations owed by Holy Land, such as salary, rent and utility payments, among others, must also be made in writing to the above address.

**Willful violations of IEEPA and of licenses and orders issued thereunder, including this Blocking Notice, are punishable by criminal penalties ranging up to 10 years in prison and/or fines up to $500,000 for corporations and up to $250,000 for individuals.  Civil penalties of up to $11,000 per count may be imposed by OFAC.**

Should you wish to seek a license to engage in any transaction involving blocked property, please refer to the licensing procedures set forth in §§ 501.801-802 of the Reporting and Procedures Regulations, 31 C.F.R. Part 501, (the "Reporting Regulations").

If it is believed that this designation is in error and Holy Land wishes to challenge it, a letter should be sent to the attention of the Director at the address indicated above.  For further information, please refer to § 501.807 of the Reporting Regulations.

If you have any questions concerning this notification, please contact OFAC Chief of Enforcement at (202) 622-2430.

Sincerely,

R. Richard Newcomb
Director
Office of Foreign Assets Control

Served by OFAC Enforcement Officer _____ on the _____ day of December, 2001.

_____        _____
(Signature of Recipient)         (Printed Name and Title of Recipient)

Witnessed by:_____



## DECLARATION OF MARK J. MACDOUGALL

1.   I am a resident of the Commonwealth of Virginia, over the age of eighteen years, and otherwise competent to make this declaration.

2.   I am admitted to practice law in the Commonwealth of Massachusetts, the State of Maryland and the District of Columbia and, at all times relevant to this declaration, have practiced law as a partner in the litigation section of the law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin Gump") in Washington, D.C.

3.   Since in or about the month of March 2001, Akin Gump has represented the Holy Land Foundation for Relief and Development (the "Foundation") in connection with civil litigation in the United States District Court for the Northern District of Illinois and the United States Court of Appeals for the Seventh Circuit.

4.   On the morning of December 4, 2002, I received a series of telephone calls from officers and directors of the Foundation, who reported that federal agents, including agents of the U.S. Department of Treasury, had contacted them for the purpose of blocking the Foundation's assets.   At approximately 9:15 AM (EST) that morning, to the best of my recollection, I received a telephone call from Shukri Baker, whom I knew to be the president of the Foundation. Mr. Baker stated that an individual identifying himself as an agent of the U.S. Treasury had arrived at his home that morning, seeking to serve him with some form of legal notice and insisting that Mr. Baker provide his signature on the notice.

5.   I asked Mr. Baker to permit me to speak with the agent, who stated that he was serving a freeze order and intended to take control of all of the assets of the Foundation and remove them from the Foundation's offices.  To the best of my recollection, I asked the agent to read the substantive portions of the order to me and confirmed that the action was purportedly based on the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06.  I then asked the agent to delay the removal of furniture, records and equipment from the Foundation's offices to permit the Foundation to petition a U.S. District Court to temporarily stay enforcement of the blocking order.  The agent stated that he would "take the matter under advisement," and the telephone discussion was terminated.

   I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 2nd day of April, 2002.

MARK J. MACDOUGALL

FILED
JUN 2 8 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EXHIBIT
7

1:02CV00442(GK)



1 WS/ic
12/3/01

BY LIAISON                              556 -1357

Date:     November 5, 2001

To:       Mr. R. Richard Newcomb, Director
          Office of Foreign Assets Control
          Department of Treasury

From:     Mr. Dale L. Watson
          Assistant Director
          Counterterrorism Division

Subject:  HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
          INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

          ACTION MEMORANDUM

I.  INTRODUCTION

        Pursuant to the provisions of the International Emergency
Economic Powers Act (IEEPA), 50 U.S.C. §1701 et seq., the
President of the United States may invoke the provisions of
the Act to deal with any "unusual and extraordinary threat,
which has its source in whole or substantial part outside the
United States, to the national security, foreign policy, or
economy of the United States, if the President declares a
national emergency with respect to such threat." (IEEPA Sec.
202(a)). Accordingly, on January 23, 1995, the President
issued Executive Order (E.O.) 12947 declaring a national

FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



EXHIBIT

tabbies      8

1:02CV00442(GK)

In furtherance of this authority, E.O. 12947 directs all
federal agencies, including the Federal Bureau of
Investigation (FBI), to take all appropriate measures within
their authority to carry out the provisions of the Order.
[E.O. 12947, Section 4(a)]. Further, any investigation
emanating from a possible violation of the Order shall be
coordinated with the FBI. [E.O. 12947, Section 4(b)].

Accordingly, the FBI is providing the following
information to Treasury regarding the Holy Land Foundation
for Relief and Development (HLFRD), located at 525
International Parkway, Suite 509, Richardson, Texas. The FBI
has obtained information which indicates that the HLFRD acts
for or on behalf of HAMAS. In compliance with its
obligations under the Order, the FBI submits this memorandum
for OFAC's consideration in ordering the SDT designation of
the HLFRD.

## II.  HAMAS IS A TERRORIST ORGANIZATION

HAMAS is one of the SDTs listed in the Annex to E.O.
12947 as a foreign terrorist group engaged in grave acts of
violence that disrupt the MEPP and constitute an unusual and
extraordinary threat to the national security, foreign
policy, and economy of the United States. (Exhibit 1).

HAMAS is a terrorist organization that espouses an
extremist Islamic fundamentalist ideology. HAMAS was founded
in 1988 in the Gaza Strip and is dedicated to the
establishment of an Islamic Palestinian State that
encompasses Israel, the West Bank and Gaza. HAMAS is a
militant Palestinian offshoot of the Muslim Brotherhood which
was founded in 1928 to replace secular rulers with an Islamic
society.

In late 1987, activist members of the Muslim Brotherhood
opted to play a more direct role in the popular uprising,
known as the Intifada, than the Muslim Brotherhood leadership
would allow. As a result, Sheikh Ahmad Yassin, then head of
the Muslim Brotherhood in the Gaza Strip, formed HAMAS. In
May 1989, Yassin was arrested and in October 1991, he was
tried and sentenced to life imprisonment by an Israeli court
for HAMAS terrorist activities. (Exhibit 2).

3

In October 1997, following a failed Israeli attempt to assassinate Khalid Mishal, another HAMAS leader in Amman, Jordan, Yassin was released to the Jordanians and subsequently returned to Gaza.  On October 29, 1998, Yassin was placed under house arrest by the Palestinian Authority (PA) following an unsuccessful HAMAS suicide attack to blow up a bus full of school children in Kfar Darom, which resulted in the death of an Israeli soldier.  Yassin was released from house arrest two months later, in December 1998. (Exhibit 2).

HAMAS is primarily based in the West Bank and Gaza.  When HAMAS was declared an illegal organization by the Government of Israel (GOI) in 1989, HAMAS leaders moved its support structures outside Israel.

HAMAS has publicly rejected Yasir Arafat and the PA as the representatives of the Palestinian people.  HAMAS also announced that it opposes the Palestine National Council's 1988 decision to establish an independent Palestinian state in the West Bank.  Since the group's inception, HAMAS has forged significant inroads into acceptance by mainstream Palestinians.

The ideology of HAMAS is codified in the HAMAS covenant. (Exhibit 3).  This covenant establishes HAMAS' primary goal as the creation of an Islamic State in all of Palestine through "Jihad" (Holy War).  HAMAS' covenant emphasizes Jihad as the immediate and sole solution to Palestinian problems and regards participation in the armed struggle as the duty of every Muslim.  HAMAS rejects absolutely any political solution entailing the concession of any part of historic "Palestine."

The primary tenets of HAMAS philosophy are opposition to compromise with Israel over creation of a Palestinian State and replacement of the PA as the sole representative of the Palestinian people.  To these ends, HAMAS pursues a combined program of violence and terror on one hand, and educational, charitable, and social functions on the other.  The principal purpose of its armed attacks is to intimidate and coerce the GOI and its civilian population.  Its benevolent programs are used to enhance its image and earn goodwill in the Palestinian community.

4

7   A recent interview with a senior HAMAS spokesman
identifies the influence the political wing of HAMAS has over
the military wing.  In a July 31, 2001, Reuters article,
Abdel-Aziz al-Rantissi, a senior HAMAS official and spokesman
stated, "The (HAMAS) political leadership has freed the hand
of the brigades to do whatever they want against the brothers
of monkeys and pigs."  The term 'brigades' refers to the
group's military wing, Izz el-Din el Qassam brigades.
Rantissi further stated, "I urge all the brigades to chase
and target the Israeli political leaders and members of
parliament, the killer (Prime Minister Ariel) Sharon and the
criminal (Foreign Minister) Shimon Peres."  This was believed
to be the first public call by HAMAS to target Israeli
leaders.  According to the article, "Hamas's political wing
determines overall policy for the movement . . ."
(Exhibit 4).

     Even after the September 11, 2001 terrorist attacks
against the World Trade Center and Pentagon, HAMAS' public
statements urge support for continued violence against Israel
and the United States.  In a September 2001 public statement
published by Reuters, Rantissi echoed calls by Taliban
clerics in Afghanistan, urging "Muslims on Friday to unite
against any U.S. retaliation for the terror attacks in New
York and Washington."  He went on to say, "It is impossible
for Muslims to stand handcuffed and blindfolded while other
Muslims, their brothers, are being attacked.  The Muslim
world should stand up against the American threats which are
fed by the Jews. . . . " (Exhibit 5).

     Through its acts of violence, HAMAS has established
itself as one of the primary Palestinian terrorist
organizations continuing the "armed struggle" against Israel.
These terrorist attacks target not only military targets, but
civilian ones as well.  HAMAS terrorist attacks have resulted
in scores of deaths and hundreds of injuries in Israel,
including the killing of several U.S. citizens.

     From October 1, 2000 to September 10, 2001  HAMAS has
claimed responsibility for at least 20 bombings; two
shootings; one kidnaping; and one mortar attack.  Another six
bombings have been averted through the failure or discovery
of explosive devices.  At least 77 persons, including three
American citizens, have been killed in these attacks and at

least 547 injured, including four American citizens. The use
of suicide bombers has become a HAMAS trademark. A few
examples of those bombings are described below:

On August 9, 2001, HAMAS claimed responsibility for a
suicide bombing in Jerusalem, that killed 15 civilians
and injured more than 130 others. The attack occurred at
one of Jerusalem's most prominent street corners. Two
American citizens, including a 31 year old pregnant
elementary school teacher died and four other American
citizens, including a three year old boy were wounded
when a Palestinian walked into a Sbarro pizzeria at the
height of the lunch hour and detonated an explosive
device filled with nails. At the funeral for five
members of a family from the West Bank settlement of
Talmon, an 11 year old, on a hospital bed with plastic
breathing tubes in her nose, was wheeled into the
cemetery, where her father, mother and three siblings,
ages two, four, and 14 were to be buried. (Exhibit 6).

On June 1, 2001, HAMAS claimed responsibility for a
suicide bombing in Tel Aviv, Israel, that killed 21
Israeli youths and injured nearly 100, as they stood
outside a popular disco. Most of the youths killed or
injured were girls, between the ages of 14 and 18,
celebrating their high school graduation. According to
eyewitnesses, two HAMAS operatives drove the suicide
bomber to the disco, a popular club often packed with
Russian immigrant teenagers. They said the bomber
slipped unnoticed into line and positioned himself among
several girls, including a 14-year-old who had survived a
previous bombing in Netanya. Then, while flirting with
one of the girls, he triggered the explosives. The blast
was so intense that it tore limbs from the victims'
bodies, scattered their flesh up to six blocks away and
vaporized the bomber and the girl next to him.
(Exhibit 7).

On May 25, 2001, HAMAS took credit for carrying out a
truck bombing to mark the anniversary of Israel's
withdrawal from Lebanon. According to a May 25, 2001,
Associated Press article, Islamic militants said they
were trying to undermine Israel's morale with the
bombings. The article stated that there have been more
than a dozen explosions in the past eight months of
Israeli-Palestinian fighting. On that date, Sheikh

6

Yassin, the spiritual leader of HAMAS, was quoted as saying, "We want to plant terror in the heads of the enemies." (Exhibit 8).

On February 25, 1996, HAMAS conducted suicide bombings in both Jerusalem and Ashkelon, claiming the lives of 26 people and wounding at least 79 others. Those blasts occurred at two of the country's busiest intersections at the height of rush hour. The Jerusalem blast occurred at 6:48 a.m. on a local bus that was stopped at a red light just a block away from the central bus station. The suicide bomber killed 24 people and wounded 50 others. Two Americans, Matthew Eisenfeld, 25, and his girlfriend. Sarah Duker, 23, were among the dead. The second attack took place 50 minutes later at a hitchhiking stop for soldiers, near Ashkelon. That suicide bomber killed two people and wounded 23. HAMAS took credit for both attacks. (Exhibit 9).

III.  HISTORY AND ORGANIZATIONAL STRUCTURE OF HLFRD

   Background:  The HLFRD was established in 1989 as a non-profit, non-political, charitable, and tax-exempt organization which solicits donations to help Palestinian people in the West Bank and Gaza. As noted above, the HLFRD is listed as a tax-exempt charity, not a religious organization.

   The HLFRD was originally known as the Occupied Land Fund, and incorporated in California on January 11, 1989, with a mailing address of P.O. Box 1448, Los Angeles, California 90053. The Occupied Land Fund's physical address at the time was located at 5855 Green Valley Circle, Suite 207, Culver City, California 90230. On July 27, 1992, the Occupied Land Fund relocated to Texas, and had a forwarding address of P.O. Box 832390, Richardson, Texas 75083.

   The Occupied Land Fund was registered with the Texas Secretary of State on November 18, 1992, under the name, "HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT." (Exhibit 10). The HLFRD is listed as a non-profit corporation with a registered office of 850 N. Dorothy Drive, Suite 516, Richardson, Texas. In August 1994, the HLFRD relocated from 1710 Firman Drive, Suite 100, Richardson, Texas 75081 to its current address located at 525 International Parkway, Suite 509, Richardson, Texas 75081.

The Texas Secretary of State records further reveal that the HLFRD proposed to pursue, in conducting its affairs in Texas, "charitable-relief for refugees and the indigent needy, fund raising furthering the corporation's exempt purposes, and to sponsor charitable activities benefiting (sic) and to make contributions or distributions to other 501(c)(3) organizations or the corresponding section of any future federal tax code." (Exhibit 10).

Organizational structure: The HLFRD is currently headquartered in Richardson, Texas, with branch offices and representatives scattered throughout the United States, West Bank and Gaza. Key leaders at the HLFRD include: Shukri Abu Baker, President, Secretary, and Chief Executive Officer (CEO); Haitham Maghawri, Executive Director; Mohammed El Metain, Director of Endowments; and Ghassan Elashi, Chairman of the Board. (Exhibit 11).

According to public records, the HLFRD raised 13.0 million in 2000; $6.3 million in 1999; and $5.2 million in 1998. (Exhibit 12).

IV. THE HLFRD ACTS FOR OR ON BEHALF OF HAMAS

As will be described in detail below, the HLFRD acts for or on behalf of HAMAS based on the following analysis:

1. Intercepted Discussions Of HAMAS Leaders: In 1993 and 1994, the FBI monitored meetings of identified HAMAS leaders and senior representatives from the HLFRD. During these meetings, discussions were held regarding the need for HAMAS fund-raising in the United States, as well as the primary role of the HLFRD to serve this function.

2. HAMAS Financing: FBI investigation has determined that in the early 1990s, HAMAS, through Mousa Abu Marzook, provided substantial funds to the HLFRD.

3. Fund Recipients: FBI investigation has determined that a majority of the funds collected by the HLFRD are used to support HAMAS activities in the Middle East.

4. HLFRD Leadership: Key decision-makers within the HLFRD have been identified as active members of HAMAS.

8

1. FBI SURVEILLANCE OF HAMAS MEETINGS

1993 Philadelphia meeting:  A recently declassified electronic surveillance of Abdelhaleem Hasan Ashqar disclosed that he organized a meeting that took place in Philadelphia, Pennsylvania, on October 1 to October 3, 1993.  FBI physical surveillance and subsequent investigation corroborate that this meeting took place.  The electronic intercepts disclosed that participants in the meeting included Ashqar, Akram Kharroubi, Mohammad Al-Hanooti, Ismail Elbarasse, Muin Kamel Mohammed Shabib, three officials from the HLFRD:  Shukri Abu Baker, Ghassan Elashi and Haitham Maghawri; and representatives from the Islamic Association for Palestine (IAP).

The FBI deems this meeting significant since it represented a meeting in the United States among senior leaders of HAMAS, the HLFRD and the IAP.  A brief review of key attendees include:

1.  Abdelhaleem Hasan Ashqar:  In November 1992, the GOI advised that Ashqar was a U.S.-based HAMAS activist who was involved in transferring funds from the United States to HAMAS in the West Bank and Gaza.  (Exhibit 15).

Interviews conducted by the Israeli Police (IP) of self-admitted HAMAS member Sufian Abu Samara provided evidence of Ashqar's membership in HAMAS.  In Samara's January 7, 1991 and January 14, 1991 interviews, he stated that he was recruited and appointed the head of HAMAS in the Southern Gaza Strip by Mousa Abu Marzook in 1989 and also headed the HAMAS Security Apparatus in 1990.  Samara described several instances where Ashqar transferred hundreds of thousands of dollars on behalf of HAMAS, at Samara's direction.  (Exhibit 16).

---

[1] Review of American Express records determined that the above-mentioned individuals traveled to Philadelphia on October 1-3, 1993, and stayed at the Courtyard by Marriott Hotel, 8900 Bartram Avenue, Philadelphia, Pennsylvania.  (Exhibit 13).  Among the individuals physically observed by the FBI to be at the Courtyard by Marriott on October 1-3, 1993, were:  Ashqar, Maghawri, Shabib, Elbarasse, Baker, and Elashi.  (Exhibit 14).

During the February 21, 1993, IP interview of self-admitted HAMAS member Mahmud Rumahi, he stated that he was recruited to HAMAS in December 1990, by his brother-in-law, Mahmud Qazim.  Qazim gave Ashqar's phone and fax numbers to Rumahi, so that he would be able to get money and pamphlets. In April 1991, Ashqar sent a representative from the United States to Israel to obtain detailed reports on HAMAS activities in Rumahi's region. (Exhibit 17).

Additionally, Rumahi stated that in July 1991, he traveled to the United States to meet with Ashqar, who arranged for him to fly to Tennessee and meet with Abu Omar Musea (a.k.a. Mousa Marzook). one of the HAMAS leaders in America.  Rumahi gave a full report to Musea on his group's HAMAS activities.  After Rumahi returned, he gave Ashqar a detailed report of that conversation. (Exhibit 17).

2. Akram Kharroubi:  During the early 1990s, Akram Kharroubi (a.k.a. Maroubi, Harroubi) was head of the Washington, D.C. Muslim Arab Students Association   He was in contact with HAMAS leaders, including Mousa Abu Marzook.  He reportedly distributed HAMAS statements when they were issued.

He returned to the West Bank and Gaza in 1994.  In early 1999, the GOI detained him for questioning.  During his interview by the IP, he admitted that from 1994 to 1999, he was a money courier between HAMAS members in Jordan and the West Bank.

Kharroubi further stated that in approximately 1997, the HAMAS headquarters in Jordan gave instructions to found a united headquarters of HAMAS in the West Bank, which was to include representatives of all the regions.  Due to the objection of all the regional headquarters to the establishment of a united headquarters for the West Bank, it was decided to establish an Inter-Regional Coordinating Committee where Kharroubi served as the Ramallah region representative. (Exhibit 18).

3. Mohammad Al-Hanooti: In April 1992, HLFRD-1, an FBI source, who has been found to be reliable in the past stated that Al-Hanooti was a big supporter of HAMAS.  The source further stated that it was well known in the Palestinian

7. Haitham Maghawri (HLFRD's Executive Director):
According to the U.S. Immigration and Naturalization Service
(INS) records, on November 4, 1990, Maghawri filed a request
for asylum in the United States.  In his asylum request he
stated his reasons for seeking asylum were that he was being
persecuted for his religion by the Amal Movement (Shia
terrorist group in Lebanon, a rival to Hizballah).  During
an interview, Maghawri told INS officials the following
information about his past: 1) He had been arrested for
placing a car bomb, however, the INS interviewer made no
further notes regarding this incident; 2) he was arrested in
Lebanon in June, 1988, and was held for three weeks, the
reasons not recorded; 3) in May, 1987, he was again arrested
in Lebanon and held for five days. (Exhibit 26).

Maghawri's asylum request was denied.  On
December 19, 1991, he married a U. S. citizen, Fadia Tariq
Akilah.  As a result of his marriage, Maghawri received
permanent residency status on September 15, 1992.

Ghassan Elashi (HLFRD's Chairman of the Board):
Elashi and his brothers are the founders of InfoCom, Inc., a
computer hardware business and Internet service provider
located across the street from the HLFRD in Richardson,
Texas.  Elashi is currently the Vice-President of marketing.
In September 2001, OFAC blocked the assets of InfoCom, based
upon evidence that InfoCom received $250,000 from Marzook,
during the same time frame as Marzook was providing funds to
the HLFRD and others associated with HAMAS (detailed below).

Results of the 1993 Philadelphia Meeting: The electronic
surveillance revealed the following:

The overall goal of the meeting was to develop a strategy
to defeat the Israeli/Palestinian peace accord, and to
continue and improve their fund-raising and political
activities in the United States.  During the meeting the
participants went to great length and spent much effort
hiding their association with the Islamic Resistance
Movement, a.k.a. HAMAS.  Instead, they referred to HAMAS as
"SAMAH", which is HAMAS spelled backwards.  Most of the time,
the participants referred to HAMAS as "The Movement."

The participants decided that for fund-raising purposes, the United States theater was very valuable to them. They stated they could not afford to lose it. In the United States, they could raise funds, propagate their political goals, affect public opinion and influence decision-making of the U.S. Government. In addition, they hoped that sometime in the future they would be viable enough and strong enough to represent an alternative to the Palestinian Liberation Organization.

It was mentioned that the United States provided them with a secure, legal base from which to operate. The democratic environment in the United States allowed them to perform activities that are extremely important to their cause. In discussing financial matters the participants stated a belief that continuation of the Holy War was inevitable.

It was decided that most or almost all of the funds collected in the future should be directed to enhance the Islamic Resistance Movement and to weaken the self-rule government. Holy War efforts should be supported by increasing spending on the injured, the prisoners and their families, and the martyrs and their families. (Exhibit 28).

1994 Oxford, Mississippi Meeting: Declassified electronic surveillance of Ashqar and Muin Shabib disclosed that in early 1994, Ashqar's Al-Aqsa Educational Fund (AAEFI) and the HLFRD were in conflict over fund-raising issues. The electronic surveillance further disclosed that HAMAS Political Bureau head Mousa Abu Marzook designated the HLFRD as the primary fund-raising entity in the United States and ordered the AAEFI to curtail fund-raising operations. Ultimately, Marzook traveled to the United States and chaired a meeting in Dallas, Texas, regarding this issue. (Exhibit 29). Two senior HAMAS activists, Jamal Hamami, one of the founders of HAMAS, and Sheikh Mohammad Siyam (a.k.a. Siam), a self-admitted HAMAS official (Exhibit 30), met with Ashqar in Oxford, Mississippi, on March 13, 1994, to explain Marzook's decision.[5]

_____

[5] On March 13, 1994, the FBI observed Ashqar's travel to Memphis International Airport where he picked-up Sheik Jamal Hamami and Sheik Mohammad Siyam. Ashqar drove Hamami and Siyam to his residence where the three remained until March 14, 1994. (Ex. 31).

13

It should further be noted that FBI investigation has
determined that the HLFRD has used both Hamami and Siyam as
guest speakers at HLFRD fund-raising events.  American
Express records reveal that from September 20, 1990, to
November 29, 1991, the HLFRD paid for at least six trips
taken by Hamami to the United States.  The HLFRD also paid
for at least five trips taken by Siyam, a.k.a. M. Siam, M.
Seyam, from April 20, 1992 to March 9, 1994.  These trips
were charged on either the Occupied Land Fund/Baker Corporate
American Express Account # 3783-647335-91006 or the
HLFRD/Baker Corporate American Express Account # 3783-647335-
92002 or 93002.  (Exhibit 32).

2. EARLY FUNDING FROM HAMAS:

According to the documents filed on October 4, 1995, in
the Southern District of New York by the State of Israel's
Ministry of Justice, Marzook was identified as the head of
the Political Bureau of HAMAS.  The document reads:

The (political) bureau operates as the highest ranking
leadership body in the HAMAS organization, setting
policies and guidelines respecting HAMAS' activities.  In
addition to its other functions, this bureau has
responsibility for directing and coordinating terrorist
acts by HAMAS against soldiers and civilians in Israel
and the territories.  In his role as head of the
political bureau, Marzook financed certain activities of
HAMAS, including terrorist activities.  In addition, he
played an important role in organizing and structuring
HAMAS and in supervising the activities of the wing of
HAMAS responsible for the terrorist acts and in
appointing individuals to important leadership roles in
the military wing . . . Even by the time that Marzook
became a leader in HAMAS in 1989, he was already clearly
aware of the nature of the terror attacks committed by
HAMAS. (Exhibit 33).

Investigation corroborates the GOI's statement that
Marzook was a significant member of HAMAS.  According to the
July 25, 1995, FBI interview of Marzook, he described himself
only as a "mid-level political activist" within the political
arm of HAMAS since 1990. (Exhibit 34).  However, as of
August 15, 2001, the HAMAS website, www.palestine-

14

info.com/hamas, identified "HAMAS symbols and leaders." The
website stated that Marzook was "Elected as Chairman of Hamas
Political Bureau in 1991." (Exhibit 35). Based on Marzook's
well-established affiliation with HAMAS, Marzook was
subsequently designated by the U.S. Government on
August 25, 1995, as a SDT. (Exhibit 36).

    FBI investigation has revealed that during March, 1992
and August, 1992, Marzook deposited a $100,000.00 check from
the Central Fidelity Bank Account # 7920439173 and a
$100,000.00 check from a First Virginia Bank Account
#68168179 to the HLFRD account at Bank of America, California
Account #0941402284. Ismail Elbarasse's name was printed on
the check along with Marzook's. The 1993 HLFRD tax form 990
further reflects the receipt of $210,000.00 from Marzook.
(Exhibit 37).

    During an FBI interview of Naaser Alkhatib on
March 15, 1994, he advised that he worked for Marzook and
conducted various bank transactions for Marzook. (Exhibit
38). FBI investigation has determined that on August 31,
1992, Naaser Alkhatib deposited a check for $22,000.00 into
the HLFRD Bank One Account #1070001258. This check was dated
August 24, 1992, and written to "Holy Land Foundation" from
First Virginia Bank Account # 5065 0599, listing Naaser and
Narman Alkhatib, 6166 Leesburg Pike, Falls Church, on the
check. (Exhibit 37).

Marzook Simultaneously Funds the HLFRD & HAMAS Terrorist
Operations:

    As described, in 1992, Marzook, Elbarasse and Alkhatib
were providing funds to the HLFRD. During 1992 to January
1993, these same HAMAS activists were also providing funds to
Mohamad Salah, designated by U.S. Government as a SDT in
February 1995. Salah was arrested January 25, 1993 in Israel
for supporting HAMAS terrorist activities. At the time of
his arrest, he had $97,000.00 in cash in his possession,
after having admitted to already disbursing approximately
$140,000.00 to individuals identified by the GOI as members
of HAMAS. (Exhibit 39).

    Records verified that Marzook deposited a total of
$23,410.00 into Salah's U.S. bank account during the time
period of May 20, 1990 to November 29, 1992. Records also

15

verified that Elbarasse deposited a total of $740,000.00 in
Salah's account during the time period of August 8, 1992 to
January 25, 1993; and Nasser Alkhatib deposited a total of
$251,000.00 into Salah's account during the time period of
August 21, 1992 to January 22, 1993. (Exhibit 21).

Business records further indicate that during the same
period that Marzook is funding the HLFRD and Salah, he is
providing large sums of money to IAP. March 1990 Texas State
business records list IAP as a d.b.a. for American Middle
Eastern League for Palestine (AMEL). Ahmad Agha (who has
served as the HLFRD's treasurer, Exhibit 11) and Ismael
Elbarasse are listed as Directors of AMEL. In addition,
financial records reveal that Elbarasse and Marzook opened a
bank account in the name of IAP on January 12, 1990, at the
Central Fidelity Bank, Arlington, VA. Elbarasse was the
signatory on that account. Bank records show deposits of
seven checks totaling $125,000 to this IAP account in 1990
and 1991.

## 3. RECIPIENTS OF HLFRD FUNDS OVERSEAS

The following interview is provided as evidence of how
the HLFRD's "charitable" fund-raising activity furthers the
HAMAS terrorist organization's agenda. The interview,
published in the London Filastin Al-Muslimah, with
Dr. Ibrahim Al-Yazuri, one of the founders of HAMAS,
described the HAMAS philosophy concerning charitable giving.
He stated:

Everyone knows that the Islamic Resistance Movement,
HAMAS, is a Palestinian Jihad movement that strives for
the liberation of all Palestine, from the (Mediterranean)
sea to the river (Jordan), from the north to the south,
from the tyrannical Israeli occupation, and this is the
main part of its concern. Social work is carried out in
support of this aim, and it is considered to be part of
the HAMAS movement's strategy . . . The HAMAS movement is
concerned about its individuals and its elements,
especially those who engage in the blessed Jihad against
the hateful Israeli occupation, since they are subjected
to detention or martyrdom. The movement takes care of
their families and their children and provides them with
as much material and moral support as it can. This is
one of the fundamental truths of Islamic work and thus

16

represents the duties of the Islamic state . . . The
HAMAS movement provides financial assistance, material
aid of food packages in the blessed month of Ramadan, and
gifts, clothes, and sacrifice meats for the 'ID AL-ADHA
to poor and needy Palestinian families without
discrimination.  It also provides poor and needy students
and sons of martyrs in the first year of study with
school bags containing paper and other study essentials
and supports orphans in the Gaza Strip.  The movement
provides this aid through the support and assistance it
gives to the zakat (Islamic alms-giving) committees and
the Islamic associations and institutions in the Gaza
Strip. (Exhibit 40). (Emphasis added)

In a <u>Washington Post</u> article, dated August 11, 2001,
Sheikh Yassin described the purpose of HAMAS' charitable
giving in the West Bank and Gaza.  The article states,

On the streets of Gaza, and to a somewhat lesser extent
in the West Bank, Hamas's status has been underpinned by
a network of medical clinics, schools and welfare
institutions that distribute free and subsidized food to
the needy.  According to Yassin, the group distributes $2
million to $3 million in monthly handouts to the
relatives of Palestinian suicide bombers; "martyrs" who
have been killed by Israelis; and prisoners in Israeli
jails.  When pressed, he was vague about the provenance
of the money, which, according to the State Department,
comes mainly from Palestinians overseas, Iran and private
benefactors in Saudi Arabia and other moderate Arab
states. (Exhibit 41).

Ronni Shaked, a journalist and former official in the
GOI, commented on HAMAS fund-raising in a book he wrote based
on his interviews with operatives while they were imprisoned:

The major channel for fund-raising for the HAMAS
organization in the United States is the Occupied Land
Fund that was established in Los Angeles, California.  In
1992, the organization changed its name to the Holy Land
Foundation and moved to Richardson, Texas.  The President
of this organization is Shukri Abu Baker.[4]

---

[4] Shaked, Ronni and Aviva Shabi, <u>Hamas: M'Emunah B'Allah
L'Darech Ha-Terror</u> (Hamas: From Belief in Allah to the Road of

As will be described below, it has been documented that the HLFRD provided charitable aid to the very individuals and institutions described by HAMAS as its recipients.

As to the individuals receiving support from the HLFRD, evidence strongly suggests that the HLFRD has provided crucial financial support for families of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement. It is believed that by providing these annuities to families of HAMAS members, the HLFRD assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace. According to HLFRD-4, an FBI asset who has provided reliable information in the past, in the words of Shukri Abu Baker, HLFRD's mission is to support the families of the martyrs.

FBI investigation has determined the HLFRD transfers funds to HAMAS overseas utilizing at least three methods:

1) Direct fund transfers from the HLFRD Richardson, Texas office to the HLFRD offices in the West Bank and Gaza;

2) Transfers of funds from the HLFRD Richardson, Texas office to zakat (Islamic charity) committees located in the West Bank and Gaza, controlled by HAMAS;

3) Transfers of funds from the HLFRD Richardson, Texas office to other "charitable" organizations in the Middle East, not controlled by HAMAS, but believed to be supporting HAMAS.

FBI analysis has seen what appears to be the more common use of the HLFRD offices in the West Bank and Gaza as a preferred means of distributing funds to zakat committees. While zakat committees formerly received larger sums directly from the HLFRD Richardson, Texas office, since 2000 the FBI has observed a decrease or elimination of funds sent directly to the zakat committees. This coincides with the increase in funds to the HLFRD offices in the West Bank and Gaza, located in the same region as those zakat committees. (Exhibit 43).

---

Terror), Keter Publishing House, Jerusalem, 1994, p. 171.

The largest HLFRD recipients outside of the West Bank and Gaza are Sanabil Association for Relief and Development in Lebanon and Human Appeal International in Jordan. As will be discussed, these organizations have been linked to HAMAS.

## 3A. HLFRD OFFICES OVERSEAS

Significant information has been provided through the GOI's search of the HLFRD Jerusalem on May 7, 1995 and the closure of all HLFRD offices in Israel on May 6, 1997.

### Search of the HLFRD Office in Jerusalem:

The GOI have provided numerous documents that were seized during the May 7, 1995 search of the HLFRD office in Beit Hanina (an arab village outside of Jerusalem), which was operated by Muhammad Anati. It is the FBI's analysis that the documents seized and statement by the head of that office demonstrate the control the HLFRD headquarters in Richardson, Texas, had over the HLFRD Jerusalem office.

Documents retrieved in the search show that the two HLFRD offices were in frequent contact. Numerous documents seized from the office were facsimiles that bore the HLFRD letterhead and included the "sender's" fax number from the HLFRD office in Richardson, Texas. The following are the main findings:

1. Records reflecting funds transferred from the HLFRD to the Islamic Aid Committee, a.k.a. Islamic Relief Agency (IRA) and lists of people supported by those funds. Those lists bear the HLFRD name and Richardson office telephone number on the top of the pages, indicating the lists of recipients were reviewed in the HLFRD's Richardson office and then faxed from Texas to Jerusalem. Further, according to GOI analysis, the names of people who are not known to be affiliated with HAMAS received relatively low monthly payments.

The lists contained dozens of names of recipients who received more significant sums. Most of those individuals have been identified by the GOI as having ties to HAMAS activists. (Exhibit 45). The GOI has provided over 50 names of individuals listed by the HLFRD as recipients, having HAMAS connections. As an example, a paper with a request for 18 fund transfers for families of HAMAS deportees included as follows:

16 transfers of between $100.00 and $200.00 each to
families of deportees - without the names of the
deportees listed.[5] (Exhibit 45). The payment was for
February 28, 1993. Each of these transfers bears the
registration: family of a deportee, with the date
(usually January 15 or February 15, 1993), and the sum to
be paid. It is also noted that these families did not
receive any previous payments;

Two transfers of $400.00 each for the following:

(a) Ansharah Mahmoud Shukri, Ramallah; date of payment,
January 15, 1992; last payment, October 31, 1992;
$400.00.

According to the GOI, Ansharah Ali Shukri is the mother
of Ahmed Hussein Mahmoud Shukri, who is in jail for the
murder of a Jew at a Tel Aviv building site in September
1989, as well as an attempt to cause a bus (line 405) to
go off the road. He was arrested in September 1989 and
sentenced to life imprisonment. While in prison, Shukri
murdered a warden. (Exhibit 45).

(b) Fawzi Salman Abd Al-A'al, Gaza; date of payment,
January 15, 1992; last payment, October 31, 1992;
$400.00.

According to GOI, Fawzi Salman Mahmoud Abd Al-A'al, Gaza,
born in 1945, was a former detainee in 1989. He was
fired from his job at the civilian administration (he was
a male nurse) following his arrest. Al-A'al's sons,
Mazzen and Muhammad, are former detainees and HAMAS
activists. (Exhibit 45).

The search produced other examples of individuals
receiving money from the HLFRD (Exhibit 45), including:

---

[5] In December 1992, the GOI deported approximately 400
HAMAS and Palestine Islamic Jihad (PIJ) members to Lebanon. The
deportees were not admitted to Lebanon, and were forced to live in
makeshift tent cities for several months on the Lebanese border. As
previously mentioned, during this time, the HLFRD sent funds to these
deportees. (Exhibit 46).

20

The father of Muhammad Shawan, a wanted member of the
Izz-Al-Din Al-Qassam who was killed in a clash with an IDF
force in March 1994, and who participated in several attacks,
including the murder of two grocers in the Khan Younes area
in May 1993;

The widow of Abd Al-Rahman Aruri, a former deportee, and
a senior member of Izz Al-Din Al-Qassam, who was killed in a
clash with the Israeli Defense Forces (IDF) in December 1993;

The family of Suleyman Idan, killed during a car-bomb
attack in Beit-El in October 1993;

The mother of Ashraf Ba'aluji, serving a life sentence
for the murder of three Jews in Jaffa, in December 1992;

The wife of Jamil Al-Baz, a HAMAS activist serving a life
sentence for running over a soldier at Nitzanim crossing on
July 19, 1991;

The wife of Majdi Hamad, a senior Izz Al-Din Qassam
activist in Jabaliyah, who killed local residents and is
serving a life sentence;

The family of Yasser Hajaj, a HAMAS activist serving a
life sentence for placing an explosive charge on a Tel Aviv
beach on July 28, 1990, killing a Jewish tourist from Canada;

The brother of Raid Zakarana, a HAMAS terrorist who
committed suicide in Afula in April 1994;

2. An agreement between HLFRD Richardson, Texas and HLFRD
Jerusalem: This agreement was dated June 3, 1994, and signed
by Shukri Abu Baker, as Executive Director of the HLFRD, and
Mohamed Anati, Executive Director, HLFRD Jerusalem office,
(Exhibit 47). That agreement states that the HLFRD
recognized the HLFRD Jerusalem as its sole agency in the West
Bank and Israel and authorized it to oversee fund
disbursement for programs.

The key points of Anati's 1995 interview (Exhibit 45) are
as follows: Anati's office performed the functions of
liaison, mediation and supervision on behalf of the fund in
the United States and did not conduct money transfers;

The budget of the Jerusalem office was between $80,000.00 and $120,000.00 per year. This money was earmarked for regular operation of the office and was directly deposited in the HLFRD's account at the Mercantile Discount Bank in East Jerusalem;

The Jerusalem office's task was to draw up lists of needy from the West Bank and to provide those lists to the HLFRD office in Richardson, TX. After the HLFRD sent monies to the zakat committees, the Jerusalem office was then tasked with confirming that the individuals identified by the HLFRD received the allocations from the zakat committees in the West Bank;

The aid (money) was transferred directly from the United States to the zakat committees' bank accounts abroad.

The HLFRD in the United States had two branches in Israel, one in Beit Hanina, which was operated by Anati, and the second in the Gaza Strip, which was under the direction of Zuhair Baghadi. Both branches were directly subordinate to the HLFRD's management in the United States;

The annual budget of the fund in the West Bank was assessed at about one million dollars (valid to 1993-1994)

The center of the fund was in the United States where the contributions are collected. The fund was headed by Shukri Abu Baker, who operated from the main office in Texas. There was another office in New Jersey, headed by Muhammad El-Mezain.

Anati's statement and the above described lists seized from the HLFRD Jerusalem office, which designate the recipients of HLFRD funds, clearly indicate that Shukri Abu Baker played a controlling role in deciding who would receive support by the HLFRD. Many of these recipients have been identified by the GOI as being supporters of HAMAS.

1997 HLFRD Closure:

On May 6, 1997, the Israeli Minister of Defense named five Islamic associations as "non-permissible" and on that basis declared that funds reaching individuals and organizations in the West Bank and Gaza through those associations could be confiscated. (Exhibit 49). The HLFRD

22

was the only U.S. organization listed in this group.⁴ At the time, the HLFRD operated two offices in Israel, one in Gaza and the other in the West Bank town of Beit Hanina. The HLFRD offices in Israel were closed, based on the determination that the HLFRD raised funds that supported the HAMAS terrorist apparatus. On December 10, 1997, the head of the HLFRD's Jerusalem office, Mohammad Anati, was arrested and detained on charges of aiding and abetting a terrorist organization.

During his interview by the GOI (Exhibit 50), Anati stated that he was enlisted by HAMAS in 1990 and participated in writing HAMAS slogans and throwing stones.

In early 1993, he met Shukri Abu Baker, who personally hired him to run the HLFRD Jerusalem office. Anati ran the HLFRD Jerusalem office from early 1993 until its closure. That office was responsible for HLFRD activities throughout the West Bank. Anati stated the following about the HLFRD:

1. On March 17, 1996, the army and police came to the HLFRD office in Jerusalem and on authority of a decree by the Minister of Defense, shut down the office for one year. A year later, Anati re-opened the office, since he had not received an extension of the closure decree. According to Anati, despite the closing down of the office, all the branches received their money regularly, directly to their bank accounts. In 1997, when he re-opened the office, he received the money for the entire year.

2. Anati stated the HLFRD provided aid to the needy, but some of the aid was channeled to HAMAS;

3. Anati enabled every branch to allocate the money freely, and since some of the heads of the branches were connected with or supporters of HAMAS, some of the money served HAMAS.

⁴ The GOI orders stated, that despite its declared goals, the HLFRD "deals in the practice of transferring monies to the families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks" and "benefits from funding sources which are identified, according to security assessments, with the overall financial network of HAMAS."

23

4. While working for the HLFRD, Anati also secretly promoted HAMAS interests. For example, when he helped build an Islamic clinic in a certain area, everyone around knew that it was the HAMAS organization behind the clinic. When food was distributed during holidays, the population knew that HAMAS was behind this.

5. Approximately six months prior to this interview, Shukri Abu Baker told Anati to establish an advisory committee to the HLFRD, in order to advise which projects to fund. Baker proposed that Anati turn to Dr. Akram Harubi, a.k.a. Kharroubi, as one of the committee members. As previously stated, Kharroubi has admitted to being the Ramallah regional representative on HAMAS' Inter-Regional Coordinating Committee, which coordinated HAMAS activity in the West Bank.

Anati stated he turned to Fuaz Hamad Kamil, a.k.a. Fawaz Hamdan, who studied economics and operated in the Welfare Committee of the Al Razi Hospital in Jenin, for assistance in establishing the HLFRD advisory committee. As discussed later, Hamdan has been imprisoned for his activities in connection with HAMAS, which included aiding fugitives and funding weapons purchases. (The HLFRD has provided support to the Jenin Zakat Committee and Al Razi Hospital.) Hamdan established the committee, which included himself, Anati, Kharroubi and one other.

6. Anati described the HLFRD's headquarters in Richardson, Texas, and Shukri Abu Baker as being in charge.

7. Funds were transferred from the United States to Israel. The HLFRD office in Dallas sent the funds directly to the bank accounts of the different organizations in the West Bank, as well as the bank accounts of the various projects. The money did not pass through his office, except for funds intended for the Jerusalem area, which Anati personally allocated.

8. According to Anati, the HLFRD is connected with HAMAS. When he visited the United States in 1994, he understood that they were pro-HAMAS and engaged in helping the needy. He also stated that he was told by HLFRD members visiting Israel that during parties and conventions held by the HLFRD abroad, it was mentioned that they were pro-HAMAS and they sang HAMAS songs.

24

According to the 1999 interview of Kharroubi, after Anati
was arrested he was contacted by Hoda Abadin, a resident of
Jerusalem, known to Kharroubi as being involved with the
handling of orphans at the HLFRD Jerusalem office. Abadin
began to coordinate all contacts with the charity committees
in the West Bank, which provided lists of candidates for
support. She then sent these lists to the HLFRD in
Richardson, Texas for approval. Later, she received a list
of approved candidates and the sum approved for distribution
to each recipient. Simultaneously, the HLFRD sent the
approved sum to the relevant charity committee.

Abadin told Kharroubi that following Anati's arrest,
HLFRD's lawyer, Mudhi Rishak, indicated that the HLFRD was
transferring its activity from the office in A-Ram/Qalandiya
outside Jerusalem to her home, since the offices could be
shut down on decree. The HLFRD's lawyer, Rishak recommended
to stop the HLFRD's activities from its offices until Anati's
trial was over. (Exhibit 18). It is the FBI's analysis that
the continued operation of the HLFRD subsequent to it's ban
demonstrates its continued efforts to provide support to what
had been identified as HAMAS recipients. In addition, this
activity demonstrates the HLFRD's control over the allocation
of funds from the Richardson, Texas headquarters.

### HLFRD HEBRON OFFICE

According to FBI analysis of the HLFRD's Richardson
office bank records, the HLFRD Hebron office has only been
receiving funds from the HFLRD Richardson since October 1999.
Hebron received the following:

1999: $442,491.00; Jan.-Sept. 2000: $1,001,492.00

The former head of the HLFRD Hebron office was Kamal al
Tamimi. Tamimi has been identified by the GOI as a HAMAS
activist. (Exhibit 18). In 1992 he was one of the HAMAS
activist deported to Lebanon.

### HLFRD GAZA OFFICE

The FBI has little current knowledge as to the leadership
of the HLFRD Gaza office. The HLFRD Richardson office sends
significantly less money to its Gaza office, as compared to
the West Bank. FBI analysis indicates that the HLFRD Gaza
received the following:

25

1997: $231,434.00; 1998: $76,697.00; 1999: $217,495.00, Jan.-Sept. 2000: $65,458.00

According to GOI and public source reporting, on September 25, 1997, as a result of HAMAS terrorist attacks, the PA closed what they identified as 16 HAMAS institutions and associations as part of it's efforts to degrade the terrorist infrastructure. The HLFRD's Gaza office was one of those 16 offices that the PA closed. (Exhibits 51, 53). According to the interview of Anati, subsequent to his December 10, 1997, arrest, the HLFRD Gaza office was headed by Muhammad Shawa and was shut down by the PA on the charge that it had ties with HAMAS. (Exhibit 50).

According to HLFRD-4 an FBI source, who has provided reliable information in the past, Shukri Abu Baker, at the September 30, 1997, HLFRD fund-raiser in Buena Park, California, commented on the closing of the HLFRD Gaza office. Baker discussed the HLFRD mission to support the families of the martyrs. He further talked about Yassar Arafat closing a number of charitable organizations' offices in Gaza, including the HLFRD office. Baker stated that Arafat would be sorry that he did this and that the goal of HAMAS to form an Islamic State could not be thwarted. This office has now been re-opened.

The GOI has further reported that Zuhari Barghati was the former Director of the HLFRD Gaza office. The GOI identified Barghati as a HAMAS activist and the nephew of Ismail Barghati, who had a joint account with Marzook while Marzook served as the head of the Political Bureau of HAMAS. (Exhibit 52).

One of the projects this office oversees is the Dar el Salam Hospital discussed below.

3B. ZAKAT COMMITTEES IN THE WEST BANK AND GAZA

[FBI COMMENT: Individual names which appear in bold print in this section have been identified by the GOI as being zakat committee leaders. Individual names appearing under these zakat committee leaders are HAMAS activists who have corroborated the HAMAS leadership role of those individuals who immediately appear in bold.]

26

FBI analysis has determined that HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for their movement. (Exhibit 53). These charity committees receive funds from such organizations as the HLFRD and manage social services, such as hospitals and schools, and distribute food and clothing.

An August 13, 2001 USA Today article describes how HAMAS' social infrastructure, in this case HAMAS-run schools, serve HAMAS' ends:

In HAMAS-run kindergartens, signs on the walls read: "The children of the kindergarten are the shaheeds (holy martyrs) of tomorrow." The classroom signs at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs." At an Islamic school in Gaza City run by HAMAS, 11-year-old Palestinian student Ahmad states, "I will make my body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys . . . I will tear their bodies into little pieces and cause them more pain than they will ever know." "Allah Akbar," his classmates shout in response: "God is great." "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise. Even the principal smiles and nods his approval. "You don't start educating a shaheed at age 22," says Roni Shaked, a terrorism expert and former officer in Israel's Shin Bet secret service. "You start at kindergarten so by the time he's 22, he's looking for an opportunity to sacrifice his life." (Exhibit 7).

Zakat committees are located in most communities throughout the West Bank. (Exhibit 53). Financial analysis of the HLFRD Richardson, Texas office records reveal that it has provided funds to the zakat committees representing the major communities in the West Bank, including: Hebron, Ramallah, Jenin and Nablus.

It is the FBI's analysis that the zakat committees receiving HLFRD financial support are controlled by HAMAS. GOI analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat committees. GOI analysis, as well as open source reporting, has identified that the civilian population is

27

aware that the services being provided by the zakat
committees, whether it's the distribution of food, medical
services or other social services, are being provided by
HAMAS. (Exhibit 53-54). The HLFRD's funding of the Islamic
Charity Association (ICA) is one example of the role that
zakat committees play in the overall goal of building HAMAS
grassroots support through charitable projects.

### Islamic Charity Association
### a.k.a. Islamic Charitable Society in Hebron

.A March 2, 2001, Associated Press article (Exhibit 54)
described a large unfinished building in Hebron, West Bank,
where Palestinian men and teen-age boys worked on a makeshift
assembly line, packing food items into boxes. Inspirational
music extolling HAMAS played in the background. "The holy war
is calling," a singer intoned on a tape. "We will continue
the resistance, the HAMAS revolution."

The article went on to explain that the warehouse is run
by the Islamic Charity Organization in Hebron, which
distributed 50,000 food packages to destitute Palestinian
families in the West Bank ahead of the Muslim holiday of Eid
al Adha. The article stated that across the Palestinian
areas Islamic charities are filling a growing need created by
skyrocketing unemployment and poverty. In so doing, they are
winning hearts and minds for HAMAS' unyielding doctrines at
the expense of the PA. "People realize more than before who
is honest and who is not. In the long run, it will pay off
in increased political popularity," said Khaled Amayreh, a
Palestinian journalist close to the Islamic movement."

The article describes that, along Shuhada Street in
Hebron, 56 families have received monthly donations of food
from Islamic charities. Anaya Bader of Shuhada Street said
that she desperately needed the donations to make ends meet.
With 10 children to feed, she said her Islamic brothers have
not only her thanks, but also her support. "All we know is
they are the ones who bring us food," she said.

Financial analysis of HLFRD bank records (Exhibit 43)
indicate that the ICA received the following from the HLFRD:

1997: $138,302.00; 1998: $690,297.00; 1999: $275,313.00;
Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, approximately $53,474.00 was transferred to this zakat committee from the HLFRD Richardson office, exact dates unknown.

It is reasoned that the decrease in funding by the HLFRD is due to the fact that a library building project in Hebron, for which the HLFRD has collected large donations, was completed.  The HLFRD Hebron may have taken over the maintenance of the library as well.

According to information from the GOI, the ICA has been identified as a HAMAS entity. (Exhibit 55).

In addition, the GOI reports that the ICA is in charge of such institutions as the Islamic Associations in Dura, Bani Na'im, Yata, and Beit Ola. (Exhibit 56).  The GOI identifies the following individuals as leaders of ICA:

Muhammad Ayad Muhammad Missaq, a.k.a. Muhammad Eid Muhammad Missak, ICA director/manager; Administrative detention from April to August 1989[7] and from December 1992 to April 1993; identified by the GOI as a senior HAMAS activist in Hebron. (Exhibits 56-57).

Abdallah Najar, a HAMAS activist, was interviewed by the GOI in January 1997.  Najar stated that when he worked in the Hebron Orphanage, owned by the ICA, Missaq was one of the HAMAS activists with whom he worked. (Exhibit 58).

Ibrahim Abd Al-Fatah Shubaka, a HAMAS activist, was interviewed by the GOI.  Shubaka stated that Missaq was a member of the ICA, which maintains two orphanages and financially supports the town's orphans.  He stated that the schools instill the pupils with HAMAS values, and their graduates include operational HAMAS activists. (Exhibit 59).

---

[7] According to GOI, an administrative detention is based on terrorism-based information obtained by Israeli authorities, and reviewed by the region's military commander or a judge.  The detention can last for three to six months and can be extended.

29

Hashem abd al-Nabi Natshe, Directorate Co-Chairman and
Chairman of the Trade Bureau (Chamber of Commerce.)  In
August 1990, Natshe was arrested by the GOI, but released due
to a health condition.  The GOI identifies Natshe as a senior
HAMAS activist. (Exhibit 56-57).

Abdallah Najar, the HAMAS activist mentioned above, was
interviewed in January 1997.  Najar stated that he worked
in the Hebron Orphanage, which is affiliated with the
ICA.  One of the HAMAS activists he identified working
with was Natshe. (Exhibit 56).

Adnan abd al-Hafez Musbah Maswada  Directorate Co-
Chairman.  Detained June to July 1989 and April to October
1994 for HAMAS activity.  Maswada was a 1992 deportee to
Lebanon.  According to the GOI, Maswada is a member of HAMAS
headquarters in Hebron and is connected to HAMAS terrorist
activities against settlers. (Exhibit 57).

When HAMAS founder Sheikh Ahmad Yassin was interviewed by
the GOI, he said that in the period of April to May 1989,
he received a message from HAMAS activists in Jordan
stating that operational HAMAS representatives should be
appointed in Gaza, Hebron and Nablus.  Yassin asked his
aide to forward the message to Maswada in Hebron, so that
he could assist and advise them whom to appoint.
(Exhibits 60).

Yahya Arshad, a HAMAS activist, was interviewed by the
GOI.  He stated that in early 1996, HAMAS/Muslim
Brotherhood established the Hebron Majles Al-Shura to be
responsible for advising and deciding on the political
platform of both organizations.  Arshad stated he
attended both meetings of this forum and Maswada had also
attended. (Exhibits 61).

Mun Wazuz, a Hebron HAMAS activist was interviewed by the
GOI.  He stated that Maswada was a senior HAMAS activist.
(Exhibits 62).

Assad Keimuni, a Hebron Democratic Front for Liberation
of Palestine (DFLP) activist, was interviewed by the GOI.
He stated that he knew Maswada to be a HAMAS activist.
(Exhibits 63).

30

Izzam Naaman abd al-Rahman Salhab, Head of Orphans'
Branch. He was a 1992 deportee to Lebanon, returning in
December 1993. Salhab was placed under administrative arrest
from May to December 1989 and March to June 1990. He was
also in prison from December 1990 to December 1991 and
October to December 1992. The GOI identified him as a member
of the HAMAS leadership in Hebron. (Exhibits 56-57). During
an interview in December 1990, Salhab admitted being
recruited by HAMAS and being a member of the HAMAS
headquarters and in charge of the prison committee.
(Exhibit 57, 64).

During the GOI interview of Kutla (student organization
of HAMAS) activists Adel Badrin and Fuad Tabish, it was
determined that they attended meetings between the Kutla
leadership and HAMAS. The last meeting was in April/May
1999. Both Badrin and Tabish separately identified
Salhab as being one of the HAMAS representatives present.
(Exhibit 65-66).

Akram Kharroubi, a HAMAS activist, was detained and
interviewed by the GOI in 1999. Kharroubi stated that
Salhab was the Hebron representative to the united
headquarters of HAMAS in the West Bank, called the "al
Lajna al-Marjiyah," which was to include representatives
of all the regional Headquarters. (Exhibit 18). The role
of these representatives was to maintain contact with
HAMAS activists in his area on various issues including
political-organizational activity. HAMAS emissaries came
from abroad, and members of the committee were sent
abroad, to consult on specific issues. (Exhibits 18, 67).

Fatham Mahmud Hassan Shahada, Secretary. Identified by
the GOI as a HAMAS activist. (Exhibit 57).

Taher abd al-Aziz Dandis, ICA member. Dandis was a 1992
deportee to Lebanon and was imprisoned from June to September
1994. GOI reporting states he is a HAMAS leader in Hebron,
with strong ties to other HAMAS leaders. (Exhibit 56).

Hebron Library Project: During the 1999 GOI interview of
Kharroubi, he stated he was involved in the "founding of a
library in Hebron," presumed to be the Al Anwar al Ibrahimi
Library. His involvement was at the request of Hitham
(Haitham Maghawri, HLFRD Executive Director). (Exhibit 18).

According to the 1999 HLFRD Annual Report, the HLFRD undertook the financing of a library, called the Al Anwar Ibrahimi Youth Education Center. (Exhibit 11). That library was under the oversight of the HLFRD Jerusalem.

<u>Charity Committee in Ramallah</u>
<u>a.k.a. Ramallah Zakat Committee</u>

According to the GOI, the Ramallah Zakat Committee is a HAMAS entity and provides relief and assistance to the needy in Ramallah and Jerusalem.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $89,239.00; 1998: $72,652.00; 1999: $58,532.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, approximately $24,304.00 was transferred to this zakat committee from the HLFRD Richardson office, exact dates unknown.

The following HAMAS activists have been identified by the GOI as being associated with the Ramallah Zakat Committee (Exhibit 56):

Aqel Suliman Muhammad Rabia a.k.a. Aqal Sulayman Muhammad Rabiyah, Director/Manager; incarcerated from December 1990 to March 1992, due to his involvement in HAMAS. (Exhibit 56).

Ahmad Sati, an identified HAMAS activist, was interviewed by the GOI. He stated that Rabia was Hebron's representative to HAMAS' national propaganda apparatus. He described this apparatus as being guided directly by the regional HAMAS headquarters and indirectly by the national headquarters. (Exhibit 68).

Omar Quasma, a HAMAS activist, was interviewed by the GOI. He stated that in 1990, he received HAMAS written materials from Rabia to distribute in the Hebron Mosques. (Exhibit 69).

Mahammed Anati, an admitted HAMAS activist and former head of the HLFRD Jerusalem office, was interviewed by the GOI. He stated that after the HLFRD was outlawed by

32

the GOI, Rabia gave him a room at the Ramallah Zakat Committee premises from which he ran HLFRD affairs. (Exhibits 45, 56).

Amar Muhammad Ahmed Hamadan, Committee member and former head of the Committee and Treasurer. He was reportedly involved in transferring HAMAS funds to the families of detainees. (Exhibit 56).

Ibrahim Said Hassan Abu Salem, is an "unofficial member." He was subject to several administrative arrests from December 1992 to September 1993; currently under administrative detention and serving as a HAMAS leader in prison. A religious lecturer, he served as one of the HAMAS leaders in the West Bank, in contact with HAMAS leaders in Israel and abroad. While deported to Lebanon in 1992, he met other HAMAS leaders there and received assignments to be carried out on his return to the West Bank. (Exhibit 56).

Fadel Muhammad Salah Hamadan, Committee member. Hamadan was placed under administrative arrest four times from 1988 to 1992. He was one of the HAMAS members deported to Lebanon in December 1992. He is an Imam and senior HAMAS activist who serves as one of the HAMAS headquarters leaders in Ramallah. He also heads the Majlis al Shura (advisory council) with six members and guides their activities. Reportedly, he is directly connected with the planning of suicide attacks and the spiritual preparation of those about to commit suicide attacks, including the Mahane Yehuda attack in July 1997. (Exhibit 56).

Mahmud Ahmed Abd Al-Rahman Ramhi, Committee member. Ramhi was imprisoned from December 1992 to April 1995 for recruitment to HAMAS and having been in charge of the center area of Ramallah on behalf of HAMAS. (Exhibit 57).

Nabil Abd Al-Hadi Mustafa Mansur, Committee Secretary. Mansur was arrested three times: October 1985, October to December 1990, and 1994. (Exhibit 56).

### Jenin Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $42,849.00; 1998: $89,779.00; 1999: $40,394.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, transfers were made totaling approximately $21,437.00, exact dates unknown.

The GOI reported that the individuals who run this zakat committee are HAMAS members. (Exhibits 56-57).

Ahmed Salim Ahmed Saltana, head of the Committee. Saltana was imprisoned from May 1993 to June 1996. Saltana admitted that in 1992, he participated in transferring materials for the preparation of explosive charges. In 1993, he participated in the planning of a car bombing. (Exhibits 71, 57).

Nazia Abu Aoun, a senior HAMAS activist was interviewed by the GOI. He was incarcerated with Sultana from 1993 to 1997. Aoun stated that when Sultana was in prison, he was a senior HAMAS activist. (Exhibit 72).

Iyyad Braham, the HAMAS chief in the Village of Siris, was interviewed by the GOI. He stated that in 1992, he had been appointed to this post by the HAMAS chief in Jebba, Ahmad Sultana. (Exhibit 73).

Fathi Katit, a HAMAS activist in Siris was interviewed by the GOI. He stated that Sultana had given him two manuals for the preparation of explosive charges. (Exhibit 74).

Muhammad Radwan, a HAMAS activist, was interviewed by the GOI. He stated that in 1991 or 1992, Sultana, with whom he worked in the Charity Committee, approached him with an offer to recruit him into HAMAS. Radwan agreed and later, under Sultana's guidance, distributed HAMAS leaflets in Jenin's Mosques. It is the FBI's analysis that this is a typical method of HAMAS using the Dawa (i.e. social infrastructure) to recruit members. (Exhibit 75).

34

Ibrahim Hassan Ali Jaber, Committee member.  Jaber was placed under administrative arrest four times for being a senior HAMAS member who, among other activities, led riots during the Intifada (1987-1993).  He was also under GOI arrest from January 1995 to January 1996. (Exhibits 56-57).

During the GOI interview, Jaber admitted to having been in charge of HAMAS in Jenin's refugee camp, where he recruited activists and distributed leaflets.  He was also detained by the PA's General Intelligence from February to August 1996, in the PA's attempt to contain HAMAS' support structure, following a wave of suicide attacks. (Exhibit 76).

Nur Al-Din Kamal Asad Tahaina is in charge of the Zakat Committee computer.  Tahaina was imprisoned from July 1994 to December 1994, for "aiding" one of the suicide bombers in the 1994 terrorist attack against an Israeli bus in Afula.  He also was imprisoned by the GOI from January 1995 to January 1996 for conducting HAMAS activities. (Exhibits 56-57).

Naser Khaled Ibrahim Jarar, Committee member.  Jarar was detained in April 1994, for three months for recruiting young men to the HAMAS terrorist wing; and again in January 1998, for his connection to one of the suicide bombers in the 1994 terrorist attack against an Israeli bus in Afula, as well as his assistance to other HAMAS operatives.  Jarar was imprisoned during the 1980s for other terrorist activity, including throwing firebombs at a border guard vehicle and a bus, rioting, and distribution of leaflets. (Exhibits 56-57).

Abd al-Jaber Muhammad Ahmed Jarar, Committee member.  Jarar was arrested in May 1993, for transferring weapons to HAMAS recruits who subsequently conducted terrorist attacks.  Jarar was released from prison in November 1994, and placed under administrative arrest on account of his desire to continue his terrorist activities.  He was released in December 1997. (Exhibits 56-57).

Fawaz Hamdan, Committee member.  Hamdan was imprisoned for his activities in connection with HAMAS, which included aiding fugitives and funding weapons purchases.  After being released in 1996, Hamdan was again arrested in 1997 for his activities in connection with the Jenin Zakat Committee.  He

was released in February 1998 and is currently active with the Jenin Zakat Committee and the Al R..i Hospital. (Exhibit 56).

Professor Khalid Said "Abu Hemmam," former Committee President.  Khalid was detained for more than one year in 1991 for heading the HAMAS administrative office in Jenin since 1988 and  being a member of the HAMAS administrative office for the Northern West Bank region. (Exhibit 56).

Al Razi Hospital:  The Al Razi Hospital is administered by the Jenin Zakat Committee.  Therefore, funds are not normally directly transferred there.  However, the hospital, which is supported, in part, by the HLFRD (Exhibit 78), received two transfers:  One occurred in April 1998, in the amount of approximately $40,000.00; and one in the amount of approximately $12,000.00, occurred sometime between January 1998 to April 1999, exact dates unknown.

As previously described, Fawaz Hamdan was identified as a Committee member and Administrative Director of the Al Razi Hospital, described above.[8]

<u>Nablus Zakat Committee</u>

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $43,951.00; 1998: $31,008.00; 1999: $46,482.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, transfers of approximately $25,707.00 were made, exact dates unknown.

Abd Al-Rahim Taha Nanbali, head of the Committee. (Exhibit 57).

Mohammed Anati, HAMAS activist and former head of the HLFRD Jerusalem was interviewed by the GOI in 1997. Anati stated that, the Nablus Charity Committee, a.k.a.

---

[8] The "State of Palestine/Ministry of Health" website confirmed that Fawaz Hamad a.k.a. Hamdan was an employee at the Al Razi Hospital, which is managed by the Jenin Zakat Committee and indicated that his title is Administrative and Financial Manager.

36

Nablus Zakat was headed by Dr. Abd Al Rahim Hanbali, a HAMAS activist. He further identified individuals who worked with the orphans as Haj Marzook and Siham Al-Masri, also both reportedly HAMAS activists. (Exhibit 48).

Iesa Abu Al-Az, HAMAS activist in the Ayn Beit Alma Refugee Camp, was interviewed by the GOI. He identified Hanbali as a HAMAS activist. (Exhibit 56).

Hamid Sulayman Jaber Bitawi, senior Committee member. Bitawi was administratively detained from December 1990 to October 1991. He was expelled to Lebanon in December 1992 and returned to the West Bank in December 1993. (Exhibit 56).

Abd Al-Rahman 'Ashur, a self-admitted HAMAS activist, was interviewed by the GOI. He stated that he had been recruited to HAMAS in 1993 and assisted in disturbances. In early 1995, he decided to become an operative for which he applied to three persons he knew as senior Nablus HAMAS activists, one of which was Bitawi. 'Ashur asked to be recruited to operational activity in Nablus, but the three refused, adding that if they were to change their minds, they would know where to find him. (Exhibit 82).

Musbah Daher, a HAMAS activist from Aksaka, was interviewed by the GOI. He stated that Bitawi was in charge of rallies on behalf of HAMAS. (Exhibit 83).

### Tolkarem a.k.a. Tulkarm Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $23,820.00; 1998: $18,314.00; 1999: $30,079.00; Jan.-Sept. 2000: no funds.

From January 1997 to April 1999, the amount of approximately $15,344.00 was transferred, exact dates unknown.

The GOI indicates that the Tolkarem Zakat Committee
exists to support HAMAS activities.  The following Tolkarem
Zakat Committee members were identified by the GOI as HAMAS
members, in some cases senior members in the Tolkarem area.
(Exhibit 57):

Hammad Muhammed Hamed Qa'adan, head of the Committee,
identified by the GOI as a HAMAS activist who belongs to the
HAMAS headquarters in Tolkarem and is in contact with the
HAMAS leadership in Samaria.

Ibrahim Muhammad Salim Salim Nir Al Shams, member of the
HAMAS Financial Committee in Tolkarem, and as an Imam of the
Mosque.  Salim also reportedly belonged to the Supreme HAMAS
Leadership in Nur Al-Shams.  He was imprisoned from October
to December 1990 for rioting.

Riad Abd Al-Latif Abd Al-Karim Al Ras is a HAMAS activist
assigned to the HAMAS Headquarters in Tolkarem.  He is also
in contact with the HAMAS leadership in Samaria and he is
also a member of the Majlis Al Shura in Tulkarm.

Husni Hassan Hussein Hawaja head of the Committee and a
HAMAS activist.

Bilal Hamis Yussef Abu Safira, Committee member.  Safira
is the head of the waqf (Islamic Trust) in Tulkarm and a
senior HAMAS member.

### Orphan Care Association (Bethlehem)

Financial analysis of HLFRD bank records (Exhibit 43)
indicate that this zakat committee received the following:

1997-1998: no funds; 1999: $38,435.00; Jan.-Sept. 2000:
no funds

According to the GOI, this association is run by
prominent HAMAS activists, identified below.  It is located
on the ground floor of the Salah al Din Mosque in Bethlehem.
(Exhibit 57):

Nasri Musa Issa Abada, founder. Abada is one of the HAMAS leaders in Bethlehem and is connected with senior HAMAS operatives in and out of Bethlehem, and is one of six members of the Supreme Majles Shoura in Bethlehem.

Ghassan Muhammad Harmas, Chairman; administratively detained from December 15, 1990 to February 23, 1991 and December 1992 to January 1994. Harmas was a HAMAS deportee to Lebanon.

Khalil Ali Rashad Dur Rashad, Association member. According to the GOI, Rashad is a HAMAS member who has been known to provide assistance to HAMAS fugitives. He provided assistance to HAMAS bomb-maker Muhi A-Din Sharif and HAMAS Operations Planner Hassan Salameh while the two hid in Bethlehem.

As previously stated, this organization was used during 1998 as a conduit for the HLFRD to send funds to HLFRD Jerusalem staff member Hoda Abdeen after the HLFRD office was closed in December 1997. (Exhibits 18, 90)

### Qalqilia, a.k.a. Qalqiliyah Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $35,577.00; 1998: $29,827.00; 1999: $40,441.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, there were transfers of approximately $17,471.00, exact dates unknown.

GOI reporting indicates that this zakat committee exists to support HAMAS activity. All four identified members of this committee have been identified by the GOI as HAMAS members. (Exhibit 57):

Bilal Abd Al-Rahim Muhammad Hanoun, Imam of the local Mosque, as well as a HAMAS activist.

Riad Rashid Hamed Walwil, member of the leadership in the Qalqilia and, currently believed to be under PA arrest. He also served prison time from December 1990 to February 1991

39

for rioting and December 1992 to January 1993. He was
detained by the GOI in August 1995 for interview and admitted
membership in the HAMAS. He was held under administrative
arrest until July 1996, due to his HAMAS activities.

Ibrahim Zahran, Committee member and HAMAS activist.

Walid Abd Al-Latif Suliman Abu Labadah, Committee member
and a HAMAS activist.

### Halhul Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43)
indicate that this zakat committee received the following:

1997: $31,652.00; 1998: $22,173.00; 1999: $29,643.00;
Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999,
transfers totaling approximately $17,273.00 were made, exact
date unknown.

GOI information indicates that the Halhul Zakat Committee
is controlled by HAMAS. Their information is based at least
partly on the fact that the following three Committee members
are HAMAS members and they actively direct the Committee.
(Exhibit 57):

Tawfiq Muhammad Ali Atrash, Committee member. He also
serves as headmaster of an affiliated school, and is a HAMAS
member. Atrash was under administrative arrest from March
1996 to September 1996.

Ahmed abd al-Rahman Abdallah Jahshan, Committee member;
the headmaster of a school in Halhul; and a known HAMAS
member. In late 1992 he visited Ahmed Salah, a senior HAMAS
member in the United States.

Ahmed Rashid Ahmed Abu Aroush, Committee member;
secretary at the local secondary school; and a known HAMAS
member. He also visited Ahmed Salah in the U.S. in late
1992.

<u>Hebron Zakat Committee a.k.a.</u>
<u>Hebron Tithing And Alms Committee</u>

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $20,090.00; 1998: $12,799.00; 1999: $24,279.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, transfers totaling approximately $12,992.00 were made, exact date unknown.

GOI information indicates that this zakat committee is connected to the HAMAS terrorist wing, specifically that HAMAS members run the organization.

According to GOI reporting, the following individuals are leaders of the Hebron Zakat Committee (Exhibit 52):

Majed Musbah abd al-Fatah Naser al-Din, is reportedly a HAMAS member and the head of the Committee. He is known to go abroad on assignment of the Committee to raise funds.

Muhammad Najab Kamal Sadeq Jabari, is Chairman of the Committee, head of the Hebron Religious Sages Council in Hebron, and reportedly a HAMAS member.

<u>Dar El Salam Hospital</u>

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this hospital received the following:

1997: $104,600.00; 1998: $128,850.00; 1999: $37,222.00; Jan.-Sept. 2000: $31,050.00.

Additionally, from January 1997 to April 1999, transfers totaling $15,500.00 were sent from the HLFRD to the Dar El Salam Hospital, exact dates unknown. It is possible that the reduction in funds was due to the fact that HLFRD was channeling funds through the HLFRD Gaza which oversees the hospital.

41

According to the GOI, the Dar el Salam Hospital was
founded in 1995 with HAMAS funds and protection.  The
building is located on the land of a HAMAS-associated family
by the name of Al Bata from Khan Yunis.  Members of the
family work at the hospital. (Exhibit 57).

FBI investigation indicates that since 1995, Dar el Salam
has received over $400,000.00 from the HLFRD.  The GOI
provided the following information regarding the employees of
the Dar el Salam Hospital (Exhibit 57):

Mufid Muhammad Mahmud Mukhalilati, Hospital Director.
Mukhalilati also heads the health center near the Shifa
Hospital in Gaza.  The GOI has identified Mukhalilati as a
HAMAS activist.

Naji Muhammad Said Bata, operates the family pharmacy and
has been identified as a HAMAS activist.  Bata was imprisoned
from December 1992 to January 1993 for participating in
riots.

Salah Muhammad Said Bata, sales agent and works at the
Dar el Salam hospital pharmacy.  The GOI has identified him
as a HAMAS activist.

### Islamic Aid Committee a.k.a. Islamic Relief Agency (IRA)

According to the GOI, the IRA was an association based
mainly in Nazareth, Israel.  Its declared purposes were,
"Charity, collection of contributions, aid to the needy and
charity."  The HLFRD provided funding to the IRA.  The GOI
searched the offices of the IRA and ultimately closed the
association, at the same time as it closed the HLFRD.  While
this organization was closed by the GOI on March 17, 1996, it
illustrates the role of the HLFRD in funding HAMAS.

Based upon the search of the IRA offices on July 27,
1995, and November 8, 1995, the GOI determined that the IRA
transferred funds to, among others, the families of HAMAS
activists who carried out several terrorist attacks,
including kidnaping and murder of civilians, policemen and
soldiers.  The beneficiaries of the funds also included
families of prisoners, deportees and HAMAS activists killed

during attacks.  The IRA also transferred funds to families whose homes were demolished according to an administrative decree.

According to the records found, the money transfers to the families of HAMAS activists were separated from the lists of other beneficiaries.  The IRA paid salaries to some ten HAMAS activists in the West Bank who have been imprisoned and/or deported in the past and are acting as the "representatives" of the IRA in their area of residence.  The GOI found forms requesting aid for the families of "The Fallen", filled in by the "representative."  The form included the name of "The Fallen," a detailed description of the attack during which he was killed; his former nationalistic activities in HAMAS; and a description of the special circumstances of the family of "The Fallen." (Exhibit 84).

The court decision to close the IRA stated:

The appellant is engaged in provision of massive aid to the families of HAMAS activists, who perpetrated or planned to perpetrate severe terrorist attacks and who were imprisoned, killed or deported, and that the main source of funds of the appellant is contributions by organizations abroad, all of which constitute part of the funding system of the HAMAS organization. (Exhibit 85).

Many of the lists of HAMAS beneficiaries, previously described in the May 7, 1995, search of the HLFRD Jerusalem offices were funded through the HLFRD providing money and guidance to the IRA.

3C.  ORGANIZATIONS FUNNELING MONEY TO HAMAS

Sanabil Association For Relief And Development (Sanabil)

Sanabil is a Lebanese-based organization.  Financial analysis of HLFRD bank records (Exhibit 43) indicate that this organization received the following:

1997: $125,744.00; 1998: $232,110.00; 1999: $649,386.00; Jan.-Sept. 2000: $456,105.00.

43

Additionally, from January 1997 to April 1999, transfers totaling $161,165.00 were sent from the HLFRD to Sanabil, exact dates unknown.

FBI analysis suggests that the HLFRD has devoted large amounts of money to gain favor and/or facilitate projects with the Lebanese government. For example, on March 10, 2000, Shukri Abu Baker, CEO, and Haitham Maghawri, Executive Director, flew to Lebanon to present a $100,000.00 check to the President and Prime Minister of Lebanon for the reconstruction of power plants destroyed by the Israeli air force on February 8, 2000. (Exhibit 87). The Israeli attack on the power plants was retaliation for Hizballah guerrilla attacks in which five Israeli soldiers were killed since January 25, 2000. (Exhibit 88).

Sanabil also has ties to The Palestine Relief Fund (a.k.a. Interpal), a United Kingdom based organization, which the GOI has identified as belonging to the HAMAS organization. (Exhibit 49). FBI analysis has linked Sanabil, Interpal and the HLFRD:

1. According to its website, www.interpal.org, Interpal describes itself as "The Palestinians' Relief and Development Fund, a non-political, non-profitable, independent charitable organization. The Charity is principally concerned with providing much needed support to the poor and needy Palestinian people in the primary areas of operation in Palestine - West Bank, the Gaza Strip and the refugee camps in Jordan and Lebanon." (Exhibit 89).

2. According to the August 24, 2001 Interpal website, most of the donations received by Interpal are zakat payments which places the charity under a religious duty to distribute funds according to Islamic Law. (Exhibit 89).

3. Interpal's August 15, 2001 website states that it "works closely with Sanabil." (Exhibit 89).

4. Interpal further identifies other organizations, if one wishes to make "International Donations." The only organization listed for the United States is the HLFRD. (Exhibit 89).

44

5. Finally, a review of the HLFRD's financial records shows that on April 11, 2000, the HLFRD wired Interpal $66,000.00 (Exhibit 89).

### Human Appeal International-Jordan (HAI)

While there is no evidence that HAI is a HAMAS organization, FBI investigation has revealed a close relationship among the HLFRD, HAMAS and HAI. FBI investigation has determined that the HLFRD provides significant funding to HAI, which benefits the HAMAS agenda.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that HAI received the following:

1997: $31,475.00; 1998: $105,236.00; 1999: $281,608.00; Jan.-Sept. 2000: $233,377.00.

Additionally, during the time period of January 1997 to April 1999, transfers totaling approximately $34,745.00 were made, exact dates unknown.

FBI investigation has determined that Bassam Fares was the HLFRD's Projects and Grants Director, from February 1997 until his voluntary removal from the United States in 2000. Fares held a senior HLFRD position. From April 1990 through May 1992, Fares was the Deputy Regional Manager for HAI in Jordan. (Exhibit 90).

In February 1996, an HLFRD-5, an FBI source, who has provided reliable information in the past, reported on a meeting at which Bassam Fares, a.k.a. Bassam Farris and others discussed how HAMAS meetings should be structured.

According to the source, FARES, a Jordanian, indicated that he had been affiliated with the Islamic Association for Palestine (IAP) for approximately ten years, and that organization donates to the Palestinian area approximately $3 million per year. These donations were reportedly sent to the Holy Land Foundation in Palestine, and the money goes to HAMAS.

As previously stated, the IAP also received funds from Mousa Marzook in the early 1990s, during the same time frame as Marzook, acting on behalf of HAMAS, was providing funds to the HLFRD and InfoCom.

45

FBI analysis suggests that unlike some of the other recipients of HLFRD funds, this organization is not controlled by HAMAS, but is a well-funded Gulf organization. It currently appears that HAI-Jordan could be serving as a conduit through which the HLFRD sends funds to its HLFRD representative in Amman.  The HLFRD is not licensed to operate in Jordan, and thus cannot legally have an office or bank account in Amman, Jordan.  It is likely that this close relationship with the HAI allows the HLFRD to circumvent this restriction on its activities.

4. HLFRD And Its Leadership Identified As HAMAS

4A. FBI asset reporting:

HLFRD-1, an FBI source who has provided reliable information in the past reported that during a speech at the Islamic Center of Passaic County (ICPC) in November, 1994, Mohammad El-Mezain, the HLFRD's current Director of Endowments and Former Chairman of the HLFRD Board, admitted that some of the money collected by the ICPC and the HLFRD goes to HAMAS or HAMAS activities in Israel.  El-Mezain also defended HAMAS and the activities carried out by HAMAS.

HLFRD-4, an FBI source, who has provided reliable information in the past, reported that on November 5, 1994, the IAP held a conference at the Culver City Memorial Building in Culver City, California.  The HLFRD's CEO, Shukri Abu Baker was identified to the audience as the Director of the HLFRD in Dallas, Texas, and the Senior Vice-President in HAMAS (second only to Mohammed El Mezain).  The source reported that at this conference, El Mezain and Baker stated that the monies raised by the HLFRD were strictly for HAMAS terrorists.

HLFRD-4 further reported that HAMAS leaders Shukri Abu Baker and Mohamed El-Mezain attended a Muslim Arab Youth Association (MAYA) Conference, December 30, 1994 to January 2, 1995, at the Hyatt Regency in Los Angeles, wherein Sheikh Muhammed Siyam was the keynote speaker.  Siyam was introduced as "Head of operations of Al Jihad Al Islamia in Gaza, the HAMAS military wing."

Siyam stated, "I've been told to restrict or restrain what I say . . . I hope no one is recording me or taking any pictures, as none are allowed . . . because I'm going to

46

speak the truth to you. It's simple. Finish off the
Israeli's. Kill them all! Exterminate them! No peace ever!
Do not bother to talk politics."

Following Siyam's speech, El-Mezain exhorted the crowd to
contribute money. It was subsequently announced that
$207,000 was raised for "the cause."

At that conference, El-Mezain reportedly stated that
during 1994 he (El-Mezain) raised $1,800,000 inside the
United States for HAMAS. El-Mezain and Abu Baker stated that
funds raised by the HLFRD were strictly dollars for HAMAS.
(Exhibit 96).

In December 1994, HLFRD-3, an FBI asset who has provided
both reliable and unreliable information in the past,
reported that Baker described the HLFRD as follows, "We raise
funds for Islam, money goes to projects." In describing the
projects the HLFRD funds, Baker said, "Some money goes to
HAMAS, but we build hospitals, schools, etc."

On September 30, 1997, an HLFRD-4, reported on the HLFRD
fund-raiser at the Sequoia Convention Center, Buena Park,
California. At that fund-raiser, Shukri Abu Baker stated
that the individuals present owed the money to the HLFRD and
the people fighting for the Islamic state in the West Bank
and Gaza. He also talked about the HLFRD mission to support
the families of the martyrs. He stated that the goal of
HAMAS to form an Islamic State could not be thwarted. Abu
Baker indicated that in the end HAMAS would throw out Arafat
and an Islamic State would be established.

In March 1994, HLFRD-6, an FBI source, who has provided
reliable information in the past advised that Ammar Hussein
Imreish, who source identified as the local leader for the
HLFRD, specifically talked about HAMAS and its ties to HLFRD.
Imreish stated that HAMAS leadership wants to hit only
military individuals and targets, not civilians.
Additionally, according to the source, the HAMAS leadership
says that HLFRD is their voice. Imreish surmised that in the
future, HAMAS will be recognized as a legitimate
representative of the Palestinian people and then the HLFRD's
ties to HAMAS will then be known.

HLFRD-3 further reported that the HLFRD raises funds for HAM.... and Shukri Abu Baker is a U.S.-based leader of HAMAS.

HLFRD-7, an FBI source, who has provided reliable in...rmation in the past reported that El-Mezain travels th...ughout the United States conducting fund-raising events on...ehalf of HAMAS and toured different Arab Gulf countries in...994, giving speeches about HAMAS and collecting do...tions.

HLFRD-8, an FBI source, who has provided reliable in...rmation in the past reported that on Friday, April 6, 20.., an HLFRD representative spoke to a crowd of ap...oximately 500 to 600 at the mosque in Cleveland. He sp...e about the plight of Muslims overseas. This individual, in...roduced an official representative of the HLFRD and stated th...: it was the duty of Muslims in Cleveland to help the Mu....ims overseas through the HLFRD.

This same source reported that on Friday, April 13, 2001. th...s individual again spoke about the HLFRD. The speaker in...roduced the HLFRD representative and encouraged people to su...port Muslims overseas through the HLFRD. During this ta...k, the speaker repeatedly made the statement that the H...RD is accused of being HAMAS. He then stated, "if we are H...AS, so what, we are helping our people."

Jamil Sarsour Confession. On October 23, 1998, Sarsour w... arrested by the GOI for his involvement with the HAMAS t...rorist organization, specifically, for providing financial a... other assistance to HAMAS fugitive and military activist, A...l Awadallah. At the time of his arrest, Sarsour was c...rying $66,530 00, a personal telephone book and two A...rican passports. Sarsour was interviewed and provided i...ormation concerning his and his brother, Salah's a...ivities in support of HAMAS over the last several years.

During the course of his interview, Sarsour described his ...other Salah Sarsour's involvement with HAMAS and fund-...ising activities by the HLFRD, in Richardson, Texas on ...alf of HAMAS. Sarsour stated that some of the members of ...e Islamic Center in Milwaukee, Wisconsin and his brothers ...lah and Imad are involved in raising money in the name of ...e HLFRD that is actually for HAMAS. (Exhibit 102).

5. HLFRD Bank Account:

FBI investigation has revealed that the HLFRD in Richardson, Texas funded the above described zakat committees. HLFRD offices and organizations by means of wire transfers from its Bank One accounts in Texas. Shukri Abu Baker and Ghassan Elashi are the primary signatories of record on these accounts. (Exhibit 103).

IV. SUMMARY

FBI investigations of HAMAS activities in the United States have revealed that the HLFRD is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by the HLFRD are clearly being used by the HAMAS organization. The information provided in this document confirms that the HLFRD is acting for or on behalf of HAMAS. Further, senior members of HLFRD support HAMAS ideology and activities. These HAMAS activities interfere with the Middle East peace process and pose a threat to the national security, foreign policy, or economy of the United States. As such, HLFRD should be considered by OFAC for SDT designation as a HAMAS entity, subject to the prohibitions of the IEEPA statute.

## Exhibit List

1. Executive Order 12947; Federal Register Publication, 1/25/95, re: HAMAS as SDT;

2. www.palestine-info.com/hamas/leaders; Reuters article, 12/1/89; Info-Prod Research Ltd. article, 12/29/98, re: Yassin's arrest history;

3. HAMAS covenant;

4. Reuters article, 7/31/01, re: relationship between HAMAS political and military;

5. Reuters article, 5/14/01, re: Rantisi quote;

6. Washington Post article, 8/11/01, re: Sbarro attack;

7. USA Today article, 8/13/01, re: disco attack;

8. Associated Press article, 5/25/01, re: May 2001 bombing;

9. The Ethnic Newswatch article, 2/25/96, re: February 1996 bombing;

10. Texas Secretary of State application for certification of authority by a non-profit corporation for the HLFRD;

11. HLFRD 1999 Annual Report; employee list recovered in trash cover;

12. IRS forms 990: 1998, 1999; Dun & Bradstreet report;

13. American Express credit card records, re: Philadelphia meeting;

14. 10/27/93 Airtel, re: Courtyard Marriott Hotel; room assignments;

15. GOI report 10/7217/92, 11/01/92 re: Ashqar;

16. Marzook extradition request, transcript of interviews with Sufian Abu Samara, 1/07/91 and 1/14/91, at pages 17-19;

17. TV interview of Mahmud Rumahi, 3/21/93;

18. GOI report 10/5830-99, 8/08/99, Akram Haroubi interview summary; www.hlf.org/May 2000 newsletter, re: AlAnwar Alibrahimiya Education Center;

19. Asset reporting;





**DallasNews.com**
**The Dallas Morning News**

An **The Dallas Morning News** Ads

April 4, 2002

| _____ | Local News | _____ | _____ | Classifieds |



Columnists
Entertainment
GuideLive
Health/Science
Nation
Opinion
Religion
Special Reports
Texas Living
Texas/Southwest
Travel
Weather
World

My DallasNews.com

Register
Account Info
• My-Cast
• Make this your
  home page

FRONT PAGE STORE
OWN A PIECE OF HISTORY

☐ **Archive**
☐ Start a search | Search tips | Terms and Conditions

# FOSTERING UNREST OR HELPING THE POOR?

# Public records show a case open to debate

**By Steve McGonigle Staff Writer of The Dallas Morning News**
Published June 11, 2000

Click here to go back to results.

Israeli police touted Mohammed Anati's 1997 arrest as a breakthrough in the war to disrupt funding for the militant Hamas movement.

He told police that his work for a Richardson-based foundation helped channel money to families of Hamas activists and that donors and recipients of the aid knew about the connection.

Two and a half years later, Mr. Anati is free, and he has recanted. His former employer, the **Holy Land Foundation** for Relief and Development, is still sending at least $1 million each year to the West Bank and Gaza.

Israeli officials contend that they have overwhelming evidence that the foundation is a financial front for Hamas. But the smattering of records they have made public portrays a case that is open to debate. Two Israeli courts that examined documents seized from the **Holy Land Foundation** and an affiliated Islamic charity reached different conclusions about the extent to which Hamas supporters were targeted for aid.

The Israeli Supreme Court said that the assistance to Hamas families was massive. But the military court that presided over Mr. Anati's case called the amount small in comparison with overall grants to families.

Mr. Anati also told the court during his trial that his earlier statements about the **Holy Land Foundation** and Hamas were products of coercion.



FILED

1:02CV00442(GK)

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EXHIBIT

9

Israel's efforts to use these and other records to persuade the United States to prosecute the **Holy Land Foundation** also have generated mixed results.

State Department documents show that U.S. authorities have investigated the foundation since 1996 and considered putting it on a list of foreign terrorist organizations. But the foundation was not listed, and no charges have been filed.

Justice Department attorneys have said that the Israeli evidence is not sufficient to convict the **Holy Land Foundation** under a U.S. law that bans fund-raising for Hamas, even for humanitarian purposes, sources said.

The foundation's president, Shukri Abu Baker, said that Israeli interpretations of the confiscated records are politically motivated lies and that American authorities realize they have no crime to prosecute.

"They know very much through all these years of investigation that there is nothing, that no action will they take against the **Holy Land Foundation** will stand in court," Mr. Baker said in a Dallas interview.

Israel has had difficulty sustaining its charges. Mr. Anati, for instance, is free because prosecutors did not prove that he was distributing money for the **Holy Land** Foundation on behalf of Hamas.

After a yearlong trial, prosecutors agreed to let him plead guilty to a lesser charge of working for an illegal organization. The court sentenced him to nine months in prison but ordered him released for time served.

Mr. Anati had initially implicated himself and the **Holy Land Foundation** in Hamas activities. He told police he had been a member of a Hamas cell and said that the foundation was a well-known arm of the movement.

But at his trial, he disputed large portions of his statement to police, maintaining that he had been pressured by the interrogators to link the Texas foundation to Hamas.

Although the Israeli military judges expressed doubts about the prosecution's evidence, in a written explanation of Mr. Anati's sentence they agreed that the **Holy Land Foundation** "is identified as a supporter of the Hamas organization and its purposes."

The Israeli Supreme Court reached stronger conclusions about the foundation in a separate case decided in August 1996. The decision upheld an Israeli general's closing of the Islamic Relief Committee of Nazareth, a charity that worked with the **Holy Land Foundation**.

The same general issued a simultaneous order closing the **Holy Land Foundation**'s Jerusalem-area office. After filing an appeal with the Israeli Supreme Court, foundation officials decided to drop the matter.

The court agreed with the Israeli government that the Texas foundation and three European-based funds were "part of the funding network of Hamas" and provided "massive assistance to families of Hamas activists."

The ruling was followed nine months later by an Israeli government declaration that the **Holy Land Foundation** and the European funds were illegal arms of Hamas and should be outlawed from operating in Israeli territory.

Among the confiscated documents the government relied on were lists of aid recipients identified by Israeli security agents as almost all families of Hamas "martyrs," exiles and prisoners. The documents are on file with the Israeli Supreme Court.

Aid to casualty's family

One family was that of Imad Akel, a famous Hamas military commander, killed in a firefight with Israeli soldiers in November 1993.

Within a month of Mr. Akel's death, records the Israelis seized from the **Holy Land Foundation** show, his family in Gaza received $800 from the Texas foundation.

All but two of the 27 other families on the same list, which carried the words "**Holy Land Foundation**" and the organization's fax number in Richardson printed across the top, were allocated between $200 and $600.

A worker for the Islamic Relief Committee in Nazareth who reviewed the Akel family's application for financial aid called Imad "a giant in the battalions" whose exploits had honored Palestinians.

"We can only give a token to the family from which Imad sprang," read the recommendation. "This succor we provide as a recognition and

appreciation of I    d Akel, the mercy of God be
upon him."

Attorneys for the Nazareth committee stated in
court filings that many families that had received
aid were those of Hamas activists, including some
killed in terrorist acts. But they, like **Holy Land
Foundation** officials, maintained that Hamas
membership was not a factor in awarding aid.

Mr. Baker, the foundation president, said Islamic
tenets dictate that aid be given to anyone in need,
regardless of what created the hardship.

"We cannot say, 'You are a child; your father died
in a struggle with the Israelis; we are gonna starve
you to death,'" Mr. Baker said.

He dismissed the Israeli Supreme Court's decision
as the product of a biased judicial system that he
said until last year permitted Israeli security agents
to torture Palestinian prisoners during
interrogations.

The foundation's decision not to pursue an appeal
of the closing of its office near Jerusalem - at the
same time as the Nazareth shutdown - was a
reflection of reality, he said.

"We don't have the budget, we will be
discriminated against, and we have all the odds
against us because we have a very racist regime
that doesn't want us near them," Mr. Baker said.

Shai Nitzan, the deputy state prosecutor who
handled both appeals, said that the **Holy Land
Foundation** quit because of the strength of the
evidence produced by the Israeli government.

"They are giving you statements," he said during
an interview in Jerusalem. "I am giving you
documents. They cannot refute documents."

U.S. not ready to act

Israeli officials say they are exasperated that the
United States has not closed the foundation. The
Israeli government has openly urged the United
States for at least five years to shut off the flow of
dollars from the **Holy Land** Foundation. It has also
provided reams of intelligence and documentary
information.

"We gave the American authorities a lot of
evidence in 1996. We gave them all the evidence,"
a senior Israeli government official said.

The Israeli officer said that he had been told late

last year by top S. law enforcement officials, including Deputy Attorney General Eric Holder, that the evidence was not sufficient.

"They want to be sure 100 percent that they will win at trial," said the Israeli officer, who spoke on the condition of anonymity. "But it's very, very difficult."

Repeated efforts to obtain comment from Mr. Holder were unsuccessful.

The Justice Department has used Israeli-obtained confessions in civil cases involving purported Hamas leaders in the United States. But use of foreign evidence can be problematic, a retired FBI official said.

"It's very difficult to get that kind of information that will rise to our standard of prosecution in the states," said Bob Blitzer, a former deputy chief of foreign counterterrorism.

Even the 1996 anti-terrorism law has not eliminated the obstacle of convincing a jury that money was not used for charity, Mr. Blitzer said.

"You still have to prove that it's not going to the widows and orphans of martyrs," he said, "which is not easy."

Contact Us    Terms    Privacy    Advertising    Site Map    About Us
©2002 Belo Interactive





# Emergency Appeal



## January - December 2002

FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNRWA Headquarters Gaza
Department of External Relations
Tel: + 972 8 677 7720
Fax: + 972 8 677 7698
e-mail: ero@unrwa.org
web site: www.unrwa.org

1:02CV00442(GK)

**EXHIBIT**

tabbies

10

# Foreword



*UNRWA's Fourth Emergency Appeal is being launched against the backdrop of continuing strife, closures and sanctions that have afflicted the Palestinian communities of the West Bank and Gaza Strip for over fifteen months, taking a profound toll in casualties and human suffering.*

*As a result of closures imposed upon their communities, many thousands of Palestinians have lost their livelihoods and fully half the Palestinian population of the West Bank and Gaza Strip is reportedly now living in poverty. Assessments by the World Bank and the Office of the United Nations Special Coordinator in the Occupied Territories have estimated that the economic losses resulting from these sanctions will take years to recover, even if present conditions were to ease in the near future.*

*Profound as these economic realities are, the long-term burdens facing humanitarian agencies and service-providers are wider. The needs of those who have been injured and disabled, the psychological traumas of children and the effects upon them of lost schooling, the rehabilitation of damaged shelter and infrastructure are among the concerns demanding our concerted action now even as we respond to immediate humanitarian needs.*

*Those whom UNRWA serves, the Palestine refugees, are among the communities worst affected by the closures and sanctions whether in terms of physical casualties, loss of livelihoods, damage to property and infrastructure or access to basic services. Thanks to the generous support of the international community, UNRWA has been able to respond rapidly and effectively to their needs and to maintain the provision of essential services under difficult and frequently hazardous conditions. While committed at all times to discharge our mandated responsibilities towards the refugees, who constitute roughly half the Palestinian population of the West Bank and Gaza Strip, in this crisis UNRWA has been called upon frequently to provide prompt assistance to non-refugee communities. The Agency's effectiveness in delivery of assistance is attested by various surveys conducted over the past year, placing UNRWA in the front rank of humanitarian aid providers responding to this crisis.*

*UNRWA is appealing once more to the international community for assistance to continue this vital work. This Fourth Emergency Appeal outlines the core responses that the Agency has set out to undertake, building upon our emergency activities and assessments to date. Relief priorities will be reviewed in line with circumstances as they develop, and we will continue to share the reports on our activities.*

*In an environment of considerable political uncertainty and instability, it is our hope and expectation that the international community will respond generously to the needs described.*

*Peter Hansen,*
*UNRWA Commissioner General*

# Introduction

Fifteen months into the ongoing crisis in the Palestinian Occupied Territory and with little sign that the cycle of violence will end, the Palestinians face a stark and uncertain future. Ever tightening restrictions on freedom of movement, prolonged curfews, military incursions deep into population centres, house demolitions, the destruction of agricultural crops, the uprooting of citrus and olive groves, and widespread damage to infrastructure have exacted an alarming toll: economic, social and psychological. Even if there is progress in negotiations toward a just, comprehensive and durable peace in the Middle East, the consequences of disrupted health, education and other vital services will be lasting.

Persistently high rates of unemployment (according to World Bank estimates, already 33 per cent by June 2001) have driven increasing numbers of households into poverty. By that date 47 per cent of households had seen their incomes halved. According to the Office of the United Nations Special Coordinator in the Occupied Territories (UNSCO), in the third quarter of 2001, the unemployment reached 31.5 per cent in the West Bank and 48 per cent in the Gaza Strip[1].

If economic conditions continue to deteriorate, increasing numbers of middle-income earners will also fall into poverty.

To sustain themselves, households have been forced to forego expenditures, borrow from relatives and friends, buy on credit, tap savings, sell off possessions, or defer payment of bills.

More than one year into the current crisis however, these strategies are becoming less and less viable. It may take years for many families to get out from under the burden of debt they have assumed.

The Intifada and the measures that Israel has taken to counter it have touched virtually every family in the West Bank and Gaza Strip. The effects on women and children give particular cause for alarm.

UNRWA, the UN agency whose sole concern is the welfare of the Palestine refugees, has not been spared. Repeated and prolonged closures have led to disruptions in its services, particularly in the West Bank. Its installations have come under fire, several members of staff have been humiliated and others beaten or injured by gunfire in the course of carrying out their duties. Since the start of the crisis, UNRWA has been unable to deliver 42 ten-tonne truckloads of supplies in storage in its warehouse in Jerusalem to the Gaza Strip, because of procedures at the Karni border crossing entailing the off-loading and on-loading of goods. Medical supplies account for more than half the value of the goods in storage

> *"I have never seen the Palestinians so deflated, angry, frustrated and hopeless."*
>
> ———
>
> A long serving UNRWA staff member



2

Owing to differences in the geography and demographics of the West Bank and Gaza Strip, the security measures that Israel has taken have affected the residents of the Occupied Territory differently and to varying degrees.

The West Bank covers 5,860 square kilometres, and Israel controls 82 per cent of the territory, including major highways. By prohibiting Palestinian traffic from major roads and blocking secondary roads, Israel has been able to isolate major towns and cities from each other and villages and refugee camps from nearby urban centres.

There are now 72 permanent checkpoints manned by the Israeli Defence Forces (IDF) in the West Bank. The Gaza Strip, where Israeli settlements and military areas also constitute a large part of the territory, has nine permanent checkpoints and is broken into three separate zones during times of closure.

Travelling between towns means crossing in and out of areas under Palestinian and Israeli control. Covering just the 50 kilometres between Ramallah and Nablus in the West Bank often takes several hours. Occasionally the IDF erects temporary checkpoints on roads as well.

[1] *The Impact on the Palestinian Economy of Confrontations, Border Closures and Mobility Restrictions,* UNSCO, January 2002

> *On 20 October 2001, one of UNRWA's physicians was struck by gunfire in the Beit Jibrin refugee camp in the West Bank while tending to an injured person. An ambulance driver who later returned to the scene to retrieve a stretcher and the physician's medical bag was also hit by gunfire.*

## The situation of refugees

Amongst Palestinians, refugees have been the most vulnerable. In the Gaza Strip there are over 850,000 UNRWA-registered refugees and in the West Bank 607,000, constituting approximately 70 per cent and 30 per cent of the Palestinian population respectively. Consequently, even during peaceful times UNRWA is responsible for the delivery of education, health and relief and social services to nearly half of the Palestinian population. During emergencies such as the region has experienced in the last fifteen months, UNRWA's ability to respond to the needs of the refugee community becomes even more critical.



In the Gaza Strip 51 per cent of the refugees reside in eight refugee camps, and in the West Bank 27 per cent in nineteen refugee camps. Therefore in the West Bank the vast majority of the refugee population lives outside the camps, many in remote villages. This is particularly significant in appreciating the difficulties of providing emergency assistance to dispersed communities.

The vulnerability of the refugees comes mainly from their high dependence upon work as unskilled or semi-skilled labour, particularly in Israel, where they are extremely susceptible to closures. In a University of Geneva survey, 27 percent of refugees interviewed reported losing employment as a result of the Intifada, compared with 20 per cent of the non-refugee population. In the West Bank refugee camps a reported 46 per cent of households now fall below the poverty line, while in the Gaza Strip this figure rose to 65 per cent. Clearly, with very little chance of work, and traditional alternative safety nets, such as savings, borrowing and assistance from extended families becoming exhausted, the only relief for these families must come from outside. The majority of refugees own neither land nor other property, and few have accumulated savings.

Apart from the economic effects of the crisis, the residents of the camps have been hardest hit in terms of physical injury, damage or destruction of property, most seriously in the southern part of the Gaza Strip.

Refugee camps, particularly those bordering Israel, Israeli settlements or military encampments are frequently targeted, by military incursions or strikes. In the Gaza Strip the refugee camps of Rafah and Khan Younis have been particularly affected, and in the West Bank, Camp No.1, Aida, Beit Jibrin, Tulkarem and Jenin.

More than half of the 843 Palestinians killed by the middle of January 2002 were refugees registered with UNRWA. By then, in the Gaza Strip alone, over 2,600 refugees were without shelter, after the Israeli Defence Forces had completely demolished or damaged 336 refugee dwellings beyond repair. More troubling, since the start of the Intifada 25 students enrolled in UNRWA's schools in the Gaza Strip and four in the West Bank have been killed, 11 of them between the ages of six and 12. Anther 545 students in the Gaza Strip and 245 in the West Bank have been injured.

Tight closures imposed by the Israeli security forces in both the West Bank and the Gaza Strip have also severely affected access to health and education services. This has been particularly serious for the population in the West Bank, where towns and villages have been isolated for considerable periods of time, by permanent and temporary roadblocks, ditches, concrete blocks and gates. This has not only made access extremely difficult for those needing services, but also for service providers such as UNRWA and the Palestinian Authority.

In the Gaza Strip medical consultations at UNRWA clinics rose by 21 per cent and dental consultations by 18 per cent as refugees increasingly turned to the Agency's services. In the West Bank, the crisis has led to a 10.4 per cent increase in the incidence of low birth weights and a 52 per cent in the stillbirth rate. The numbers of refugees seeking secondary health care in hospitals where UNRWA contracts services on their behalf have fallen by 18.4 per cent in the West Bank, as refugees are often unable to access these hospitals because of closures.

Children's education has been profoundly affected by the crisis, and the results of final examinations in 2001 showed a marked deterioration in children's scores.



**Results of final examinations for 2001 showed a marked deterioration in children's scores. In the West Bank for example, in the Arabic language only 38 per cent of students scored passing grades. In mathematics, only 26 per cent of students scored passing grades, down from 54 per cent the year before. During the month of December 2001, in the West Bank the Agency lost 5,228 teacher days due to access problems, compared with 5,585 teacher days lost during the whole of the 2000/2001 academic year.**

# UNRWA response under this appeal

Despite the worsening economic and social situation facing the refugees in the West Bank and the Gaza Strip, and the onerous restrictions placed on the freedom of movement of Agency staff, vehicles and supplies, UNRWA has continued to meet the challenge of providing emergency humanitarian assistance to over 1.4 million refugees. Humanitarian assistance, funded by the previous UNRWA Emergency Appeals, has reached its target beneficiaries, despite the many obstacles. Recent studies have highlighted the successful role the Agency has played in this regard, and UNRWA is committed to continue providing its regular programme services, as well as its emergency assistance for as long as is necessary.

Whether there is a political solution to this conflict, and with it an end to the violence that has plagued the region for the last fifteen months, or not, both the Palestinian people, in particular the refugees, and UNRWA are faced with a considerable challenge for the year 2002. The economic hardship brought on by the months of conflict will not disappear overnight. Even if a road towards peace is embarked on the effects will be with us for a considerable time to come. It is with this in mind that UNRWA has considered carefully how it should respond in the coming twelve months. It has critically analysed its own performance in responding to the situation to date and has made adjustments wherever it has considered this to be necessary.

UNRWA is satisfied that it has responded appropriately to the crisis since September 2000. However, in an attempt to keep abreast of developments in the needs of the refugee community, the Agency has made certain adjustments to its approach for the coming months. Past activities were a means of immediate response to urgent needs. However, in order to meet better the needs of specific families changes are being made in the scheduling and packaging of food assistance, and in selective relief and cash assistance.

UNRWA will continue to focus on employment creation, as it did in the Third Emergency Appeal. Under this appeal, greater attention will be given to the poorer areas of the southern Gaza Strip and the hardest hit village areas of the West Bank. The issue of access to refugees in the West Bank, especially those outside towns, is particularly important since 73 per cent of West Bank refugees reside outside the camps.

UNRWA will continue its assistance to those injured, both physically and psychologically, by the events. An increasing number of shelters has sustained damage or been demolished, and it is essential that UNRWA assists those affected.



In health, further procurement of medical sup-
plies and equipment is necessary to meet the
increasing demands on UNRWA health services,
whilst mobile health teams will continue to be
used to reach those refugees who are unable to
access health centres.

> *During 2001, UNRWA successfully
> delivered 857,191 household food
> packages to 124,979 families in the
> Gaza Strip*

In education, remedial classes will be held for
children identified with learning difficulties re-
sulting from the situation, and after school ac-
tivities will be run to provide children with a
peaceful environment in which to express them-
selves.

The Agency considers it essential to look with a
critical eye at both the effects of the last fifteen
months and the Agency's response. To this end,
the Agency will carry out a number of assess-
ments, using both internal and external re-
sources, in the areas of psychological well be-
ing, employment, physical rehabilitation, health,
education and infrastructure. Assessment will
be carried out as a matter of urgency as soon as
funds are available, and will assist the Agency
to continue to adapt its approach to its emer-
gency work as appropriate.



The Agency will remain responsive to changing
circumstances, and this may entail altering its
priorities as events unfold during 2002. There-
fore, UNRWA's response as outlined in this Ap-
peal will remain open to adjustment during the
next twelve months if circumstances so dictate.

# Coordination

To implement its emergency activities under
the first three appeals UNRWA increased its
cooperation with other UN agencies, Palestinian
Authority (PA), ministries and NGOs. This
enables UNRWA to benefit from the expertise
and experience of others, to ensure that its
interventions are appropriate, not duplicated,
and to allow UNRWA to share its expertise. In
some cases UNRWA has implemented its
activities with partners. It should be emphasised
that UNRWA had traditionally cooperated with
many of these organisations before the present
crisis.

UNRWA has participated in the Humanitarian
Task Force for Emergency Needs (HTFEN)
convened by UNSCO, and co-chairs, with OCHA,
the Area Tasks Force established in West Bank
and the Gaza Strip. These two task forces
include UN Agencies, Palestinian ministries,
donors, the ICRC and NGOs. They allow mem-
bers to co-ordinate activities, air specific
problems and discuss policy issues.

UNRWA also participates in the Sectoral Working
Group meetings on emergency employment
generation in the West Bank and Gaza Strip
convened by UNSCO, along with representatives
of the Palestinian Authority's Ministry of

Planning and International Cooperation, UNDP,
the World Bank, OCHA and donor repre-
sentatives.

With respect to UN agencies, UNRWA cooperates
with OCHA on the overall humanitarian crisis,
with UNDP and ILO on job creation, WHO on
health, UNESCO on education, and UNICEF on
children's and women's needs, immunisation
and psychological counselling. Of particular
benefit has been the assistance of UNDP in
preparing for the extension of the emergency
employment programme into villages and rural
areas. UNRWA coordinates access issues on
behalf of all UN organisations and, with funding
from OCHA, has established a legal post to deal
solely with such issues and to prepare an access
database. This access information is shared with
all UN agencies, embassies, consulates,
representative offices and the ICRC. The
Commissioner-General is also the Designated
Official in the region with responsibility for the
security of UN staff.

Since 1994 UNRWA has coordinated its
education and health programme activities with
PA ministries as well as with other institutions
such as the PLO Department of Refugee Affairs.

It has continued to do so in regard to emergency activities. The Agency has regularly met with them to discuss both the general approach to emergency assistance for refugees and also specific issues that have arisen.

They have been helpful in resolving problems that have faced the Agency when implementing its programme of emergency assistance.

The Agency has kept abreast of the current needs of the refugee community by regularly meeting with PA officials and community leaders at the national, regional and local levels. A Memorandum of Understanding has been signed with the Palestinian Ministry of Housing for the use of land in the Tel es-Sultan district of Rafah, in the Gaza Strip, to build shelters for refugees made homeless by Israeli bulldozing activities.

The Agency provides assistance, mainly logistical, to a number of UN agencies, international and local NGOs and PA ministries. In addition it has cooperated with health sector NGOs and hospitals on the provision of medical services to the refugee community.



# EMERGENCY PROGRAMME ACTIVITIES

## Emergency employment generation

In responding to the massive loss of jobs and income in the West Bank and Gaza Strip, a range of options for generating employment is available to UNRWA. These include:

◆  direct hire by the Agency

◆  indirect hire through agreements for community-based projects in camps and villages, or through support to associated institutions

◆  indirect hire through private-sector contracts

Temporary direct hire by UNRWA delivers immediate poverty alleviation benefits. However, these are limited by the number of temporary employees UNRWA can maintain at any one time. Private-sector construction activities also deliver short-term poverty-alleviation benefits, particularly through infrastructure work that can be started immediately such as the paving of alleyways and shelter rehabilitation. Contracts for the reconstruction of health centres, schools and classrooms will provide job opportunities over the medium-term.

These contracted activities will have anti-recessionary and second-round economic benefits - by creating opportunities for businesses supplying and manufacturing materials for the construction sector.

A significant focus for all UNRWA's employment activities is the creation or maintenance of community assets, in terms of infrastructure, services or other benefits that will accrue from these activities.

### Direct hire

The number of direct-hire employees working for UNRWA will increase under this appeal, but applications to the Agency for temporary jobs remain many times greater than the Agency can accommodate. Decisions on recruitment for skilled and unskilled workers will be made according to the local priorities facing the Agency in its field operations and in the delivery of its services.

In the Gaza Strip UNRWA intends to create and maintain about 3,850 short-term, direct-hire positions within the Agency's various programmes and departments.

7



These temporary jobs, to be rotated among those seeking work, will create around 1,169,000 work opportunity days over a 12-month period. This equates to supplying over 7.5 million days when family members will have a breadwinner in work. The immediate aim of this programme is to contain the poverty of families. Most funds involved in this go directly to labour employment, creating jobs immediately.

As in earlier appeals, workers will be selected on the basis of family size to ensure that the programme benefits as many people as possible. By targeting large families, jobs created in the direct hire programme will provide income support for an average of six dependants per person employed. At a wage equivalent to USD 12-13 per working day, this provides income support of approximately USD 2 per day for each dependant.

This is expected to be sufficient only to maintain households at subsistence levels and prevent them from sinking into deeper poverty. This daily rate is below the general market rate and so ensures an element of self-targeting among those in greatest need - while also encouraging workers to seek regular employment opportunities as soon as the economy improves.



*In the period between January and December 2001, a total of 11,787 persons with over 95,000 dependants benefited from three months' temporary employment under the direct-hire programme in the Gaza Strip. In the West Bank over the same period 2,669 individuals with over 12,500 dependants were employed.*

In the West Bank, UNRWA will seek to create and maintain up to 834 temporary direct-hire positions, generating 219,648 work days during the year. A priority of the direct-hire scheme is to help maintain services in the West Bank, given the damaging effects of closures on the functioning of these services. Specific effort will be made to absorb larger numbers of women into the Agency's programme departments.

**Graduate work experience**

Paid placements will be offered to over 400 new and unemployed graduates in the Gaza Strip and 190 in the West Bank. This will provide both temporary employment and practical work experience in various UNRWA programmes and departments, including schools, clinics, pharmacies, warehouses, engineering, construction and in general administration. Work experience combined with technical supervision will enhance their subsequent employability as well as contribute to family income. This part of the direct-hire programme will aim to fill 30 to 50 per cent of positions with female graduates from universities and training colleges whose job prospects have been limited by the shrinkage of the labour market.

**Indirect hire through community-based projects**

By having camp committees and village councils accept responsibility for hiring and procurement UNRWA can create further job opportunities in West Bank refugee camps and villages. These projects will be used to improve infrastructure, including the construction of pathways, drains and roads. It is envisaged that eight-man work crews will be rotated every 10 days in order to maximise the numbers of unemployed able to benefit. The work will be supervised and monitored by UNRWA. This appeal provides USD 1,700,000 of such work in refugee camps and USD 2,500,000 in villages, where large numbers of refugees in the West Bank live. Approximately 65,500m² of pathways, 12,000m of drains and 8,700m² of retaining walls will be constructed and 74,750m² of road asphalted - yielding in total approximately 100,000 days of work.

**Indirect hire through associated institutions**

UNRWA will help create more jobs by underwriting the costs of additional temporary staff in West Bank institutions that provide services to refugees. Projects of this kind will enable the Agency to reach non-camp areas that have a large population of refugees.

The Agency will support only projects that generate employment, especially for refugees, and organisations that provide services to refugees in significant numbers. This will include maintenance work at Augusta Victoria Hospital in Jerusalem, where UNRWA has contracted services on behalf of refugees for some 50 years. The hospital makes beds for refugees available to UNRWA at a subsidised rate, and since the start of the current crisis has offered its own medical professionals to augment the staff at UNRWA's hospital in Qalqilya. While creating jobs, such work will also contribute to improved standards of health care for patients.

### Private-sector contracts

Works planned for the Gaza Strip, which are expected to generate over 322,600 additional days of employment, include:

- The paving of approximately 220,000m² of sandy alleyways in refugee camps

- The construction and equipping of six Agency schools

- Constructing and equipping 56 additional classrooms and specialised rooms at ten Agency schools

- Small construction projects including playgrounds, sheds and toilet blocks at seven Agency schools

- Installing the sewerage and drainage system at Rafah camp and extending that at Deir al-Balah camp

- The reconstruction of Rimal Health Centre

- The reconstruction or rehabilitation of approximately 200 refugee shelters.

*By the end of December 2001, the Agency had paved more than 70,000m² of sandy alleyways in the refugee camps of the Gaza Strip under the emergency employment programme, and the paving of a further 160,000m² was in progress*

Works planned for the West Bank, expected to generate over 150,000 days of employment among both construction workers and suppliers of building materials, include:

- Constructing and equipping 188 classrooms and 39 specialised rooms at 18 schools, either to replace aging premises or to provide new accommodation for a

- The reconstruction of eight workshops, a library and a multi-purpose hall and the construction of four new classrooms at UNRWA's vocational training centres

- A further 22 contracts for maintenance work at various installations.

It is estimated that these projects will be implemented within twelve months of the allocation of the funds necessary. However this is contingent upon the Israeli authorities permitting entry of construction materials in sufficient quantities into the Gaza Strip. In the West Bank increasing restrictions on freedom of movement have affected the schedules of construction projects. UNRWA nevertheless has often been able to facilitate contractors reaching work sites and has transported construction materials using its own fleet of vehicles.





## Emergency Employment Generation

| DESCRIPTION | GAZA STRIP | | WEST BANK | | Totals USD |
|---|---|---|---|---|---|
| | Job opportunity days | Amounts USD | Job opportunity days | Amounts USD | |
| Direct Hire | 1,169,000 | 12,621,170 | 219,648 | 2,500,980 | 15,122,150 |
| Graduate work experience | 94,000 | 866,844 | 59,592 | 792,840 | 1,659,684 |
| Community-based projects, villages and Camps | | | 100,000 | 4,200,000 | 4,200,000 |
| Indirect hire through associated institutions | | | | 1,800,000 | 1,800,000 |
| Private-sector contracts | 322,600 | 16,090,935 | 150,000 | 10,136,181 | 26,227,116 |
| Sub Total | | 29,578,949 | | 19,430,001 | 49,008,950 |
| PSC | | 1,478,947 | | 971,500 | 2,450,447 |
| VAT | | 2,688,964 | | 1,759,182 | 4,448,146 |
| TOTAL | | 33,746,860 | | 22,160,683 | 55,907,543 |



# Emergency food aid

**Food aid reaches a large number of the poorest households. By supplying staple commodities it releases household funds for other needs as well as contributing to nutritional security. The staples to be bought and distributed are not, for the most part, commodities produced locally. Accordingly, emergency food assistance is not a disincentive to local food production.**



As in past appeals, households eligible for emergency food aid will not include those households registered with UNRWA as special hardship cases because they already receive food assistance under UNRWA's regular programmes. Also excluded are households with at least one family member employed by UNRWA. In the Gaza Strip, where the majority of the population is refugees, UNRWA has the greatest capacity for continuous, wide-scale distributions of this nature. Food will be targeted primarily at those refugee households in the West Bank and Gaza Strip eligible under the Agency's criteria, but it will continue to be made available as emergency assistance to non-refugee households with such urgent needs as may arise in the course of the crisis. Under previous appeals this has included extending aid to a number of communities under tight or prolonged closure.

The different geography and demographics of the Gaza Strip and West Bank impose differing logistical and distribution schedules. The quantities of food per delivery will vary between the West Bank and Gaza Strip according to these differences.

After appraising UNRWA's food aid operations over the past year the distribution cycles in both the West Bank and Gaza Strip, and the contents of the packages, will be modified from previous appeals.

In the Gaza Strip 127,000 households will receive nutritional support. UNRWA plans six distribution rounds to each household between May and December 2002[1.] Each food parcel will comprise 50 kg of flour, five kg of rice, five kg of sugar, two litres of oil, one kg of powdered milk and five kg of lentils.

In the West Bank, the target is to reach 90,000 households. UNRWA plans to supply each household twice between May and December 2001.



The much greater length of time between distribution rounds in the West Bank has led the Agency to vary the size of the package to reflect family size more closely. Each household will receive multiples of food packages, each of which is intended to cover the needs of two people. In all 444,600 of these two-person rations will be distributed in each distribution round, each consisting of 30 kg of flour, seven kg of rice, seven kg of sugar, four litres of cooking oil and four kg of powdered milk.

Distribution operations are planned and implemented by the Agency's Field Procurement and Logistics, and Field Relief and Social Services departments. Procurement is undertaken through the Agency's Procurement and Logistics Division at the Agency's headquarters in Amman. Local packing and distribution staff will be hired for as long as the food distribution operation continues.

[1] *Food being distributed between January and April 2002 is funded under the Third Emergency Appeal.*



## Emergency Food Aid

| DESCRIPTION | GAZA STRIP | | WEST BANK | | Totals USD |
| --- | --- | --- | --- | --- | --- |
| | *Target no. households* | Amounts USD | *Target no. households* | Amounts USD | |
| Food procurement, packing and distribution | *127,000* | 14,016,504 | *90,000* | 10,922,238 | 24,938,742 |
| PSC | | 700,825 | | 546,112 | 1,246,937 |
| VAT | | 25,500 | | 97,783 | 123,283 |
| TOTAL | | 14,742,829 | | 11,566,133 | 26,308,962 |

# Emergency relief and social assistance

Job creation programmes assist a set number of economically active households for limited periods of time. Food aid has a broader reach, allowing household income to go further and providing a level of nutritional security. However, growing numbers of households are in acute crisis, whether through the loss of breadwinners or because of events such as the loss of homes or the destruction of crops. Coping mechanisms, like borrowing from the extended family or selling jewellery, are becoming exhausted. Some families have no one able to join an emergency job programme. UNRWA therefore seeks to extend other forms of relief, including selective cash assistance, on the basis of needs arising. Based on the Agency's experience of increasing demand over the past year, greater provisions are being made under this appeal for the provision of this selective relief assistance.



### Selective cash assistance

Under the Agency's previous emergency appeals cash assistance has been extended to households in deep crisis following events such as the destruction of housing or injury to a principal breadwinner. Pressing emergency-related requirements have included help with food, urgent utility payments or assistance with transport costs for medical treatment.

## Emergency Relief and Social Assistance

| DESCRIPTION | GAZA STRIP | | WEST BANK | | Totals USD |
|---|---|---|---|---|---|
| | Expected beneficiaries | Amounts USD | Expected beneficiaries | Amounts USD | |
| Selective cash and in-kind assistance | 5,270 (households) 100,000 (students) | 5,250,000 | 13,000 (households | 7,125,000 | 12,375,000 |
| Post-injury physical and social needs | | | 690 (individuals) | 350,000 | 350,000 |
| Support to community-based organisations | | | | 270,000 | 270,000 |
| Sub Total | | 5,250,000 | | 7,745,000 | 12,995,000 |
| PSC | | 262,500 | | 387,250 | 649,750 |
| VAT | | 510,000 | | 0 | 510,000 |
| TOTAL | | 6,022,500 | | 8,132,250 | 14,154,750 |

13

Most grants have been within the range of USD 40 to USD 1,000. The amounts granted are based on a careful assessment of the families' financial position, including prior cash needs, the requirements caused by their situation and whether they can expect assistance from any other source. UNRWA social workers make recommendations that are reviewed and approved by the Chiefs of Relief and Social Services and in some cases by the Directors of UNRWA Operations for the West Bank and Gaza Strip.

In the Gaza Strip, up to the end of December 2001 UNRWA issued USD 2,380,136 in cash to 7,014 families, an average of USD 339 per family. In the West Bank UNRWA had extended cash grants totalling USD 817,560 to 10,885 families.

Because of the continuing destruction of homes in the Gaza Strip and deepening family poverty after months of strife, UNRWA forecasts the need to distribute USD 2,250,000 million among 5,270 households, at an average of USD 427 per family. In the West Bank, the Agency is budgeting to provide USD 7,125,000 to 13,000 households. Under the previous emergency appeal, a cash supplement of USD 40 was distributed to every family receiving food assistance in the West Bank. The supplement is ending and this money will be distributed selectively to those in greatest need.

*During the month of December 2001, facing growing humanitarian needs, UNRWA distributed USD 292,580 among 842 families in the Gaza Strip. In the West Bank UNRWA distributed USD 173,690 among 1,223 families, 625 of which lived in refugee camps, 314 in villages and 284 in towns.*

### In-kind assistance to poor schoolchildren

Severe economic hardship has made it impossible for a large number of families in the Gaza Strip to buy basic school necessities for their children. The families of about 100,000 schoolchildren, out of some 185,000 enrolled at UNRWA schools in the Gaza Strip, are known to need assistance in meeting their children's needs. UNRWA will provide the families of these pupils with school clothes, shoes, school bags and stationery for the children.

### Post-injury physical and social needs

By mid-2001, the Palestinian Central Bureau of Statistics had recorded 9,958 people injured in the West Bank alone, among whom UNRWA has identified 725 refugees with disabilities. In most cases, their disabilities resulted from injuries to the lower body. In four cases, the injured lost their vision, either partially or completely.



The needs of the disabled and their carers are extensive and long-term. Some require specialist medical attention, reconstructive surgery or sophisticated prosthetic devices that cannot be obtained locally. Many would benefit from treatment abroad.

As the prevailing situation continues UNRWA will increasingly be called on by growing numbers of newly-disabled refugees to assist with the regaining of mobility, reintegration into families and communities and to support the work of carers. Such assistance already includes supplying physical rehabilitation, counselling, vocational rehabilitation, prosthetic devices and home modification.

### Support to community-based organisations

In all, fifty community-based organisations, originally established by UNRWA to work with refugees in the West Bank, undertake valuable educational, social support and recreational activities for women, children, youth and the disabled. Present economic conditions threaten the survival of these centres, given the difficulties their members face in raising funds. Provisions made under this appeal will enable UNRWA to provide each centre with emergency financial support, enabling them to survive through the present crisis.

14

# Emergency shelter-repair and reconstruction



Armed clashes, shelling and military incursions by Israeli forces into areas under the jurisdiction of the Palestinian Authority have resulted in damage to large numbers of homes. The Gaza Strip, especially in Khan Younis and Rafah, has experienced systematic destruction of housing by Israeli forces. By 30 November 2001, 284 refugee shelters in the Gaza Strip had been demolished. The rate of destruction escalated and by the middle of January 2002 the number stood at 336 refugee houses demolished or damaged beyond repair. These houses had accommodated 464 families - a total of 2,630 refugees. 80 non-refugee houses, in which 532 persons had lived, were similarly destroyed. A further 234 refugee shelters, housing 1,843 refugees were damaged and in need of repair.

In the West Bank, during the latter months of 2001, homes were also damaged in unprecedented numbers. In Beit Jibrin, Aida and other refugee camps, many have been razed or burned and their occupants have lost all their possessions. For many others their dire economic state has meant they have been unable to afford even minor repairs to their shelters such as fixing broken windows, reconnecting utilities and patching water tanks. This appeal makes provisions for greater levels of assistance.

## Shelter repair

Provision is being made so that UNRWA can repair over 600 shelters in the Gaza Strip and 1,700 homes in the West Bank damaged as a result of the emergency. Teams of engineers and social workers assess damage to each dwelling and prepare cost estimates for repairs needed. Repairs are limited to what is required to make them habitable. In the West Bank where the costs of repair are met through cash assistance, grants are paid in instalments as repairs are completed.

## Re-housing

In previous appeals UNRWA planned to completely re-build 100 shelters in the Gaza Strip. Meanwhile the destruction of housing has continued and the security threat in the areas most affected by demolitions or fighting has prevented the reconstruction of shelters at the sites where they were located.

In July 2001 a location for the construction of housing for approximately 100 refugee families in the Rafah area, made homeless by Israeli military action and bulldozing, was identified and allocated by the Palestinian Ministry of Housing. A Memorandum of Understanding was signed between UNRWA and the Ministry regarding this land in the Tel es-Sultan district of Rafah. Both refugee and non-refugee families will be accommodated in this area.

15

Work has been progressing since November 2001 on the construction of 64 housing units for 67 refugee families entitled to UNRWA assistance, with the Ministry taking responsibility for building homes for homeless non-refugee families. This work is scheduled for completion in April 2002. Work on the construction of housing for a further 33 families at this site is scheduled to commence in February 2002.

UNRWA will carry out similar re-building work for the many families made homeless in recent months as soon as new land is identified and allocated, or when the security situation improves. The appeal contains provision for the reconstruction of a further 165 shelters.

**Emergency shelter supplies**

This appeal includes buying supplies that will allow the Agency to meet the immediate needs of those whose homes have been destroyed. This will take the form of buying tents, blankets, cooking utensils plastic sheeting and other emergency supplies.



## Emergency Shelter Repair and Reconstruction

| DESCRIPTION | GAZA STRIP | | WEST BANK | | Totals USD |
| --- | --- | --- | --- | --- | --- |
| | Expected beneficiaries (households) | Amounts USD | Expected beneficiaries (households) | Amounts USD | |
| Shelter repairs | 643 | 419,000 | 1,700 | 600,000 | 1,019,000 |
| Re-housing | 165 | 5,280,000 | | | 5,280,000 |
| Emergency shelter supplies, tents, utensils, bedding etc. | 200 | 145,000 | | | 145,000 |
| Sub Total | | 5,844,000 | | 600,000 | 6,444,000 |
| PSC | | 292,200 | | 30,000 | 322,200 |
| VAT | | 854,817 | | 0 | 854,817 |
| TOTAL | | 6,991,017 | | 630,000 | 7,621,017 |

# Emergency health

A comparison of the number of patients using UNRWA clinics in the nine months immediately preceding the start of the Intifada with the first nine months of the crisis shows how demand for our services has increased. In the West Bank outpatient visits increased by 13 per cent while in the Gaza Strip they rose by 16 per cent. By the time of this appeal the increase in demand has risen to 21.4 per cent in the West Bank. The extra patient visits are placing a major burden on staff and the Agency's medical supplies. At the same time, closures and curfews are making it increasingly difficult for staff to reach the health centres where they work.

The two principal reasons for increased demand over the period of the emergency are:

♦ The growing number of refugees who previously used private-sector healthcare who have been forced to turn to UNRWA because of increasing economic hardship.

♦ The large number of physical injuries and the psychological trauma caused by the ongoing violence.

In addition, because of the closures, for many people UNRWA health centres may be the most accessible clinics available. With 51 primary health care facilities UNRWA is the second-largest health provider in the West Bank and Gaza after the Palestinian Authority.

## Medical supplies

Under its previous emergency appeals, UNRWA health centres were furnished with extra drugs, first aid supplies and medical equipment, including specialist physiotherapy equipment. To cope with the increasing demand for medical care, stocks need further replenishment under this appeal.

## Supplementary medical staff

UNRWA needs to retain the additional medical staff it recruited in 2001 in order to cope with the increased demand for its health services and with the closures and curfews preventing staff from reaching their places of work in the West Bank. This will enable the Agency to maintain its outpatient services and hospital in Qalqilya and provide the extended hours of service that are currently necessary.

## Mobile clinical services

In remote villages of the West Bank the closures have meant that many patients are either unable to reach health clinics or can do so only with great difficulty. In order to reach these patients UNRWA will support mobile health teams run by Palestinian non-governmental organisations. The Agency will appoint, on a temporary basis, a physician to supervise, coordinate and monitor the operations of these mobile clinics. UNRWA will establish a system to identify the areas where these services are most urgently needed by consulting with the Palestinian Authority and organisations such as the Palestinian Red Crescent Society.

## Hospitalisation assistance

Other health costs facing the Agency come from the drop in the number of patients using UNRWA-contracted hospital services. Due to restrictions on their freedom of movement, refugees are often unable to reach hospitals where UNRWA contracts services on their behalf. This is a particular problem in the West Bank. In a growing number of cases, the Agency has to assist patients with the costs of treatment at other, more accessible hospitals when their lives are at risk. Growing poverty means that increasing numbers of refugees will be unable to share the costs of their hospital treatment.

*In the Gaza Strip, by comparison with the situation prior to the Intifada, during 2001 UNRWA recorded the following increases in demand for its health services:*

♦ *medical consultations increased by 21 per cent*

♦ *dental consultations increased by 18 per cent*

♦ *laboratory tests increased by 16 per cent*

♦ *new physiotherapy cases increased by 30 percent and physiotherapy sessions increased by 25 per cent*

*Chronic disease cases being treated by UNRWA in the Gaza Strip also rose:*

♦ *Diabetes Mellitus patients increased 12 per cent*

♦ *Hypertension cases increased 12 per cent*

♦ *Bronchial Asthma patients increased 13 percent*

*Consumption of medical supplies rose by about 17 per cent. The number of pregnant women receiving supplementary rations increased 21 per cent.*

17

## Environmental health

UNRWA's ability to remove and dispose of solid waste from the refugee camps has been seriously affected by the closures. Several of the Agency's waste containers in the West Bank were destroyed in the course of armoured incursions by the Israeli military into Palestinian areas. When homes have been damaged or even razed, UNRWA has had to clear building rubble in several camps. A wheel-loader for the clearance of waste and rubble is now required in the Gaza Strip, while in the West Bank the Agency urgently needs to purchase three compactor trucks and large waste-containers.

## Central pharmacy

An increased quantity of pharmaceutical supplies needs to be held at UNRWA's Central Pharmacy in the West Bank. This is due to increased demand for healthcare and because regular distribution in the West Bank has been affected by access problems. Additionally, pharmaceutical supplies destined for the Gaza Strip are being stored at the Central Pharmacy, pending resolution of access restrictions between the West Bank and Gaza Strip. The refrigerated storage facilities at the Central Pharmacy therefore need to be expanded.

## Psychological well-being

The psychological well being programme developed during the last year has sought to identify and help refugees suffering from trauma while simultaneously developing community support groups to address the psychological and social impact of the Intifada. The Palestinian Authority has adopted the same integrated approach as UNRWA by providing assistance to non-refugee populations with the support of international organisations. Donor support has enabled UNRWA to cover the cost of its major activities over the next 18 months. However, additional funding is sought in order to cover further activities currently planned for this programme in the West Bank.

## Physiotherapy services

During the first year of the crisis, under its earlier emergency appeals, UNRWA supplemented its provision of physiotherapy services and stock of specialist equipment. In the West Bank this included establishing six new physiotherapy clinics to cope with the additional numbers of injured and disabled. The increased need for physiotherapy care is a long-term commitment for the Agency.

## Emergency Health

| DESCRIPTION | GAZA STRIP Amounts USD | WEST BANK Amounts USD | Totals USD |
|---|---|---|---|
| Medical supplies | 480,000 | 600,000 | 1,080,000 |
| Supplementary medical staff | | 164,000 | 164,000 |
| Mobile clinical services | | 520,500 | 520,500 |
| Hospitalisation assistance | | 400,000 | 400,000 |
| Environmental health and waste management | 150,000 | 907,400 | 1,057,400 |
| Central pharmacy, expansion of controlled temperature storage facilities | | 120,331 | 120,331 |
| Psychological well being | | 200,000 | 200,000 |
| Physiotherapy services | 40,000 | 250,000 | 290,000 |
| Sub Total | 670,000 | 3,162,231 | 3,832,231 |
| PSC | 33,500 | 158,112 | 191,612 |
| VAT | 88,400 | 190,060 | 278,460 |
| TOTAL | 791,900 | 3,510,403 | 4,302,303 |

18

# Emergency education

The crisis has caused major damage to children's education. Teachers and pupils have frequently been unable to reach schools. The violent events witnessed by the children, both at home and at school, have caused emotional and psychological trauma. Schools themselves have been hit by gunfire or damaged by shelling and many pupils have suffered the loss of classmates or family members.

In the Gaza Strip the 185,000 students enrolled in the Agency's 169 elementary and preparatory schools have each lost an average of 24 school days since the start of the Intifada. The closures and mobility restrictions imposed by the Israeli authorities caused 108,412 teacher days to be lost - at a cost of USD 2,168,240. These factors, combined with others affecting children in this crisis, have had a major negative impact on student achievements in 2001. In all key subjects and at all grade levels in the Gaza Strip, overall results are down by comparison with the previous school year. Exam results in Arabic and Mathematics have fallen by between nine and 16 per cent, depending on grade.

In the West Bank, during the last school year the Agency recorded 5,585 absences among its teachers and 3,104 among instructors at its vocational training centres. Mobility restrictions have increasingly affected teachers' absences in the West Bank. In December 2001 alone, 5,228 teachers' days were lost in the West Bank, where results of final examinations showed a marked deterioration in numeracy and literacy. In Arabic only 38 percent of students scored passing grades, a 32.8 per cent drop from the year before, and in mathematics only 26 per cent of students scored passing grades, down from 54 per cent.

Behavioural problems and aggression towards parents, teachers and other pupils have increased since the start of the crisis. In addition to recruiting temporary teachers who live close to the schools and enhancing transport arrangements to circumvent access problems for teachers and pupils, compensatory education programmes are being developed, building on work undertaken under the past appeals.



## Compensatory education

Approximately 60,000 pupils at UNRWA schools in the Gaza Strip are considered to need special remedial educational support as a result of the crisis.  These students will be offered six additional class hours per week, for a period of four weeks, in Arabic, mathematics and English. A total of 432 additional class hours will be offered at each of the Agency's 169 schools. Pupils will be taught by their regular teachers, who are most familiar with their individual needs. The teachers concerned will be compensated for the extra hours worked.

In the West Bank, to halt any further deterioration in student performance, UNRWA will introduce a comprehensive remedial education programme for pupils in grades one through seven. Without such a programme, there is a growing fear not only that the children will be ill prepared to continue their education, but also that others will abandon their schooling altogether. The remedial programme will focus on language and mathematics skills.

*During 2001, in the Gaza Strip UNRWA offered 216 additional hours of education, at each of its schools, to 30,000 of the Agency's students achieving low results*

## Self-learning materials

As part of UNRWA's strategy to remedy the damage to education in the Gaza Strip the Agency is developing home-learning materials for Arabic, mathematics and English. These will be created according to the needs of each school within the Agency's five educational areas in Gaza (Jabalia and Beit Hanoun, Gaza City and Beach Camp, Maghazi and Bureij, Deir al-Balah and Nuseirat, Khan Younis and Rafah). To lessen the difficulties caused by anticipated future closures, they will be prepared and implemented separately in each of the five areas. This necessitates the purchase of equipment, including computers and printers for the production of the materials, heavy-duty photocopiers and paper.

## Extra-curricular activities

UNRWA is planning an extensive programme of after-school activities and summer camps so it can provide children with positive and happy experiences to relieve some of the stress they face in their out-of-school lives. To help students use their free time constructively, to keep them off the streets as much as possible and because there are few other safe areas for play, UNRWA will organise after-school activities at 40 of its school buildings for a period of four months. Activities will be designed to promote concepts like teamwork, tolerance, democracy and leadership. Around 200 personnel hired under the emergency employment creation programme will be responsible for day-to-day running of the programme for some 14,000 pupils. Approximately 50,000 pupils in the Gaza Strip will participate in summer-camp activities, where in addition to recreational, cultural, sports and environment-protection activities, students will be offered training in civic education.

UNRWA will try to ensure that its schools remain a safe haven for students and shield - or at least distract them, from the violence around them. At a time when they have to cope with fear and uncertainty about the future, it is particularly important to provide them with the opportunity to express their creativity and develop personal confidence. For these reasons, UNRWA plans to continue offering a variety of structured extra-curricular activities. In the West Bank, these will include computer training, creative writing, fine arts, sports, scouting, theatre, puppet shows and films. UNRWA will offer these activities with help from non-governmental organisations and individuals, including artists and musicians.

## Special needs and inclusive education

In the Gaza Strip a summer camp for pupils with special needs will be held, catering for those with physical and learning difficulties and the visually impaired. Approximately 11,250 children will take part in various activities, similar to those offered in the main summer camp. Under supervision of the staff of UNRWA's Field Relief and Social Services Programme Department, the camp will be held at the Agency's Rehabilitation Centre for the Visually Impaired, and at the seven community rehabilitation centres in the refugee camps of the Gaza Strip.

In the West Bank, only a few of the Agency's school buildings are accessible to the disabled. The emergency has highlighted the need for this to be improved. Basic work will be undertaken where required. This will include the provision of ramps for wheelchair access and the painting of doorframes to make them more visible to the partially sighted.

In the West Bank, the Agency will develop a mechanism for identifying, screening and referring children with learning difficulties to specialists for help. Teachers and administrators need training to be able to assist these pupils adequately. Learning materials specific to children's needs have to be developed and learning opportunities made available for children after school.



### Learning achievement project

In both the Gaza Strip and the West Bank the need has been identified for more information concerning the effects of the Intifada on educational achievement. Specialists will develop tests to measure student achievement and aptitudes in basic subjects while also developing remedial learning materials and training teachers in their use.

In the West Bank UNRWA requires the services of a team of education specialists to assist the staff of its Field Education Programme and sixty teachers will be recruited and trained in remedial teaching techniques.

### University fees assistance

In the past UNRWA offered scholarship assistance to promising students to pursue their higher education in recognised universities in the Middle East. In 1997, however, budgetary concerns forced the Agency to discontinue the programme. In light of the depressed economic conditions, the Agency believes that assistance with fees needs to be reintroduced.

Assistance with their fees will help ensure that gifted students are not forced to abandon their studies because of economic hardship. With a college or university degree, recipients will have greater earning potential and be in a better position to assist in supporting their families. Awards are based on merit and cover only a part of the cost of their education.

### Vocational and technical training

Among the educational and training initiatives that UNRWA is seeking to develop under this appeal is an increase in the number of young men and women using its vocational training centres in the West Bank. Short-term courses held in afternoon sessions and during the summer will be offered. These will be designed to correspond with local labour market demands and technical needs.



### Counselling programme

The psychological counselling developed by UNRWA over the past year will be maintained. The Agency appointed 33 counsellors in 2001 for its West Bank schools in an attempt to respond to the psychological needs of children and to help create an environment that promotes academic achievement and emotional growth. The counsellors meet with groups of students and encourage them to speak openly about their fears and frustrations. They support the teaching staff in confronting crises and identifying children who show signs of anxiety or stress. Pupils who behave aggressively or show signs of neurosis are counselled individually.

Because the effects of violence on children often manifest themselves over the long term, UNRWA intends to continue to make counselling available to schoolchildren in 2002 and to retain the services of the counsellors. The Agency will provide counsellors with further training so that they in turn can train teaching staff to cope with the needs of their pupils.

*In the 2000-2001 academic year 466 places in UNRWA's vocational and technical training centres at Ramallah in the West Bank were designated for students from the Gaza Strip. Due to closures however, only 136 students were able to attend, the rest being denied permission by the Israeli authorities to travel to the West Bank. Only 89 students from the Gaza Strip are enrolled in the current academic year.*

21

| Emergency Education | | | | | |
|---|---|---|---|---|---|
| **DESCRIPTION** | **GAZA STRIP** | | **WEST BANK** | | **Totals USD** |
|  | *Beneficiaries* | **USD** | *Beneficiaries* | **USD** |  |
| Compensatory education | *60,000* | **390,390** | *48,190* | **362,000** | 752,390 |
| Self-learning materials | *184,951* | **109,590** |  |  | 109,590 |
| Extra-curricular activities | *64,000* | **1,298,570** | *28,300* | **250,000** | 1,548,570 |
| Special needs activities and inclusive education | *11,250* | **688,500** | *6,000* | **225,000** | 913,500 |
| Learning achievement project |  | **20,000** |  | **25,000** | 45,000 |
| University fees assistance | *560* | **560,000** | *100* | **100,000** | 660,000 |
| Vocational and technical training |  |  | *224* | **280,000** | 280,000 |
| Counselling programme |  |  |  | **230,000** | 230,000 |
| Sub Total |  | **3,067,050** |  | **1,472,000** | 4,539,050 |
| PSC |  | **153,353** |  | **73,600** | 226,953 |
| VAT |  | **257,480** |  | **54,700** | 312,180 |
| **TOTAL** |  | **3,477,883** |  | **1,600,300** | 5,078,183 |



# Additional logistics, monitoring and reporting

**A wide range of requirements is associated with supporting and monitoring emergency programme activities. Extra vehicles and specialist equipment are needed to implement emergency operations over the coming year. These are essential for the effective administration, communications and transport associated with maintaining services and for supervising job creation, construction and distribution activities throughout the West Bank and Gaza Strip. The costs of extra staff hours will be met and funding will be needed for surveys and assessments.**

## Operations support officer programme

During 2001 the Operations Support Officer programme was concentrated in the West Bank in response to the problems of closures. Four Operations Support Officers and their teams have performed monitoring and advisory duties that assist UNRWA operations by securing access for staff and vehicles across checkpoints throughout the West Bank. These teams have further assisted emergency operations by identifying areas in need of emergency assistance as a result of closures or punitive action, by escorting medical teams and distribution teams into villages under curfew, by evacuating refugee families from locations under fire, and by arranging water deliveries to communities where the supply system has been damaged or destroyed. UNRWA has deemed the work of these teams to be vital to its emergency operations under the field conditions encountered. Under this appeal a fifth Operations Support Officer will be added to the programme.

## Operations logistical support, monitoring and information

Additional staff are needed to monitor the effectiveness of UNRWA programmes in the current crisis and recommend strategies to address any shortcomings. They will also need to design, implement and evaluate the Agency's longer-term activities. In order to strengthen UNRWA's programme departments there is an immediate need to improve their ability to conduct surveys, analyse data and measure the success or otherwise of their activities. Departments will establish mechanisms to design surveys, collect data, monitor relevant indicators and report on progress and implementation.

## Situation assessment

UNRWA's activities were key in sustaining the Palestine refugee population in the West Bank and Gaza Strip during the last year. The Agency's ability to respond to the crisis quickly and on a wide scale was thanks to its existing structures, its wide physical presence and knowledge of the refugee population. Nevertheless, its emergency assistance programmes were initially designed as short-term interventions, targeting the most acute and immediate needs. After more than a year, the lasting effects of the Intifada on individuals and society are now becoming more obvious.

UNRWA plays a prominent role in most spheres of activity in the West Bank. As economic conditions have worsened increasing numbers of Palestinian, including non-refugees, have come to rely on the Agency for some form of assistance. The Agency, by maintaining its policy of continuous assessment, hopes to address more effectively the long-term needs of the population.

UNRWA has approached several partners including ILO and international NGOs, to cooperate in carrying out these assessments by devising monitoring and reporting systems for any intervention envisaged, including developing key performance indicators, base line surveys and evaluation reports.



Numerous surveys, assessments, and studies have been carried out over the course of the last 15 months. The Agency has used the findings to adapt its programmes to respond to the needs identified. UNRWA intends to carry out focused assessments of the content and direction of its programmes to provide the appropriate assistance to the refugees it serves. In addition to the aptitude testing of school students already described, assessments would include review of the Agency's work on:

- Health
- Employment creation
- Physical Rehabilitation
- Psychological well being
- Infrastructure and Shelters
- Food and cash assistance

### Transport assistance

The Al-Mawasi area of Rafah, adjacent to an Israeli settlement in the southern Gaza Strip, has been under strict closure since the start of the Intifada. In the area there are 346 refugee and 130 non-refugee schoolchildren who have faced difficulties while attempting to cross Israeli military checkpoints on their way to and from school. Two buses are urgently required to provide safe transportation for these children.

Travel costs facing staff in the West Bank have been rising with the growth of Israeli checkpoints, longer and more circuitous routes and the many changes of transport that can be required to reach places of work. A number of teachers recruited at the start of the 2001/2002 academic year turned down offers of employment because an allowance for transport could not be offered. This problem most affects lower-paid staff positions and those travelling longer and more difficult routes. A provision is made to assist staff with meeting the increasing costs.

### Additional support capacity and equipment

The Field Engineering Division in the Gaza Strip requires funds for extra equipment needed to manage its emergency activities. The increased workload has already required additional staff, hired under the job creation programme. Office equipment is required now to enable the Division to carry out its additional duties.

UNRWA will require additional vehicles, and funds to cover their running costs for one year, in order to support programme implementation in the West Bank. The programmes include job creation in villages and supervision of construction work at installations throughout the West Bank. Funds are also required to enable various departments to carry out their duties, including Administration, Legal, Engineering and Construction Services, Finance, Relief and Social Services, Procurement and Logistics. A budgetary provision is required also, for the remuneration of staff for long and extended overtime work.

## Additional Logistics, Monitoring and Reporting

| DESCRIPTION | GAZA STRIP Amounts USD | WEST BANK Amounts USD | Totals USD |
|---|---|---|---|
| OSO Programme | | 820,000 | 820,000 |
| Operations logistical support and monitoring | 175,000 | 200,000 | 375,000 |
| Additional support capacity and equipment | 32,010 | 291,308 | 323,318 |
| Transport assistance | 201,000 | 600,000 | 801,000 |
| Area staff overtime | 500,000 | 286,000 | 786,000 |
| Situation assessment | 125,000 | 250,000 | 375,000 |
| Sub Total | 1,033,010 | 2,447,308 | 3,480,318 |
| PSC | 51,650 | 122,365 | 174,015 |
| VAT | 30,943 | 4,760 | 35,703 |
| TOTAL | 1,115,603 | 2,574,433 | 3,690,036 |

24

# UNRWA Emergency Appeal budget for 2002

## Total Emergency Operations

| DESCRIPTION | GAZA STRIP USD | WEST BANK USD | Total USD |
|---|---|---|---|
| Emergency employment generation | 33,746,860 | 22,160,683 | 55,907,543 |
| Emergency food aid | 14,742,829 | 11,566,133 | 26,308,962 |
| Selective relief assistance | 6,022,500 | 8,132,250 | 14,154,750 |
| Emergency shelter repair and reconstruction | 6,991,017 | 630,000 | 7,621,017 |
| Emergency health | 791,900 | 3,510,403 | 4,302,303 |
| Emergency educational activities | 3,477,883 | 1,600,300 | 5,078,183 |
| Additional logistics, monitoring and reporting | 1,115,603 | 2,574,433 | 3,690,036 |
| Total | 66,888,592 | 50,174,202 | 117,062,794 |





UNRWA Headquarters Gaza
Department of External Relations
Tel: + 972 8 677 7720
Fax: + 972 8 677 7698
e-mail: ero@unrwa.org
web site: www.unrwa.org

All photographs in this appeal © UNRWA
Gaza photos: UNRWA/Adnan Abu Hasna
West Bank photos: UNRWA/p. 14 Mia Grondahl





THE INTERNET
# JERUSALEM POST

# NII must support Nahariya suicide bomber's 2 widows, 10 orphans

By Nina Gilbert | September, 11 2001

JERUSALEM (September 11) - The widows and children of Muhammad Shaker Habeishi, the Israeli Arab suicide bomber who killed three people in Nahariya on Sunday, are now entitled to as much as NIS 10,000 a month in state support, National Insurance Institute Deputy Director-General for Benefits Yehezkel Bakal confirmed yesterday.

Bakal said the law is "liberal and ensures equality among widows and children" and does not discriminate against relatives of those who have committed crimes against the state.

"The law would have to be changed to prevent terrorists' survivors from receiving state aid," he said.

Bakal said that, according to his information, Habeishi had two wives and 10 children.

Internal Security Minister Uzi Landau said the government intends to take steps to change the law to ensure that families of terrorists, including those in prison, don't get NII support. Landau said child support payments should also be withheld.

Each widow with three children is entitled to NIS 3,800 in monthly support, with an additional NIS 476 for every child, according to Bakal.

This is in addition to the monthly child stipends for children younger than 18. As long as the widow lives here and the husband paid NII insurance, the family is entitled to support, Bakal said.

MK Zvi Hendel (National Union) is drafting legislation that would change the law retroactively to cancel NII support in such cases. He hopes to push it through the legislative pipeline quickly, when the Knesset reconvenes for its winter session in mid-October.

Hendel called the law "distorted" and said it is inconceivable that the state should grant support to Habeishi's family. "Hamas is giving a one-time financial prize to the families of the terrorists, while the State of Israel is supporting families until the end of their lives," he said. He said he is sure he will have an overwhelming majority for the bill.

FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1:02CV00442(GK)

EXHIBIT

11

Bakal noted that the only relevant provision the NII now has to disqualify applicants concerns persons who commit crimes. If they are injured while carrying them out, they are not eligible for NII support, he said.



# HOLY LAND FOUNDATION
# FOR RELIEF AND DEVELOPMENT

## Exhibit 45



FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1:02CV00442(GK)



EXHIBIT

tabbies

12



5TH JUNE 1995

REPORT NO.: 10/4374/95

SUBJECT: THE HOLYLAND FOUNDATION



- 7-

EXHIBIT NO. 5

SUBJECT: A SEARCH OF THE 'HOLYLAND FOUNDATION' OFFICES IN BEIT
HANINA - MAIN FINDINGS

1. ON 7TH MAY, 1995, THE HOLYLAND OFFICE IN BEITH HANINA, RUN BY
MUHAMMAD ANATI, WAS SEARCHED AND MANY DOCUMENTS WERE SEIZED.

2. THE FOLLOWING ARE THE MAIN FINDINGS SO FAR:

   A. LISTS OF PEOPLE SUPPORTED BY THE FUND, INCLUDING SOME
      FAVORED INDIVIDUALS WHO RECEIVED 300 DOLLARS AND MORE.  THE
      LATTER INCLUDE NUMEROUS INDIVIDUALS INVOLVED IN HAMAS
      ACTIVITY.  FOR EXAMPLE:

      (1) THE MOTHER OF AHMAD SHOUKRI, RAMALLAH, A HAMAS ACTIVIST
          WHO IS SERVING A LIFE SENTENCE FOR THE MURDER OF A JEW
          AT A TEL-AVIV BUILDING SITE IN SEPTEMBER 1989 AND AN
          ATTEMPT TO CAUSE A BUS (LINE 405) TO GO OFF THE ROAD.

      (2) THE FATHER OF MUHAMMAD SHAWAN, KHAN YOUNES, A WANTED
          MEMBER OF AZZ-AL-DIN AL-QASSEM WHO WAS KILLED IN A CLASH
          WITH AN IDF FORCE IN MARCH 1994 AND WHO PARTICIPATED IN
          SEVERAL ATTACKS, INCLUDING THE MURDER OF TWO
          GREENGROCERS IN THE KHAN YOUNES AREA IN MAY 1993.

      (3) THE WIDOW OF ABD AL-RAHMAN ARURI, ARURA/BENYAMIN, A
          FORMER DEPORTEE, A SENIOR WANTED MEMBER OF AZZ AL-DIN
          AL-QASSEM, WHO WAS KILLED IN A CLASH WITH AN IDF FORCE

8/..



- 8-

IN DECEMBER 1993.

(4) THE FAMILY OF SULEYMAN IDAN, QIBIYA/RAMALLAH,

   KILLED DURING A CAR-BOMB ATTACK IN BEIT-EL IN OCTOBER

   1993.

(5) THE MOTHER OF ASHRAF BA'ALUJI, TUFAH, SERVING A LIFE

   SENTENCE FOR THE MURDER OF 3 JEWS IN JAFFO, DECEMBER

   1992.

(6) THE WIFE OF JAMIL AL-BAZ, DEYR AL-BALAH, HAMAS ACTIVIST,

   SERVING A LIFE SENTENCE FOR HAVING RUN OVER A SOLDIER AT

   NITZANIM CROSSING ON 19 JULY, 1991.

(7) THE WIFE OF MAJDI HAMAD, JABALIYAH, A SENIOR AZZ AL-DIN

   QASSAM ACTIVIST IN JABALIYAH, WHO KILLED LOCAL RESIDENTS

   AND IS SERVING A LIFE SENTENCE.

(8) THE FAMILY OF YASSER HAJAJ, MIZRAA SHARQIYAH/BENYAMIN,

   HAMAS ACTIVIST, SERVING A LIFE SENTENCE FOR HAVING

   PLACED AN EXPLOSIVE CHARGE ON A TEL AVIV BEACH ON 28

   JULY, 1990, KILLING A JEWISH TOURIST FROM CANADA.

(9) THE BROTHER OF RAID ZAKARANA, KABATIYAH, THE TERRORIST

   WHO COMMITTED SUICIDE IN AFULA IN APRIL 1994.



- 9 -

(10) FAMILIES OF DEPORTEES (NO NAMES)..

B. ORPHANS SUPPORTED BY THE FUND:

   (1) SOME HUNDRED ORPHANS RECEIVING SUPPORT HAVE BEEN
       CHECKED.

   (2) ACCORDING TO MINISTRY OF THE INTERIOR RECORDS, IT SEEMS
       THAT THE PARENTS OF 4 'ORPHANS' ARE ALIVE. THE MATTER IS
       BEING CHECKED.

   (3) THE FAMILIES OF SEVERAL ORPHANS ARE DIRECTLY CONNECTED
       WITH HAMAS.

C.



D.



E. MOREOVER, MANY ADDITIONAL DOCUMENTS AND A TALK WITH
   MUHAMMAD ANATI SHOW THAT:               :

   (1) ANATI'S OFFICE SERVES FOR LIAISON, MEDIATION AND
       SUPERVISION ON BEHALF OF THE FUND IN THE UNITED STATES
       AND DOES NOT CONDUCT MONEY TRANSFER.

-10-

(2) THE BUDGET OF THE JERUSALEM OFFICE IS 80-120 THOUSAND
DOLLARS. THIS MONEY IS EARMARKED FOR REGULAR OPERATION
OF THE OFFICE AND IS DIRECTLY DEPOSITED IN THE FUND'S
ACCOUNT AT THE MERCANTILE DISCOUNT BANK IN EAST
JERUSALEM.

(3) THE OFFICE'S TASK IS TO DRAW UP LISTS OF NEEDY FROM THE
WEST BANK AND TO TRANSFER THEM TO THE UNITED STATES, AND
LATER ON TO CONFIRM THAT THESE INDIVIDUALS INDEED
RECEIVED THE ALLOCATIONS FROM THE ZAKAT COMMITTEES IN
THE WEST BANK.

(4) THE AID IS TRANSFERRED DIRECTLY FROM THE U.S. TO THE
ZAKAT COMMITTEES' BANK ACCOUNTS. IN SOME CASES THE MONEY
WAS TRANSFERRED TO THE ACCOUNTS OF ZAKAT COMMITTEES
ABROAD. IN ONE CASE, THE MONEY WAS TRANSFERRED TO THE
ZAKAT COMMITTEE BY MEANS OF SALAH HARZALLAH'S ACCOUNT IN
LONDON.

(5) THE FUND IN THE U.S. HAS TWO BRANCHES IN ISRAEL - ONE IN
BEIT HANINA, RUN BY ANATI, AND THE SECOND IN THE GAZA
STRIP, RUN BY ZUHAIR BAGHADI. BOTH BRANCHES ARE DIRECTLY
SUBORDINATE TO THE FUND'S MANAGEMENT IN THE U.S.

(6) THE ANNUAL BUDGET OF THE FUND IN THE WEST BANK IS
ASSESSED AT ABOUT ONE MILLION DOLLARS (VALID TO
1993-1994).



-11-

(7) THE FUND SUPPORTS SOME 700 ORPHANS IN THE WEST BANK, TO
THE TUNE OF ABOUT 30,000 DOLLARS PER MONTH. IN ADDITION,
IT RUNS SPECIAL PROJECTS.

(8) THE CENTER OF THE FUND IS IN THE U.S., WHERE THE
CONTRIBUTIONS ARE COLLECTED. THE FUND IS HEADED BY
SHAKRI ABU BAKER, WHO OPERATES FROM THE MAIN OFFICE IN
TEXAS. THERE IS ANOTHER OFFICE IN NEW-JERSEY, HEADED BY
MUHAMMAD MEZAIN.



12/..

-13-

EXHIBIT NO. 6

SUBJECT: THE HOLYLAND FUND - TRANSFER OF FUNDS TO FAMILIES OF
DEPORTEES AND HAMAS ACTIVISTS

1. THE DOCUMENTS FOUND DURING THE SEARCH OF THE HOLYLAND FUND
OFFICES INCLUDED A PAPER WITH A REQUEST FOR 18 FUND TRANSFERS,
AS FOLLOWS:

    A. 16 TRANSFERS OF 100-200 DOLLARS EACH TO FAMILIES OF
       DEPORTEES - WITHOUT THE NAMES OF THE DEPORTEES. THE PAYMENT
       IS FOR 28TH FEBRUARY, 1993. EACH OF THESE TRANSFERS BEARS
       THE REGISTRATION: FAMILY OF A DEPORTEE, WITH THE DATE
       (USUALLY 15TH JANUARY OR 15TH FEBRUARY, 1993), AND THE SUM
       TO BE PAID. IT IS ALSO NOTED THAT THESE FAMILIES DID NOT
       RECEIVE ANY PREVIOUS PAYMENT.

    B. TWO TRANSFERS OF 400 DOLLARS EACH, FOR THE FOLLOWING:
       (1) ANSHARAH MAHMOUD SHUKRI, RAMALLAH, DATE OF PAYMENT -
          15TH JANUARY, 1992. LAST PAYMENT: 31ST OCTOBER, 1992 -
          THE SUM OF 400 DOLLARS.
          TRACES WERE FOUND ON ANSHARAH ALI SHUKRI, THE MOTHER OF
          AHMED HUSSEIN MAHMOUD SHUKRI, WHO MURDERED A JEW AND
          ATTEMPTED TO RUN A BUS OFF THE ROAD. HE WAS ARRESTED IN
          SEPTEMBER 1989 AND SENTENCED TO LIFE IMPRISONMENT. WHILE
          IN PRISON, HE MURDERED A WARDEN. IN A MESSAGE FROM JAIL,
          HE WROTE THAT SINCE HIS ARREST, NO MONEY HAD REACHED HIS

-14-

HOME, AND NEW-YORK SHOULD BE NOTIFIED OF THIS. ANSHARAH

MAHMOUD SHUKRI WAS NOT LISTED IN THE MINISTRY OF THE

INTERIOR RECORDS.


(2) FAWZI SALMAN ABD AL-A'AL - GAZA. DATE OF PAYMENT: 15TH

    JANUARY, 1992. LAST PAYMENT: 31 OCTOBER, 1992, THE SUM

    OF 400 DOLLARS.

    TRACES WERE FOUND OF FAWZI SALMAN MAHMOUD ABD AL-A'AL,

    GAZA, BORN IN 1946, A FORMER DETAINEE (1989). HE WAS

    FIRED FROM HIS JOB AT THE CIVILIAN ADMINISTRATION (HE

    WAS A MALE NURSE) FOLLOWING HIS ARREST. HIS SONS MAZZEN

    AND MUHAMMAD ARE FORMER DETAINEES AND HAMAS ACTIVISTS.

HOLY LAND FOUNDATIONN    TEL:214-699-0198              Oc        214 699 01

EXHIBIT 6

Families dues paid Through October 31, 1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|--------------|---------|----------|--------|----------------|
| IRA | GAZA | Husneya Saeed Shaban | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Khaldeya Abdulhadi Kelab | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Asmaa Jaber Abu Eid | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Noura Saleh | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Rahma Yousef Temraz | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Maryam Nasser Abu Mostafa | 02/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Fatema Mohamad Aljudaily | 03/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Reda Jibreel Alkahlout | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Inam Mohamad Akel | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Reda Abdullah Aleenwar | 07/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Hala Moustafa Masoud | 04/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Khadra Deib Akeilan | 01/15/93 | 06/30/93 | | $400.00 |
| | RAMALLAH | Alaa Anwar Akel | 07/15/93 | | | $800.00 |
| | GAZA | Effat Abdulqader Rayan | 04/15/93 | 06/30/93 | | $600.00 |
| | GAZA | Fawzy Salman Abd-alaal | 03/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Nahla Ahmad Othman | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Kefaya Abu Namous | 03/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Suad Mohamad Shaban | 01/15/93 | 06/30/93 | | $400.00 |
| | GAZA | Maryam Hasan Zakout | 03/15/93 | 06/30/93 | | $400.00 |

otal:

\# 8200

HOLY LAND FOUNDATION   TEL:214-699-0198        Se      214 699 0198 P.001

| Org | Full Name | City | Paid Thru | Amount | New |
|---|---|---|---|---|---|
| | *AL-Zies Family* | | | | |
| 9 | ALLAHMAD SHAHEEN | JERUSALEM | 05/31/94 | $300.00 | |
| | JUMAH MOHAMAD JUMHOOR | JERUSALEM | 05/31/94 | $300.00 | |
| | MAHMOUD MOHAMAD KHDEIR | JERUSALEM | 05/31/94 | $300.00 | |
| | NEEMAH MOHAMAD ABUKAFF | JERUSALEM | 05/31/94 | $300.00 | |
| 18 | Total Count | | | $1,200.00 | 4 |

ILL:214 099-0198                 Dec 22,94    18:29 No.0:

| Org | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| IRC | DALAL ABDULQADER ALBAZ | GAZA | 08/31/94 | $400.00 | NO  360 |
|     | HUMEIDAN SHQEIRAT HUMEIDAN | GAZA | 08/31/94 | $400.00 | NO |
|     | NAHLA MOHAMAD HAMMAD | GAZA | 08/31/94 | $400.00 | NO |
| IRC | Total | | | $1,200.00 | |
|     | Count | | | 3 | |

1680
360
360
360
160

1200 - 120  = #1080

2160

LAND FOUNDATION    TEL:214-699-0198    DEC 22'94    10:21 NO.011

5

(11)

| Org | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| IS | JUMAH MOHAMAD JUMHOOR | JERUSALEM | 08/31/94 | $400.00 | NO 300 |
|    | MAHMOUD MOHAMAD KHDEIR | JERUSALEM | 08/31/94 | $400.00 | NO |
|    | NEEMAH MOHAMAD ABUKAFF | JERUSALEM | 08/31/94 | $400.00 | NO |
| IS | Total | | | $1,200.00 | |
|    | Count | | | 3 | |

1080
-220
1350

$$ 1200 - 120 = \$1080 $$

FOUNDATIONN   TEL:214-699-0198 .          Dec 22,94   18:25 No.

| Full Name | City | Paid Thru | Amount | New |
|-----------|------|-----------|--------|-----|
| MAHMOUD FAHMI SALAHUDDIN | JENEEN | 08/31/94 | $400.00 | NO 362 |
| MOHAMAD ALI ALHASHASH | JENEEN | 08/31/94 | $400.00 | NO 360 |
| MOHIYIDDIN MOHAMAD ZAKARNEH | JENEEN | 08/31/94 | $300.00 | NO 270 |
| NEDAL MOSTAFA SAKALLAH | JENEEN | 08/31/94 | $400.00 | NO 360 |
| OSAMA SALEH ZIAB | JENEEN | 08/31/94 | $300.00 | NO 270 |

| JZ | Total | | $1,800.00 | |
|----|-------|--|-----------|--|
| | Count | | 5 | |

$$1800 - 180 = \$1620$$

| Org | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| HLFJ | ABDELJAWAD IBRAHIM ALJAABARI | HEBRON | 08/31/94 | $400.00 | YES — 360 |
| | ABDULRAHIM ABDULRAHMAN ABU SNEINEH | HEBRON | 08/31/94 | $400.00 | YES |
| | ABDULRAHIM MOHAMAD ALAJLOUNI | HEBRON | 08/31/94 | $400.00 | YES |
| | AHMAD ABDULLAH TAHA | HEBRON | 08/31/94 | $400.00 | YES |
| | AIMAN AYOUB ALKAWASMEH | HEBRON | 08/31/94 | $400.00 | YES |
| | ALAA BADER TAHA | HEBRON | 08/31/94 | $400.00 | YES |
| | ARAFAT MAHMOUD ALBAYEDH | HEBRON | 08/31/94 | $400.00 | YES |
| | DIAB ABDELLATIF ALKARAKY | HEBRON | 08/31/94 | $400.00 | YES |
| | ISMAIL FAYEZ KAFEESHA | HEBRON | 08/31/94 | $400.00 | YES |
| | JABR AREF ABU HADEED | HEBRON | 08/31/94 | $400.00 | YES |
| | JAMEEL AYED ALNATSHEH | HEBRON | 08/31/94 | $400.00 | YES |
| | KAMAL JAMAL KAFEESHA | HEBRON | 08/31/94 | $400.00 | YES |
| | KHALED ABU HUSSEIN | HEBRON | 08/31/94 | $400.00 | YES |
| | KHALED MOHAMAD ALKARAKY | HEBRON | 08/31/94 | $400.00 | YES |
| | MARWAN MOTLAQ ABU NAJMEH | HEBRON | 08/31/94 | $400.00 | YES |
| | MOHAMAD KEFAH KARKAH | HEBRON | 08/31/94 | $400.00 | YES |
| | MOHAMAD ZEIDAN ABU AWDEH | HEBRON | 08/31/94 | $400.00 | YES |
| | MOHAMMAD RADHI GHEITH | HEBRON | 08/31/94 | $400.00 | YES |
| | NEMR MOHAMAD MOJAHED | HEBRON | 08/31/94 | $400.00 | YES |
| | NOOR IBRAHIM ALMOHTASEB | HEBRON | 08/31/94 | $400.00 | YES |
| | OSAMA MOHAMAD ALMASRI | HEBRON | 08/31/94 | $400.00 | YES |
| | RAMI ARAFAT ALRAJAB | HEBRON | 08/31/94 | $400.00 | YES |
| | SALEEM IDRIS IDRIS | HEBRON | 08/31/94 | $400.00 | YES |
| | SUFIAN BARAKAT ZAHREH | HEBRON | 08/31/94 | $400.00 | YES |
| | TALAL MAHMOUD DANDOUSI | HEBRON | 08/31/94 | $400.00 | YES |
| | WAEL SALAH ALMOHTASEB | HEBRON | 08/31/94 | $400.00 | YES |
| | WALEED ZUHAIR ABU HAMDEYAH | HEBRON | 08/31/94 | $400.00 | YES |
| HLFJ | Total | | | $10,800.00 | |
| | Count | | | 27 | |

10,800 – 1080 = $ 9720

جميع المبلغ المذكور 27 اسم دفع في

$ 1080

HOLY LAND FOUNDATION    TEL:214-638-0148                    DEC 22'94

اخراج    3

| Org | Full Name | City | Paid Thru | Amount | New | |
|-----|-----------|------|-----------|--------|-----|--|
| HLFJ | ATEYAH MOHAMAD AL-SALAYMEH | HEBRON | 08/31/94 | $400.00 | NO → 360 ؤ | |
| | HATEM KHADER ALFAKHOURI | HEBRON | 08/31/94 | $600.00 | NO → 550 ؤ | |
| | IYAD ABU SNEINEH | HEBRON | 08/31/94 | $300.00 | NO 270 ؤ | |
| | MAHMOUD SADEK ABOU ZANOUNEH | HEBRON | 08/31/94 | $400.00 | NO 360 ؤ | |
| | MARWAN ABU RMEILAH | HEBRON | 08/31/94 | $300.00 | NO 270 ؤ | |
| | MOHAMAD AYED ABU SNEINEH | HEBRON | 08/31/94 | $400.00 | NO 360 ؤ | |
| | NADER SALEM ZAHREH | HEBRON | 08/31/94 | $400.00 | NO 360 ؤ | |
| | RAED ABDELMUTALEB ALNATSHEH | HEBRON | 08/31/94 | $400.00 | NO 360 ؤ | |
| | SABER MOUSA BADER | HEBRON | 08/31/94 | $400.00 | NO 360 ؤ | |
| | SALMAN AWAD ALJAABARIS | HEBRON | 08/31/94 | $600.00 | NO 550 ؤ | |
| | TAREQ ADNAN ASHOUR | HEBRON | 08/31/94 | $400.00 | NO 360 ؤ | |
| HLFJ | Total | | | $4,600.00 | | |
| | Count | | | 11 | | |

4600 - 440 =        # 4160

= 440

الاسماء التي عليها خط معناها

مسؤول عليها نسبة ا م. ن. = 940. + 217.

ID FOUNDATION   TEL:214-699-0198          Se        214 6

| rg | Full Name | City | Paid Thru | Amount | Ne |
|---|---|---|---|---|---|
| HLFG | BASEL MOHAMMAD ABU SHAMMALAH | GAZA | 12/31/93 | $800.00 | YEB |
| HLFG | Total Count | | | $800.00 | 1 |

AND FOUNDATIONN   TEL:214-699-0198        Dec 22.94    18:29 h'

| | Full Name | City | Paid Thru | Amount | New |
|---|---|---|---|---|---|
| ,AG | ADNAN ABDELAZIZ ALSOURI | GAZA | 08/31/94 | $400.00 | YES~360 |
| | GHAZI IBRAHIM HANEYAH | GAZA | 08/31/94 | $400.00 | YES 360 |
| | | | | $800.00 | |
| SAG | Total | | | | 2 |
| | Count | | | | |

$720

SAG

تشم من الخير    ٨١١٠    د عام للعائلات

صدقة غير الذين الإصلاح وتسيع عبد ... ع.ح. ط جرح بالغار

٨١١٠ + ... = ٨١١٠

LAND FOUNDATIONN    TEL:214-699-0198          Dec 22,94    18:22 No.011

| Org | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| ZH | JAMEEL MOHAMAD ABO AREESH | HALHOUL | 08/31/94 | $300.00 | NO 270 |
|    | OMAR ABDULRAHMAN ZAMAE'REH | HALHOUL | 08/31/94 | $400.00 | NO 360 |
| ZH | Total | | | $700.00 | |
|    | Count | | | 2 | |

86

كانك ابراهيم العربي = ٧٠ دولار

= زمارعة = ٢٦٠ دولار

جميل = ٢٦٠ دولار

ABED LAND FOUNDATION   TEL:214-099-0196          DEC 22194   10:25

५

| Org | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| SAG | ABED RABBO RAMADAN ABO RUKBAH | GAZA | 08/31/94 | $600.00 | NO-56 |
| | AHMAD MOHAMAD MORTAJA | GAZA | 08/31/94 | $400.00 | NO. 36 |
| | AHMAD MOHAMMAD MOUFIREN | GAZA | 08/31/94 | $400.00 | NO-36 |
| | AIMAN ALSHAWA | GAZA | 08/31/94 | $300.00 | NO 270 |
| | AISHA ABDELMAJID ALMAQOUSI | GAZA | 08/31/94 | $400.00 | NO-360 |
| | ALI AHMAD ALAMOUDI | GAZA | 08/31/94 | $300.00 | NO 270 |
| | BADER ABDELFATTAH DAWAS | GAZA | 08/31/94 | $300.00 | NO 270 |
| | HEYAM AHMAD ALMAGHEER | GAZA | 08/31/94 | $400.00 | NO 360 |
| | INTISAR ALI ELEIWAH | GAZA | 08/31/94 | $400.00 | NO 360 |
| | INTISAR MOHAMAD AZIZ | GAZA | 08/31/94 | $400.00 | NO 360 |
| | JENAN ABED RABBO AWDEH | GAZA | 08/31/94 | $400.00 | NO 360 |
| | KHALEEL SALEH SALAMEH | GAZA | 08/31/94 | $400.00 | NO 360 |
| | MOHAMAD MAHMOUD ABO MUSAMEH | GAZA | 08/31/94 | $300.00 | NO 10 |
| | MONA REZK ABEID | GAZA | 08/31/94 | $400.00 | NO 360 |
| | MOSTAFA MOHAMAD SHAHWAN | GAZA | 08/31/94 | $400.00 | NO 160 |
| | OLFAT ABDELFATTAH ABO IBTEHAN | GAZA | 08/31/94 | $400.00 | NO 360 |
| | SAEED FARAH SHAMALY | GAZA | 08/31/94 | $400.00 | NO 360 |
| | SANAA JIHAD ABO ABDO | GAZA | 08/31/94 | $400.00 | NO 360 |
| | WATFA MOHAMAD ALQRENAWI | GAZA | 08/31/94 | $400.00 | NO 360 |
| | YOUSEF MOHAMAD ALQERSHALI | GAZA | 08/31/94 | $400.00 | NO 360 |

SAG     Total                                          $7,800.00
        Count                                              20

7030

122262

770

7800 - 770     =     -1030

HOLY LAND FOUNDATIONN . TEL:214-699-0198                    Uc          214,699,019

## Families dues paid Through October 31,1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|--------------|---------|----------|--------|----------------|
| IS | JERUSALEM | Mahmoud Mohamad Khdair | 01/01/92 | 06/30/93 | | $400.00 |
| | JERUSALEM | Jumaa Mohamad Jamhour | 01/01/92 | 06/30/93 | | $400.00 |
| | JERUSALEM | Neemat Abu Kaff | 01/01/92 | 06/30/93 | | $400.00 |
| | JERUSALEM | Ali Ahmad Shahin | 01/01/92 | 06/30/93 | | $400.00 |

Total:                                                              *******
                                                                   $1600

Families dues paid Through June 30, 1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|-------------|---------|----------|--------|----------------|
| IRA | GAZA | Asmaa Jaber Abu Eid | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Hala Moustafa Masoud | 04/15/93 | | NEW | $300.00 |
| | RAMALLAH | Insherah Mahmoud Shukri | 09/15/92 | 02/28/93 | | $400.00 |
| | GAZA | Nemah Abdulla Hamdeyeh | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Maryam Hasan Zakout | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Reda Jibreel Alkahlout | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Fatema Mohamad Aljudaily | 03/15/93 | | NEW | $400.00 |
| | GAZA | Husneya Saeed Shaban | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Inam Mohamad Akel | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Kefaya Abu Namous 19/10-6 | 03/15/93 | | NEW | $400.00 |
| | GAZA | Noura Saleh | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Sabah Ahmad Ali | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Khaldeya Abdulhadi Kelab | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Suad Mohamad Shaban | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Maryam Naseer Abu Moetafa | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Effat Abdulqader Rayan | 04/15/93 | | NEW | $450.00 |
| | GAZA | Hanan Ahmad Abdelwahab | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Rahma Yousef Temraz | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Nahla Ahmad Othman | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Fawzy Salman Abd-alaal | 01/15/92 | 02/28/93 | | $400.00 |
| | GAZA | Khadra Deib Akeilan | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Fatheya Mohamad Abu Ras | 02/15/93 | 02/28/93 | | $400.00 |

al:

8750

23

TEL:214-699=0198                214 699 0198

| )rg | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| Z | MAHMOUD FAHMI SALAHUDDIN | JENEEN | 05/31/94 | $300.00 | |
| | MOHAMAD ALI ALHABHASH | JENEEN | 05/31/94 | $300.00 | |
| | MOHIYIDDIN MOHAMAD ZAKARNEH | JENEEN | 05/31/94 | $300.00 | |
| | NEDAL MOSTAFA SAKALLAH | JENEEN | 05/31/94 | $300.00 | |
| | OSAMA SALEH ZIAB | JENEEN | 05/31/94 | $600.00 | |
| JZ | Total | | | $1,800.00 | |
| | Count | | | 6 | |

HOLY LAND FOUNDATION    TEL:214-699-0198                    Ma            214 699 0198

377

## Families dues paid Through June 30, 1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|--------------|---------|----------|--------|----------------|
| TZ | TOLKAREM | Salah Ahmad Zahra | 01/15/92 | 02/28/93 | | $400.00 |
| | TOLKAREM | Mahmoud Mohamad Da'as | 02/15/92 | 02/28/93 | | $400.00 |
| | TOLKAREM | Khawlah Hussein Atwah | 11/15/91 | 02/28/93 | | $400.00 |

otal:                                                                        *******

$1200

27

EXHIBIT 7

# Agreement

The Holy Land Foundation For Relief And Development (HLFRD,) is proud to sign this accord by which it recognizes the Holy Land Foundation, Jerusalem as its sole agency in the West Bank and Israel.

As and agency, the Holy Land Foundation, Jerusalem is authorized to conduct business on behalf of HLFRD in the following areas:

Oversee fund disbursement for programs in the area
Report work progress and evaluate results
Manage all sponsorship program, including but not limited to the Orphan Sponsorship Program
Make presentations and conduct public relation activities on behalf of the HLFRD
Manage human resource needs including staffing, hiring and firing of paid personnel and volunteers

As a consideration, the HLFRD will pay a fixed fee of $2000 a month, excluding any direct expenses related solely to HLFRD.

Signed this third day of June, 1994

Shukri Baker, Executive Director
Holy Land Foundation For Relief And Development, USA

Mohamed Anati, Executive Director
Holy Land Foundation, Jerusalem

HOLY LAND FOUNDATION   TEL:214-699-0198                          214,699,019

## Families dues paid Through October 31,1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|--------------|---------|----------|--------|----------------|
| IS | JERUSALEM | Mahmoud Mohamad Khdair | 01/01/92 | 06/30/93 | | $400.00 |
| | JERUSALEM | Jumaa Mohamad Jamhour | 01/01/92 | 06/30/93 | | $400.00 |
| | JERUSALEM | Neemat Abu Kaff | 01/01/92 | 06/30/93 | | $400.00 |
| | JERUSALEM | Ali Ahmad Shahin | 01/01/92 | 06/30/93 | | $400.00 |

Total:                                                          ******
                                                                $1600

Families dues paid Through June 30, 1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|------|------|------|------|------|
| IRA | GAZA | Asmaa Jaber Abu Eid | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Hala Moustafa Masoud | 04/15/93 | | NEW | $300.00 |
| | RAMALLAH | Insherah Mahmoud Shukri | 09/15/92 | 02/28/93 | | $400.00 |
| | GAZA | Nemah Abdulla Hamdeyeh | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Maryam Hasan Zakout | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Reda Jibreel Alkahlout | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Fatema Mohamad Aljudaily | 03/15/93 | | NEW | $400.00 |
| | GAZA | Husneya Saeed Shaban | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Inam Mohamad Akel | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Kefaya Abu Namous 19/10+6 | 03/15/93 | | NEW | $400.00 |
| | GAZA | Noura Saleh | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Sabah Ahmad Ali | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Khaldeya Abdulhadi Kelab | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Suad Mohamad Shaban | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Maryam Naseer Abu Moetafa | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Effat Abdulqader Rayan | 04/15/93 | | NEW | $450.00 |
| | GAZA | Hanan Ahmad Abdelwahab | 02/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Rahma Yousef Temraz | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Nahla Ahmad Othman | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Fawzy Salman Abd-alaal | 01/15/92 | 02/28/93 | | $400.00 |
| | GAZA | Khadra Deib Akeilan | 01/15/93 | 02/28/93 | | $400.00 |
| | GAZA | Fatheya Mohamad Abu Ras | 02/15/93 | 02/28/93 | | $400.00 |

8750

(23)

| Org | Full Name | City | Paid Thru | Amount | New |
|-----|-----------|------|-----------|--------|-----|
| Z | MAHMOUD FAHMI SALAHUDDIN | JENEEN | 05/31/94 | $300.00 | |
| | MOHAMAD ALI ALHASHASH | JENEEN | 05/31/94 | $300.00 | |
| | MOHIYIDDIN MOHAMAD ZAKARNEH | JENEEN | 05/31/94 | $300.00 | |
| | NEDAL MOSTAFA BAKALLAH | JENEEN | 05/31/94 | $300.00 | |
| | OSAMA SALEH ZIAB | JENEEN | 05/31/94 | $600.00 | |
| JZ | Total | | | $1,800.00 | |
| | Count | | | | 5 |

. HOLY LAND FOUNDATION    TEL:214-699-0198                    Ma—        214 699 0198

$3^{17}$

## Families dues paid Through June 30, 1993

| Code | CITY | Gardian Name | Sponsor | Last Pay | Status | New Amount Due |
|------|------|--------------|---------|----------|--------|----------------|
| TZ | TOLKAREM | Salah Ahmad Zahra | 01/15/92 | 02/28/93 | | $400.00 |
| | TOLKAREM | Mahmoud Mohamad Da'as | 02/15/92 | 02/28/93 | | $400.00 |
| | TOLKAREM | Khawlah Hussein Atwah | 11/15/91 | 02/28/93 | | $400.00 |

otal:                                                      *******
$1200

(27)

EXHIBIT 7

# Agreement

The Holy Land Foundation For Relief And Development (HLFRD,) is proud to sign this accord by which it recognizes the Holy Land Foundation, Jerusalem as its sole agency in the West Bank and Israel.

As and agency, the Holy Land Foundation, Jerusalem is authorized to conduct business on behalf of HLFRD in the following areas:

Oversee fund disbursement for programs in the area
Report work progress and evaluate results
Manage all sponsorship program, including but not limited to the Orphan Sponsorship Program
Make presentations and conduct public relation activities on behalf of the HLFRD
Manage human resource needs including staffing, hiring and firing of paid personnel and volunteers

As a consideration, the HLFRD will pay a fixed fee of $2000 a month, excluding any direct expenses related solely to HLFRD.

Signed this third day of June, 1994

Shukri Baker, Executive Director
Holy Land Foundation For Relief And Development, USA

Mohamed Anati, Executive Director
Holy Land Foundation, Jerusalem

EXHIBIT B

بسم الله الرحمن الرحيم

سيد شعيب المحترم

وعند قيامك أخوي بالمؤسسان الداخلية التي نتعامل معها

كما وأرجو تذكير السيد هيثم بالإسراع في إرسال مخصصات الأيتام

وتقبلوا مناشر الاحترام      ستري عناني

خالد

الجمعية الاسلامية - غزة

```
ORGANIZATION: THE ISLAMIC SOCIETY
CITY: GAZA
ADDRESS: AL-NASER,GAZA
P.O.BOX: 99,GAZA
PHONE: 07-866988
FAX: 07-866988
BANK NAME: ARABIC BANK PLC
BANK ADDRESS: KENSINGTON , LONDON
ACOUNT NO.:                      532964
ACOUNT NAME: SALAH KAMEL HERZALLAH
```

مؤسسة من فتح حساب
خاص بالجمعية }

السيد المسؤول ، محمد البارود

بعثة غزة
الرحمة للاطفال

```
ORGANIZATION: THE MERCY ASSOCIATION FOR CHILDREN -GAZA
CITY: GAZA
ADDRESS: THE EASTERN ROAD,ALSHEGAEYEH,GAZA
P.O.BOX: 59-GAZA
PHONE: 07-822208
FAX: 07-865653
BANK NAME: HABOALEEM BANK -GAZA BROACH
BANK ADDRESS: EREZ ,GAZA
ACOUNT NO.:                      290666
```

السيد المسؤول ، د. عامر الغزالي  تلفون
07-862505 - العيادة
07-861 779 المنزل

جمعية الصلاح الاسلامية

```
ORGANIZATION: EL SALAH ISLAMIC ASSPCIATION (GAZA
CITY: GAZA
ADDRESS: AL-THALATHEEN ST.,GAZA
P.O.BOX:
PHONE: 07-820636
FAX: 07-820636
BANK NAME: HABOALEEM
BANK ADDRESS: EREZ,GAZA
ACOUNT NO.:                      275527
```

السيد المسؤول ، أحمد الكرد

ORGANIZATION: MOSLEM WOMEN SOCIETY جعيت لنابات لسلمات
CITY: GAZA
ADDRESS: ALREMAL(INFRONT OF PALASTINE
P.O.BOX:
PHONE: 07-822206
FAX:
BANK NAME: BANK LEUMI (969 BRANCH)
BANK ADDRESS: GAZA,ERIZ
ACOUNT NO.: 330-200877/73

السيدة بمسؤولة ، فاطمة الزندي

ORGANIZATION: EL WAFA INVALIDIES SOCIETY جمعية الوفاء لرعاية
CITY: GAZA المسنين
ADDRESS: AL-SHAAF ,EASTERN ROAD,GAZA
P.O.BOX: 1051,GAZA
PHONE: 07-865653
FAX: 07-865653
BANK NAME: PALASTINE BANK
BANK ADDRESS: GAZA
ACOUNT NO.: 21934/1

07-862922 السيد المسؤول ، محمد رشيد الخرب  تلفون

ORGANIZATION: THE ISLAMIC UNIVERSITY الجامعة الإسلامية
CITY: GAZA STRIP
ADDRESS: AL-THALATHEEN ST.,GAZA
P.O.BOX: 108
PHONE: 07-863554/2
FAX:
BANK NAME: PALASTINE BANK
BANK ADDRESS: GAZA
ACOUNT NO.: 023470/8

السيد المسؤول : مدير السؤون العامة  د. غدمشير

بة رعاية لجنة الزكاة المركزية

```
ORGANIZATION: JERUSALEM CENTRAL COMMITTEE OF ZAKAT
CITY: JERUSALEM
ADDRESS: ALRAHMEH GATE
P.O.BOX: 17329,JERUSALEM
PHONE:              285848
FAX:               285848
BANK NAME: MARCINTALE DISCOUNT BANK
BANK ADDRESS: SALAHEDIN ST.,JERUSALEM
ACOUNT NO.:        455113
```

، السيد المسؤول ، مراتب الراعي    سنوليتها)    02-288089

جمعية أصدقاء المرضى

```
ORGANIZATION: PATINTS FREINDS SOCIETY
CITY: HEBRON
ADDRESS: INFRONT OF ALBALADEYAH BIULDING
P.O.BOX: 140 ,HEBRON
PHONE: 929247
FAX:          929247
BANK NAME: CAIRO AMMAN (HEBRON BROAACH)
BANK ADDRESS: HEBRON
ACOUNT NO.: 1100425/8
```

السيد المسؤول ، د. حافظ إنتشي  سنوليبارده :    0292 8244

الجمعية بعلمية الطبية

```
ORGANIZATION: SCIENTIFIC MEDICAL ASSOCIATION
CITY: JERUSALEM
ADDRESS: DAHYET ALBAREED          .RAM
P.O.BOX: 477,RAMMALAH
PHONE:            958861
FAX:             958861
BANK NAME: MARCINTALE DISCOUNT BANK
BANK ADDRESS: SALAH EDIN ST. ,JERUSALEM
ACOUNT NO.: 911-02-459224
```

المسؤول ، د. عبدالودود التميمي

لجنة التراث الاسلامي

ORGANIZATION: THE ISLAMIC HIRITAGE COMMMITTEE
CITY: JERUSALEM
ADDRESS: ALRAHMEH GATE
P.O.BOX: 17329,JERUSALEM
PHONE:                276408
FAX:                  285848
BANK NAME: MARCINTILE DISCOUNT BANK
BANK ADDRESS: SALAHEDIN ST.,JERUSALEM
ACOUNT NO.:           459208

السيد المسؤول ، ناجح بكيرات

٠ ١٥٤

جمعية الاصلاح الخيرية

ORGANIZATION: AL-ESLAH CHARITIABLE SOCIETY
CITY: JERUSALEM
ADDRESS: AL-AQSA MOSQUE
P.O.BOX: 51518,JERUSALEM
PHONE:                959881
FAX:
BANK NAME: MARCINTILE DISCOUNT BANK
BANK ADDRESS: SALAH EDIN ST, JERUSALEM
ACOUNT NO.:           455040

السيد المسؤول ، عبداللطيف ابوخوالة  - ابوسمح .

الجمعية الخيرية الكرومية - البيرة

ORGANIZATION: THE ISLAMIC CHARITABLE SOCIETY
CITY: ALBIREH,RAMALLAH
ADDRESS: ALHASHEMEYEH ST.ALBIREH
P.O.BOX:
PHONE:                957736
FAX:
BANK NAME: THE ARABIC BANK
BANK ADDRESS: AMMAN
ACOUNT NO.: 500/10887-1
the second acou:  CAIRO AMMAN BANK
                  RAMMALLAH BRANCH
                  A/C  13232/2

السيد المسؤول ٠٠ عبد المطلب عبد الرحمن

جمعيات ومؤسسات والكفيفات

```
ORGANIZATION: FRIENDS OF THE BLIND ASSOCIATION
CITY: RAMMALAH
ADDRESS: AL-BIREH RAMMMLAH STR,BIREH
P.O.BOX:
PHONE:               955336
FAX:
BANK NAME: CAIRO AMMAN BANK (RAMMALAH BRANCH)
BANK ADDRESS: RAMMALAH
ACOUNT NO.: (12149 SHAKEL)(1110070/2 JD)
```

السيد المسؤول ، حسين الادريسي

جمعية اصدقاء الايتام

```
ORGANIZATION: FRIENDS SOCIETY OF THE ORPHANAGE SCHOOL IN الجولسا
CITY: JERUSALEM
ADDRESS: DAHEYET ALBARID,ALRAM
P.O.BOX: 20818,JEERUSALEM
PHONE:               959510
FAX:
BANK NAME: MARCINTALE DISCOUNT BANK
BANK ADDRESS: SALH EDIN ST,JERUSALEM
ACOUNT NO.:               451010
```

السيدة المسؤولة : ندوف زلاطيمو

لجنة زكاة صدقة

```
ORGANIZATION: HALHUL COMMITTEE FOR SADAKAT & ZAKAT
CITY: HALHUL
ADDRESS: MOUSA MOSQUE
P.O.BOX:
PHONE: 927521(A.ABDELRAHMAN
FAX:
BANK NAME: CAIRO - AMMAN(HEBRON BRANCH)
BANK ADDRESS: HEBRON
ACOUNT NO.: 1101125\4
```

السيد المسؤول ، أحمد عبد الرحمن (الأمين الصندوق) تلفون 927521 2-

20TH SEPTEMBER, 1995

REPORT NO. : 10/6822/95

SUBJECT: BENEFICIARIES OF THE HOLYLAND FUND

      FURTHER TO OUR 10/6751/95

1. FACSIMILES SENT BY THE HOLYLAND FUND OFFICES IN THE U.S. WERE
FOUND DURING A SEARCH HELD ON 7TH MAY, 1995 AT THE FUND OFFICE
IN BEIT HANINAH. THE LISTS INCLUDE THE NAMES OF BENEFICIARIES OF
THE FUND, INCLUDING MANY FIRST-DEGREE RELATIVES OF HAMAS
ACTIVISTS, DETAINEES, FUGITIVES AND DEAD ACTIVISTS (INCLUDING
SUICIDES). THE FOLLOWING IS A LIST OF THE ACTIVISTS TRACED.

DATE OF PAYMENT: 30 APRIL, 1994
(PARAGRPHS 2 - 24)

2. NA'AMA HUSSEIN AROURI - AROURI/RAMALLAH, 800 DOLLARS.
BEGINNING OF FUNDING - 15 DECEMBER 1993.

------------------------------------------

TRACED: NA'AMA HUSSEIN MAHMOUD AL AROURI - AROURA, BORN IN 1971,
IDENTITY CARD NO. 99586098-8. SHE IS THE WIDOW OF ABD AL-RAHMAN

IBRAHIM YUSSEF AL-AROURI, A FORMER DEPORTEE AND HAMAS FUGITIVE
AND A SENIOR MEMBER OF IZZ A-DIN AL-QASSEM. HE WAS KILLED DURING
A CONFRONTATION WITH THE IDF. HIS WIDOW HAS BEEN RECEIVING
FINANCIAL ASSISTANCE FROM THE HAMAS SINCE FEBRUARY 1995.

3. THE ZAYDAN FAMILY, QIBIYAH, 800 DOLLARS.
BEGINNING OF FUNDING : 15TH NOVEMBER, 1993.
---------------------------------------------

TRACED: SULIMAN MUSTAFA HASSAN ZAYDAN, QIBIYAH,
THE SUICIDE ATTACKER IN THE CAR-BOMB NEAR BEIT EL, KILLED ON 4TH
OCTOBER 1993 (JUST BEFORE THE BEGINNING OF FUNDING MENTIONED
ABOVE). HIS SON AYHAB IS A FORMER ADMINISTRATIVE DETAINEE
(HAMAS).

4. RADA JIBRIL AL-KAHLUT, GAZA, 400 DOLLARS.
BEGINNING OF FUNDING: 15TH JANUARY, 1993.
---------------------------------------------

TRACED: RADA JIBRIL MUHAMMAD HAWAYLA/KAHLUT, JEBALYAH.
HUSBAND: ALI HASSAN ABD AL-HADI HAWAYLA, JEBALYAH, A FORMER
HAMAS DETAINEE AND FORMER DEPORTEE, ARRESTED PRIOR TO HIS
DEPORTATION IN DECEMBER 1992 (JUST BEFORE THE BEGINNING OF
FUNDING MENTIONED ABOVE).

5. SHAMS AHMED SHABANA, GAZA, 400 DOLLARS.

BEGINNING OF FUNDING: 15TH MARCH, 1993.

------------------------------------------------

TRACED: SHAMS AHMED MAHMOUD BA'AJLOUNI, SHABANA,

A FORMER DETAINEE. SHE HAS BEEN RECEIVING SUPPORT FROM THE FUND

SINCE FEBRUARY 1994.

SON: ASHRAF HASSAN YUSUF BA'AJLOUNI, GAZA, A HAMAS MEMBER,

SENTENCED TO LIFE IMPRISONMENT FOR THE MURDER OF THREE JEWS IN

JAFFA, IN 1990.

SON: ADHAM HASSAN YUSUF BA'AJLOUNI, GAZA, A FORMER HAMAS

DETAINEE.

6. AMANAH IBRAHIM AL-GALBAN, KHAN YUNES, 400 DOLLARS.

BEGINNING OF FUNDING: 15 MARCH, 1993

------------------------------------------------------

TRACED: AMANA IBRAHIM MAHMOUD JALABAN, KHAN YUNES, BORN IN 1958.

HER HUSBAND IS JIHAD MUHAMMAD AHMED JALABAN, KHAN YUNES, A

FORMER DETAINEE. HE WAS A PIJ ACTIVIST AND IN PRISON HE WAS

RECRUITED BY THE HAMAS. HE SERVED AN 18-YEAR SENTENCE FOR

INVOLVEMENT IN TERRORIST ATTACKS.

7. QAFAYAH ABU NAMUS, GAZA, 400 DOLLARS

BEGINNING OF FUNDING: 15TH MARCH, 1993

------------------------------------------------

TRACED: QAFAYAH SALEM JUM'A ABU NAMUS, KHAN YUNES.

SON: SAMI IBRAHIM ATIYAH ABU NAMUS, KHAN YUNES, A FORMER
DETAINEE (ARRESTED SEVERAL TIMES), A FORMER DEPORTEE AND A
SENIOR HAMAS ACTIVIST.

8. SA'AD MUHAMMAD SHABAN, GAZA, 400 DOLLARS.
BEGINNING OF FUNDING: 15TH JANUARY, 1993
-------------------------------------------------

TRACED: SA'AD MUHAMMAD AHMED SHABAN, JEBALIYAH. HUSBAND: ISMAIL

MAHMASH SAID SHABAN, JEBALIYAH, A SENIOR HAMAS ACTIVIST, A
FORMER DEPORTEE AND FORMER DETAINEE.

9. RAHMA YUSSUF TAMARAZ, GAZA, 400 DOLLARS.
BEGINNING OF FUNDING: 15 JANUARY 1993.
-------------------------------------------------

TRACED: RAHMA YUSSUF ABD AL-AZIZ TAMARAZ, JEBALIYAH.
HUSBAND: MAHER ABD AL RAHMAN ABD AL-RAHIM TAMARAZ, JEBALIYAH, A
HAMAS ACTIVIST, FORMER DEPORTEE, FORMER ADMINISTRATIVE DETAINEE
AND FORMERLY IMPRISONED. HE UNDERWENT MILITARY TRAINING ON
BEHALF OF THE HAMAS.

10. KHALDIYAH ABD AL-HADI QULAB, GAZA, 400 DOLLARS
BEGINNING OF FUNDING: 15 JANUARY 1993.
-------------------------------------------------

TRACED: KHALDIYAH ABD AL-HADI HATAYAH QULAB, KHAN YUNES.
HUSBAND: SUBHI ABD AL-QADER AHMED OULAB, FORMER DETAINEE AND
FORMER HAMAS DEPORTEE.

11. NURAH SALAH, GAZA, 400 DOLLAR
BEGINNING OF FUNDING: 15 JANUARY, 1993
-------------------------------------------

TRACED: NURAH MANSI MUHAMMAD SALAH, GAZA, A HAMAS ACTIVIST AND
FORMER DEPORTEE. HE MAINTAINS TELEPHONE CONTACT WITH HAMAS
ACTIVISTS ABROAD AND DEALS WITH FINANCIAL MATTERS.

12. HUSNIYAH SAID SHABAN, GAZA, 400
BEGINNING OF FUNDING: 15TH JANUARY, 1993
-------------------------------------------

TRACED: HUSNIYAH SAID MUSTAFA SHABAN, JEBALIYAH.
HUSBAND: SAID AHMED MUHAMMAD SHABAN, JEBALIYAH, FORMER HAMAS
DETAINEE AND DEPORTEE.

13. AN'AM MUHAMMAD AQEL, GAZA, 400 DOLLARS
BEGINNING OF FUNDING: 15TH JANUARY, 1993
-------------------------------------------

TRACED: AN'AM MUHAMMAD MUHAMMAD AQEL, JEBALIYAH.
HUSBAND: ADEL HASSAN IBRAHIM AQEL, JEBALIYAH, A HAMAS FORMER
DETAINEE AND DEPORTEE. HE IS THE BROTHER OF IMMAD AQEL, A
FUGITIVE WHO WAS KILLED.

14. NAHLA MUHAMMAD HAMAD, JEBALIYAH, 400 DOLLARS

BEGINNING OF FUNDING: 15TH FEBRUARY, 1993

------------------------------------------------

TRACED: NAHLA MUHAMMAD MAHMOUD HAMAD, JEBALIYAH.

HUSBAND: MAJDI AHMED MUHAMMAD HAMAD, JEBALIYAH, A HAMAS FORMER
DETAINEE AND DEPORTEE. HE WAS ACTIVE IN THE IZZ-AL-DIN AL-QASSEM
AND ADMITTED TO THE MURDER OF COLLABORATORS, STABBING AN IDF
SOLDIER AND PARTICIPATING IN WEAPONS TRAINING.

15. SUHAIR IBRAHIM AL-GOUL, GAZA, 400 DOLLARS
BEGINNING OF FUNDING: 15 NOVEMBER, 1993

------------------------------------------------

TRACED: SUHAIR IBRAHIM JABER GOUL, GAZA.

HUSBAND: OMAR MAHMOUD JABER GOUL, GAZA, SERVING A LIFE SENTENCE.
HE WAS A MEMBER OF A PIJ SQUAD WHICH PARTICIPATED IN ATTACKS AND



PLANNED ADDITIONAL TERRORIST ACTS. HE TRANSFERRED TO THE HAMAS
IN PRISON.

16. MOUNA SULIMAN HASSAN, GAZA, 400 DOLLARS
BEGINNING OF FUNDING: 15 NOVEMBER, 1993

------------------------------------------------

TRACED: MOUNA SALMAN HUSSEIN HASAN, GAZA.

HUSBAND: MUHAMMAD RIAD MUHAMMAD SHAHADA HASSAN, GAZA, SERVING A

LIFE SENTENCE. HE BELONGED TO A PIJ SQUAD WHICH CARRIED OUT
ATTACKS. HE TRANSFERRED TO THE HAMAS IN PRISON.

17. ANWAR AZIZ, GAZA, 800 DOLLARS
BEGINNING OF FUNDING: 15 DECEMBER, 1993
------------------------------------------

TRACED: ANWAR ABDALLAH ABD AL-KARIM AZIZ, JEBALIYAH. HE IS A
FORMER DETAINEE WHO WAS BLOWN UP DURING AN ATTEMPTED SUICIDE
ATTACK ON OUR FORCES ON 13TH DECEMBER, 1993 (THE
AMBULANCE-BOMB). HE WAS A PIJ ACTIVIST. ACCORDING TO THE
PROXIMITY BETWEEN THE DATE OF HIS DEATH AND THE BEGINNING OF THE
FUNDING, IT SEEMS THAT THIS IS THE PERSON IN QUESTION (THE
REPORT NOTES THAT THIS IS A NEW ALLOCATION).

18. NIDAL MUSTAFA SAQALA, JENIN, 400 DOLLARS
BEGINNING OF FUNDING: 15 NOVEMBER, 1993
-------------------------------------------------

TRACED: NIDAL MUSTAFA YUSUF SAQALLAH, JENIN, A PFLP ACTIVIST, A
CO-OPTEE OF FUGITIVES, AN ADMINISTRATIVE FORMER DETAINEE.

19. MAHMOUD FAHMI SALAH AL-DIN, JENIN, 500 DOLLARS
BEGINNING OF FUNDING: 15TH DECEMBER, 1993
-------------------------------------------------

TRACED: MAHMOUD FAHMI MUHAMMAD HUSSEIN SALAH A-DIN, JENIN, A
PFLP ACTIVIST WHO COMMITTED SUICIDE IN PRISON IN 1986. HIS WIFE:
AMAI MUSTAFA SALAH A-DIN, IS THE SISTER OF PFLP ACTIVIST NIDAL

SAQALA, A CO-OWNER OF 'RED EAGLE' (A TERRORIST CELL OF THE HAMAS THAT WAS EXPOSED).

20. AMAR SALAH AMARANA, YABED, 500 DOLLARS
BEGINNING OF FUNDING: 15 MAY, 1994
-------------------------------------------

TRACED: AMMAR SALAH DIAB AMARANA, YABED, BORN IN 1973. A HAMAS ACTIVIST WHO WAS KILLED DURING A SUICIDE ATTACK IN HEDERA  ON 13TH APRIL, 1994. THE ATTACK RESULTED IN FIVE ISRAELIS DEAD AND OTHERS WOUNDED.

21. ZAKIAH MUHAMMD AL-DAHSHAN, ZAITUN, GAZA, 400 DOLLARS.
BEGINNING OF FUNDING: 15 NOVEMBER 1993.
------------------------------------------------------------

TRACED: ZAKIAH MUHAMMAD ABD DAHSHAN/ABU SAMARA, ZAITUN. SON: KHALED HAMADI KHALIL DAHSHAN, A HAMAS DETAINEE, SENTENDED TO 10 YEARS IN PRISON. HE PARTICIPATED IN THE INTERVIEW OF A SUSPECTED COLLABORATOR WHICH RESULTED IN THE DEATH OF THE INTERVIEWEE.

22. RADA ABDALLAH AL-SANWAR, GAZA, 400 DOLLARS
BEGINNING OF FUNDING: 15TH JULY, 1993.



---------------------------------------------------

TRACED: RADA ABDALLAH ISMAIL SANWAR, KHAN YUNES.

SON: YIHYE IBRAHIM HASSAN SANWAR, KHAN YUNES, A SENIOR HAMAS
ACTIVIST, IN CHARGE OF THE SECURITY APPARATUS IN THE SOUTH. HE
WAS SENTENCED TO LIFE IMPRISONMENT FOR PARTICIPATING IN THE
MURDER OF SUSPECTED COLLABORATORS.

23. ALA'A ANWAR AQEL, RAMALLAH, 800 DOLLARS
BEGINNING OF FUNDING: 15TH JULY, 1993
---------------------------------------------------

TRACED: ALA'A ANWAR AQEL ABD AL-WAHAB, AL BIREH, A HAMAS FORMER
DEPORTEE.

24. FURIAL ALI MAHMOUD AL NAMROUTI, KHAN YUNES, 300 DOLLARS
BEGINNING OF FUNDING: 15 FEBRUARY, 1994
------------------------------------------------------------

TRACED: FURIAL ALI MAHMOUD NAMROUTI, KHAN YUNES, BORN IN 1968.
HUSBAND: YASSER AHMED YUSSUF NAMROUTI, KHAN YUNES, A HAMAS
FUGITIVE KILLED DURING AN ENCOUNTER WITH THE IDF.

25. DATE OF PAYMENT: 30TH JUNE, 1993:

   A. HALA MUSTAFA MASOUD - 400 DOLLARS.

   B. NIMA ABDALLAH HAMADIYAH - 400 DOLLARS.

   C. MIRIAM HASSAN ZAQUT - 400 DOLLARS, IDENTITY NO. 91253045.

   D. RIDA JIBRIL AL-HAQUT - 400 DOLLARS.

   E. HUSNIYAH SAID SHA'ABAN - 400 DOLLARS.

   F. IN'AM MUHAMMAD AQEL - 400 DOLLARS, IDENTITY NO. 90083686.

THE ABOVEMENTIONED ARE FAMILY MEMBERS OF HAMAS DEPORTEES.

26. OMAR ABD AL-RAHMAN ZAMARA, HALHOUL/HEBRON - 400 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994.

----------------------------------------------------------------

THERE ARE NO TRACES ON ZAMARA. BROTHER: SULIMAN, AN ARAB
TERRORIST DEPORTEE, INVOLVED IN ATTACK INTENTIONS IN ISRAEL,
ACTIVE IN THE FATAH.

27. AYAD ABU SANINAH, HEBRON - 270-300 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994

-------------------------------------------------------

TRACED: AYAD HUSSEIN ABD AL-ADHI ABU HADID/ABU SANINAH, QITOUN,
HEBRON. HE IS A HAMAS FUGITIVE CONNECTED WITH A SHOOTING ATTACK
AGAINST ISRAELIS. HE WAS KILLED DURING HIS INTERCEPTION IN MARCH
1994.

RELATIVES WHO ARE HAMAS ACTIVISTS:

FATHER - HUSSEIN ABD AL-AZIZ ABD AL-HAMID ABU HADID.

BROTHER - BASSAM HUSSEIN ABD AL-AZIZ ABU HADID.

HE IS A HAMAS ACTIVIST TURNED EXTREMIST, WHO SINCE THE DEATH OF
HIS BROTHER IS INVOLVED IN ATTACK INTENTIONS. HE WAS RELEASED IN
MAY 1995.

28. MARWAN ABU RAMILAH, HEBRON - 360-400 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994.

-------------------------------------------------

TRACED: MARWAN MUHAMMAD KHALIL ABU RAMILAH, JABL GOUHAR, HEBRON.
A HAMAS ACTIVIST INVOLVED IN AN ATTACK AGAINST A JEW IN HEBRON.

HE PARTICIPATED IN ANOTHER SHOOTING ATTACK IN HALHOUL AND WAS
MENTIONED AS SOMEONE WHO WAS PLANNING A SUICIDE ATTACK. HE WAS
KILLED DURING HIS INTERCEPTION IN DECEMBER 1993.
BROTHER: MUHAMMAD KHALIL ABU RAMILAH, MENTIONED IN CONNECTION
WITH TIES WITH A HAMAS ACTIVIST.

29. MUHAMMAD AYAD ABU SANINAH, HEBRON, 270-300 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994.
------------------------------------------------------------

TRACED: MUHAMMAD (AYAD) IZZAT MUHAMMAD ATRASH ZANOUN,
QUITUN/HEBRON, A HAMAS FUGITIVE AND SQUAD MEMBER WHO RECEIVED
HAND GRENADES AND PARTICIPATED IN AN UNTRACED ATTACK. HE WAS
KILLED DURING HIS INTERCEPTION IN MARCH 1994.
BROTHERS WHO ARE HAMAS MEMBERS:
MUHAMMAD IZZAT MUHAMMAD ATRASH.
GHALEB IZZAT MUHAMMAD ATRASH.
AYAD IZZAT MUHAMMAD ATRASH.

30. ABDEL GAWAD IBRAHIM AL-JABARI - 400 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994

---------------------------------------------------------

TRACED: GAWAD IBRAHIM HAWISHEL JABARI MASHAH, NAMRA/HEBRON, BORN
IN 1969. HE IS A PFLP ACTIVIST, INVOLVED IN RIOTS (JANUARY
1995).

31. BASEL MUHAMMAD ABU SHAMALLAH, GAZA, 800 DOLLARS.
BEGINNING OF FUNDING: 31ST DECEMBER, 1993.

---------------------------------------------------------

TRACED: BASEL ABDALLAH MAHMUD ABU SHAMALA, A FORMER HAMAS
DETAINEE. HE WAS IMPRISONED FROM 25TH JANUARY, 1993 UNTIL 24TH
APRIL, 1994. HE ADMITTED BEING A HAMAS RECRUIT WHO OPERATED IN
THE ORGANIZATION COMMITTEE IN NAZARETH.
BROTHER - ABD AL HAI, A FORMER DETAINEE WITH A SIMILAR
BACKGROUND.

32. GHAZI IBRAHIM HANAYA, GAZA, 400 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994.

---------------------------------------------------------

TRACED: GHAZI IBRAHIM HANAYA ASQULA, BORN IN 1940. HIS SON IMAN
IS A PFLP ACTIVIST WHO WAS KILLED DURING RIOTS IN FEBRUARY 1994,
AFTER THE EVENTS IN HEBRON.

33. ABD RABOU RAMADAN ABU RAQBA, GAZA, 600 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994.

---------------------------------------------------------

TRACED: ABD RABOU RAMADAN ABU RAQBA JEBALIYAH, BORN IN 1937. HIS

SON AYAD IS AN ALF ACTIVIST KILLED DURING A LOCAL INCIDENT IN
JANUARY, 1994.

34. AYSHA ABD AL MAJID AL-MAQUSSI, GAZA, 400 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994
------------------------------------------------------

TRACED: AYSHA ABD AL MAJID MAQUSSI, IDENTITY NO. 90387195-2,
JEBALIYAH. HER HUSBAND ANWAR IS A FATAH ACTIVIST, KILLED IN A
CONFRONTATION WITH THE IDF IN MARCH 1994.

35. MUHAMMAD MAHMOUD ABU MASMAH, GAZA, 300 DOLLARS
BEGINNING OF FUNDING: 31ST AUGUST, 1994
------------------------------------------------------

TRACED: MUHAMMAD MAHMOUD ABU MASMAH, KHAN YUNES, BORN IN 1927.
HIS SON TAHA WAS A HAMAS ACTIVIST, KILLED DURING A CHANCE
ENCOUNTER WITH THE IDF IN MARCH 1994, WHEN HE WAS WITH THE
FUGITIVE MUHAMMAD SHAWAN.

36. NAIMA MUHAMMAD ABU KEF, JERUSALEM, 400 DOLLARS
BEGINNING OF FUNDING: 31ST AUGUST, 1994.
------------------------------------------------------

TRACED: NAIMA MUHAMMAD ALI ABU KEF, BORN IN 1960. THERE ARE NO
DEROGATORY TRACES IN HER FILE.

BROTHER: ATEF IS KNOWN AS A HAMAS ACTIVIST CONNECTED WITH SENIOR HAMAS ACTIVISTS, INCLUDING A MILITARY OPERATIVE.

37. MAHMOUD MUHAMMAD KHADIAR, JERUSALEM, 400 DOLLARS.
BEGINNING OF FUNDING: 31ST AUGUST, 1994
--------------------------------------------------------

TRACED: MAHMUD MUHAMMAD SALAH ABU KHAIDAR, BORN IN 1931, NO DEROGATORY TRACES.
FOUR OF HIS SONS ARE INVOLVED IN RIOTS. ALL OF THEM ARE FORMER DETAINEES, SOME ARE PFLP ACTIVISTS. THEY SEEM TO HAVE NO CONNECTION WITH THE HAMAS.

38. JUM'A MUHAMMAD JUMHOUR, JERUSALEM
BEGINNING OF FUNDING: 31ST AUGUST, 1994
-------------------------------------------

TRACED: JUM'A MUHAMMAD IBRAHIM JAMHOUR, BORN IN 1970, A SENIOR HAMAS ACTIVIST.

39. MUSTAFA MUHAMMAD SHAWAN, GAZA, 400 DOLLARS
BEGINNING OF FUNDING: 31ST AUGUST, 1994
-------------------------------------------

TRACED: MUSTAFA MAHMUD SHAWAN KHAI, BORN IN 1938. HIS SON MUHAMMAD WAS KILLED DURING A CHANCE ENCOUNTER WITH AN IDF FORCE IN MARCH 1994. HE WAS AN IZZ AL-DIN AL-QASSEM FUGITIVE WHO PARTICIPATED IN SEVERAL ATTACKS, INCLUDING THE MURDER OF TWO VEGETABLE DEALERS IN THE KHAN YUNES AREA IN MAY 1993.

40. THE AL-ZIR FAMILY RECEIVED 300 DOLLARS ON 15TH DECEMBER, 1993 AND ON 31ST MAY 1994.

------------------------------------------------------------------

TRACED: THE FAMILY OF KHALED MAHMOUD MUSTAFA ZIR, A HAMAS ACTIVIST WITH TIES TO HAMAS ACTIVISTS IN THE TA'AMARA AREA. MENTIONED IN CONNECTION WITH A SHOOTING ATTACK AT SOLDIERS IN SAIR.

BROTHER: WAGIAH MAHMOUD MUSTAFA AL-ZIR, TARMALA/BETHLEHEM, A HAMAS ACTIVIST WHO DELIVERED AN IMPROVISED EXPLOSIVE CHARGE WHICH WAS SUPPOSED TO BE USED IN A SUICIDE ATTACK IN JERUSALEM.

41. JOUM'A MUHAMMAD JUMHOUR, JERUSALEM, RECEIVED 300 DOLLARS ON 31ST MAY 1994 AND 200 DOLLARS ON 1ST JANUARY 1992 AND ON 31ST OCTOBER, 1993.

------------------------------------------------------------------

TRACED: JOUM'A MUHAMMAD IBRAHIM JAMHOUR, BEIT ANAN/BINYAMIN, A SENIOR HAMAS ACTIVIST WHO PARTICIPATES IN RIOTS CONDUCTED IN HIS AREA OF RESIDENCE.

42. NAIMA MUHAMMAD ABU KEF, JERUSALEM, RECEIVED 300 DOLLARS ON 31ST MAY, 1994 AND 200 DOLLARS IN NOVEMBER, 1992 AND ON 31ST OCTOBER, 1993.

TRACED:

A. NAIMA MUHAMMAD AHMED ABU KEF, BORN IN 1964, IDENTITY NO.
8039721 OF TSUR BAHER, NO TRACES.

BROTHER: AHMED MUHAMMAD AHMED ABU KEF, TSUR BAHER, A HAMAS
ACTIVIST, ORTHODOX, CONNECTED WITH HAMAS ACTIVISTS.

BROTHER: HUSSEIN MUHAMMAD AHMED ABU KEF, TSUR BAHER, A
HAMAS ACTIVIST.

B. NAIMA MUHADDAM ALI ABU KEF, TSUR BAHER, NO DEROGATORY
TRACES.

BROTHERS: ATEF MUHAMMAD ALI ABU KEF, TSUR BAHER, MENTIONED
AS A HAMAS SQUAD MEMBER.

43. ALI AHMED SHAHIN, 300 DOLLARS.
BEGINNING OF FUNDING: 31ST MAY, 1994

TRACED: ALI AHMED MAHMUD SHAHIN, INTERROGATES SUSPECT
COLLABORATORS, PLANNED TO KIDNAP A SUSPECT.
BROTHER: MUSA AHMED SHAHIN, WOUNDED BY SOLDIERS DURING A RIOT.
BROTHER: MAHMUD, KILLED DURING A DEMONSTRATION, A FORMER HAMAS
DETAINEE.

44. MUHI A-DIN MUHAMMAD ZAQARANAH, JENIN, RECEIVED 300 DOLLARS
ON 31ST MAY, 1994

TRACED: MUHI AL-DIN MUHAMMAD ABDALLAH HAMED ZAOARANAH, IDENTITY NO. 85291792, BORN IN 1991, BROTHER OF RAID MUHAMMAD ZAOARANAH, THE SUICIDE TERRORIST IN AFULA.

45. HADRAH DIB AQILAN, RECEIVED 400 DOLLARS ON 30TH JUNE, 1993
---------------------------------------------------------------

TRACED: HADRAH DIB YUSSUF AQILAN, BORN IN 1945, RESIDES AT BLOCK 1, DAB REFUGEE CAMP. MARRIED TO ABD AL-FATEM AYOULAN, A HAMAS ACTIVIST. HER SON MAHMUD IS A HAMAS DEPORTEE WHO DID NOT RETURN AND STAYED IN SYRIA. ANOTHER SON, AHMED, IS A FORMER FATAH DETAINEE.

46. RAHMA TAIF TAMARAZ, RECEIVED 400 DOLLARS ON 30TH JUNE, 1993
---------------------------------------------------------------

TRACED: RAHMA MUSTAFA YUSSUF TAMARAZ, BORN IN 1959, OF DEIR AL BALAKH. SHE IS A PFLP ACTIVIST. HER SON YIYHE DOUGMOUSH WAS A FATAH DETAINEE (CORRECT TO NOVEMBER 1993). ANOTHER SON, ZAKARI, BELONGED (CORRECT TO APRIL 1991) TO THE PIJ.

47. SA'AD MUHAMMAD SHABAN, RECEIVED 400 DOLLARS ON 30TH JUNE, 1993
---------------------------------------------------------------

TRACED: SA'AD MUHAMMAD SULIMAN SHABAN, BORN IN 1956, RESIDES AT

QUARTER 15, JEBALYAH EAST REFUGEE CAMP. SHE IS THE WIFE OF
MUHAMMAD ALI SHABAN, WHO HAS BEEN ABSENT FROM THE AREA FOR
YEARS. IN THE SEVENTIES HE BELONGED TO THE FATAH. IN 1989 HE WAS
TRACED AS AN ABU MUSA ACTIVIST, WITH NO UPDATED SECURITY TRACES,
A RESIDENT OF JORDAN.

48. SABAH AHMED ALI – RECEIVED 400 DOLLARS ON 30TH JUNE, 1993
-----------------------------------------------------------------
TRACED: SABAH AHMED ALI SABAH, BORN IN 1967, OF SHATI NORTH
REFUGEE CAMP. HE IS A FORMER DETAINEE, INVOLVED IN RIOTS, A
MEMBER OF THE LOCAL POPULAR COMMITTEE AT THE SHATI REFUGEE CAMP
(CORRECT TO APRIL 1989).

49. SALAH AHMED ZAHARA, TULKAREM, RECEIVED 400 DOLLARS ON 28TH
FEBRUARY, 1993
-----------------------------------------------------------------
SALAHA AHMED HASSAN ABU ZAHARA, BORN IN 1954, IMAM OF MUJAMA'A
ISLAMI, A FORMER HAMAS DETAINEE, A PROMINENT HAMAS ACTIVIST FROM
THE TULKAREM REFUGEE CAMP, INVOLVED IN RIOTS. HE CURRENTLY
RESIDES IN SHUWAYQA AND HAS 10 CHILDREN.

50. MUHAMMAD MUSTAFA ABU JAMOUS, TULKAREM, RECEIVED 300 DOLLARS
ON 31ST MAY, 1994
-----------------------------------------------------------------
MUHAMMAD MUSTAFA SAID ABU JAMOUS (ABU OMAR), BORN IN 1925,
IDENTITY NO. 90453841. IN JANUARY 1991 HE WAS APPARENTLY WOUNDED



# HOLY LAND FOUNDATION
# FOR RELIEF AND DEVELOPMENT

## Exhibit 28


FILED

JUN

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1:02CV00442(GK)


EXHIBIT

tabbies

13

10/11/01

SP?CF/WB
c
Admin. Review

(S)



| Time | Initial | I.C.<br>op | Activity Recorded: ▓▓▓▓▓▓ &Taped 4 Conference Room |
|------|---------|------|--------------------------------------------------|
| 10/2/93 | OSh | | Continuation of the meeting:     A |
| | | — | Ashqar made the following presentation, the |
| | | | title of his paper is organizing the |
| | | | relationship between American ( the palestinian/ |
| | | | Arab Community in America) and the inside |
| | | | ( the occupied lands). In addition, based on |
| | | | my experience I would like to make |
| | | | comments on statements made by both |
| | | | Abu-Usama and brother Abdul Salam. Ashqar |
| | | | said: |
| | | — | In Madrid conference people supported the |
| | | | conference, when the conference didn't produce |
| | | | any results people turned their back to it. |
| | | | Therefore we shouldn't bet on people's attitude. |
| | | | We should shape the public opinion and |
| | | | shouldn't wait for the News Media and events |
| | | | to shape it. The most important thing is |
| | | | that we should be strong, information wise, |
| | | | Economically, politically .. in some of these fields |
| | | | we are week. For example the entire world |
| | | | is against <s>them</s> them (in the inside) even those whom we hoped |
| | OSh | | |

Log   Page 1

Day Wedn Date 11/3/93

Language Specialist Name:

A. Shikata

St Louis Office

Date Stamp

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE.

SECRET

(S)

A

| Time | Initial | IC | Activity Recorded: ▮▮▮▮▮  Tape# 4 Conference Room |
|------|---------|----|--------------------------------------|
| 10/2/93 | ⊘Sh | | They will stand by us became part of the |
| | | | conspiracy. Sudan, For example, in the Arab |
| | | | Foreign Ministers Conference, they supported the |
| | | | accord. No one dares to say No. Even the |
| | | | guidance office (This is the name of the |
| | | | leadership of the Muslim brotherhood in Egypt). |
| | | | They did approve. |
| | | | To concentrate on informing the people not |
| | | | only through the papers and radio, but through |
| | | | the TV. |
| | | | We have to understand the issue of the |
| | | | police force who will be between 30,000 and |
| | | | 50,000. It mainly consists of Fatah people |
| | | | who spent some time in jail. They are trained |
| | | | to worship Abu-Ammar and hate the Islamists. |
| | | | Even more than the Jews. The Islamic Movement |
| | | | is their enemy number one. This opinion is |
| | | | based on experience. Those people are |
| | | | uneducated. They are the one who will be |
| | | | implementing the ~~accord~~ goals of the accord. |
| | | | The problem is that even the returnees from |
| | ⊘S↓ | | |

| | | |
|---|---|---|
| 1 ? __ Page 2<br>Day Wed Date 11/3/93 | Language specialist Name:<br>A. Shihata<br>St. Louis office | Date Stamp |

SECRET

A

(5)

| Time | Initial | IC | Activity Recorded: ▓▓▓▓▓▓ Tape # 4 Conference Room |
|------|---------|-----|----------------------------------------------------|
| 10/2/93 | OSh | | deportation has no effect on the people. No |
| | | | one has effect on the people. These from |
| | | | Ramallon / Jerusalem area hasn't returned I |
| | | | don't think we will be able to adjust |
| | | | to the self rule stage. |
| | | | - it has been said that events slows us, that |
| | | | we have no strength. who started the |
| | | | uprising who is guiding the uprising |
| | | | until now. the united leadership role is |
| | | | limited to issuing the announcements. they |
| | | | don't even distribute it it is broadcasted |
| | | | through Monte Carlo Broadcasting System. Since |
| | | | the begining of the uprising the Islam's is |
| | | | are the one who is directing it effectively. |
| | | | I wrote about reorganing the relationship |
| | | | between american and the inside for a |
| | | | number of reasons. |
| | ✳ | 1 - | Muhamed Salah incidens proves that inside |
| | | | the occupied lands the american passport / |
| | | | American citizenship means nothing. they are |
| | | | treated like all other nationalities. if is needed |
| | OSh | | |

Log ___ Page  3 ___    Language Specialist Name : ___    Date Stamp.

Day Wed Date 11/3/93 ___    Q. Shihata

ST. louis Office.

SECRET
A

| Time | Initial | I C | Activity Recorded: ▮▮▮▮ Tape# 4 Conference Room |
|------|---------|-----|--------------------------------------------|
| 10/2/93 | ØSh | | to be more cautious in the inside. More than |
| | | | when you are in America. |
| | | — | The signing of the peace accord ended the |
| | | | legitimacy of resisting the ISRAELI occupation. |
| | | | In the past America didn't condemn operations |
| | | | against the military targets. After the peace |
| | | | accord any operations will be considered acts |
| | | | of terrorism. When the ISRAELI weren't able |
| | | | to Encounter the opposition ( resistance) they |
| | | | brought. Some one else to do the Job in |
| | | | their behalf, to stand in their side against |
| | | | the opposition ( the resistance) and the same |
| | | | thing will take place in the future. if they |
| | | | fail to contain the opposition they will |
| | | | ask Some one else to eliminate the remaining |
| | | | pockets of resistance where ever it may |
| | | | exist. We have many institutions that support |
| | | | actions in the inside. Since December No one |
| | | | from here went to visit the deportees. |
| | | | Because we don't have resources to do that. |
| | | | No one from America went to visit the |
| | ØSh | | |

Log __ page 4    Language specialist Name:    Date Stamp:
Day Wed Date 11/3/93.    A. Shihata
St. Louis Office

SEGRET

A

| Time | Initial | IC | Activity Recorded: ▮▮▮▮ Tape# 4 Conference Room |
|------|---------|----|--------------------------------------------------|
| 10/2/93 | 054 ✕ | | families of the Martyrers, the Prisoners, the |
| | | | injured in the hospitals. Such visits has |
| | | | great effect on their Morals, but No one |
| | | | Does it. In addition, They in the inside, don't |
| | | | have the Capabilities to recieve official |
| | | | delegations. |
| | | | what the inside Need from america |
| | | | include the following: |
| | | 1- | charitable activities. The future of the |
| | | | institutions isn't Known. we Need to |
| | | | support the families of the martyrers, this |
| | | | efforts has to Continue. |
| | ✕ | 2 | Studies at the graduate level is important. |
| | | | we Need people to control the institutions |
| | | | and who form a political force for our |
| | | | brothers in the inside. Because the coming |
| | | | administration May close the News papers, |
| | | | Magazines. we have institutions and announce |
| | | | That can be issued in America, this way |
| | | | it will be difficult for the comining authority |
| | | | to prohibit from Entering the homelands. |
| | 054 | | |

l g    Page 5    Language Specialist NAme :    Date Stamp
Day Wed Date 11/3/93    A. Shahta
ST. Louis OFFICe

SECRET

(s)

A

| Time | Initial | I C | Activity Recorded: ▓▓▓▓ Tape # 4 Conference Room |
|------|---------|-----|---|
| 10/3/93 | Ash | | If the conference The News That are Published in |
| | | | The inside They can't prevent The american |
| | | | Magazines from Entering, Even if They Tried |
| | | | To do That You can raise The Issue with |
| | | | The americans. Some Times The inside Needs |
| | | | reSearch to be made for them, and Some time |
| | | | They request This information. We have to |
| | | | be able to do Such Things. examples |
| | | | Studying ne Zionist Movement The Zionist |
| | | | Loby in America extra. |
| | — | | issue we have to adopt include The |
| | | | human rights, we have to Strengthen our |
| | | | relations with The human rights organizations |
| | | | we have to raise issue -- Such as Sheikh |
| | | | Ahmad (yasin) Case .. were it raised in |
| | | | The American circles . Some People who were |
| | | | arrested were injured before Their arrest |
| | | | and didn't recieve medical treatment from |
| | | | The arrest , This subject could be raised. |
| | | | Such of Things will take place as a result |
| | Ash | | of future Events, we Should be able to |

| Log _____ page _6 | Language specialist Name : | Date Stamp. |
|---|---|---|
| Way Wed _Date 11/3/93 | 2. Shehata | |
| | ST- Louis office | |

SECRET

(S)

A

| Time | Initial | I C | Activity Recorded: ▮▮▮▮▮▮ (S)    Tape # 4   Conference Room |
|------|---------|-----|------------------------------------------------------------|
| 10/2/93 | ASh | | raise these issues in America. |
| | | - | Sending official delegations to the home land |
| | | | will be very important particularly during |
| | | | the coming phase. You have to make the |
| | | | people inside feel they arent alone. That they |
| | | | have extentions — delegations to be sent for |
| | | | the purpose of improving Providing Moral |
| | | | Support. For information purposes. I also suggest |
| | | | suggest keeping a record system so we |
| | | | don't start from scratch every time we |
| | | | do something. |
| | | - | Investment: we need to Encourage investment |
| | | | during the coming period; to get dividends |
| | | | and to Employ the unemployed youth. |
| | | | future relations can be summarized as |
| | | | follows: |
| | | 1- | Legality of action: We Shouldn't get |
| | | | involved in any work that isn't legal. |
| | | | This is because of the negative probable |
| | | | Consequences. I don't think we work behind |
| | | | the Eyes of the people (We Recent our actions |

| Log     page 7 | Language specialist NAME: | Date Stamp: |
|----------------|----------------------------|-------------|
| Day WH Date 11/3/93 | A. Shihata | |
| | St. Louis office | |

SECRET

A

| Time | Initial | IC | Activity Recorded: ▮▮▮▮▮▮ Topt# 4 Conference Room (s) |
|------|---------|-----|---------|
| 10/2/93 | Ash | X | are watched by The american authorit[ies]. So. They have The ability to know every Thing we do. Therefore, every Thing we do should be legal. |
| | | 2 | To avoid Troubles relations Should only be between institutions. |
| | | 3. | Continuation our actions Should Continue with greater vigor. End of Ashgar's Presentation. There were Some questions/ Comments relating to Ashgar's Presentation. |
| | | — | There are other organizations in The american Theatre That do Some functions. in The Same time of increasing our efforts our relations with Those other organizations in America Should be studied and Strengthened. |
| | | — | Concerning Security Matters it was Said at The present Time You are opposing The whole world. All The world is against You and You Must expect legal Troubles... Years ago we Said. OH Brothers, in The Day when |
| | Ash | | |

L :    page  8    Language Specialist NAME :    Date Stamp
Day. Wed Date 11/3/93    A. Shihata
                          St. Louis office

SEC█ET

A

| Time | Initial | IC no | Activity Recorded: ███████ (S) Tape# 4 Conference Room |
|------|---------|-------|--------------------------------------------------------|
| 10/2/93 | ␣h | | Sister Saman (He meant Hamas. This Entire |
| | | | Statement are Made in code). get Divorced |
| | | | and Every body discard her, and Say about |
| | | | her She is a Terrorist. They Said This |
| | | | will Never happen. America is a country |
| | | | of Laws and Constitutions, and This is |
| | | | what happened. You are Trying to get her |
| | | | Married again. will you really Continue to |
| | | | be respected in The Eyes of The Law |
| | | | or There. will be more talk. I beg of you |
| | | | O Brothers to Think about This issue * |
| | | | |
| | | | * L/S Comment: The meaning of the above |
| | | | relates to The fact That Hamas was |
| | | | considered a legal organization in The past. |
| | | | At present Hamas is classified as a Terrorist |
| | | | organization by The American authorities, and |
| | | | Therefore, they should be careful in functioning. |
| | | | in this country so they willn't be Treated |
| | | | as terrorist which will jeopradize Their |
| | | | efforts in This country. |
| | ␣h | | |

| Log  Page 9 Day Cuid Date 11/3/93 | Language Specialist Name : A. Shihata St. Louis OFFICE. | Date Stamp |
|------------------------------------|---------------------------------------------------------|------------|

SECRET

A

| Time | Initial | I C | Activity Recorded: ▭▭▭▭ (5) Tope#4 Conference Room |
|------|---------|-----|------------------------------------------------|
| 10/2/93 | Ⓢ h | - | Abu-Muhamed has a comment to make. |
| | | | He said we, at the present time spend 75% |
| | | | of our efforts providing assistance and services |
| | | | to the inside, and 25% of the efforts spent |
| | | | on the community here. Should we do the |
| | | | opposite. Should our work focuse on the community |
| | | | here. Should we work to enlarge and strengthen |
| | | | our community in America, Like what the Jews |
| | | | did . Then say, After 10 years we can use |
| | | | our power to benifit those inside. |
| | | | It was Mentioned that brothers Akram and |
| | | | Ghassan will address this issue |
| | | - | In response to the above inquiry |
| | | | Ashgar said - if if Look at the Jewish |
| | | | community in This County, we will Find |
| | | | That all their efforts are Directed to Serve |
| | | | ISRAEL. to achieve and Build the Zionist |
| | | | Dream. The Dream of the international Zionist |
| | | | Movement. |
| | | - | This point was dsbated For Some time. |
| | Ⓢ h | | it was Said if you Studied the Jewish |

| | | | |
|---|---|---|---|
| I ng  ___ Page 10 | Language specialist NAME : | | Date Stamp: |
| Day Wed Date 11/3/93 | A. Shihata | | |
| | St. Louis office | | |

SECRET

A

(s)

| Time | Initial | IC per | Activity Recorded: ▓▓▓▓▓ Tape # 4 Conference Room |
|------|---------|--------|---------------------------------------------------|
| 10/2/93 | (S)4 |  | history you will find they concentrated on |
|  |  |  | Building their Economic/political base in |
|  |  |  | This country. and when They reached These |
|  |  |  | goals they Started Specially in 1967 to Concentrate |
|  |  |  | Their efforts on ISRAEL, and gave ISRAEL |
|  |  |  | Every Thing it needs. Even Some of The |
|  |  |  | american Jews Rejected ISRAEL ann Zionism |
|  |  |  | They Said The Building of ISRAEL will destroy |
|  |  |  | us in America. |
|  |  |  | Askin replied The Point (I am Trying to |
|  |  |  | Make is That we Should use all our |
|  |  |  | resources To Support The inside. There are |
|  |  |  | urgent needs such as helping The Prisoners |
|  |  |  | families. Should we let Them Die. The unurgent |
|  |  |  | Needed Can be delayed but The urgent Needs |
|  |  |  | Should be Met. The Islamic acts in palestine |
|  |  |  | doesn't have The resources to Grow. There |
|  |  |  | a Need for Journalists/lawyers who will defend |
|  |  |  | The Islamises. we have to have people who |
|  |  |  | Think in The american way — and who |
|  |  |  | under Stand The american System |
|  |  | (S)4 |  |

| Log | Page 11 | Language Specialist Name : | Date Stamp. |
|-----|---------|----------------------------|-------------|
| way Wed Date 11/3/93 | A. Shihata | | |
|  | ST. Louis Office. | | |

SECRET

A

| Time | initial | I C | Activity Recorded: ▮▮▮▮ | Tape # 4 Conference Room |
|------|---------|-----|-------------------------|--------------------------|
| 10/2/93 | Bh | — | um replic in fact we need Those who | |
| | | | Can assist The inside Not The ones who | |
| | | | understand The american system. Our interest | |
| | | | isn't to understand The american system | |
| | | | but to understand The palestinian people | |
| | | | more to understand Their situation and | |
| | | | Their suffering. Should we change our | |
| | | | way in working in America ? | |
| | | | | |
| | | | Akram: | |
| | | | it is dangerous to oppose The accord first, | |
| | | | To Talk (To The west) about democracy is | |
| | | | a waste of time, in fact The west | |
| | | | supports The dictators. Many Dictators are | |
| | | | supported by The west. Our Strategy Should | |
| | | | be Maximising The best benefits of The | |
| | | | accord. For example if you said we are | |
| | | | fighting For our own state. suppose in a | |
| | | | year or two The Jews said okay, here is Your | |
| | | | state .. you Can say The accord didn't | |
| | | | achieve anything For The palestinians abroad | |

Log — page 12
Day Won Date 11/3/93

Language specialist Name:
A. Shihata
St. Louis, office

Date Stamp

SEC̶R̶E̶T̶

A

| Time | Initial | I.C. | Activity Recorded: ▬▬▬▬▬ (s) Tape # 4 Conference Room |
|------|---------|------|------|
| 10/2/93 | (A)sh | | The ISRAELIS will say okay, let us form a |
| | | | committee to look into the matter and |
| | | | this could take forever. |
| | | — | We are Talking about our work in America. |
| | | | Should we say we are the alternative leadership? |
| | | | There is a political [leadership] vacancy to in America. |
| | | | Specially among the Islamists. Every day we |
| | | | receive telegrams Telephone calls from the |
| | | | Democratic (Front) and the Popular (Front) |
| | | | asking us what we are going to do. They have |
| | | | No Plans. therefore we should not be hesitant in |
| | | | our decisions. We have to make it very |
| | | | clear That we oppose This Thing 100%. and |
| | | | we, The Islamists has a different position. |
| | | | Throw Throw this to the palestinian people. |
| | | | we are The leadership of the opposition. |
| | | — | In response To The above point um said |
| | | | what do you mean we are the alternative. |
| | | | Are we the Alternative ideologically or physically? |
| | | | This Talk can cost us. The people will |
| | | | come to you and say we repent. we are |
| | (A)sh | | |

| | | | |
|--|--|--|--|
| ___g ___ Page 13 ___<br>Day Wed Date 11/3/93 | Language Specialist Name:<br>A. Shihata<br>St. louis OFFICe | | Date Stamp |

SECRET

A

(S)

| Time | Initial | I C | Activity Recorded: ▓▓▓▓▓ | Tape # 4  Conference Room |
|------|---------|-----|--------------------------|---------------------------|
| 10/2/93 | Sh | | with you.. we want to work with you.. we | |
| | | | you ready for That.. I am talking from | |
| | | | experience. we were in Brazil.. people who | |
| | | | belong to The popular front Come to us and | |
| | | | Said we are with you.. we want To Enter | |
| | | | and work with you.. are we ready for That? | |
| | | | Another Speaker: | |
| | ⊗ | | we Should acknowledge That we Lost this Round. | |
| | | | The Ball in ours Now. I believe whatever we | |
| | | | do we will achieve Nothing. In one or Two | |
| | | | years people will look. by that Time The record | |
| | | | will be failing and The people will look For | |
| | | | Those who oppose it and we have to be There. | |
| | ✳ | | Ashgar said: Meanwhile, in The Short Run, | |
| | | | we Should initiate activities Such as | |
| | | | demonstrations.. with Other parties as a first | |
| | | | Stage. But The Movement On strategy Doesn't | |
| | | | Call for extentions abroad. | |
| | | | Akram said The self rule administration will | |
| | Sh | | be in The homeland and will not have | |

Lg   Page 14
Day Wed Date 11/3/93

Language Supervisor Name:
(A) Shiheta
St. Louis OFFICe

Date Stamp.

SECRET

A

| Time | Initial | I.C. 99 | Activity Recorded: ▓▓▓▓▓ (5) Tape #4 Conference Room |
|---|---|---|---|
| 10/2/93 | A.h | | extensions over here |
| | | — | another speaker Mentioned That he observed |
| | | | That all The talk pertains to Gaza/west |
| | | | Bank, and inquired what about The 1948 |
| | | | Borders. if The Israelis Said okay, |
| | | | you can Take Gaza and The west Bank |
| | | | what else you want, Then Means we are |
| | | | Trapped at That point. Our demonstrators |
| | | | what our demands will be? will we ask |
| | | | for 1948 Borders. we can't Say it publicly |
| | | | all what I am Trying to Say our demands |
| | | | should be Made clear -- If I used to Live |
| | | | in Haifa, I should be able to return to |
| | | | Haifa. |
| | | — | The second point is we can't stop the |
| | | | self Rule authorities from Materializing, America |
| | | | and Europe are behind it. Once it Takes |
| | | | place it will Establish institutions in |
| | | | America which we have to Compete with. |
| | | | In This case will relationships and coordination |
| | | | will Take place between a us and The |
| | A.h | | |

| Log ____ Page 15 | Language specialist NAme : | Date Stump. |
|---|---|---|
| ▓▓▓▓▓ Date 11/3/93 | A- Shihata | |
| | St. louis OFFice | |

SECRET

A

(S)

| Time | Initial | IC 90 | Activity Recorded: ▓▓▓▓ Topet 4 Conference Room |
|------|---------|-------|--------------------------------------------------|
| 10/6/93 | AJ4 | | These is government institutions? |
| | | | New speaker: Abdul Jabbar Lhu |
| | | — | Jabbar Mentioned the conflict will |
| | | | come sooner than expected. |
| | | | The End of this tape |
| | AJ4 | | |

| Log — page 16 | Language specialist Name: | Date Stamp |
|---------------|---------------------------|-----------|
| Day WED Date 11/3/93 | A. Thhata | |
| | (St. Louis Office) | |

DEN▮E

(S) A

| Time | Initial | IC | Activity Recorded: ▮▮▮▮ Tape # 6 Conference Room |
|------|---------|-----|-----|
| 10/2/93 | ĠSh | | Continuation. This is The Second Session. |
| | | — | The Subject of This session is The |
| | | | Charitable activities and its Future in |
| | | | The Light of The current Changes. |
| | X | — | Speaker: Abu-Basim (From Canada. |
| | | — | Abu-Basim Said This paper was developed |
| | | | as a result of The Meeting of AL- |
| | | | AQsa Mosque committee of Human |
| | | | Services; it includes The recommendations |
| | | | of The Committee. |
| | | — | AL-AQsa Fund, The Holy Land Fund, and other |
| | | | charitable organizations Should widen The |
| | | | Scope of its activities to include serving |
| | | | The refugees Camps in Lebanon, Jordan, and |
| | | | Every where else. These camps did not get |
| | | | its Share of information in The canadian |
| | | | Theatre. In addition, Investment Should be |
| | | | encouraged in The inside. |
| | | — | Since information/political activities will be |
| | | | Focused on GAZa during the Coming period |
| | ĠS 4 | | |

| Log ____ Page 1 | Language specialist NAme: | Date Stamp. |
|---|---|---|
| Day Thursd Date 11/4/93 | A. Shalata | 10/11/01 |
| | St. louis office. | CLASSIFIED BY: SP7CI/WB |
| | | REASON: 1.5 ( C ) |
| | | DECLASSIFY ON: X-1- |

: (5) A

| Time | Initial | I C 00 | Activity Recorded: ▓▓▓▓▓ Topet 6 Conference Room |
|------|---------|--------|---------------------------------------------------|
| 10/2/93 | QSh | | therefore we shall focus our efforts on the |
| | | | west Bank. |
| | | - | One of the ways of increasing charitable |
| | | | activities is to bring guests from the |
| | | | occupied Lands. These will come deliver Sermons |
| | | | on Friday in the Mosques and Islamic Centers, |
| | | | give information and describe the situation |
| | | | in the homeland. There is a Lot of talk |
| | | | That many Millions of Dollars will be contributed |
| | | | to Gaza and the west Bank by the |
| | | | international Community. We hope this is |
| | | | true and hope it will contribute to raising |
| | | | the Standard of Living in Gaza. Say-it is |
| | | | important when these guests come they |
| | | | Can explain the impact of these Monais |
| | | | and who actually received it. |
| | | - | It is important to study statements and |
| | | | announcements That will be made by both the |
| | | | ISRAELI's and the palestinians. So we can use |
| | | | this information in the future. We shouldn't |
| | | | Just sit and wait for the Events to shape |
| | QSh | | |

| Log ___ Page 2 | Language specialist Name : | Date Stamp. |
|-----------------|----------------------------|-------------|
| Day Thursd Date 11/4/93 | A. Shihata | |
| | St. Louis Office | |

SECRET

(S) A

| Time | Initial | IC | Activity Recorded: ▓▓▓▓▓ Tape # 6 Conference Room |
|------|---------|----|---------|
| 10/2/93 | OSh | | our actions |
| | | – | we Have to Find New ways to deal with |
| | | | The people. And we have to find The |
| | | | Suitable individuals we Can perform This |
| | | | Task. There is a Lot of Need For |
| | | | information by The Mosques and Those |
| | | | who come to these Mosques. (in Canada). |
| | | – | we have to give Much attention To the |
| | | | association Meeting which will be held in |
| | | | Detroit Next Month. Many palestinian will |
| | | | be attending this Meeting. |
| | | – | I would Like To talk a Little about The |
| | | | Islamic Community in Canada and Then |
| | | | about The palestinian Community. |
| | | – | The Islamic Community in Canada is not |
| | | | active, with us, at all. we did As Much as |
| | | | we can but we weren't Successful. They |
| | | | don't support / or oppose, either The organization |
| | | | (Fatah) or The Islamists. They are not |
| | | | interested in The palestinian Cause. The |
| | | | only Communities who Contribute are The |
| | OSh | | |

| Log _____ page 3 | Language Specialist NAme : | Date Stamp |
|---|---|---|
| Day Thurs Date 11/4/93 | A. Shihata | |
| | St. Louis Office | |

SECRET

(S) A

| Time | Initial | IC/00 | Activity Recorded: ▓▓▓▓▓ Tape # 6 Conference Room |
|------|---------|-------|---------------------------------------------------|
| 10/2/93 | ASh | | indian and pakistani communities. The other |
| | | | muslim/arab communities such as the |
| | | | Egyptian and the Lebanese ask us; You |
| | | | palestinians solved your problems with the |
| | | | Jews, what do you want from us. |
| | | — | We, As AL-Quds Islamic Services organization, |
| | | | are trying to register ourselves in canada. |
| | | | This Process will be completed Soon. |
| | | | |
| | | | Shukri LNu ( From AL-AQSa Fund in USA. |
| | | — | My Paper consists of 4 points: |
| | | 1- | Describing the whole scinario. |
| | | 2- | How This will affect the contributer. |
| | | 3- | The nature of the New Methodology. |
| | | 4- | Broad lines which can be implied to any |
| | | | Charitable organization. |
| | | | |
| | | 1- | I assume that Gaza, under the New Situation |
| | | | will witness a relative Calmness. Escallation |
| | | | and Confrontations will decline .. International |
| | | | Bodies will work hard to make the self rule |
| | ASh! | | |

| Log ... Page 4 | Language Specialist Name : | Date Stamp: |
|----------------|----------------------------|-------------|
| y Thur & Date: 11/4/93 | A- Sh. Lata | |
| | St. louis Office | |

SECRET

(S) A

| Time | Initial | I C 00 | Activity Recorded: ▨ ▨ Tape# 6 Conference Room |
|------|---------|--------|------------------------------------------------|
| 10/01/93 | Ash |  | a success... To convince The palestinians and |
|  |  |  | The world Community That The relationship |
|  |  |  | between The Jews and The palestinians is no |
|  |  |  | More a relation between occupiers and |
|  |  |  | occuppees.. The self rule authority will only Show |
|  |  |  | The positive changes and will hide The Negative |
|  |  |  | Consequences. Even it will cover up The Practices |
|  |  |  | of the ISRAELis. With The result That |
|  |  |  | The contributors will not hear very Much about |
|  |  |  | The occupier bad practices or about The |
|  |  |  | continuous sufferings of The palestinian |
|  |  |  | people. They will Try To remove The |
|  |  |  | sychological Barriers between The Jews and |
|  |  |  | The palestinians. For example, The Jewish |
|  |  |  | philanthropist (ph) Network will hold a Meeting |
|  |  |  | Next Month in New York. The purpose of |
|  |  |  | The meeting is to Look into the possibility of |
|  |  |  | helping The palestinians people and to award |
|  |  |  | Them for reaching on agreement with ISRAEL |
|  |  |  | look how Much effect Some Thing Like This |
|  |  |  | will have... I expect a dramatic change. |
|  | Ash |  |  |

| Log ____ Page 5 | Language specialist NAme: | Date Stamp: |
| Day Thur Date 11/4/93 | Ash. Ants |  |
|  | (SL Lang OFFiC |  |

SECRET

(s) A

| Time | Initial | I C | Activity Recorded: ▓▓▓▓▓ Topt £ 6 Conference Room |
|------|---------|-----|--------|
| 10/2/93 | Ah | | Dramatic decline of Contribution for The |
| | | | Next Year in America. |
| | ✳ | – | I Cautious The charitable organization Not |
| | | | to divert its attention to Trivial activities, |
| | | | Such as Bosnia and Somalia. This will |
| | | | give a signal To The Contributors That There |
| | | | is No More Need in palestine. Last year |
| | | | we collected Two Millions and Seventy Thousands. |
| | | | I don't Think we will be able to reach |
| | | | Two Millions This Year. |
| | | | |
| | | ② | The Nature of The New Method of |
| | | | Collecting Contributions. In The past we |
| | | | used to Say our objective is to Meet The |
| | | | Need and Treat The Suffering which resulted |
| | | | From The occupation. In The coming phase |
| | | | we Con't continue to Say That. we have |
| | | | to Sustain our notes and grew. |
| | | – | we have to reorient The Mind of the |
| | | | Contributor. This requires Education and |
| | | | information |
| | PSh | | |

| Log      page 6 | Language Specialist Name : | Date Stamp. |
|-------------------|----------------------------|-------------|
| L 4 Thursd Date 11/4/93 | A. Shihata | |
| | St. louis office | |

SECRET

(S) A

| Time | Initial | IC | Activity Recorded: ▮▮▮▮▮▮ Top&Go Conference Room |
|------|---------|----|----|
| 10/2/93 | Ash | - | To concentrate on The suffering of The |
| | | | refugees. To Raise issues Such as Jerusalem. |
| | | - | To concentrate on Human Needs which |
| | | | aren't Affected by The changing political |
| | | | climate, Such as The orphans, The Needy |
| | | | children, The students Fighting Poverty |
| | | | projects and so on. |
| | | - | stress The neglicous sides of The Cause. |
| | | - | stress Supporting Islamic institutions during |
| | | | The Next phase. Say if we don't support |
| | | | Islamic institutions they will be destroyed, |
| | | | Absorbed by Other NoN∉ Islamic institutions. |
| | | - | we have to open a dialogue with The |
| | | | american public asking Them to contribute |
| | | | The rebuilding of Gaza and Jericho. |
| | | - | To open a dialogue with American/internati |
| | | | Charitable organizations, Such as UN organizations, |
| | | | and ask Them to Opinion Joint projects |
| | | | in palestine. The only positive impact The |
| | | | accord has is That it Make it Easier |
| | ▮▮▮ | | for us To ask The american Public For |

| Log _____ page 7 | Language specialist Name : | Date Stamp: |
|---|---|---|
| ny[?] Date 11/4/93 | A. Shihata | |
| | St. Louis Office | |

SECRET (s) A

| Time | Initial | IC OO | Activity Recorded: ▮▮▮▮▮ Tape # 6 Conference Room |
|------|---------|-------|---------------------------------------------------|
| 10/2/93 | Ⓢsh | | Contributions. If we approached Them in a Narrow minded way we will achieve Nothing. To Tell Them we demand 1948 Borders. No way on Earth.. The approach Should concentrate on Human rights refugees rights .. These are The issues The americans agree with us about. |
| | | | Broad strategies |
| | | | In charitable activities we can't check The accord. Because as a charitable organization we can't Make a political opinion or judgement about such issues. Ours isn't a political organization. There is a New reality which I have to deal with I have to keep good relations with all sides in palestine. And as an organization registered in America we Shouldn't be associated with This party or That... Should Not be The charitable arm of this or That. I Think This is wrong...and we Should behave |
| | | Ⓢsh | |

| Log _____ page 9 | Language specialist NAme : | Date Stamp |
| S.j Thus Date 11/4/93 | P. Shhata | |
| | St. Laurs office | |

(S) A

| Time | Initial | I C<br>00 | Activity Recorded: ▓▓▓▓▓ tape #6 Conference Room |
|------|---------|-----------|--------------------------------------------------|
| 10/12/93 | OSh | | in such a way.. we have to behave as an |
| | | | omnicon organization - and Take care of |
| | | | The palestinian people and Not a particular |
| | | | population. Our Relation has to be gone |
| | | | with Every one .. but we Can give The |
| | | | islamists 100,000 and 5,000 in The Others |
| | | ✗ - | we have to bo cautious with Spending. |
| | | | We can't get involved in Transactions that |
| | | | Can violate our Status -- we are an |
| | | | organization That has to look After its |
| | | | own interests. Not to Spend any Money |
| | | | on any project before Carefully Studying |
| | | | it. We Shouldn't do any Thing That is |
| | | | Contrary to the law. |
| | | | |
| | | | The End of The Tape. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Log ___ Page 9 | Language specialist NAme : | Date Stamp. |
|----------------|----------------------------|-------------|
| - y Thursday Date 11/4/93 | A. Shihata | |
| | ST. Louis OFFICE | |

SECRET

(S) A

| Time | Initial | IC 99 | Activity Recorded: ▓▓▓▓▓ tape # 7 Conference Room |
|------|---------|-------|------------------------------------------------|
| 10/2/93 | Ash | | Continuation of Second Session : |
| | | - | The only thing which we shouldn't do, |
| | | | is illegal Transactions. This we shouldn't |
| | | | do. if any one Knamed you it will become |
| | | | a disaster- we shouldn't participate in |
| | | | any illegal transactions. |
| | | - | Shaker Finished his Presentation. |
| | | | |
| | | | New speaker Muin Shabib. |
| | | - | The presentation Concerns The situation of |
| | | | The institutions in palestine. |
| | | - | The Islamic works during The past Two decades |
| | | | was based on what can be called The Superman |
| | | | That is a person who take charge of |
| | | | Everything. If any thing happen to such |
| | | | person projects collapse. However, before The |
| | | | uprising There were very Few Islamic |
| | | | Foundations. This has changed after The |
| | | | uprising. |
| | | - | Gaza is almost Free of any institutions. |
| | | | This is because it was under military |
| | ⓓ34 | | |

| I g _____ page 1 | Language Specialist Name : | Date Stamp. |
|------------------|----------------------------|-------------|
| Day Frid Date 11/5/93 | Q - Shihata | 10/11/01 |
| | St. Louis Office | CLASSIFIED BY: ▓▓▓▓▓ |
| | | REASON: 1.5 ( C ) |
| | | DECLASSIFY ON: X 7 |
| | | Admin Review |

SECRET

(S) A

| Time | Initial | IC oo | Activity Recorded: ▓▓▓▓ tape # 7 Conference Room |
|------|---------|-------|--------------------------------------------------|
| 10/2/93 | Ash | | Rule and Emergency laws For Many years. |
| | | | The Other reasons include the lack of |
| | | | human and Other resources and because it was |
| | | | tied to the Israeli Economy. |
| | | - | The Situation in the west Bank was better |
| | | | for Many Reasons. However, both the Strip |
| | | | and the Bank lacked Needed Foundations. |
| | | | The institutions mentioned by Musa |
| | | | are classified as follows: |
| | | 1- | Educational Such as Schools, universities |
| | | 2. | Social and & charitable relating to Social |
| | | | ills such as refugees, orphans, relieve acti... |
| | | 3. | cultural Such as research centers. |
| | | 4. | Health institutions, Such as clinics and |
| | | | medical centers. |
| | | 5 | public Syndicates. |
| | | 6- | Technical institutions. |
| | | 7. | Sports |
| | | 8- | informational such as News paper. |
| | | 9. | religion Teaching institutes. |
| | | 10 | women institutions |
| | Ash | | |

| ! ? Page 2 | Language specialist NAme: | Date Stamp. |
| Day Frid Date 11/5/93 | A. Shihata | |
| | St. Louis office | |

SECRET

(S) A

| Time | Initial | I C | Activity Recorded: ▮▮▮▮ topc#7 Conference Room |
|------|---------|-----|------------------------------------------------|
| 10/2/93 | ⊖sh | ✱ | Our institutions said Rain, in the |
| | | | Strip, include: |
| | | 1- | The Islamic university. |
| | | 2. | The Islamic Complex. Founded in 1975, |
| | | | registered in 1976. |
| | | 3. | The Islamic ~~Foundation~~ Association, Founded |
| | | | in 1976. |
| | | 4. | AL- Salah Association. |
| | | 5- | The Young women Association. |
| | | 6- | AL- WAFA Association For The Elderly. |
| | | 7- | The orphans Center. |
| | | 8. | Some of AL- Zakah (Islamic Tax that |
| | | | represents 2.5% of annual Saving) committees. |
| | | 9. | Some of general Service committees received |
| | | | New licenses, Such as The organization of |
| | | | The Truth and The law. |
| | | — | In The west Bank The following Organization |
| | | | were Mentioned. (That include The towns |
| | | | of QalQelia, Nables, Jenne and AL- BeQa'a |
| | | | Valey. |
| | | 1. | AL- Zakah committee, Founded in 1976. |
| | ⊖sh | | |

| L-q      page 3 | Language specialist NAme : | Date Stamp. |
|-----------------|----------------------------|-------------|
| Day Friday Date 11/5/93 | A. Shihata | |
| | St. louis OFFice | |

SECRET 

(s) A

| Time | Initial | IC bar | Activity Recorded: ▮▮▮▮▮ Tape # 7 Conference Room |
|------|---------|--------|---------------------------------------------|
| 10/2/93 | GSh | | This committee is in charge of More Than |
| | | | 1000 orphans 2700 Families get monthly |
| | | | assistance From it. It has investments and |
| | | | other activities. In reality we, The |
| | | | Islamists don't have much presence in This |
| | | | Committee |
| | | – | AL Tadamon AL-Eslami Committee Founded |
| | | | in 1984 and it has the largest Medical |
| | | | Center in The west Bank, it serves North |
| | | | of The West Bank approximately 300,000 |
| | | | people. |
| | | – | AL. Tadamon Charitable Association Founded |
| | | | by Islamic Scholars in The Area. at present |
| | | | our presence in This association is weak. |
| | | – | In Jenine, AL-Zakah Committee, Established |
| | | | a hospital. Controlled by The Islamists. |
| | | | |
| | | – | AL-AQsa institutions Should have a big |
| | | | role and we can benefit From Controlling |
| | | | These institutions. |
| | | – | In Jeruselem, we have The Association of |
| | GSh | | |

| L ___ ___ Page 4 | Language specialist Name: | Date Stamp. |
|------------------|---------------------------|-------------|
| Day Frid, Date 11/5/93 | A. Shihata | |
| | ST. Louis OFFice | |

SECRET

HAnAmi's
CEnTER

A

| Time | Initial | I C O O | Activity Recor | ... | ...#7 Conference Room |
|------|---------|---------|----------------|-----|------------------------|
| 10/2/93 | Os7 | | Islamic Studies and Cultures. It has | | |
| | | | research Centers. | | |
| | | | The Christians has over 100 Christian | | |
| | | | Foundation in Beir Lahom only. | | |
| | | | We have active institutions in Ram Allah, | | |
| | | | such as Al-Zakah Committee. | | |
| | | | If The Resuming functions interfered in | | |
| | | | institutions Obligations, This causes trouble. | | |
| | | | The physician who founded The Center, | | |
| | | | who was in charge with Almost every | | |
| | | | Thing and who was active and efficient | | |
| | | | get mixed up and was arrested and | | |
| | | | charged with organization work (presumably | | |
| | | | has to Do with Hamas) and was investigated | | |
| | | | and imprisoned. What happened To him | | |
| | | | affected The institution drastically. There | | |
| | | | should be No Mix of the Two works. | | |
| | | | In Ramallah The Islamic Syndicate was | | |
| | | | founded and registered, it has a lot of | | |
| | | | influence in The area. The Name of its | | |
| | | | director is Hussien. He has a lot of | | |

| 1 9 ____ page 5 | Language specialist NAme : | Date Stamp. |
|---|---|---|
| Day Fridy, Date 11/5/93 | A- S.I.hata | |
| | A. ST. louis OFFice | |

SECRET

(5) A

| Time | Initial | $\frac{IC}{00}$ | Activity Recorded: ▮▮▮▮ Tape # 7 Conference Room |
|------|---------|------|------------------------------------------|
| 10/2/93 | OSh | | influence. Even he was Art king Hussien |
| | | | met him. He now has 2500 members in |
| | | | his Syndicate. |
| | | – | The Director of the Islamic Youth Assrn... |
| | | | was deported |
| | | | |
| | | | future situation : |
| | | – | The relation with the self rule authority will |
| | | | be a hostile one. Because historically, we |
| | | | opposed them. |
| | | – | They will encourage the Arabs and the |
| | | | Israelis to act against us. |
| | | – | The possibility that the holy struggle will |
| | | | continue against the jews. The self rule |
| | | | authority will n't like this. |
| | | | |
| | | – | expected problems. |
| | | – | They may suspend the institutions licenses. |
| | | – | They will try for control the institutions |
| | | | Through Forefisted elections or Through |
| | | | Nationalization. They mentioned that the |
| | OSh | | |

| ! , ___  page  6 | Language specialist Name : | Date Stamp. |
|------------------|---------------------------|-------------|
| Day Friday Date 11/5/93 | A. Shihata | |
| | St. Louis office | |

SECRET

(s) A

| Time | Initial | I C oo | Activity Recorded: ⬛⬛⬛⬛ Tape # 7 Conference Room |
|------|---------|--------|-------------------------------------------------|
| 10/2/93 | OSh | | previous elections are Nill and void. |
| | | — | They will prevent Funds from reaching |
| | | | our institutions |
| | | — | They will issue laws and regulations that |
| | | | Limits freedom of Movement. |
| | | | |
| | | — | Suggestions and general recommendations: |
| | | — | The deportees should have a role in |
| | | | our institutions in our order to form |
| | | | a political Block. |
| | | — | Should Form a Committee For possible |
| | | | dialogue with Other Countries. |
| | | — | To Form a Committee to solve The |
| | | | disputes and deal with Abroad. |
| | | — | To develop a role for The 1948 people. These |
| | | | people Can play an important Role in The |
| | | | future. Use Their Human (rights) organization |
| | | | in order To recieve official recognition, |
| | | | So they Can perform Functions in Gazal |
| | X | | Jericho and to spare The Movement The Need |
| | | | to get involved Directly. |
| | Sh | | |

| Lng. ___ page 7 | Language specialist NAme : | Date Stamp: |
|------------------|----------------------------|-------------|
| Day Fv.d Date 11/5/93 | A. Shihata | |
| | ST. louis oFFiee | |

Case 1:02-cv-00442-GK    Document 29-1    Filed 06/28/02    Page 255 of 359

SECRET

(S)

A

| Time | Initial | I C | Activity Recorded : ▓▓▓▓▓ #7 Conference Room |
|------|---------|-----|-------------------------------------------------|
| 10/2/93 | 5h | — | We should afford them the flexibility in dealing with the self rule authority. |
| | | — | We have to use the issue of Jerusalem and open institutions in it. |
| | | — | To protect the current existing foundations by registering them under the names of trusted people rather than keeping them public foundations. This will make it difficult for the self rule authority to nationalize them. The people whom we register these institutions under their names should not be connected with the organization. (probably Hamas). |
| | | — | To keep the achievements we achieved in the past. By typing these institutions with the islamic institutions in America. Such as the fund and other institutions. To sign contracts with these institutions saying that its assets belong to the american side and they can show these contracts whenever they need to. This is a very |
| | 5h | | |

| I ng ____ Page 8 | Language specialist Name : | Date Stamp |
|---|---|---|
| Day Frid, Date 11/5/93 | A. Shihata | |
| | St. Louis Office | |

SECRET

(S) A

| Time | Initial | IC oo | Activity Recorded: ▓▓▓▓ Tape #7 Conference Room |
|------|---------|-------|------|
| 10/2/93 | OS4 | | important issue That we have to |
| | | | Consider. |
| | | - | To establish a general union For Those |
| | | | institutions and open exteutions For |
| | | | Them abroad. |
| | | - | Other recommendations : |
| | | - | Not to establish any New institution : |
| | | | to run the existing ones and support |
| | | | 48 people institutions. * |
| | | | * L/S comment : |
| | | | 48 people are These people who were |
| | | | expelled from their lands / homes as a |
| | | | result of 1948 War between The Arabs |
| | | | and The ISRAELIS. |
| | | | |
| | | - | Two recommendation relating to the |
| | | | american Theatre. |
| | | - | To Form an Economic Committee — a Number |
| | | | of people approached Me and Said They |
| | | | Can Establish risk Free Enterprises.. why |
| | | | Not benefit from This. |
| | Oth: | | |

| L 7 ___ page 9 | Language specialist NAme : | Date Stamp. |
|------|------|------|
| Day Fid Date 11/5/93 | A. Shihata | |
| | ST. Louis OFFICE | |

SECRET

(S) A

| Time | Initial | I C OG | Activity Recorded: ▮▮▮▮ Tape 2 7 Conference Room |
|------|---------|--------|--------|
| 10/2/93 | Sh | – | we can develop Computer Enterprises This |
| | | | we can generate income from, in a Scientific |
| | | | way |
| | | – | Shukri Presentation is Completed |
| | | – | Another Speaker UN'l From The holy Land |
| | | | Foundation). |
| | | – | um Said he agrees with what Shukri |
| | | | ~~said~~ Said . |
| | | – | To Avail an official ~~for~~ american Cover |
| | | | For The Islamic Community so what he |
| | | | Means is That The Islamic Community in |
| | | | US Should be able to form official delegation |
| | | | goes to the homeland, GAZa in particular, |
| | | | discuss The Situation with The |
| | | | institutions over There, provide Them with |
| | | | assistance and by doing So, we will achieve |
| | | | two goals: |
| | | | 1 to Make it known That The Islamic |
| | | | Community is interested in Them |
| | | – | To avail an official Cover For This |
| | Sh | | |

| Lng _____ Page 10 | Language Specialist NAme : | Date Stamp: |
|------|------|------|
| Day Fri  Date 11/5/93 | (1)- Shihata | |
| | St. Louis OFFice | |

SECRET

(S) A

| Time | Initial | I C 09 | Activity Recorded: ▓▓▓▓▓ Tape # 7 Conference Room |
|------|---------|--------|---------------------------------------------------|
| 10/2/93 | ASh | | institutions and be able to provide them |
| | | | with assistance in the future. |
| | | ← | Speaker said when we go there we should |
| | | | not identify ourselves as the 'Holy Land |
| | | | association because we are already stamped |
| | | | with ( didn't complete the sentence). |
| | | ← | We have to provide these institutions of |
| | | | a legal cover so it will become difficult |
| | | | to dissolve them, by tying them with |
| | | | large institutions as the ones in Chicago |
| | | | and Paterson New Jersey. |
| | | | |
| | ✳ | | New Speaker: Abdul Haleem Ashqar. |
| | | ← | His presentation relates to the establishment |
| | | | of an education fund. He discussed the |
| | | | issue, in advance with Al Aqsa fund. |
| | | ← | He said the future struggle and the |
| | | | capital asset of the movement will be based |
| | | | on education. Most of the youth in GAZA |
| | | | work for ISRAELI Factories, he said. there |
| | ASh | | is much need for information specialists |

| ! 9 ___ Page 11 | Language specialist Name: | Date Stamp. |
|------------------|---------------------------|-------------|
| Day Fri. Date 11/5/93 | A- Shihata | |
| | ST. Louis office | |

SECRET

(S) A

| Time | Initial | IC | Activity Recorded: ▮▮▮ Topic #7 Conference Room |
|------|---------|-----|--------------------------------------------------|
| 10/2/93 | (sh) | | Lawyers, Journalists, and political Scientists. |
| | | — | We have to support graduate studies in |
| | | | The Arab Countries. The cost over There is |
| | | | Little. We allocate $1000 a year (per student) |
| | | | in The Arab Countries The allocation is ($1500) |
| | | | Per student. We can't afford spending on |
| | | | students in this country. The Cost in This |
| | | | Country is between $15,000 and 20,000 annually. |
| | | | But we can bring students here, and Enroll |
| | | | Them in The Colleges with The assistance |
| | | | of Those who are here already. (Scholarships). |
| | | — | The fund intends To allocate Some Funds |
| | | | for our Brothers to study here, in The fields |
| | | | which are Mentioned above. |
| | | — | We arranged for one oF The brothers to |
| | | | come here. He will recommended Sy Those |
| | | | in Jerusalem and he is a Teacher at The |
| | | | College of The Coll and religion Foundations. |
| | | | His Name is Ahmad Mustafa WAFFAGE, he |
| | | | will arrive on Wednesday; and with The |
| | | | fund we will arrange a Program For him |
| | (sh) | | |

| | | | |
|---|---|---|---|
| 1 g_____ Page 12 | | Language Specialist Name : | Date Stamp. |
| Day Friday Date 11/5/93 | | A. Shihata | |
| | | St. Louis office | |

A          SECRET

(s)

| Time | Initial | I C | Activity Recorded: ███████ Tape# 7 Conference Room |
|------|---------|-----|------------------------------------------------------|
| 10/2/93 | ASH | | hoping That we will raise Some Funds. |
| | | | A question was directed To Shukri concerning |
| | | | The possible problems That May Face |
| | | | The institutions in usA if they Joined |
| | | | Their efforts. |
| | | | Shukri replied There will be no Problems |
| | | | if The union Joined efforts with The |
| | | | fund as long as They are not involved in |
| | | | any illegal transactions. According To the |
| | | | american laws The american institutions can |
| | | | deal with Each Other. The union is as |
| | | | important as The Fund. And if The union |
| | | | Said, or did any Thing That resulted in |
| | | | it's closure, the fund shouldn't do The |
| | | | Same Thing. Therefore, the fund and The |
| | | | union can joint projects as long as This |
| | | | is done within The boundaries OF The |
| | | | american laws. |

| Log _____ Page 13 | Language specialist NAme : | Date Stamp. |
|-------------------|----------------------------|-------------|
| Day Friday Date 11/5/93 | A. Shihaz | |
| | St. Louis office | |



# HOLY LAND FOUNDATION
# FOR RELIEF AND DEVELOPMENT

## Exhibit 37





1:02CV00442(GK)

EXHIBIT

14

Form **990**

1849014102434 - 4

### Return of Organization Exempt From Income Tax

Under section 501(c) of the internal Revenue Code (except black lung benefit trust or private foundation) or section 4947(a)(1) nonexempt charitable trust

OMB No. 1545-0047

**1993**

This Form is Open to Public Inspection

Department of the Treasury
Internal Revenue Service

Note: *The organization may have to use a copy of this return to satisfy state reporting requirements.*

**A** For the 1993 Calendar year, OR tax year period beginning _____ 19 _____, 1993, and ending _____

**B** Check if:
- ☐ Initial return
- ☐ Final return
- ☐ Amended return
- ☐ Change of address

Please use IRS label or print or type. See Specific Instructions.

**C** Name of organization
Holy Land Foundation for Relief & Level opment

Number and street (or P.O. box if mail is not delivered to street address) | Room/suite
P O BOX 832390

City, town, or post office, state, and ZIP code
Richardson, Texas   75083

**D** Employer identification number
95 : 4227517

**E** State registration number
7 454143

**F** Check ▶ ☐  if exemption application is pending

**Type of organization** ▶ ☒ Exempt under section 501(c)( 3 ) ◀ (insert number) OR ▶ ☐  section 4947(a)(1) nonexempt charitable trust
Note: *Section 501(c)(3) exempt organizations and 4947(a)(1) nonexempt charitable trusts MUST attach a completed Schedule A (Form 990).*

**H(a)** Is this a group return filed for affiliates? ☐ Yes ☒ No
**(b)** If "Yes," enter the number of affiliates for which this return is filed: ▶
**(c)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**I** If either box in H is checked "Yes," enter four-digit group exemption number (GEN) ▶

**J** Accounting method: ☒ Cash ☐ Accrual
☐ Other (specify) ▶

**K** Check here ▶ ☐  if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if it received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return.
Note: *Form 990-Q may be used by organizations with gross receipts less than $100,000 and total assets less than $250,000 at end of year.*

### Part I  Statement of Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received. | | | |
| a | Direct public support | 1a | 2,047,584 | |
| b | indirect public support | 1b | | |
| c | Government contributions (grants) | 1c | | |
| d | Total (add lines 1a through 1c) (attach schedule-see instructions)<br>(cash $ 2,038,365  noncash $ 9,219 ) | | | 1d | 2,047,584 |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 | |
| 3 | Membership dues and assessments (see instructions) | | | 3 | |
| 4 | Interest on savings and temporary cash investments | | | 4 | |
| 5 | Dividends and interest from securities | | | 5 | 13,333 |
| 6a | Gross rents | 6a | | | |
| b | Less: rental expenses | 6b | | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c | |
| 7 | Other investment income (describe ▶ ) | | | 7 | |
| 8a | Gross amount from sale of assets other than inventory | (A) Securities | (B) Other | | |
| | | 8a | | | |
| b | Less: cost of other basis and sales expenses | 8b | | | |
| c | Gain or (loss) (attach schedule) | 8c | | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | | 8d | |
| 9 | Special events and activities (attach schedule-see instructions): | | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1 a) | 9a | | | |
| b | Less: direct expenses other than fundraising expenses | 9b | | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c | |
| 10a | Gross sales of inventory, less returns and allowances | 10a | | | |
| b | Less: cost of goods sold | 10b | | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c | |
| 11 | Other revenue (from Part VII, line 103) | | | 11 | |
| 12 | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12 | 2,060,917 |
| 13 | Program services (from line 44, column (B)—see instructions) | | | 13 | 1,837,105 |
| 14 | Management and general (from line 44, column (C)—see instructions) | | | 14 | 131,590 |
| 15 | Fundraising (from line 44, column (D)—see instructions) | | | 15 | 182,050 |
| 16 | Payments to affiliates (attach schedule-see instructions) | | | 16 | |
| 17 | Total expenses (add lines 16 and 44, column (A)) | | | 17 | 2,150,745 |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18 | (89,828) |
| 19 | Net assets or fund balances at beginning of year (from line 74, column (A)) | | | 19 | 683,431 |
| 20 | Other changes in net assets or fund balances (attach explanation) Rounding | | | 20 | 1 |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21 | 593,604 |

For Paperwork Reduction Act Notice, see Page 1 of the separate instructions.       Cat. No. 11282Y       Form **990** (1993)

Fork 990 (1993)

Page 2

## Part II Statement of Functional Expenses

All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. (See instructions.)

Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I.

| | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) | 22 | 1,651,690 | 1,651,690 | | |
| (cash $ _____ noncash $ _____ ) | | | | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 18,600 | 4,650 | 9,300 | 4,650 |
| 26 Other salaries and wages | 26 | 69,677 | 27,870 | 40,413 | 1,394 |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | 3,195 | 1,278 | 1,853 | 64 |
| 29 Payroll taxes | 29 | 9,977 | 3,990 | 5,787 | 200 |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 6,504 | 2,168 | 2,168 | 2,168 |
| 32 Legal fees | 32 | 498 | 249 | | 249 |
| 33 Supplies | 33 | 15,255 | 7,317 | 3,659 | 4,268 |
| 34 Telephone | 34 | 10,778 | 2,629 | 2,250 | 5,899 |
| 35 Postage and shipping | 35 | 83,946 | 13,523 | 16,016 | 54,407 |
| 36 Occupancy | 36 | 41,291 | 13,599 | 14,448 | 13,244 |
| 37 Equipment rental and maintenance | 37 | 2,209 | 552 | | 1,657 |
| 38 Printing and publications | 38 | 108,743 | 62,637 | 8,105 | 38,001 |
| 39 Travel | 39 | 71,957 | 28,325 | 15,490 | 28,142 |
| 40 Conferences, conventions, and meetings | 40 | 4,421 | | 1,336 | 3,085 |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | 24,395 | 6,876 | 4,380 | 13,139 |
| 43 Other expenses (itemize): a | 43a | | | | |
| b ..... See attached schedule | 43b | 27,620 | 9,752 | 6,385 | 11,483 |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | | | | |
| 44 Total functional expenses (add 22 through 43) Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 2,150,745 | 1,837,105 | 131,590 | 182,050 |

Reporting of Joint Costs–Did you report in column (B) (Program services) any joint costs from a combined educational campaign and fundraising solicitation? ▶ ☐ Yes ☒ No
If "Yes," enter (i) the aggregate amount of these joint costs $ _____ ; (ii) the amount allocated to Program services $ _____ ;
(iii) the amount allocated to Management and general $ _____ ; and (ii) the amount allocated to Fundraising $ _____

## Part III Statement of Program Service Accomplishments (See instructions.)

Describe what was achieved in carrying out the organization's exempt purposes. Fully describe the services provided; the number of persons benefited; or other relevant information for each program title. Section 501 (c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.

| | Expenses (Required for 501(c)(3) and (4) organizations and 4947(a)(1) trusts; optional for others. |
|---|---|
| a ......... See attached statement ......... | |
| Grants and allocations $ 1,651,690 | 1,837,105 |
| b ................................................ | |
| Grants and allocations $ | |
| c ................................................ | |
| Grants and allocations $ | |
| d ................................................ | |
| Grants and allocations $ | |
| e Other program services (attach schedule) Grants and allocations $ | |
| f Total (add lines a through e) (should equal line 44, column (B), Program services) ▶ | |

Schedule A (Form 990) 1993 — Page 3

## Part IV — Support Schedule (continued) (Complete only if you checked a box on lines 10, 11, or 12.)

Organizations described on line 12:

a Attach a list, for amounts shown on lines 15, 16, and 17, to show the name of, and total amounts received in each year from, each "disqualified person." Enter the sum of such amounts for each year:

(1992) .............. (1991) .............. (1990) .............. (1989) ..............

b Attach a list to show, for 1989 through 1992, the name of, and amount included in lines 17 for each person (other than a "disqualified person") from whom the organization received, during that year, an amount that was more than the larger of (1) the amount on line 25 for the year or (2) $5,000. Include organizations described in lines 5 through 11, as well as individuals. After computing the difference between the amount received and the larger amount described in (1) or (2), enter the sum of all these differences (the excess amounts) for each year:

(1992) .............. (1991) .............. (1990) .............. (1989) ..............

c For an organization described in line 10, 11, or 12, that received any unusual grants during 1989 through 1992, attach a list (which is not open to public inspection) for each year showing the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. Do not include these grants in line 15. (See instructions.)

## Part V — Private School Questionnaire
(To be completed ONLY by schools that checked the box on line 6 in Part IV)   N/A

| | Yes | No |
|---|---|---|
| 29 Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | | |
| 30 Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | | |
| 31 Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves?. If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | | |

........................................................
........................................................
........................................................
........................................................

| | | |
|---|---|---|
| 32 Does the organization maintain the following: | | |
| a Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | |
| b Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis?. | 32b | |
| c Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships?. | 32c | |
| d Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | |

If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.)

| | | |
|---|---|---|
| 33 Does the organization discriminate by race in any way with respect to: | | |
| a Students' rights or privileges?. | 33a | |
| b Admissions policies? | 33b | |
| c Employment of faculty or administrative staff? | 33c | |
| d Scholarships or other financial assistance? (See instructions.). | 33d | |
| e Educational policies? | 33e | |
| f Use of facilities? | 33f | |
| g Athletic programs? | 33g | |
| h Other extracurricular activities? | 33h | |

If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.)

........................................................
........................................................

| | | |
|---|---|---|
| 34a Does the organization receive any financial aid or assistance from a governmental agency? | 34a | |
| b Has the organization's right to such aid ever been revoked or suspended? | 34b | |
| If you answered "Yes," to either 34a or b, please explain using an attached statement. | | |
| 35 Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation. (See instructions for Part V.) | 35 | |

Schedule A (Form 990) 1993

Page 4

## Part VI-A  Lobbying Expenditures by Electing Public Charities (See instructions.)
(To be completed ONLY by an eligible organization' that filed Form 5768)      N/A

Check here ▶ a ☐ If the organization belongs to an affiliated group (see instructions).
Check here ▶ b ☐ If you checked a and "limited control" provisions apply (see instructions).

| Limits on Lobbying Expenditures<br>(The term "expenditures" means amounts paid or incurred) | | (a)<br>Affiliated group<br>totals | (b)<br>To be completed<br>for ALL electing<br>organizations |
|---|---|---|---|
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures (see Part VI-A instructions) | 39 | | |
| 40 Total exempt purpose expenditures (add lines 38 and 39) (see instructions) | 40 | | |
| 41 Lobbying nontaxable amount. Enter the amount from the following table— | 41 | | |
| If the amount on line 40 is-    The lobbying nontaxable amount is- | | | |
| Not over $500,000 . . . . . . 20% of the amount on line 40 . . . . . | | | |
| Over $500,000 but not over $1,000,000.  $100,000 plus 15% of the excess over $500,000 | | | |
| Over $1,000,000 but not over $1,500,000  $175,000 plus 10% of the excess over $1,000,000 | | | |
| Over $1,500,000 but not over $17,000,000 $225,000 plus 5% of the excess over $1,500,000 | | | |
| Over $17,000,000 . . . . . . . $1,000,000. . . . . . . . . . . . | | | |
| 42 Grassroots nontaxable amount (enter 25% of line 41). . . . . . . . . . . | 42 | | |
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36. . . . . . | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38. . . . . . | 44 | | |

Caution: File Form 4720 if there is an amount on either line 43 or line 44.

### 4-Year Averaging Period Under Section 501(h)  —
(Some organizations that made a section 501(h) election do not have to complete all of the five columns below.
See the instructions for lines 45 through 50.)

| | Lobbying Expenditures During 4-Year Averaging Period | | | | |
|---|---|---|---|---|---|
| Calendar year (or<br>fiscal year beginning in) ▶ | (a)<br>1993 | (b)<br>1992 | (c)<br>1991 | (d)<br>1990 | (e)<br>Total |
| 45 Lobbying nontaxable amount (see instructions) | | | | | |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | |
| 47 Total lobbying expenditures (see instructions) | | | — | | |
| 48 Grassroots nontaxable amount (see instructions) . . . | | | | | |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | |
| 50 Grassroots lobbying expenditures (see instructions) . . . | | | | | |

## Part VI-B  Lobbying Activity by Nonelecting Public Charities
(For reporting by organizations that did not complete Part VI-A)   · N/A

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a Volunteers . . . . . . . . . . . . . . . . . . . . . . | | | |
| b Paid staff or management (include compensation in expenses reported on lines c through h) . | | | |
| c Media advertisements . . . . . . . . . . . . . . . . . | | | |
| d Mailings to members, legislators, or the public . . . . . . . . . . . . . . | | | |
| e Publications, or published or broadcast statements . . . . . . . . . . . . | | | |
| f Grants to other organizations for lobbying purposes . . . . . . . . . . . | | | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body. . . . . | | | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means . . . . | | | |
| i Total lobbying expenditures (add lines c through h) . . . . . . . . . . . . . . | | | |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities.

Form 990 (1993)

Page 5

## Part VII  Analysis of Income-Producing Activities  N/A

Enter gross amounts unless otherwise indicated.

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | Related or exempt function income (See instructions.) |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments . . . | | | | | |
| 95 Interest on savings and temporary cash investments | | | | | |
| 96 Dividends and interest from securities | | | | | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property . . . . . . | | | | | |
| b not debt-financed property . . . . . | | | | | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income . . . . . | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | | | |
| 101 Net income or (loss) from special events . | | | | | |
| 102 Gross profit or (loss) from sales of inventory . | | | | | |
| 103 Other revenue? a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) . . | | | | | |

105 TOTAL (add line 104, columns (B), (D), and (E)). . . . . . . . . . . . . . ▶

Note: (Line 105 plus line 1d, Part I, should equal the amount on line 72, Part I.)

## Part VIII  Relationship of Activities to the Accomplishment of Exempt Purposes  N/A

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). (See instructions.) |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

## Part IX  Information Regarding Taxable Subsidiaries (Complete this Part if the "Yes" box on line 88 is checked.)

| Name, address, and employer identification number of corporation or partnership | Percentage of ownership interest | Nature of business activities | Total income | End-of-year assets |
|---|---|---|---|---|
| | % | | | |
| | % | | | |
| | % | | | |
| | % | | | |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

Signature of officer: _(signature)_   Date 5/18/94   Title Executive Director

**Paid Preparer's Use Only**

| Preparer's signature ▶ _(signature)_ | Date 05/13/94 | Check if self-employed ▶ ☒ | Preparer's social security no 360 : 52 : 7356 |
|---|---|---|---|

Firm's name (or yours if self-employed) and address ▶ Mohammed H Azad, CPA, 11300 North Central Expwy, # 45, Dallas, Texas  ZIP code ▶ 75243

E.I. No. ▶

Printed on recycled paper

*U.S. Government Printing Office: 1994 — 345-174

**SCHEDULE A**
**(Form 990)**

## Organization Exempt Under Section 501( c)(3)

(Except Private Foundation), and Section 501(e), 501(f), 501(k),
or Section 4947(a)(1) Nonexempt Charitable Trust

Supplementary Information

Department of the Treasury
Internal Revenue Service

▶ Must be completed by the above organizations and attached to their Form 990 (or 990-EZ).

OMB No. 1545-0047

**1993**

Name of the organization

Holy Land Foundation for Relief & Development

Employer identification number

95 4227517

### Part I    Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees
(See instructions.) (List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $30,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total number of other employees paid over $30,000 ▶

### Part II    Compensation of the Five Highest Paid Persons for Professional Services
(See instructions.) (List each one. If there are none, enter "None.")

| (a) Name and address of each person paid more than $30,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |

Total number of others receiving over $30,000 for
professional services . . . . . . . . . . ▶

### Part III    Statements About Activities

| | | Yes | No |
|---|---|---|---|
| During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? . . . . . . . . . . . . . | 1 | | X |
| If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities. $ _____ | | | |
| Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | | | |
| During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any of its trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary: | | | |
| a  Sale, exchange, or leasing of property? . . . . . . . . . . . . . . . . . . . | 2a | | X |
| b  Lending of money or other extension of credit? . . . . . . . . . . . . . . . . . | 2b | | X |
| c  Furnishing of goods, services, or facilities? . . . . . . . . . . . . . . . . . . | 2c | | X |
| d  Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? . . . . . . . | 2d | | X |
| e  Transfer of any part of its income or assets? . . . . . . . . . . . . . . . . . | 2e | | X |
| If the answer to any question is "Yes," attach a detailed statement explaining the transactions. | | | |
| Does the organization make grants for scholarships, fellowships, student loans, etc.? . . . . . . . . . | 3 | X | |
| Attach a statement explaining how the organization determines that individuals or organizations receiving grants or loans from it in furtherance of its charitable programs qualify to receive payments. (See instructions.) | | | |

Schedule A (Form 990) 1993                                       Page 2

**Part IV**    Reason for Non-Private Foundation Status (See instructions for definitions.)

The organization is not a private foundation because it is (please check only ONE applicable box):

5  ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6  ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V, page 3.)

7  ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8  ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9  ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). Enter the hospital's name, city, and state ▶

10  ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the Support Schedule below.)

11a  ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the Support Schedule below.)

11b  ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the Support Schedule below.)

12  ☐ An organization that normally receives: (a) no more than ⅓ of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975, and (b) more than ⅓ of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions—subject to certain exceptions. See section 509(a)(2). (Also complete the Support Schedule below.)

13  ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: (1) lines 5 through 12 above; or (2) section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

Provide the following information about the supported organizations. (See instructions for Part IV, line 13.)

| (a) Name(s) of supported organization(s) | (b) Line number from above |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

14  ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See instructions.)

Support Schedule (Complete only if you checked a box on lines 10, 11, or 12 above.) Use cash method of accounting.
Note: You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting.

| Calendar year (or fiscal year beginning in) ▶ | (a) 1992 | (b) 1991 | (c) 1990 | (d) 1989 | (e) Total |
|---|---|---|---|---|---|
| 15 Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.). | 1,544,023 | 1,042,706 | 884,090 | 210,275 | 3,781,094 |
| 16 Membership fees received | | | | | |
| 17 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is not a business unrelated to the organization's charitable, etc., purpose. | | | — | | |
| 18 Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975. | 1,093 | 1,972 | 160 | | 3,225 |
| 19 Net income from unrelated business activities not included in line 18 | | | | | |
| 20 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| 21 The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge. | | | | | |
| 22 Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| 23 Total of lines 15 through 22. | 1,645,116 | 1,044,678 | 884,250 | 210,275 | 3,784,319 |
| 24 Line 23 minus line 17. | 1,645,116 | 1,044,678 | 884,250 | 210,275 | 3,784,319 |
| 25 Enter 1% of line 23 | 16,451 | 10,447 | 8,842 | 2,103 | |

26 Organizations described in lines 10 or 11:
 a Enter 2% of amount in column (e), line 24 ................................................................ ▶   75,686
 b Attach a list (which is not open to public inspection) showing the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 1989 through 1992 exceeded the amount shown in line 26a. Enter the sum of all these excess amounts here ......... ▶   185,942

(Support Schedule continued on page 3)

Form 990 (1993)

Page 3

## Part IV   Balance   Sheets

Note: Where required, attached schedules and amounts within the description column should be for end-of-year amounts only.

| | | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|
| | **Assets** | | | | | |
| 45 | Cash—non-interest-bearing | | | 534,827 | 45 | 347,378 |
| 46 | Savings and temporary cash investments | | | | 46 | |
| 47a | Accounts receivable | 47a | | | | |
| b | Less: allowance for doubtful accounts | 47b | | 8,050 | 47c | 9,150 |
| 48a | Pledges receivable | 48a | | | | |
| b | Less: allowance for doubtful accounts | 48b | | | 48c | |
| 49 | Grants receivable | | | | 49 | |
| 50 | Receivables due from officers, directors, trustees, and key employees (attach schedule) | | | | 50 | |
| 51a | Other notes and loans receivable (attach schedule) | 51a | | | | |
| b | Less: allowance for doubtful accounts | 51b | | | 51c | |
| 52 | Inventories for sale or use | | | | 52 | |
| 53 | Prepaid expenses and deferred charges | | | | 53 | |
| 54 | Investments—securities (attach schedule) | | | 91,284 | 54 | 94,502 |
| 55a | Investments—land, buildings, and equipment: basis | 55a | 115,501 | | | |
| b | Less: accumulated depreciation (attach schedule) | 55b | 55,927 | 54,477 | 55c | 59,574 |
| 56 | Investments—other (attach schedule) | | | | 56 | 70,000 |
| 57a | Land, buildings, and equipment: basis | 57a | | | | |
| b | Less: accumulated depreciation (attach schedule) | 57b | | | 57c | |
| 58 | Other assets (describe ▶ _____ ) | | | 2,479 | 58 | 13,000 |
| 59 | Total assets (add lines 45 through 58) (must equal line 75) | | | 691,117 | 59 | 593,604 |
| | **Liabilities** | | | | | |
| 60 | Accounts payable and accrued expenses | | | 7,686 | 60 | |
| 61 | Grants payable | | | | 61 | |
| 62 | Support and revenue designated for future periods (attach schedule) | | | | 62 | |
| 63 | Loans from officers, directors, trustees, and key employees (attach schedule) | | | | 63 | |
| 64a | Tax-exempt bond liabilities (attach schedule) | | | | 64a | |
| b | Mortgages and other notes payable (attach schedule) | | | | 64b | |
| 65 | Other liabilities (describe ▶ _____ ) | | | | 65 | |
| 66 | Total liabilities (add lines 60 through 65) | | | 7,686 | 66 | |
| | **Fund Balances or Net Assets** | | | | | |
| | Organizations that use fund accounting, check here ▶ ☐ and complete lines 67 through 70 and lines 74 and 75 (see instructions). | | | | | |
| 67a | Current unrestricted fund | | | 597,422 | 67a | 478,103 |
| b | Current restricted fund | | | | 67b | |
| 68 | Land, buildings, and equipment fund | | | 86,008 | 68 | 115,501 |
| 69 | Endowment fund | | | | 69 | |
| 70 | Other funds (describe ▶ _____ ) | | | | 70 | |
| | Organizations that do not use fund accounting, check here ● ☐ and complete lines 71 through 75 (see instructions). | | | | | |
| 71 | Capital stock or trust principal | | | | 71 | |
| 72 | Paid-in or capital surplus | | | | 72 | |
| 73 | Retained earnings or accumulated income | | | | 73 | |
| 74 | Total fund balances or net assets (add lines 67a through 70 OR lines 71 through 73; column (A) must equal line 19 and column (B) must equal line 21) | | | 683,431 | 74 | 593,604 |
| 75 | Total liabilities and fund balances/net assets (add lines 66 and 74) | | | 691,117 | 75 | 593,604 |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes the organization's programs and accomplishments.

Form 990 (1993)

Page 4

## Part V  List of Officers, Directors, Trustees, and Key Employees (List each one even if not compensated) (see instructions.)

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (if not paid, enter -0-) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
|---|---|---|---|---|
| Ghassan Elashi 305 Townhouse Richardson, Tx | Treasurer 0 Hours | -0- | -0- | -0- |
| Mohammed Elmezain 151 Derrom Ave. Patterson, NJ | Chairman 15 Hours | -0- | -0- | -0- |
| Shukri A. Baker 324 Candlewood, Richardson, Tx | Exec. Director 50 Hours | 18,600 | -0- | -0- |

Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? ▶ ☐ Yes ☒ No
If "Yes," attach schedule—see instructions.

## Part VI  Other Information

|  |  | Yes | No |
|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity. **76** | | X |
| 77 | Were any changes made in the organizing or governing documents, but not reported to the IRS? **77** If "Yes," attach a conformed copy of the changes. | | X |
| 78a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? **78a** | | X |
| b | If "Yes," has it filed a tax return on Form 990-T, Exempt Organization Business Income Tax Return, for this year? **78b** | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement; see instructions. **79** | | X |
| 80a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? (See instructions.) **80a** | | X |
| b | If "Yes," enter the name of the organization ▶ _____ and check whether it is ☐ exempt OR ☐ nonexempt. | | |
| 81a | Enter the amount of political expenditures. direct or indirect, as described in the instructions . . **81a** none | | |
| b | Did the organization file Form 1120-POL, U.S. Income Tax Return for Certain Political Organizations, for this year? **81b** | | X |
| 82a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? . . . . . . . . . . . . . . . **82a** | | X |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions for reporting in Part III.) . **82b** | | |
| 83 | Did the organization comply with the public inspection requirements for returns and exemption applications? **83** | X | |
| 84a | Did the organization solicit any contributions or gifts that were not tax deductible? . . . . . . . . **84a** | | X |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? (See General Instruction M.) **84b** | | |
| 85 | Section 501(c)(4), (5), or (6) organizations.-a Were substantially all dues nondeductible by members? . . . . **85a** | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? . . . _ _ . . **85b** | | |
|  | If "Yes" to either 85a or 85b, do not complete 85c through 85h below. | | |
| c | Dues, assessments, and similar amounts from members for January 1994 and later . **85c** | | |
| d | Section 162(e) lobbying and political expenditures after December 1993 . . . . . **85d** | | |
| e | Aggregate nondeductible amount of section 6033(e)(I)(A) dues notices . . . . . **85e** | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e; (see instructions.) . **85f** | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount in 85f? . . . . . **85g** | | |
| h | Does the organization elect to add the amount in 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? . . . . . . . . . **85h** | | |
| 86 | Section 501(c)(7) organizations.-Enter: | | |
| a | Initiation fees and capital contributions included on line 12 . . . . . . . . **86a** | | |
| b | Gross receipts, included on line 12, for public use of club facilities (See instructions.) **86b** | | |
| 87a | Section 501(c)(12) organizations.-Enter: Gross income from members or shareholders **87a** | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . . **87b** | | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership? If "Yes," complete Part IX . . . . . . . . . . . . . . . **88** | | X |
| 89 | Public interest law firms.-Attach information described in the instructions. | | |
| 90 | List the states with which a copy of this return is filed ▶ California...................................... | | |
| 91 | The books are in care of ▶ Mohammed H. Azad, CPA........... Telephone no. ▶ (214) 692-0202 Located at ▶ 11300 N. Central Expwy, Ste. 405, Dallas, Tx  ZIP code ▶ 75243 | | |
| 92 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of Form 1041, U.S. Fiduciary Income Tax Return, should check here ▶ ☐ and enter the amount of tax-exempt interest received or accrued during the tax year. . ▶ | **92** | |

Schedule A (Form 990) 1993

**Part VII** Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations    N/A

51 Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

| | | Yes | No |
|---|---|---|---|
| **a** Transfers from the reporting organization to a noncharitable exempt organization of: | | | |
| (i) Cash | **51a(i)** | | |
| (ii) Other assets | **a(ii)** | | |
| **b** Other transactions: | | | |
| (i) Sales of assets to a noncharitable exempt organization | **b(i)** | | |
| (ii) Purchases or assets from a noncharitable exempt organization | **b(ii)** | | |
| (iii) Rental of facilities or equipment | **b(iii)** | | |
| (iv) Reimbursement arrangements | **b(iv)** | | |
| (v) Loans or loan guarantees | **b(v)** | | |
| (vi) Performance of services or membership or fundraising solicitations | **b(vi)** | | |
| **c** Sharing of facilities, equipment, mailing lists, other assets, or paid employees | **c** | | |

d If the answer to any of the above is "Yes" complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received.

| (a)<br>Line no. | (b)<br>Amount involved | (c)<br>Name of noncharitable exempt organization | (d)<br>Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

52a is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527? . . . . . . ☐ Yes ☐ No
 b If "Yes," complete the following schedule.

| (a)<br>Name of organization | (b)<br>Type of organization | (c)<br>Description of relationship |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PHOTOCOPY - DO NOT PROCESS

THE HOLY LAND FOUNDATION FOR
RELIEF AND DEVELOPMENT

T.Y.E. 12/31/93          T. I.N. 95-4227517

FORH 990

PART II. LINE 43. STATEMENT OF FUNCTIONAL EXPENSES

| | TOTAL | PROGRAM SERVICES | MANAGEMENT & GENERAL | FUND-RAISING |
|---|---|---|---|---|
| ADVERTISING | 10,646 | 5,323 | | 5,323 |
| BANK CHARGES | 1,398 | | 1,398 | |
| CONTRACT LABOR | 1,465 | | | 1,465 |
| DUES & SUBS. | 2,466 | 400 | 1,600 | 666 |
| MAILING LIST | 5,000 | 2,500 | | 2,500 |
| UTILITIES | 6,117 | 1,529 | 3,059 | 1,529 |
| PENALTIES | 234 | | 234 | |
| LIMITED P/S TAX STATE OF CALIF | 94 | | 94 | |
| | | | | |
| TOTALS | 27,620 | 9,752 | 6,385 | 11,483 |

PART III. STATEMENT OF PROGRAM SERVICE ACCOMPLISHMENTS

PROGRAM GRANTS ARE APPROPRIATED TO VARIOUS PROJECTS,
INCLUDING ASSISTANCE TO NON-PROFIT MEDICAL/DENTAL CLINICS,
ORPHANAGES, EDUCATIONAL FACILITIES AND SOCIAL WELFARE
CENTERS AND RELIGIOUS FACILITIES IN THE AREAS OF THE HOLY
LANDS AFFECTED BY WAR AND CIVIL UNREST.

PART IV. LINE 54: INVESTMENTS

INVESTMENT IN MSI LIMITED PARTNERSHIP I

| | |
|---|---|
| BEGINNING | $ 91,284 |
| ADD: PARTNERS SHARE OF EARNINGS | 7,590 |
| LESS: WITHDRAWALS & DISTRIBUTIONS | (4,278) |
| LESS: PARTNERS SHARE OF CALIF. INCOME TAX | ( 94) |
| | |
| BALANCE AS OF 12/31/93 | $ 94,502 |

THE HOLY LAND FOUNDATION FOR
RELIEF AND DEVELOPMENT

T.Y.E. 12/31/93          T. I. N. 9 - 5 1 7

FORM 990

PART II. LINE 42 & PART IV. LINE 55a: DEPRECIATION

|  | COST | METHOD | CUMULATIVE | CURRENT |
|---|---|---|---|---|
| EQUIPMENT | 71,184 | MARCS/5 | 40,335 | 15,401 |
| MAILING SORTING MACHINE | 17,551 | MARCS/7 | 6,805 | 4,298 |
| FURNISHINGS | 9,076 | MARCS/7 | 5,238 | 1,535 |
| TELEPHONE SYSTEM | 2,715 | MARCS/7 | 1,053 | 665 |
| VIDEO PRODUCTION | 14,975 | MARCS/3 | 2,496 | 2,494 |
| TOTALS | 115,501 |  | 55,927 | 24,395 |

PART IV. LINE 56: INVESTMENTS-OTHER

INVESTMENT IN A-1 JEWELERS

| | |
|---|---|
| BEGINNING | $ 70,000 |
| ADD: EARNINGS/DIVIDENDS | 5,743 |
| LESS: DISTRIBUTIONS | (5,743) |
| BALANCE AS OF 12/31/93 | $ 70,000 |

PART IV LINE 58: OTHER ASSETS

| | |
|---|---|
| GOLD | $ 9,219 |
| DEPOSITS | 2,479 |
| PREPAID PAYROLL TAXES | 390 |
| DISTRIBUTION RECEIVABLE FROM M S I | 912 |
| TOTAL | $ 13,000 |

F. TO/COPY - DC'.,CI PROCESS

THE HOLY LAND FOUNDATION FOR
RELIEF AND DEVELOPMENT

T.Y.E. 12/31/93          T.I.N. 95-4227517

SCHEDULE A

PART III. LINE 4: STATEMENT ABOUT ACTIVITIES

SCHOLARSHIPS OR EDUCATIONAL ASSISTANCE DISBURSEMENTS ARE
MADE TO THE NEEDY STUDENTS AT VARIOUS LEVELS OF THE
EDUCATIONAL SYSTEM IN THE HOLY LANDS BASER UPON THE
RECOMMENDATIONS FROM COMMUNITY LEADERS AND CHARITABLE
ORGANIZATIONS IN THE AREAS.   THE CRITERIA USED FOR SELECTION
INCLUDES NEEDS. AREA OF STUDY, PAST PERFORMANCE AND DESIRE.

PART IV. LINE 26b:

| NAME | TOTAL GIFTS 1989 - 1992 | EXCESS AMOUNT |
|------|------|------|
| KHAMIS AKEL | 103,000 | 27,314 |
| MOUSA ABOU MARZOOK | 210,000 | 134,314 |
| ALEXANDRIA CARPET | 100,000 | 24,314 |
| TOTALS | 310,000 | 185,942 |

PART IV. LINE 28:

| | NAME | AMOUNT | NATURE OF GRANT |
|------|------|------|------|
| 1989 | NONE | | |
| 1990 | KHAM I S AKEL | 103,000 | ONE TIME CASH |
| 1991 | BADADAH CONNECTION | 50,000 | ONE TIME CASH |
| 1992 | MQUSA ABOU MARZOOK | 210,000 | ONE TIME CASH |
| | ALEXANDERIA CARPET | 100,000 | ONE TIME CASH |
| | FAYEZ SHUKAIRY | 58,400 | ONE TIME CASH |
| | NASSER  ALKHAT I B | 22,450 | ONE TIME CASH |
| | AHMED A FAZARA | 20,000 | ONE TIME CASH |
| | ALAA SAMAN | 15,500 | ONE TIME CASH |

PHOTOCOPY - DO NOT PROCESS



IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HOLY LAND FOUNDATION FOR<br>RELIEF AND DEVELOPMENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:02CV00442 |
| | ) | (Judge Kessler) |
| JOHN ASHCROFT, in his official | ) | |
| capacity as Attorney General of | ) | |
| the United States, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

### DECLARATION OF ALLEGRA PACHECO

1.      I am a licensed American and Israeli attorney and a member of the New

York and Israeli bars.  I graduated Columbia Law School in 1990 with honors in

international law and have been practicing law since then.  My curriculum vita is attached

as exhibit one to this declaration.

2.      I am very familiar with the conduct and treatment of Palestinian detainees

by Israeli interrogators during interrogations. Since 1996 and until today, I have visited

and/or represented over 200 Palestinians detained under interrogation by the Israeli

security services.  I have represented them in the Israeli military courts and the Israeli

High Court of Justice in remand hearings to extend their interrogations and regarding

their difficult conditions and cases of torture.

3.      I have researched and published extensively on the issue of Palestinian

human rights, and torture and interrogation conditions in particular. I have also presented

papers at academic and legal conferences and testified before the United Nations on the

FILED

JUN 2 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1:02CV00442(GK)

EXHIBIT

15

torture of Palestinian detainees in Israeli interrogation centers.  I have contributed and consulted for reports on torture by Israeli and international human rights organizations. In addition I have also been interviewed by U.S., European, Arab and Israeli media on these issues.  Finally, I have been a board member and legal advisor of the Public Committee Against Torture in Israel for four years.

4.      It is an indisputable fact that until September 1999, the Israeli security services (GSS) routinely used torture and degrading methods to force confessions from Palestinian detainees. These methods included painful and prolonged shackling to low, slanting chairs in contorted positions; hanging by hands from pipes; exposure to unbearably loud music; hooding with thick, rancid sacks; forced squatting on toes; and sleep deprivation.  The methods - nicknamed "Shabah" - were used in combination, exacerbating the pain and suffering.  Also body and head shakings were used, but in less routine manner.

5.      I base the above statement on four sources: (i) my own personal experience representing Palestinian detainees (ii) research and reporting by Israeli and international human rights organizations (iii) an affidavit by the head of the GSS in 1998 during the litigation of one of my cases in the Israeli High Court, and, (iv) the conclusions and decision of the Israeli High Court of Justice in September 1999 which I litigated which banned most of the above-mentioned methods.

**(I)      Personal Experience:**

6.      Until September 1999, I estimate that 95% of my clients reported nearly identical descriptions of the Israeli torture methods - days and often weeks of Shabah, sleep deprivation, tight handcuffs and in some cases body and head shakings.  It was an

exception when my client was not tied to a chair with a rancid thick sack tied over his head, denied sleep and exposed to blaring music for long periods.

7.      When I visited my clients under interrogation in Israeli interrogation centers, I saw first hand the marks of the torture on their bodies usually in the form of swollen hands, and gashes on the wrists and feet from tight handcuffs. During my visits with my clients, they were exhausted, often discombobulated, disheveled, unshaven, and had a bad odor from lack of bathing and change in clothing. They routinely complained of intense back and shoulder pain, headaches, numbness in their hands and vomiting. Some clients could not even write their affidavits and many times they would burst out crying or would plead with me to try to put a stop to their torture.

8.      In addition to the use of torture, the GSS routinely denied me access to my clients for weeks at a time. This form of incommunicado detention was and remains a routine practice by the GSS.  In addition to denying access to a lawyer, Palestinian detainees under GSS interrogations have no access to a telephone, radio, family visits, and newspaper whatsoever.  Most but not all Palestinian detainees received a short visit from the International Committee of the Red Cross 14 days after the start of their interrogation.

9.      In almost every one of my cases, a confession was elicited during the period when my client was prohibited from meeting with me.  Until today, it is a rare occurrence that I am able to meet with my client from the beginning of his detention.

**(II)    Documentation by International and Israeli Human Rights Organizations and the UN**

10.      The routine use of torture and degrading treatment of Palestinian detainees has been documented by international and Israeli human rights organizations, including

the Committee against Torture – the official body overseeing the implementation of the

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment, 1465 U.N.T.S. 85, G.A. Res. 39/46, 39th Sess., U.N. GAOR Supp. No. 51,

at 197, U.N. Doc. A/39/51 (1984). In its conclusion regarding Israeli interrogation

practices, the committee wrote,

> "(1) restraining in very painful conditions, (2) hooding under special conditions,
> (3) sounding of loud music for prolonged periods, (4) sleep deprivation for
> prolonged periods…constitute torture. . . ."

**Conclusions and Recommendations of the Committee Against Torture, Geneva,
May 1997.**

11.     Nigel Rodley, the UN Special Rapporteur on Torture, wrote the following

in 1997 on the routine use of the Shabah position in Israeli interrogation centers against

Palestinian detainees:

> "The following forms of pressure during interrogation appear so consistently (and
> have not been denied in judicial proceedings) that the Special Rapporteur assumes
> them to be sanctioned under the approved but secret interrogation practices:
> sitting in a very low chair or standing arced against a wall (possibly in alternation
> with each other); hands and/or legs tightly manacled; subjection to loud noise;
> sleep deprivation; hooding; being held in cold air; violent shaking (an
> 'exceptional' measure, used against 8,000 persons according to the late Prime
> Minister Rabin in 1995).  Each of these measures on its own may not provoke
> severe pain or suffering. Together – and they are frequently used in combination –
> they may be expected to induce precisely such pain or suffering, especially if
> applied on a protracted basis of, say, several hours.  In fact, they are sometimes
> apparently applied for days or even weeks on end. Under those circumstances,
> they can only be described as torture…"

**Report of the Special Rapporteur, Mr. Nigel S. Rodley, Submitted Pursuant to
Commission on Human Rights Resolution 1995/37 B. U.N. ESCOR-H.R. Comm.,
53rd Sess., U.N. Doc. E/CN.4/1997/7, 10 January 1997, par. 121, p. 29.**

12.     The most prominent Israeli human rights organization, Bt'selem, reported

on Israeli torture methods in 1998 and concluded that without a doubt, thousands of

Palestinians have been tortured by the GSS in the last ten years.

"Bt'selem estimates, based on official sources, human rights organizations and attorneys, that the GSS annually interrogates between 1,000-1,500 Palestinians. Some eight-five percent of them – at least 850 persons a year – are tortured during interrogation." "Even without relying on the expert, common sense dictates that compelling an individual to withstand, for days and weeks, a combination of isolation, threats and degradation, sensory isolation, painful binding, exposure to cold, sleep deprivation, and periodic kneeling or remaining in extremely painful and tiring positions, violent shaking, and beating, can be defined as nothing less than torture…"

**Routine Torture: Interrogation Methods of the General Security Service, B'tselem – the Israeli Information Center for Human Rights in the Occupied Territories, February 1998, Jerusalem, p. 8, 38.**

13.     In 1994, the US based human rights organization, Human Rights

Watch/Middle East, also documented the use of torture against Palestinians detainees

during the first Intifada until the Oslo Agreement period. It concluded that the enormous

number of victims made the fact of Israeli torture irrefutable:

"Israel's ill-treatment of Palestinians under interrogation is notable for the enormous number of persons who have experienced it.  Well over 100,000 Palestinians have been detained since the start of the Intifada in December 1987. Of those arrested, reliable sources indicated that some 4,000 to 6,000 are subjected to interrogation each year….

"The overriding strategy of Israel's interrogation agencies in getting uncooperative detainees to talk is to subject them to a coordinated, rigid and increasingly painful regime of physical constraints and psychological pressures over days and very often for three or four weeks, during which time the detainees are, almost without exception, denied visits by their lawyers and families. These measures seriously taint the voluntariness of the confessions that they help to bring about, and therefore, compromise the fundamental fairness of the military courts that try Palestinians in the occupied territories.

"The methods used in nearly all interrogations are prolonged sleep deprivation; prolonged sight deprivation using blindfolds or tight-fitting hoods; forced, prolonged maintenance of body positions that grow increasingly painful; and verbal threats and insults.

"These methods are almost always combined with some of the following abuses: confinement in tiny, closet-like spaces; exposure to temperature extremes, such as in deliberately overcooled rooms; prolonged toilet and hygienic deprivation; and degrading treatment, such as forcing detainees to eat and use the toilet at the same

time.  In a large number of cases, detainees are also moderately or severely beaten by their interrogators…

"The intensive, sustained and combined use of these methods inflicts the severe mental or physical suffering that is central to internationally accepted definitions of torture.

"Israeli's political leadership cannot claim ignorance that ill-treatment is the norm in interrogation centers. The number of victims is too large, and the abuses are too systematic."

**Torture and Ill-Treatment: Israel's Interrogation of Palestinians from the Occupied territories," Human Rights Watch/Middle East 1994, p.x-xi.**

**(III)    Affidavit of the Head of the GSS submitted to the Israeli High Court:**

14.    In September 1999, along with several other Israeli attorneys, I achieved an historic court victory on behalf of my client Abed al-Rahman Ghanimat and other Palestinian detainees and the Public Committee Against Torture, when we convinced the Israeli High Court of Justice to ban the use of certain torture methods in Israeli interrogation centers. **See The Public Committee Against Torture in Israel, et al., H.C. 5100/94.**  The decision was praised internationally and described by Anthony Lewis of the **New York Times** as Israel's equivalent to **Brown v. Board of Education**.

15.    During the litigation of this case, the Israeli government admitted that it had been using Shabah and body-shakings during interrogations of Palestinians and that the Israeli government had approved these methods.  It argued that they did not constitute torture and thus were legal, an argument that aside from the international and local human rights community, the Israeli High Court ultimately rejected in September 1999.

16.    Ami Ayalon, the then head of General Security Services, wrote in an affidavit submitted to the Israeli High Court on May 17, 1998:

" I request to present my professional opinion especially regarding the special interrogation measure that the Shabak [GSS -ap] interrogators are permitted to

employ in exceptional circumstances which justify them. This includes the measure of shaking interrogatees and the measures which were used during the interrogation of Abed al-Rahman Ghanimat [tying in contoured positions to low-slating chair, hooding with rancid sack, blaring music, sleep deprivation, food and hygiene deprivation for extending periods - ap]…These measures, which are anchored in the procedures of permits for the interrogators, and which have been approved by the Special Ministerial Committee Regarding Shabak Interrogators are- in my best opinion and judgment – extremely vital in the struggle to abolish terrorism and we cannot forego them without reducing significantly the ability of the service to frustrate attacks."

**(IV)     Decision of the Israeli High Court of Justice:**

17.     The Israeli High Court of Justice's decision banning the use of Shabah and body and head shakings during GSS interrogations was issued after 4 ½ years of litigation and court hearings where the government admitted its use of these methods on Palestinian detainees. In its decision the President of the High Court described the methods in detail based on the government's testimony. The Court then ruled point by point why each method must be banned because of its fundamental harm to the human person and dignity.

18.     Below I have quoted excerpts from this decision. In my opinion this decision is extremely relevant and compelling because it reflects a de facto Israeli recognition of the illegality of its prior torture of thousands of Palestinian detainees.

> "The physical means employed by the GSS investigators were presented before this Court by the GSS investigators. …the State's position, which failed to deny the use of these interrogation methods, and even offered these and other explanations regarding the rationale justifying the use of an interrogation methods or another, provided the Court with a picture of the GSS' interrogation practices." [pp. 5-6]

> "The aforementioned affidavits claim that prolonged sitting in this position causes serious muscle pain in the arms, the neck and headaches. The State did not deny the use of this method before the Court." [p. 7]

> "The State, for its part, denies any use of unusually small cuffs…. They are, nonetheless, prepared to admit that prolonged hand or foot cuffing is likely to

cause injuries to the suspect's hands and feet." [pp. 7-8]

"It was argued before the Court that one of the investigation methods employed consists of the suspect crouching on the tips of his toes for five minute intervals. The State did not deny this practice. This is a prohibited investigation method. …It is degrading and infringes upon an individual's human dignity." [p. 17]

"The 'Shabach' method is composed of a number of cumulative components: the cuffing of the suspect, seating him in a low chair, covering his head with an opaque sack (head covering) and playing powerfully loud music in the area. …Notwithstanding, the cuffing associated with the 'Shabach' position is unlike routine cuffing. The suspect is cuffed with his hands tied behind his back. One hand is placed inside the gap between the chair's seat and back support, while the other is tied behind him, against the chair's back support. This is a distorted and unnatural position. …We accept that seating a man is inherent to the investigation. This is not the case when the chair upon which he is seated is a very low one, tilted forward facing the ground, and when he is sitting in this position for long hours. This sort of seating is not encompassed by the general power to interrogate. Even if we suppose that the seating of the suspect on a chair lower than that of his investigator can potentially serve a legitimate investigation objective,… there is no inherent investigative need for seating the suspect on a chair so low and tilted forward towards the ground in a manner that causes him real pain and suffering. Clearly, the general power to conduct interrogations does not authorize seating a suspect on a forward tilting chair, in a manner that applies pressure and causes pain to his back, all the more so when his hands are tied behind the chair, in the manner described. All these methods do not fall within the sphere of a "fair" interrogation. They are not reasonable. They impinge upon the suspect's dignity, his bodily integrity and his basic rights beyond what is necessary." [pp. 17-18]

"Plainly put, shaking is a prohibited investigation method. It harms the suspect's body. It violates his dignity. It is a violent method, which does not form part of a legal interrogation." [p. 17]

 "For it appears that at present, the suspect's head covering – which covers his entire head, rather than eyes alone,- for a prolonged period of time, with no essential link to the goal of preventing contact between the suspects under investigation, is not part of a fair interrogation. It harms the suspect and his (human) image. It degrades him. It causes him to lose sight of time and place. It suffocates him." [pp. 18-19]

"Being exposed to powerfully loud music of a long period of time causes the suspect suffering. Furthermore, the suspect is tied (in place) in an uncomfortable position with his head covered (all the while). The use of [this] method is prohibited." [p. 19]

"To the above, we must add that the 'Shabah' position includes all the outlined methods employed simultaneously. Their combination, in and of itself gives rise to particular pain and suffering. This is a harmful method, particularly when it is employed for a prolonged period of time…. It is an unacceptable method." [p. 19]

"If the suspect is intentionally deprived of sleep for a prolonged period of time, for the purpose of tiring him out or 'breaking' him – it shall not fall within the scope of a fair and reasonable investigation. Such means harm the rights and dignity of the suspect in a manner surpassing that which is required." [p. 20]

**The Public Committee Against Torture In Israel et al, HC 5100/94**

19.    In my opinion and experience and in light of the consistent and irrefutable evidence of torture, statements made by Palestinian detainees during their interrogation by GSS until September 1999, are not reliable sources of information since they were most likely issued after rounds of torture and ill-treatment and under extreme duress, coercion, pain and suffering.

20.    The International Convention Against Torture (1984), to which Israel and the United States are both signatories, defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him…information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him…when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official."

21.    It further states that each state "shall take effective legislative, administrative, judicial or other measures to prevent acts of torture."

22.    Therefore, any U.S. court accepting the validity and veracity of Palestinian statements made under GSS interrogation, would be in violation of the US government's obligation under the Convention Against Torture.

23.    Further, in my opinion, accepting the validity of Palestinian statements made under GSS interrogations would condone Israeli torture practices and legitimize what has now been condemned by the United Nations, international and Israeli human rights organizations, and even banned by the Israeli Supreme Court itself.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 29 day of March, 2002.

Allegra Pacheco

10



**The Supreme Court of Israel, sitting as the High Court of Justice**

**H.C. 5100/94**
**H.C. 4054/95**
**H.C. 6536/95**
**H.C. 5188/96**
**H.C. 7563/97**
**H.C. 7628/97**
**H.C. 1043/99**


Before:

The Honourable President A. Barak
The Honourable Deputy President S. Levin
The Honourable Justice T. Or
The Honourable Justice E. Mazza
The Honourable Justice M. Cheshin
The Honourable Justice Y. Kedmi
The Honourable Justice I. Zamir
The Honourable Justice T. Strasberg-Cohen
The Honourable Justice D. Dorner

Applicant in H.C. 5100/94      Public Committee Against Torture in Israel
Applicant in H.C. 4054/95      The Association for Civil Rights in Israel
Applicant in H.C. 6536/95      Hat'm Abu Zayda

Applicants in H.C 5188/96      1.  Wa'al Al Kaaqua
                               2.  Ibrahim Abd'allah Ganimat
                                 3. Center for the Defence of the Individual

Applicants in H.C. 7563/97     1. Abd Al Rahman Ismail Ganimat
                               2. Public Committee Against Torture in Israel

Applicants in H.C. 7628/97     1. Fouad Awad Quran
                               2. Public Committee Against Torture in Israel

Applicant in H.C. 1043/99      Issa Ali Batat


V.


Respondents in H.C. 5100/94        1. The State of  Israel
                                   2. The General Security Service


Respondents in H.C. 4045/95        1. The Prime Minister of Israel
                                   2. The Minister of Justice



FILED

JUN 2 8

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1:02CV00442(GK)



EXHIBIT

16

                                        3. The Minister of Police
                                        4. The Minister of the Environment
                                        5. The Head of the General Security Service

Respondent in H.C. 6536/95
and H.C. 1043/99                    The General Security Service

Respondents in H.C. 5188/96        1. The General Security Service
                                   2. The Prison Commander -Jerusalem

Respondents in H.C. 7563/97
and H.C. 7628/97              1. The Minister of Defence
                             2. The General Security Service


**Hearing : Motion for an Order *Nisi***


Dates of the Hearings:        24 of Iyar, 5758 (20.5.98)
                              25 of Tevet 5759 (13.1.99)
                              11 of Sivan 5759 (26.5.99)


Counsel for the Applicant in H.C. 5100/94:   Avigdor Feldman; Ronit Robinson, advs.

Counsel for the Applicant in H.C. 4054/95:   Dan Yakir, adv.

Counsel for the Applicants in H.C. 6536/95,
H.C. 5188/96 and H.C. 1043/99:         Andre Rosenthal, adv.

Counsel for Applicant Number Three in
H.C. 5188/96:                          Eliyahu Abram, adv.

Counsel for Applicants in H.C. 7563/97
and H.C. 7628/97:                      Leah Tzemel; Allegra Pachko, advs.


Counsel for the Respondents in all
of the Applications:                   Shai Nitzan; Yehuda Scheffer, advs.


# Judgment

**President A. Barak:**

The General Security Service (hereinafter, the "GSS") investigates individuals suspected of committing crimes against Israel's security. Is the GSS authorized to conduct these interrogations? The interrogations are conducted on the basis of directives regulating interrogation methods. These directives equally authorize investigators to apply physical means against those undergoing interrogation (for instance, shaking the suspect and the "Shabach" position). The basis for permitting such methods is that they are deemed immediately necessary for saving human lives. Is the sanctioning of these interrogation practices legal? - These are the principal issues presented by the applicants before us.

Background:

1. The State of Israel has been engaged in an unceasing struggle for both its very existence and security, from the day of its founding. Terrorist organizations have established as their goal Israel's annihilation. Terrorist acts and the general disruption of order are their means of choice. In employing such methods, these groups do not distinguish between civilian and military targets. They carry out terrorist attacks in which scores are murdered in public areas, public transportation, city squares and centers, theaters and coffee shops. They do not distinguish between men, women and children. They act out of cruelty and without mercy (For an in depth description of this phenomenon see the Report of the Commission of Inquiry Regarding the GSS' Interrogation Practices with Respect to Hostile Terrorist Activities headed by (ret. ) Justice M. Landau, 1987 - hereinafter, "Commission of Inquiry Report") published in the Landau Book 269, 276 (Volume 1 , 1995).

The facts presented before this Court reveal that one hundred and twenty one people died in terrorist attacks between 1.1.96 to 14.5.98. Seven hundred and seven people were injured. A large number of those killed and injured were victims of harrowing suicide bombings in the heart of Israel's cities. Many attacks-including suicide bombings, attempts to detonate car bombs, kidnappings of citizens and soldiers, attempts to highjack buses, murders, the placing of explosives, etc.- were prevented due to the measures taken by the authorities responsible for fighting the above described hostile terrorist activities on a daily basis. The main body responsible for fighting terrorism is the GSS.

In order to fulfill this function, the GSS also investigates those suspected of hostile terrorist activities. The purpose of these interrogations is, among others, to gather information regarding terrorists and their organizing methods for the purpose of thwarting and preventing them from carrying out these terrorist attacks. In the context of these interrogations, GSS investigators also make use of physical means. The legality of these practices is being examined before this Court in these applications.

4

The Applications:

2. These applications are entirely concerned with the GSS' interrogation methods. They outline several of these methods, in detail, before us. Two of the applications are of a public nature. One of these (H.C. 5100/94) is brought by the Public Committee Against Torture in Israel. It submits that GSS investigators are not authorized to investigate those suspected of hostile terrorist activities. Moreover, they claim that the GSS is not entitled to employ those pressure methods approved by the Commission of Inquiry's Report ("the application of non-violent psychological pressure" and the application of "a moderate degree of physical pressure"). The second application (hereafter 4054/95), is brought by the Association for Citizen's Rights in Israel (ACRI) . It argues that the GSS should be instructed to refrain from shaking suspects during interrogations.

Five of the remaining applications involve specific applicants who turned to the Court individually. They each petitioned the Court to hold that the methods used against them by the GSS are illegal. Who are these applicants?

3. The applicants in H.C. 5188/96 (Wa'al Al Kaaqua and Ibrahim Abd'alla Ganimat) were arrested at the beginning of June 1996. They were interrogated by GSS investigators. They appealed to this Court (on 21-7-96) via the Center for the Defence of the Individual, founded by Dr. Lota Saltzberger. Their attorney petitioned the Court for an order *nisi* prohibiting the use of physical force against the applicants during their interrogation. The Court granted the order. The two applicants were released from custody prior to the hearing. As per their attorney's request, we have elected to continue hearing their case, in light of the importance of the issues they raise in principle.

4. The applicant in H.C. 6536/96 (Hat'm Abu Zayda), was arrested (on 21-9-95) and interrogated by GSS investigators. He turned to this Court (on 22-10-95) via of the Center for the Defence of the Individual, founded by Dr. Lota Saltzberger. His attorney complained about the interrogation methods allegedly used against his client (deprivation of sleep, shaking, beatings, and use of the "Shabach" position). We immediately instructed the application be heard. The Court was informed that the applicant's interrogation had ended (as of 19-10-95). The information provided to us indicates that the applicant in question was subsequently convicted of activities in the military branch of the Hamas terrorist organization. He was sentenced to seventy four months in prison. The convicting Court held that the applicant both recruited and constructed the Hamas' infrastructure, for the purpose of kidnapping Israeli soldiers and carrying out terrorist attacks against security forces. It has been argued before us that the information provided by the applicant during the course of his interrogation led to the thwarting of an actual plan to carry out serious terrorist attacks, including the kidnapping of soldiers.

5. The applicant in H.C. 7563/97 (Abd al Rahman Ismail Ganimat) was arrested (on 13-11-97) and interrogated by the GSS. He appealed to this

Court (24-12-97) via the Public Committee Against Torture in Israel. He claimed to have been tortured by his investigators (through use of the "Shabach" position", excessive tightening of handcuffs and sleep deprivation). His interrogation revealed that he was involved in numerous terrorist activities in the course of which many Israeli citizens were killed. He was instrumental in the kidnapping and murder of IDF soldier (Sharon Edry, of blessed memory); Additionally, he was involved in the bombing of the Cafe "Appropo" in Tel Aviv, in which three women were murdered and thirty people were injured. He was charged with all these crimes and convicted at trial. He was sentenced to five consecutive life sentences plus an additional twenty years of prison.

A powerful explosive device, identical to the one detonated at Cafe "Appropo" in Tel Aviv, was found in the applicant's village (Tzurif) subsequent to the dismantling and interrogation of the terrorist cell to which he belonged. Uncovering this explosive device thwarted an attack similar to the one at Cafe "Appropo". According to GSS investigators, the applicant possessed additional crucial information which he only revealed as a result of their interrogation. Revealing this information immediately was essential to safeguarding state and regional security and preventing danger to human life.

6. The applicant in H.C. 7628/97 (Fouad Awad Quran) was arrested (on 10-12-97) and interrogated. He turned to this Court (on 25-12-97) via the Public Committee against Torture in Israel. Before the Court, he claimed that he was being deprived of sleep and was being seated in the "Shabach" position. The Court issued an order *nisi* and held an immediate hearing of the application. During the hearing, the State informed the Court that "at this stage of the interrogation the GSS is not employing the methods alleged by the applicant against him". For this reason, no interim order was granted.

7. The applicant in H.C.1043/99 (Issa Ali Batat) was arrested (on 22-2-99) and interrogated by GSS investigators. The application, brought via the Public Committee Against Torture in Israel, argued that physical force was used against the applicant during the course of the interrogation. The Court issued an order *nisi*. While hearing the application, it came to the Court's attention that the applicant's interrogation had ended and that he was being detained pending trial; The indictment alleges his involvement in hostile activities, the purpose of which was to harm the "area's" (Judea, Samaria and the Gaza strip) security and public safety.

The Physical Means

8. The physical means employed by the GSS investigators were presented before this Court by the GSS investigators. The State's attorneys were prepared to present them for us behind closed doors (in camera). The applicants' attorneys were opposed to this proposal. Thus, the information at the Court's disposal was provided by the applicants and was not tested in each individual application. This having been said, the State's position, which failed to deny the use of these interrogation methods, and even offered these and other explanations regarding the rationale justifying the use of an

interrogation methods or another, provided the Court with a picture of the GSS' interrogation practices.

The decision to utilize physical means in a particular instance is based on internal regulations, which requires obtaining permission from various ranks of the GSS hierarchy. The regulations themselves were approved by a special Ministerial Committee on  GSS interrogations. Among other guidelines, the Committee set forth directives pertaining to the rank authorized to allow these interrogation practices.  These directives were not examined by this Court. Different interrogation methods are employed depending on the suspect, both in relation to what is required in that situation and to the likelihood of obtaining authorization. The GSS does not resort to every interrogation method at its disposal in each case.

Shaking

9. A number of applicants (H.C. 5100/94; H.C. 4054/95; H.C. 6536/95) claimed that the shaking method was used against them. Among the investigation methods outlined in the GSS' interrogation regulations, shaking is considered the harshest. The method is defined as the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly.  According to an expert opinion submitted in one of the applications (H.C. (motion) 5584/95 and H.C. 5100/95), the shaking method is likely to cause serious brain damage, harm the spinal cord, cause the suspect to lose consciousness, vomit and urinate uncontrollably and suffer serious headaches.

The State entered several countering expert opinions into evidence. It admits the use of this method by the GSS. To its contention, there is no danger to the life of the suspect inherent to shaking; the risk to life as a result of shaking is rare; there is no evidence that shaking causes fatal damage; and medical literature has not to date listed a case in which a person died directly as a result of having been only shaken. In any event, they argue, doctors are present in all interrogation compounds, and instances where the danger of medical damage presents itself are investigated and researched.

All agree that in one particular case (H.C. 4054/95) the suspect in question expired after being shaken. According to the State, that case constituted a rare exception.  Death was caused by an extremely rare complication resulting in the atrophy of the neurogenic lung. In addition, the State argues in its response that the shaking method is only resorted to in very particular cases, and only as a last resort. The interrogation directives define the appropriate circumstances for its application and the rank responsible for authorizing its use. The investigators were instructed that in every case where they consider resorting to shaking, they must probe the severity of the danger that the interrogation is intending to prevent; consider the urgency of uncovering the information presumably possessed by the suspect in question; and seek an alternative means of preventing the danger. Finally, the directives respecting interrogation state, that in cases where this method is to be used, the investigator must first provide an evaluation of the suspect's

health and ensure that no harm comes to him. According to the respondent, shaking is indispensable to fighting and winning the war on terrorism. It is not possible to prohibit its use without seriously harming the GSS' ability to effectively thwart deadly terrorist attacks. Its use in the past has lead to the thwarting of murderous attacks.

### Waiting in the "Shabach" Position

10. This interrogation method arose in numerous applications (H.C. 6536/95, H.C. 5188/96, H.C. 7628/97). As per applicants' submission, a suspect investigated under the "Shabach" position has his hands tied behind his back. He is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support. The suspect's head is covered by an opaque sack, falling down to his shoulders. Powerfully loud music is played in the room. According to the affidavits submitted, suspects are detained in this position for a prolonged period of time, awaiting interrogation at consecutive intervals.

The aforementioned affidavits claim that prolonged sitting in this position causes serious muscle pain in the arms, the neck and headaches. The State did not deny the use of this method before this Court. They submit that both crucial security considerations and the investigators' safety require tying up the suspect's hands as he is being interrogated. The head covering is intended to prevent contact between the suspect in question and other suspects. The powerfully loud music is played for the same reason.

### The "Frog Crouch"

11. This interrogation method appeared in one of the applications (H.C. 5188/96). According to the application and the attached corresponding affidavit, the suspect being interrogated was found in a "frog crouch" position. This refers to consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals. The State did not deny the use of this method, thereby prompting Court to issue an order *nisi* in the application where this method was alleged. Prior to hearing the application, however, this interrogation practice ceased.

### Excessive Tightening of Handcuffs

12. In a number of applications before this Court (H.C. 5188/96; H.C. 7563/97), various applicants have complained of excessive tightening of hand or leg cuffs. To their contention, this practice results in serious injuries to the suspect's hands, arms and feet, due to the length of the interrogations. The applicants invoke the use of particularly small cuffs, ill fitted in relation to the suspect's arm or leg size. The State, for its part, denies any use of unusually small cuffs, arguing that those used were both of standard issue

and properly applied. They are, nonetheless, prepared to admit that prolonged hand or foot cuffing is likely to cause injuries to the suspect's hands and feet. To the State's contention, however, injuries of this nature are inherent to any lengthy interrogation.

<u>Sleep Deprivation</u>

13. In a number of applications (H.C. 6536/96; H.C. 7563/97; H.C. 7628/97) applicants have complained of being deprived of sleep as a result of being tied in the "Shabach" position, being subjected to the playing of powerfully loud music, or intense non-stop interrogations without sufficient rest breaks. They claim that the purpose of depriving them of sleep is to cause them to break from exhaustion.  While the State agrees that suspects are at times deprived of regular sleep hours, it argues that this does not constitute an interrogation method aimed at causing exhaustion, but rather results from the prolonged amount of time necessary for conducting the interrogation.

<u>Applicants' Arguments</u>

14. Before us lie a number of applications. Different applicants raise different arguments. In principle, all the applications raise two essential arguments: <u>First</u>, they submit that the GSS is never authorized to conduct interrogations. <u>Second</u>, they argue that the physical means employed by GSS investigators not only infringe upon the human dignity of the suspect undergoing interrogation, but in fact constitute criminal offences. These methods, argue the applicants, are in violation International Law as they constitute "Torture," which is expressly prohibited under International Law. Thus, the GSS investigators are not authorized to conduct these interrogations. Furthermore, the "necessity" defence which, according to the State, is available to the investigators, is not relevant to the circumstances in question. In any event, the doctrine of "necessity" at most constitutes an exceptional *post factum* defence, exclusively confined to criminal proceedings against investigators. It cannot, however, by any means, provide GSS investigators with the preemptory authorization to conduct interrogations *ab initio*. GSS investigators are not authorized to employ any physical means, absent unequivocal authorization from the Legislator pertaining to the use of such methods and conforming to the requirements of the Basic Law: Human Dignity and Liberty. There is no purpose in engaging in a bureaucratic set up of the regulations and authority, as suggested by the <u>Commission of Inquiry's Report</u>, since doing so would merely regulate the torture of human beings.

We asked the applicants' attorneys whether the "ticking time bomb" rationale was not sufficiently persuasive to justify the use of physical means, for instance, when a bomb is known to have been placed in a public area and will undoubtedly explode causing immeasurable human tragedy if its location is not revealed at once. This question elicited a variety of responses from the various applicants before the Court. There are those convinced that physical means are not to be used under any circumstances; the prohibition on such methods to their mind is absolute, whatever the consequences may be. On

the other hand, there are others who argue that even if it is perhaps acceptable to employ physical means in most exceptional "ticking time bomb" circumstances, these methods are in practice used even in absence of the "ticking time bomb" conditions. The very fact that, in most cases, the use of such means is illegal  provides sufficient justification for banning their use altogether, even if doing so would inevitably absorb those rare cases in which physical coercion may have been justified. Whatever their particular views, all applicants unanimously highlight the distinction between the ability to potentially escape criminal liability *post factum* and the granting of permission to use physical means for interrogation purposes *ab initio*.

### The State's Arguments

15. The position of the State is as follows: The GSS investigators are duly authorized to interrogate those suspected of committing crimes against Israel's security. This authority emanates from the government's general and residual (prerogative) powers (Article 40 of the Basic Law: the Government). Similarly, the authority to investigate is equally bestowed upon every individual investigator by virtue of article 2(1) of the Criminal Procedure Statute (Testimony) and the relevant accessory powers. With respect to the physical means employed by the GSS, the State argues that these do not violate International Law. Indeed, it is submitted that these methods cannot be qualified as "torture," "cruel and inhuman treatment" or "degrading treatment," that are strictly prohibited under International Law.  Instead, the practices of the GSS do not cause pain and suffering, according to the State's position.

Moreover, the State argues that these means are equally legal under Israel's internal (domestic) law. This is due to the "necessity" defence outlined in article 34(11) of the Penal Law (1977). Hence, in the specific cases bearing the relevant conditions inherent to the "necessity" defence, GSS investigators are entitled to use "moderate physical pressure" as a last resort in order to prevent real injury to human life and well being.  Such "moderate physical pressure" may include shaking, as the "necessity" defence provides in specific instances. Resorting to such means is legal, and does not constitute a criminal offence. In any case, if a specific method is not deemed to be a criminal offence, there is no reason not to employ it even for interrogation purposes. As per the State's submission, there is no reason for prohibiting a particular act, in specific circumstances, *ab initio* if it does not constitute a crime. This is particularly true with respect to the GSS investigators' case, who, according to the State, are after all responsible for the protection of lives and public safety.  In support of their position, the State notes that the use of physical means by GSS investigators is most unusual and is only employed as a last resort in very extreme cases. Moreover, even in these rare cases, the application of such methods is subject to the strictest of scrutiny and supervision, as per the conditions and restrictions set forth in the Commission of Inquiry's Report. This having been said, when the exceptional conditions requiring the use of these means are in fact present, the above

described interrogation methods are fundamental to saving human lives and safeguarding Israel's security.

The Commission of Inquiry's Report

16. The GSS' authority to employ particular interrogation methods, and the relevant law respecting these matters were examined by the Commission of Inquiry (whose report was published, as mentioned, in the Landau Book (1995) Volume 1 at 269). The Commission, appointed by the government by virtue of the Commission of Inquiry Statute (1968), considered the GSS' legal status [among other issues]. Following a prolonged deliberation, the Commission concluded that the GSS is authorized to investigate those suspected of hostile terrorist acts, even in absence of express statutory regulation of its activities, in light of the powers granted to it by specific legislation and the government's residual (prerogative) powers, outlined in the Basic Law: the Government (article 29 of the old statute and article 40 of the new version).  In addition, the power to investigate suspects, granted to investigators by the Minister of Justice as per article 2(1) of the Statute of Criminal Procedure [Testimony], equally endows the GSS with the authority to investigate (supra, p.301 and following).  Another part of the Commission of Inquiry's Report deals with, "the investigator's potential defences" (defences available to the investigator). With regards to this matter, the Commission concluded that in cases where the saving of human lives necessarily requires obtaining certain information, the investigator is entitled to apply both psychological pressure and "a moderate degree of physical pressure" (supra, at 328). Thus, an investigator who, in the face of such danger, applies that specific degree of physical pressure, which does not constitute abuse or torture of the suspect, but is instead proportional to the danger to human life, can avail himself of the "necessity" defence, in the face of potential criminal liability. The Commission was convinced that its conclusions to this effect were not in conflict with International Law, but instead reflect an approach consistent with both the Rule of Law and the need to effectively safeguard the security of Israel and its citizens.

The Commission approved the use of, " a moderate degree of physical pressure" with various stringent conditions including directives that were set out in the second (and secret) part of the Report, and for the supervision of various elements both internal and external to the GSS. The Commission's recommendations were duly approved by the government.

The Applications

17. A number of applications dealing with the application of physical force by the GSS for interrogation purposes have made their way to this Court throughout the years (See, for example, H.C. 7964/95 Billbissi v. The GSS (unpublished); H.C. 8049/96 Hamdan v. The GSS (unpublished); H.C. 3123/94 Atun v. The Head of the GSS (unpublished); H.C. 3029/95 Arquan v. The GSS (unpublished); H.C. 5578/95 Hajazi v. The GSS (unpublished)). An

immediate hearing was ordered in each of these cases. In most, the State declared that the GSS does not employ physical means. As a result, the applicants requested to withdraw their applications. The Court accepted these motions and informed the applicants of their right to set forth a complaint if physical means were or are in fact being used against them (See H.C. 3029/95 *supra*.). Only a in a minority of complaints did the State did not issue the above mentioned notice. In other instances, an interim order was issued. At times, the Court noted that, "we (the Court) did not receive any information regarding the interrogation methods which the respondent (generally the GSS) seeks to employ and we did not take any position with respect to these methods" ( See H.C. 8049/96 *Hamdan v. The GSS* (unpublished). In a different case, the Court noted that, "[T]he annulment of the interim order does not in any way constitute permission to employ methods that do not conform to the law and binding directives" (In H.C. 336/96; In H.C. 7954/95 *Billbissi v. The GSS* (unpublished)).

Until now, therefore, the Court did not actually decide the issue of whether the GSS is permitted to employ physical means for interrogation purposes in circumstances outlined by the defence of "necessity". Essentially, we did not do so due to the fact that it was not possible for the Court to hear the sort of arguments that would provide a complete normative picture, in all its complexity. At this time, by contrast, a number of applications before us have properly laid out (both orally and in writing) complete arguments from sides' respective attorneys. For this we thank them.

Although the various applications are somewhat distinct in that some are rather general or theoretical while others are quite specific, we have decided to deal with them, since above all we seek to clarify (uncover) the state of the law in this most complicated question. To this end, we shall begin by addressing the first issue- namely, are GSS investigators generally authorized to conduct interrogations. We shall then proceed to examine whether a general power to investigate would potentially sanction the use of physical means- including mental suffering-the likes of which the GSS employs. Finally, we shall probe the circumstances under which the above mentioned methods are immediately necessary to rescue human lives and whether these circumstances justify endowing GSS investigators with the authority to employ physical interrogation methods.

<u>The Authority to Interrogate</u>

18. The term "interrogation" takes on various meanings in different contexts. For the purposes of the applications before the Court at present, we refer to the asking of questions which seek to elicit a truthful answer (subject to the limitations respecting the privilege against self-incrimination; See article 2 of the Criminal Procedure Statute [Testimony ]). Generally, the investigation of a suspect is conducted at the suspect's place of detention.  An interrogation inevitably infringes upon the suspect's freedom, even if physical means are not used. Indeed, undergoing an interrogation infringes on both the suspect's dignity and his individual privacy. In a state adhering to the Rule of Law, interrogations are therefore not permitted in absence of clear statutory

authorization, be it through primary legislation or secondary legislation, the latter being explicitly rooted in the former. This essential principle is expressed by the Legislator in the Criminal Procedure Statute (Powers of Enforcement-Detention - 1996) which states as follows:

"Detentions and arrests shall be conducted only by law or by virtue of express statutory authorization for this purpose" (article 1(a)).

Hence, the statute and regulations must adhere to the requirements of the Basic Law: Human Dignity and Liberty (see article 8 of the Basic Law). The same principle applies to interrogations. Thus, an administrative body, seeking to interrogate an individual- an interrogation being defined as an exercise seeking to elicit truthful answers , as opposed to the mere asking of questions as in the context of an ordinary conversation- must point to the explicit statutory provision which legally empowers it. This is required by the Rule of Law (both formally and substantively). Moreover, this is required by the principle of administrative legality. "If an authority (government body) cannot point to a statute from which it derives its authority to engage in certain acts, that act is *ultra vires (*beyond its competence) and illegal.". (See I. Zamir, *Administrative Authority*  (1996) at 50; See also B. Bracha, *Administrative Law* (Vol. 1, 1987) at 25).

19. Does a statute, authorizing GSS investigators to carry out interrogations (as we defined this term above) exist?  A specific instruction, dealing with GSS agents, in their investigating capacity was not found. "The Service's status, its function and powers are not in fact outlined in any statute addressing this matter" (Commission of Inquiry's Report, *supra*, at 302). This having been said, the GSS constitutes an integral part of the executive branch. The fact that the GSS forms part of the executive branch is not in itself sufficient to invest it with the authority to interrogate. It is true that the government does possess residual or prerogative powers, defined as follows:

> "The Government is authorized to perform in the name of the State and subject to any law, all actions which are not legally incumbent on another
> authority." (Article 40, Basic Law: The Government).

However, we are not to conclude from this provision the authority to investigate, for our purposes. As mentioned, the power to investigate infringes on a person's individual liberty. The government's residual (prerogative) powers authorize it to act whenever there is an "administrative vacuum" (See H.C. 2918/93 *The City of Kiryat Gatt v. The State of Israel and others*, 37 (5) P.D. 832 at 843).

A so called "administrative vacuum" of this nature does not appear in the case at bar, as the relevant field is entirely occupied by the principle of individual freedom. Infringing upon this liberty therefore requires specific directives, as insisted upon by President Shamgar:

> "There are activities which do not fall within the government's powers or scope.   Employing them, absent statutory authorization, runs

contrary to our most basic normative understanding, an understanding which emanates from our system's very [democratic] character. Thus, it is respecting basic rights that forms part of our positive law, whether they have been spelled out in a Basic Law or whether this has yet to be done. Thus, the government is not endowed with the capacity to, for example, shut down a newspaper on the basis of an administrative decision, absent explicit statutory authorization to this effect, irrespective of whether a Basic Law expressly protects freedom of expression; An act of this sort would undoubtedly run contrary to our basic understanding regarding human liberty and the [democratic] nature of our regime, which provides that liberty may only be infringed upon by virtue of explicit statutory authorization...Hence, freedom of expression, a basic right, forms an integral part of our positive law, creates an exception binding the executive (branch) and does not allow it to stray from the prohibition respecting guaranteed human liberty, absent statutory authorization" (In H.C. 5128/94 *Federman v. The Minister of Police*, 48(5) P.D. 647 at 652.).

In a similar vein, Professor Zamir has noted:

"While allowing the government to act, article 40 of the Basic Law: The Government (article 29 to the old Basic Law) simultaneously subjects it to the law. Clearly, this exception precludes the government from acting in a manner contrary to statutory directives. Moreover, it prevents the government from infringing upon individuals' basic rights. This is of course all the more true respecting specific rights protected explicitly by the Basic Laws Human Dignity and Liberty and Freedom of Occupation. Notwithstanding, this is also the case for human rights not specifically enumerated in the Basic Laws. For instance, article 29 (now article 40) does not in any way authorize the government to limit freedom of expression... Indeed, article 29 "(now 40) merely endows the administrative authority with general executive powers that cannot serve to directly infringe upon human rights, unless there is explicit or implicit statutory authorization for doing so" (I. Zamir, *Administrative Authority* (vol. 1, 1996) at 337).

This is the law relevant to the case at bar. An individual's liberty is not to be the object of an interrogation- this is a basic liberty under our constitutional regime. There are to be no infringements on this liberty absent statutory provisions which successfully pass constitutional muster. The government's general administrative powers fail to fulfill these requirements. Indeed, when the Legislator sought to endow the GSS with the power to infringe upon a person's individual liberty, he proceeded to legislate specific provisions accordingly. Thus, for instance, it is stipulated that the head of a security service, under special circumstances, is authorized to allow for the secret monitoring of telephone conversations (See article 5 of the Secret Interception of Communication Statute-1979; Compare article 19(3)(4) of the Protection of Privacy Statute-1981). This requires that the following question be asked: Does there exist a special statutory instruction endowing GSS investigators with interrogating powers?

20. A specific statutory provision authorizing GSS investigators to conduct interrogations does not exist. While it is true that various interrogation directives, some with ministerial approval,   followed the Commission of Inquiry's Report, these do not satisfy the requirement that the authority flow directly from statute or from explicit statutory authorization. The directives set out following the Inquiry Commission's Report merely constitute internal regulations. Addressing these directives, Justice Levin opined:

> "Clearly, these directives are not to be understood as being tantamount to a "statute", as defined in article 8 of the Basic Law: Human Dignity. They are to therefore be struck down if they are found not to conform to it" (H.C. 2581/91 *Salhat v. The State of Israel*, 47(4)  P.D. 837, at 845).

From where then, do the GSS investigators derive their interrogation powers? The answer is found in article 2(1) of the Criminal Procedure Statute [Testimony] which provides (in its 1944 version, as amended):

> "A police officer, of or above the rank of inspector, or any other officer or class of officers generally or specially authorized in writing by the Chief Secretary to the Government, to hold enquiries into the commission of offences, may examine orally any person supposed to be acquainted with the facts and circumstances of any offence in respect whereof such officer or police or other authorized officer as aforesaid is enquiring, and may reduce into writing any statement by a person so examined."

It is by virtue of the above provision that the Minister of Justice particularly authorized the GSS investigators to conduct interrogations regarding the commission of hostile terrorist activities. It has been brought to the Court's attention that in the authorizing decree, the Minister of Justice took care to list the names of those GSS investigators who were authorized to conduct secret interrogations with respect to crimes committed under the Penal Law-1977, the Prevention of Terrorism Statute-1948, the (Emergency) Defence Regulations-1945, The Prevention of  Infiltration Statute (Crimes and Judging)-1954, and crimes which are to be investigated as per the Emergency Defence Regulations (Judea, Samaria and the Gaza strip-Judging in Crimes and Judicial Assistance-1967). It appears to us - and we have heard no arguments to the contrary- that the question of the GSS' authority to conduct interrogations can thus be resolved. By virtue of this authorization, GSS investigators are tantamount to police officers in the eyes of the law. If this solution is appropriate, is there not place for regulating the GSS investigators' powers by statute?  We shall express an opinion on the matter at this time.


The  Means Employed for Interrogation Purposes

21. As we have seen, the GSS investigators are endowed with the authority to conduct interrogations (See par. 20, *supra*). What is the scope of these powers and do they encompass the use of physical means in the course of the interrogation in order to advance it? Can use be made of the physical means presently employed by GSS investigators (such as shaking, the "Shabach" position, and sleep deprivation) by virtue of the investigating powers given the GSS investigators? Let us note that the State did not argue before us that all the means employed by GSS investigators are permissible by virtue of the "law of interrogation" per se. Thus, for instance, the State did not make the argument that shaking is permitted simply because it is an "ordinary" investigator's method in Israel. Notwithstanding, it was argued before this Court that some of the physical means employed by the GSS investigators are permitted by the "law of interrogation" itself. For instance, this is the case with respect to some of the physical means applied in the context of waiting in the "Shabach" position: the placing of the head covering (for preventing communication between the suspects); the playing of powerfully loud music (to prevent the passing of information between suspects); the tying of the suspect's hands to a chair (for the investigators' protection) and the deprivation of sleep, as deriving from the needs of the interrogation. Does the "law of interrogation" sanction the use of physical means, the like used in GSS interrogations?

22. An interrogation, by its very nature, places the suspect in a difficult position. "The criminal's interrogation," wrote Justice Vitkon over twenty years ago, "is not a negotiation process between two open and fair vendors, conducting their business on the basis of maximum mutual trust" (Cr. A 216/74 *Cohen v The State of Israel*) 29(1) P.D. 340 at 352). An interrogation is a "competition of minds", in which the investigator attempts to penetrate the suspect's thoughts and elicit from him the information the investigator seeks to obtain. Quite accurately, it was noted that:

> "Any interrogation, be it the fairest and most reasonable of all, inevitably places the suspect in embarrassing situations, burdens him, intrudes his conscience, penetrates the deepest crevices of his soul, while creating serious emotional pressure". (Y. Kedmi, *On Evidence*, Part A, 1991 at 25).

Indeed, the authority to conduct interrogations, like any administrative power, is designed for a specific purpose, which constitutes its foundation, and must be in conformity with the basic principles of the [democratic] regime. In crystallizing the interrogation rules, two values or interests clash. On the one hand, lies the desire to uncover the truth, thereby fulfilling the public interest in exposing crime and preventing it. On the other hand, is the wish to protect the dignity and liberty of the individual being interrogated. This having been said, these interests and values are not absolute. A democratic, freedom-loving  society does not accept that investigators use any means for the purpose of uncovering the truth. " The interrogation practices of the police in a given regime," noted Justice Landau, "are indicative of a regime's very character" (Cr. A. 264/65 *Artzi v. The Government's Legal Advisor,* 20(1) P.D. 225 at 232). At times, the price of truth is so high that a democratic society is

not prepared to pay it (See Barak, *On Law, Judging and Truth*, 27 <u>Mishpatim</u> (1997) 11 at 13). To the same extent however, a democratic society, desirous of liberty seeks to fight crime and to that end is prepared to accept that an interrogation may infringe upon the human dignity and liberty of a suspect provided it is done for a proper purpose and that the harm does not exceed that which is necessary. Concerning the collision of values, with respect to the use of evidence obtained in a violent police interrogation, Justice H. Cohen opined as follows:

> " On the one hand, it is our duty to ensure that human dignity be protected; that it not be harmed at the hands of those who abuse it, and to do all that we can to restrain police investigators from fulfilling the object of their interrogation through prohibited and criminal means; On the other hand, it is (also) our duty to fight the increasingly growing crime rate which destroys the positive aspects of our country, and to prevent the disruption of public peace to the caprices of violent criminals that were beaten by police investigators" (Cr. A. 183/78 *Abu Midjim v. The State of Israel*, 34(4) P.D. 533 at 546).

Our concern, therefore, lies in the clash of values and the balancing of conflicting values. The balancing process results in the rules for a 'reasonable interrogation' (See Bein, *The Police Investigation- Is There Room for Codification of the 'Laws of the Hunt'*, 12 <u>Iyunei Mishpat</u> (1987) 129). These rules are based, <u>on the one hand</u>, on preserving the "human image" of the suspect (See Cr. A. 115/82 *Mouadi v. The State of Israel* 35 (1) P.D. 197 at 222-4) and on preserving the "purity of arms" used during the interrogation ( Cr. A. 183/78, *supra*, *ibid.*). <u>On the other hand</u>, these rules take into consideration the need to fight the phenomenon of criminality in an effective manner generally, and terrorist attacks specifically. These rules reflect "a degree of reasonableness, straight thinking (right mindedness) and fairness" (Kedmi, *supra*, at 25). The rules pertaining to investigations are important to a democratic state. They reflect its character. An illegal investigation harms the suspect's human dignity. It equally harms society's fabric.

23. It is not necessary for us to engage in an in-depth inquiry into the "law of interrogation" for the purposes of the applications before us. These vary from one matter to the next. For instance, the law of interrogation, as it appears in the context of an investigator's potential criminal liability, as opposed to the purpose of admitting evidence obtained by questionable means. Here, by contrast, we deal with the "law of interrogation" as a power activated by an administrative authority ( See Bein *supra*.). The "law of interrogation" by its very nature, is intrinsically linked to the circumstances of each case. This having been said, a number of general principles are nonetheless worth noting:

<u>First</u>, a reasonable investigation is necessarily one free of torture, free of cruel, inhuman treatment of the subject and free of any degrading handling whatsoever. There is a prohibition on the use of "brutal or inhuman means" in the course of an investigation (F.H. 3081/91 *Kozli v. The State of Israel*, 35(4) P.D. 441 at 446). Human dignity also includes the dignity of the suspect being

interrogated. (Compare H.C. 355/59 *Catlan v. Prison Security Services*, 34(3) P.D. 293 at 298 and C.A.4463/94 *Golan v. Prison Security Services*, 50(4) P.D. 136). This conclusion is in perfect accord with (various) International Law treaties -to which Israel is a signatory -which prohibit the use of torture, "cruel, inhuman treatment" and "degrading treatment" (See M. Evans and R. Morgan, Preventing Torture (1998) at 61; N.S. Rodley, The Treatment of Prisoners under International Law (1987) at 63). These prohibitions are "absolute". There are no exceptions to them and there is no room for balancing. Indeed, violence directed at a suspect's body or spirit does not constitute a reasonable investigation practice. The use of violence during investigations can potentially lead to the investigator being held criminally liable. (See, for example, article 277 of the Penal Law: Pressure on a Public Servant; *supra* at 130, 134; Cr. A. 64/86 *Ashash v. The State of Israel* (unpublished)). Second, a reasonable investigation is likely to cause discomfort; It may result in insufficient sleep; The conditions under which it is conducted risk being unpleasant. Indeed, it is possible to conduct an effective investigation without resorting to violence. Within the confines of the law, it is permitted to resort to various machinations and specific sophisticated activities which serve investigators today (both for Police and GSS); Similar investigations- accepted in the most progressive of societies- can be effective in achieve their goals. In the end result, the legality of an investigation is deduced from the propriety of its purpose and from its methods. Thus, for instance, sleep deprivation for a prolonged period, or sleep deprivation at night when this is not necessary to the investigation time wise may be deemed a use of an investigation method which surpasses the least restrictive means.

From the General to the Particular

24. We shall now turn from the general to the particular. Plainly put, shaking is a prohibited investigation method. It harms the suspect's body. It violates his dignity. It is a violent method which does not form part of a legal investigation. It surpasses that which is necessary. Even the State did not argue that shaking is an "ordinary" investigation method which every investigator (in the GSS or police) is permitted to employ. The submission before us was that the justification for shaking is found in the "necessity" defence. That argument shall be dealt with below. In any event, there is no doubt that shaking is not to be resorted to in cases outside the bounds of "necessity" or as part of an "ordinary" investigation.

25. It was argued before the Court that one of the investigation methods employed consists of the suspect crouching on the tips of his toes for five minute intervals. The State did not deny this practice. This is a prohibited investigation method. It does not serve any purpose inherent to an investigation. It is degrading and infringes upon an individual's human dignity.

26. The "Shabach" method is composed of a number of cumulative components: the cuffing of the suspect, seating him on a low chair, covering his head with an opaque sack (head covering) and playing powerfully loud

music in the area. Are any of the above acts encompassed by the general power to investigate? Our point of departure is that there are actions which are inherent to the investigation power (Compare C.A. 4463/94, *supra.*, *ibid.*). Therefore, we accept that the suspect's cuffing, for the purpose of preserving the investigators' safety, is an action included in the general power to investigate ( Compare H.C. 8124/96 *Mubarak v. The GSS* (unpublished)). Provided the suspect is cuffed for this purpose, it is within the investigator's authority to cuff him. The State's position is that the suspects are indeed cuffed with the intention of ensuring the investigators' safety or to prevent fleeing from legal custody. Even the applicants agree that it is permissible to cuff a suspect in similar circumstances and that cuffing constitutes an integral part of an interrogation. Notwithstanding, the cuffing associated with the "Shabach" position is unlike routine cuffing. The suspect is cuffed with his hands tied behind his back. One hand is placed inside the gap between the chair's seat and back support, while the other is tied behind him, against the chair's back support. This is a distorted and unnatural position. The investigators' safety does not require it. Therefore, there is no relevant justification for handcuffing the suspect's hands with particularly small handcuffs, if this is in fact the practice. The use of these methods is prohibited. As was noted, "Cuffing causing pain is prohibited" (See the *Mubarak* affair *supra.*). Moreover, there are other ways of preventing the suspect from fleeing from legal custody which do not involve causing the suspect pain and suffering.

27. This is the law with respect to the method involving seating the suspect in question in the "Shabach" position. We accept that seating a man is inherent to the investigation. This is not the case when the chair upon which he is seated is a very low one, tilted forward facing the ground, and when he is sitting in this position for long hours. This sort of seating is not encompassed by the general power to interrogate. Even if we suppose that the seating of the suspect on a chair lower than that of his investigator can potentially serve a legitimate investigation objective (for instance, to establish the "rules of the game" in the contest of wills between the parties, or to emphasize the investigator's superiority over the suspect), there is no inherent investigative need for seating the suspect on a chair so low and tilted forward towards the ground, in a manner that causes him real pain and suffering. Clearly, the general power to conduct interrogations does not authorize seating a suspect on a forward tilting chair, in a manner that applies pressure and causes pain to his back, all the more so when his hands are tied behind the chair, in the manner described. All these methods do not fall within the sphere of a "fair" interrogation. They are not reasonable. They impinge upon the suspect's dignity, his bodily integrity and his basic rights in an excessive manner (or beyond what is necessary). They are not to be deemed as included within the general power to conduct interrogations.

28. We accept that there are interrogation related considerations concerned with preventing contact between the suspect under interrogation and other suspects and his investigators, which require means capable of preventing the said contact. The need to prevent contact may, for instance, flow from the need to safeguard the investigators' security, or that of the suspects and

witnesses. It can also be part of the "mind game" which pins the information possessed by the suspect, against that found in the hands of his investigators. For this purpose, the power to interrogate- in principle and according to the circumstances of each particular case- includes preventing eye contact with a given person or place. In the case at bar, this was the explanation provided by the State for covering the suspect's head with an opaque sack, while he is seated in the "Shabach" position. From what was stated in the declarations before us, the suspect's head is covered with an opaque sack throughout his "wait" in the "Shabach" position. It was argued that the sack (head covering) is entirely opaque, causing the suspect to suffocate. The edges of the sack are long, reaching the suspect's shoulders. All these methods are not inherent to an interrogation. They do not confirm the State's position, arguing that they are meant to prevent eye contact between the suspect being interrogated and other suspects. Indeed, even if such contact should be prevented, what is the purpose of causing the suspect to suffocate? Employing this method is not connected to the purpose of preventing the said contact and is consequently forbidden. Moreover, the statements clearly reveal that the suspect's head remains covered for several hours, throughout his wait. For these purposes, less harmful means must be employed, such as letting the suspect wait in a detention cell. Doing so will eliminate any need to cover the suspect's eyes. In the alternative, the suspect's eyes may be covered in a manner that does not cause him physical suffering. For it appears that at present, the suspect's head covering - which covers his entire head, rather than eyes alone,- for a prolonged period of time, with no essential link to the goal of preventing contact between the suspects under investigation, is not part of a fair interrogation. It harms the suspect and his (human) image. It degrades him. It causes him to lose sight of time and place. It suffocates him. All these things are not included in the general authority to investigate. In the cases before us, the State declared that it will make an effort to find an "ventilated" sack. This is not sufficient. The covering of the head in the circumstances described, as distinguished from the covering of the eyes, is outside the scope of authority and is prohibited.

29. Cutting off the suspect from his surroundings can also include preventing him from listening to what is going on around him. We are prepared to assume that the authority to investigate an individual equally encompasses precluding him from hearing other suspects under investigation or voices and sounds that, if heard by the suspect, risk impeding the interrogation's success. Whether the means employed fall within the scope of a fair and reasonable interrogation warrant examination at this time. In the case at bar, the detainee is found in the "Shabach" position while listening to the consecutive playing of powerfully loud music. Do these methods fall within the scope or the general authority to conduct interrogations? Here too, the answer is in the negative. Being exposed to powerfully loud music for a long period of time causes the suspect suffering. Furthermore, the suspect is tied (in place) in an uncomfortable position with his head covered (all the while). The use of the "Shabach" method is prohibited. It does not fall within the scope of the authority to conduct a fair and effective interrogation. Powerfully loud music is a prohibited means for use in the context described before us.

30. To the above, we must add that the "Shabach" position includes all the outlined methods employed simultaneously. Their combination, in and of itself gives rise to particular pain and suffering. This is a harmful method, particularly when it is employed for a prolonged period of time. For these reasons, this method does not form part of the powers of interrogation. It is an unacceptable method. "The duty to safeguard the detainee's dignity includes his right not to be degraded and not to be submitted to sub-human conditions in the course of his detention, of the sort likely to harm his health and potentially his dignity" (In Cr. A. 7223/95 *The State of Israel v. Rotenstein* (not yet published)).

A similar- though not identical- combination of interrogation methods were discussed in the case of *Ireland v. United Kingdom* (1978) 2 EHRR 25. In that case, the Court probed five interrogation methods used by England for the purpose of investigating detainees suspected of terrorist activities in Northern Ireland. The methods were as follows: protracted standing against the wall on the tip of one's toes; covering of the suspect's head throughout the detention (except during the actual interrogation); exposing the suspect to powerfully loud noise for a prolonged period and deprivation of sleep, food and drink. The Court held that these methods did not constitute "torture". However, since they treated the suspect in an "inhuman and degrading" manner, they were nonetheless prohibited.

31. The interrogation of a person is likely to be lengthy, due to the suspect's failure to cooperate or due to the information's complexity or in light of the imperative need to obtain information urgently and immediately (For instance, see The *Mubarak* affair, *supra*; H.C. 5318/95 *Hajazi v. GSS* (unpublished)). Indeed, a person undergoing interrogation cannot sleep as does one who is not being interrogated. The suspect, subject to the investigators' questions for a prolonged period of time, is at times exhausted. This is often the inevitable result of an interrogation, or one of its side effects. This is part of the "discomfort" inherent to an interrogation. This being the case, depriving the suspect of sleep is, in our opinion, included in the general authority of the investigator (Compare: H.C. 3429/94 *Shbana v. GSS* (unpublished)). So noted Justice Shamgar, in a similar instance:

> "The interrogation of crimes and in particular, murder or other serious crimes- cannot be accomplished within the confines of an ordinary public servant's work day...The investigation of crime is essentially mental resistance...For this reason, the interrogation is often carried out at consecutive intervals. This, as noted, causes the investigation to drag on ...and requires diligent insistence on its momentum and consecutiveness." (Cr. A. 485/76 *Ben Loulou v. The State of Israel* (unpublished)).

The above described situation is different from those in which sleep deprivation shifts from being a "side effect" inherent to the interrogation, to an end in itself. If the suspect is intentionally deprived of sleep for a prolonged period of time, for the purpose of tiring him out or "breaking" him- it shall not

fall within the scope of a fair and reasonable investigation. Such means harm the rights and dignity of the suspect in a manner surpassing that which is required.

32. All that was stated regarding the exceptions pertinent to an interrogation, flowing from the requirement that an interrogation be fair and reasonable, is the accepted law with respect to a regular police interrogation. The power to interrogate given to the investigator GSS investigator by law is the same interrogation powers the law bestows upon the ordinary police force investigator. It appears that the restrictions applicable to the police investigations are equally applicable to GSS investigations. There is no statutory instruction endowing a GSS investigator with special interrogating powers that are either different or more serious than those given the police investigator. From this we conclude that a GSS investigator, whose duty is to conduct the interrogation according to the law, is subject to the same restrictions applicable to a police interrogation.

Physical Means and the "Necessity" Defence

33. We have arrived at the conclusion that the GSS personnel who have received permission to conduct interrogations (as per the Criminal Procedure Statute [Testimony]) are authorized to do so. This authority-like that of the police investigator- does not include most of the physical means of interrogation which are the subject of the application before us. Can the authority to employ these interrogation methods be anchored in a legal source beyond the authority to conduct an interrogation? This question was answered by the State's attorneys in the affirmative. As noted, an explicit authorization permitting GSS to employ physical means is not to be found in our law. An authorization of this nature can, in the State's opinion, be obtained in specific cases by virtue of the criminal law defense of "necessity", prescribed in the Penal Law. The language of the statute is as follows: (Article 34 (1)):

> "A person will not bear criminal liability for committing any act immediately necessary for the purpose of saving the life, liberty, body or property, of either himself or his fellow person, from substantial danger of serious harm, imminent from the particular state of things [circumstances], at the requisite timing, and absent alternative means for avoiding the harm."

The State's position is that by virtue of this "defence" to criminal liability, GSS investigators are also authorized to apply physical means, such as shaking, in the appropriate circumstances, in order to prevent serious harm to human life or body, in the absence of other alternatives. The State maintains that an act committed under conditions of "necessity" does not constitute a crime. Instead, it is deemed an act worth committing in such circumstances in order to prevent serious harm to a human life or body. We are therefore speaking of a deed that society has an interest in encouraging, as it is deemed proper in the circumstances. It is choosing the lesser evil. Not only is it legitimately

permitted to engage in the fighting of terrorism, it is our moral duty to employ the necessary means for this purpose. This duty is particularly incumbent on the state authorities- and for our purposes, on the GSS investigators- who carry the burden of safeguarding the public peace. As this is the case, there is no obstacle preventing the investigators' superiors from instructing and guiding them with regard to when the conditions of the "necessity" defence are fulfilled and the proper boundaries in those circumstances. From this flows the legality of the directives with respect to the use of physical means in GSS interrogations. In the course of their argument, the State's attorneys submitted the "ticking time bomb" argument. A given suspect is arrested by the GSS. He holds information respecting the location of a bomb that was set and will imminently explode. There is no way to diffuse the bomb without this information. If the information is obtained, however, the bomb my be diffused. If the bomb is not diffused, scores will be killed and maimed. Is a GSS investigator authorized to employ physical means in order to elicit information regarding the location of the bomb in such instances? The State's attorneys answers in the affirmative. The use of physical means shall not constitute a criminal offence, and their use is sanctioned, to the State's contention, by virtue of the "necessity" defence.

34. We are prepared to assume that- although this matter is open to debate - (See A. Dershowitz, *Is it Necessary to Apply 'Physical Pressure' to Terrorists- And to Lie About It?*, [1989] 23 Israel L. Rev. 193; Bernsmann, *Private Self- Defence and Necessity in German Penal Law and in the Penal Law Proposa- Some Remarks*, [1998] 30 Israel L. Rev. 171, 208-210) - the "necessity" defence is open to all, particularly an investigator, acting in an organizational capacity of the State in interrogations of that nature. Likewise, we are prepared to accept - although this matter is equally contentious- (See M. Kremnitzer, *The Landau Commission Report- Was the Security Service Subordinated to the Law or the Law to the Needs of the Security Service?*, [1989] 23 Israel L. Rev. 216, 244-247) - that the "necessity" exception is likely to arise in instances of "ticking time bombs", and that the immediate need ("necessary in an immediate manner" for the preservation of human life) refers to the imminent nature of the act rather than that of the danger. Hence, the imminence criteria is satisfied even if the bomb is set to explode in a few days, or perhaps even after a few weeks, provided the danger is certain to materialize and there is no alternative means of preventing its materialization. In other words, there exists a concrete level of imminent danger of the explosion's occurrence (See Kremnitzer and Segev, *The Application of Force in the Course of GSS Interrogations- A Lesser Evil?*, [1998] 4 Mishpat U' Mimshal 667 at 707; See also Feller, *Not Actual "Necessity" but Possible "Justification"; Not "Moderate Pressure", but Either "Unlimited" or "None at All"*, [1989] 23 Israel L. Rev. 201, 207).

Consequently we are prepared to presume, as was held by the Inquiry Commission's Report, that if a GSS investigator- who applied physical interrogation methods for the purpose of saving human life-is criminally indicted, the "necessity" defence is likely to be open to him in the appropriate circumstances (See Cr. A. 532/91 *Anonymous v. The State of Israel* (unpublished)). A long list of arguments, from both the fields of Ethics and

23

Political Science, may be raised for and against the use of the "necessity" defence, (See Kremnitzer and Segev, *supra*, at p.696; M.S. Moor, *Torture and the Balance of Evils*, [1989] 23 Israel L. Rev. 280; L. Shelf, *The Lesser Evil and the Lesser Good- On the Landau Commission's Report, Terrorism and Torture,* [1990] 1 Plilim 185; W.L. & P.E. Twining, *Bentham on Torture,* [1973] 24 Nothern Ireland Legal Quarterly 305; D. Stetman, *The Question of Absolute Morality Regarding the Prohibition on Torture,* [1997] 4 Mishpat U' Mimshal 161 at 175; A. Zuckerman, *Coersion and the Judicial Ascertainment of Truth,* [1989] 23 Israel L. Rev. 357. This matter, however, has already been decided under Israeli law. Israel's Penal Law recognizes the "necessity" defence.

35. Indeed, we are prepared to accept that in the appropriate circumstances, GSS investigators may avail themselves of the "necessity" defence, if criminally indicted. This however, is not the issue before this Court. We are not dealing with the potential criminal liability of a GSS investigator who employed physical interrogation methods in circumstances of "necessity." Moreover, we are not addressing the issue of admissibility or probative value of evidence obtained as a result of a GSS investigator's application of physical means against a suspect. We are dealing with a different question. The question before us is whether it is possible to infer the authority to, in advance, establish permanent directives setting out the physical interrogation means that may be used under conditions of "necessity". Moreover, we are asking whether the "necessity" defence constitutes a basis for the GSS investigator's authority to investigate, in the performance of his duty. According to the State, it is possible to imply from the "necessity" defence, available (*post factum*)  to an investigator indicted of a criminal offence, an advance legal authorization endowing the investigator with the capacity to use physical interrogation methods. Is this position correct?

36. In the Court's opinion, a general authority to establish directives respecting the use of physical means during the course of a GSS interrogation cannot be implied from the "necessity" defence. The "necessity" defence does not constitute a source of authority, allowing GSS investigators to make use physical means during the course of interrogations.   The reasoning underlying our position is anchored in the nature of the "necessity" defence. This defence deals with deciding those cases involving an  individual reacting to a given set of facts; It is an ad hoc endeavour, in reaction to a event. It is the result of an improvisation given the unpredictable character of the events (See Feller, *ibid.* at 209). Thus, the very nature of the defence does not allow it to serve as the source of a general administrative power. The administrative power is based on establishing general, forward looking criteria, as noted by Professor Enker:

"Necessity is an after-the-fact judgment based on a narrow set of considerations in which we are concerned with the immediate consequences, not far-reaching and long-range consequences, on the basis of a clearly established order of priorities of both means and ultimate values...The defence of Necessity does not define a code of primary normative behaviour. Necessity is certainly not a basis for

establishing a broad detailed code of behaviour such as how one should go about conducting intelligence interrogations in security matters, when one may or may not use force, how much force may be used and the like (Enker, "The Use of Physical Force in Interrogations and the Necessity Defense," in Israel and International Human Rights Law: The Issue of Torture 61,62 (1995)).

In a similar vein, Kremnitzer and Segev note:

> "[t]he basic rationale underlying the necessity defence is the absence of the possibility to establish accurate rules of behaviour in advance, appropriate in concrete emergency situations, whose circumstances are varied and unexpected. From this it follows, that the necessity defence is not well suited for regulation a general situation, the circumstances of which are known and (often) repeat themselves. In similar cases, there is no reason for not setting the rules of behaviour in advance, in order that their content be determined in a thought out and well-planned manner, in advance, permitting them to apply in a uniform manner to all" (*supra,* at 705).

Moreover, the "necessity" defence has the effect of allowing one who acts under the circumstances of "necessity" to escape criminal liability. The "necessity" defence does not possess any additional normative value. In addition, it does not authorize the use of physical means for the purposes of allowing investigators to execute their duties in circumstances of necessity. The very fact that a particular act does not constitute a criminal act (due to the "necessity" defence) does not in itself authorize the administration to carry out this deed, and in doing so infringe upon human rights. The Rule of Law (both as a formal and substantive principle) requires that an infringement on a human right be prescribed by statute, authorizing the administration to this effect. The lifting of criminal responsibility does not imply authorization to infringe upon a human right. It shall be noted that the Commission of Inquiry did not hold that the "necessity" defence is the source of authority for employing physical means by GSS investigators during the course of their interrogations. All that the Commission of Inquiry determined is that if an investigator finds himself in a situation of "necessity", constraining him to choose the "lesser evil" - harming the suspect for the purpose of saving human lives - the "necessity" defence shall be available to him. Indeed, the Commission of Inquiry noted that, "the law itself must ensure a proper framework governing the [security] service's actions with respect to the interrogation of hostile terrorist activities and the related problems particular to it" (*ibid.* at 328).

37. In other words, general directives governing the use of physical means during interrogations must be rooted in an authorization prescribed by law and not from defences to criminal liability. The principle of "necessity" cannot serve as a basis of authority (See Kremnitzer, *ibid.* at 236). If the State wishes to enable GSS investigators to utilize physical means in interrogations, they must seek the enactment of legislation for this purpose. This authorization

would also free the investigator applying the physical means from criminal liability. This release would flow not from the "necessity" defence but from the "justification" defense which states:

> "A person shall not bear criminal liability for an act committed in one of the following cases:
> (1) He was obliged or authorized by law to commit it. "
>
> (Article 34(13) of the Penal Law)

The defence to criminal liability by virtue of the "justification" is rooted in a area outside of the criminal law. This "external" law serves as a defence to criminal liability. This defence does not rest upon the "necessity", which is "internal" to the Penal Law itself. Thus, for instance, where the question of when an officer is authorized to apply deadly force in the course of detention arises, the authority is found in a provision of the Law of Detention, external to the Penal Law. If a man is killed as a result of the application of force, the provision is likely to give rise to a defence, by virtue of the "Justification" (See Cr. A. 486/88, *Ankonina v. The Chief Army Prosecutor* 34(2) P.D. 353). The "necessity" defence cannot constitute the basis for the determination of rules respecting the needs of an interrogation. It cannot constitute a source of authority on which the individual investigator can rely on for the purpose of applying physical means in an investigation that he is conducting. The power to enact rules and to act according to them requires legislative authorization, by legislation whose object is the power to conduct interrogations. Within the boundaries of this legislation, the Legislator, if he so desires, may express his views on the social, ethical and political problems, connected to authorizing the use of physical means in an interrogation. These considerations did not, from the nature of things, arise before the Legislature at the time when the "necessity" defence was enacted (See Kremnitzer, *supra*, at 239-40).  The "necessity" defence is not the appropriate place for laying out these considerations (See Enker, *supra*, at 72). Endowing GSS investigators with the authority to apply physical force during the interrogation of suspects suspected of involvement in hostile terrorist activities, thereby harming the latters' dignity and liberty, raise basic questions of law and society, of ethics and policy, and of the Rule of Law and security. These questions and the corresponding answers must be determined by the Legislative branch. This is required by the principle of the Separation of Powers and the Rule of Law, under our very understanding of democracy (See H.C. 3267/97 *Rubinstein v. Minister of Defence* (has yet to be published)).

38. Our conclusion is therefore the following: According to the existing state of the law, neither the government nor the heads of security services possess the authority to establish directives and bestow authorization regarding the use of liberty infringing  physical means during the interrogation of suspects suspected of hostile terrorist activities, beyond the general directives which can be inferred from the very concept of an interrogation. Similarly, the individual GSS investigator-like any police officer- does not possess the authority to employ physical means which infringe upon a suspect's liberty during the interrogation, unless these means are inherently accessory to the very essence of an interrogation and are both fair and reasonable.

An investigator who insists on employing these methods, or does so routinely, is exceeding his authority. His responsibility shall be fixed according to law. His potential criminal liability shall be examined in the context of the "necessity" defence, and according to our assumptions (See paragraph 35 *supra*.), the investigator may find refuge under the "necessity" defence's wings (so to speak), provided this defence's conditions are met by the circumstances of the case. Just as the existence of the "necessity" defence does not bestow authority, so too the lack of authority does not negate the applicability of the necessity defense or that of other defences from criminal liability. The Attorney General can instruct himself regarding the circumstances in which investigators shall not stand trial, if they claim to have acted from a feeling of "necessity". Clearly, a legal statutory provision is necessary for the purpose of authorizing the government to instruct in the use of physical means during the course of an interrogation, beyond what is permitted by the ordinary "law of investigation", and in order to provide the individual GSS investigator with the authority to employ these methods. The "necessity" defence cannot serve as a basis for this authority.

A Final Word

39. This decision opens with a description of the difficult reality in which Israel finds herself security wise. We shall conclude this judgment by re-addressing that harsh reality. We are aware that this decision does not ease dealing with that reality. This is the destiny of democracy, as not all means are acceptable to it, and not all practices employed by its enemies are open before it. Although a democracy must often fight with one hand tied behind its back, it nonetheless has the upper hand. Preserving the Rule of Law and recognition of an individual's liberty constitutes an important component in its understanding of security. At the end of the day, they strengthen its spirit and its strength and allow it to overcome its difficulties. This having been said, there are those who argue that Israel's security problems are too numerous, thereby requiring the authorization to use physical means.    If it will nonetheless be decided that it is appropriate for Israel, in light of its security difficulties to sanction physical means in interrogations (and the scope of these means which deviate from the ordinary investigation rules), this is an issue that must be decided by the legislative branch which represents the people. We do not take any stand on this matter at this time. It is there that various considerations must be weighed. The pointed debate must occur there. It is there that the required legislation may be passed, provided, of course, that a law infringing upon a suspect's liberty "befitting the values of the State of Israel," is enacted for a proper purpose, and to an extent no greater than is required. (Article 8 to the Basic Law: Human Dignity and Liberty).

40. Deciding these applications weighed heavy on this Court. True, from the legal perspective, the road before us is smooth. We are, however, part of Israeli society. Its problems are known to us and we live its history. We are not isolated in an ivory tower. We live the life of this country. We are aware of

the harsh reality of terrorism in which we are, at times, immersed. Our apprehension is that this decision will hamper the ability to properly deal with terrorists and terrorism, disturbs us. We are, however, judges. Our bretheren require us to act according to the law. This is equally the standard that we set for ourselves. When we sit to judge, we are being judged. Therefore, we must act according to our purest conscience when we decide the law. The words of the Deputy President of the Supreme Court, Justice Landau, speak well to our purposes:

> "We possess proper sources upon which to construct our judgments and have no need, and while judging, are forbidden from, involving our personal views as citizens of this country in our decisions. Still, great is the fear that the Court shall be perceived as though it had abandoned its proper place and descended to the midst of public debate, and that its decision making will be obstructed by one side of the population's uproar and by the other side's absolute and emotional rejection. In that sense, I see myself here as someone whose duty is to decide according to the law in all cases legally brought before the Court. I am strictly bound by this duty. As I am well aware in advance that the public at large will not pay attention to the legal reasoning, but to the end result alone. And that the Court's proper status, as an institution above partisan debates, risks being harmed. What can we do, as this is our function and role as judges." (H.C. 390/79 *Dawikat v. The State of Israel*, 34(1) P.D. 1 at 4).

The Commission of Inquiry pointed to the "difficult dilemma between the imperative need to safeguard the State of Israel's very existence and the lives of its citizens, and preserving its character- that of a country subject to the Rule of Law and holding basic moral values" (*supra*, p.326). The Commission rejected an approach suggesting that the actions of security services in the context of fighting terrorism, shall take place in the recesses of the law. The Commission equally rejected the "ways of the hypocrites, who remind us of their adherence to the Rule of Law, while ignoring (being willfully blind) to what is being done in practice" (*ibid.* at 327). The Commission elected to follow a third route, "the way of Truth and the Rule of Law" (*Ibid.*, at p.328). In so doing, the Commission of Inquiry outlined the dilemma faced by Israel in a manner both transparent and open to inspection by Israeli society.

Consequently, it is decided that the order *nisi* be made absolute, as we declare that the GSS does not have the authority to "shake" a man, hold him in the "Shabach" position (which includes the combination of various methods, as mentioned in paragraph 30), force him into a "frog crouch" position and deprive him of sleep in a manner other than that which is inherently required by the interrogation. Likewise, we declare that the "necessity" defence, found in the Penal Law, cannot serve as a basis of authority for the use of these interrogation practices, or for the existence of directives pertaining to GSS investigators, allowing them to employ interrogation practices of this kind. Our decision does not negate the possibility that the "necessity" defence be available to GSS investigators, be

within the discretion of the Attorney General, if he decides to prosecute, or if criminal charges are brought against them, as per the Court's discretion.

**Deputy President** S. Levin:
I agree.

**Justice** T. Or
I agree.

**Justice** E. Mazza
I agree.

**Justice** M. Cheshin
I agree.

**Justice** I. Zamir
I agree.

**Justice** T. Strasberg-Cohen
I agree.

**Justice** D. Dorner
I agree.

**Justice J' Kedmi**

I accept the result conclusion which has been reached by my fellow, the President, by which the use of exceptional interrogation methods, according to the directives of the Ministerial Committee - that relies on a collection of legal provisions suggested by the attorneys for the State - "has no authority, and is therefore, illegal". Similarly, I am of the opinion that the time has arrived for this issue to be regulated by primary and explicit legislation, that is clear and non-partial.

Notwithstanding, it is difficult for me to accept a state of things in which, due to the absence of explicit legislation as noted (above), the State should be helpless from a legal perspective, in those rare emergencies that merit being defined as, "ticking time bombs"; and that the State would not be authorized to order the use of exceptional interrogation methods in those circumstances. As far as I am concerned, such an authority exists in those circumstances, deriving from the basic obligation of being a State- like all countries of the world- to defend (protect) its existence, its well-being, and to safeguard (the lives of) its citizens. It is clear that in those circumstances, the State - as well as its agents - will have the natural right of "self-defence", in the larger meaning of the term, since terrorist organizations, that seek the soul and the souls of its inhabitants, and carry out shocking terrorist attacks to advance their cause (objectives).

On this background, and deriving from the intention will to prevent a situation where the "time bomb will tick" before our eyes and the State's hand will be shortened to help, I suggest that the judgment be suspended from coming into force for a period of one year. During that year, the GSS could employ exceptional interrogative methods in those rare cases of "ticking time bombs", on the condition that explicit authorization is given by the Attorney General .

The suspension under these conditions, does not infringe the ruling of the judgment, that the use of exceptional interrogation methods - that relies on directives of the Ministerial Committee  as noted above - is illegal. This is because according to the suggested conditions, the suspension of the judgment does not constitute an authorization to continue acting according to those directives; and the authorization of the Attorney General does not legalize the performance of an illegal action according to the judgment, but rather deals with the non-indictment (of a violator) for the employment of exceptional interrogation methods in those emergency circumstances defined as, "ticking bombs".

During the suspension period, the Knesset will be given an opportunity to consider the issue (speak its words) concerning the views of exceptional interrogation methods in security investigations, both in general and in times of emergency. The GSS will be given the opportunity to cope with emergency situations until the Knesset considers the issue. Meanwhile, the GSS will also have an opportunity to adapt itself, after a long period in which the directives of the Ministerial Committee have governed, to the new state of things, which expresses the development that has occurred in Israel concerning the status and weight of human rights.

I, therefore, join in the judgment of the President subject to my proposal regarding the suspension of the judgment from coming into force for a period of one year, as explained above.

Opinion                          Decided    According    the    President's

Given today, the 6th of September, 1999.

17

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:02CV00442 (Judge Kessler) |
| JOHN ASHCROFT, in his official capacity as Attorney General of the United States, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF ANWAR MOHAMED

    1.  My name is Anwar Mohamed.  I live at 6116 Peregrine Ave., Orlando, Florida, 32819.

    2.  I have been a citizen of the United States since 1994.  I am now 30 years old.  I am the proprietor of a small gift shop, A.N.G. gifts, located in a hotel lobby in Orlando.  I have owned this business since May, 1999.  I am married and have one child by a former marriage.  I have two brothers in Miami, one brother in Orlando and two in New Orleans.  My father, who is deceased, was also a United States citizen and owned a clothing store in Belleglade, Florida. After selling his business in 1978, my father retired and returned to Palestine, his homeland.  He died in 1990.  My mother died in 1994 in Palestine.  My family was from Silwad, a large town in the West Bank area of Palestine.  I did not graduate from high school. I dropped out in the twelfth grade at Miami Beach High, having stopped school in 1989 because of a need to begin work.

**1:02CV00442(GK)**

EXHIBIT
17

3. My father, for whom I held great respect, advised me not to join organizations or associate myself with groups with political agendas, particularly those in Palestine. I took his advice seriously and have never been a member of any group that associates itself with the politics of the Middle East, including Hamas or any other terrorist organization.

4. Over the years before 1998, I traveled to Palestine on a number of occasions to visit with my cousins, aunts and uncles in Silwad, and I never had a problem with the Israeli occupation forces or anyone else. To my knowledge, no one with my extended family in Palestine is associated with anything radical, terrorist or any organization associated with such things, including Hamas.

5. I traveled to Palestine with my ex-wife in 1996 with our 6-year-old son for a visit and vacation without incident and without worry.

6. My wife and I divorced in 1998. Shortly after our divorce, I traveled to Palestine to visit my family and recuperate from a particularly emotionally difficult period in my life as a result of our divorce. I was traveling on my U.S. passport. I stayed in Silwad for more than a week, visiting with various relatives. To my knowledge and observation, none of the family members I stayed with appeared to have any involvement with radicalism or any radical groups.

7. I intended to visit my sister, Kadija, in Amman, Jordan. On October 28, I went to the King Hussein border crossing between Palestine and Jordan. I understood this border crossing was used by people with American and European passports to cross into Jordan, and that there was not nearly as much of a delay as at nearby crossings used by Palestinians. Since I was an American citizen and traveling on a U.S. passport, I went to cross there.

2

8. At the border crossing, I paid my taxes to the Israeli officials who operated the crossing and then stood in line to present my passport and proceed. I presented my passport and, after a few minutes, was told to "wait." I waited for perhaps two hours. Then two police asked me to get up and escorted me into a room. They searched me, my luggage and every piece of paper. The police had a discussion with one another in Hebrew which I did not (and do not) understand. I was left alone in this room and, after four hours waiting (on top of the two I had already waited) I demanded to know what was going on. I was hungry.

9. A woman police officer (named Smith) entered the room. She told me I was under arrest. I thought she was joking. I asked her what the charge was. She replied that I was a member of a terrorist organization. I asked her, "What organization? What are you talking about?" She gave no answer. I asked, "What is the name of this organization." There were others in the room and they spoke in Hebrew to each other. They had guns that were trained directly on me. I said, "I'm a U.S. citizen. I demand to make a phone call." She said "no." I asked to be able to call the American consulate and she refused. I asked at least to be able to call my family. She refused.

10. After a short while, one of the police officers brought in some papers that were in Hebrew that I was unable to read. The police officer said "sign here." I asked, "What are the papers?" The reply was to the effect that the papers just confirmed that I was under arrest. I replied that I would not sign anything that I couldn't read. I was told many weeks later by an Israeli lawyer that if I had signed these papers I would have gone to prison for three years.

3

11.  I was left alone for a while until, shortly thereafter, I was taken out of the room while my luggage was put through the security device again.  By this time, I was very afraid and had no idea what was happening to me.  I remember that there was a group of Italian tourists passing through the crossing and I said to them, "I am Mohammed.  Please remember my name."  I was taken back to the room I'd been in.

12.  Shortly after I was taken back, a group of police suddenly burst into the room and placed shackles on my hands and feet.  They ordered me to come with them and told me I would have to carry my luggage which was very difficult given that I was handcuffed and shackled.  They took me to a jeep of some sort, put me in the back seat, with a gun trained on me.  We drove for about half an hour.

13.  We arrived at a jail somewhere in Jericho. I was taken in and locked in a cell, with my shackles and handcuffs removed.  Throughout the trip and in the jail, I kept demanding to be able to call the U.S. consulate or my family.  They police who were with me only laughed.

14.  After about two hours in the jail in Jericho, members of the Israeli army arrived and shackled me again.  They loaded me into a small car and blindfolded me.  We drove at a very high speed (I could tell from the motion of the car and the noise of the tires).  They were playing loud rock 'n roll music on the car stereo.  One or two of the three seemed to speak a little English, but for the most part they would not converse with me.  I kept telling them that I was an American citizen and kept demanding to be able to call the embassy.

15.  The car stopped.  I asked, "Where are we."  The answer was "Jerusalem."  In my mind, I kept the thought that this was just some kind of a mistake and that it would get cleared up as soon as I could contact an American consul.

4

16. They took me into another police station. They began videotaping me and I objected to it vigorously. At some point, one of the policemen in the station said to me in Arabic, that it was not a police problem. "It's in the hands of Shin Bet." Shin Bet is the Israeli intelligence service. He said, "You just have to do what you're told." He told me that I was in the Moskabiya Prison, the "Russian Compound." I don't know what the connection was between this place and Russia, but it has the reputation of being a notorious location for torture, so I became very worried at this point. I was in some sort of holding room.

17. Another guard arrived, a so-called "shoter" (inside guard). He told me to take off my clothes. I did so, down to my underpants. Then he told me to take off my underwear. I told him that he would have to kill me. He said "Okay, put your clothes back on." He shackled me and put a "hood" on me. It was an army-green color. He grabbed me by the hood and pulled me out of the room. I have to say that it is very humiliating to be shackled and pulled by the hood that is being used to blind you.

18. The "shoter" pulled me by the hood through doors and down hallways. Then he removed the hood and we walked along. I saw other prisoners in an area that I later learned was for people who had committed non-political crimes such as drug dealing, theft and that sort of thing.

19. The shoter, and another who was now with him, took me to a doctor. The doctor asked if I had any medical problems. I said yes, that I had chronic ear pain after an accident at a job that caused nerve damage on one side of my head. I explained that unless I slept on a special pillow that I had, the pain (which was always present) would become excruciating. The doctor and the shoters laughed. One of them said, I forget which one, "Where do you think you are, the

5

Sheraton?" The doctor signed some papers and the guards took me to a big, heavy door. The door opened and they put the hood back on me. They pulled me along by the hood.

20. They led me to a chair inside a room and told me to sit down. They took the shackles off and took one of my hands and put it through the slats in the back rest of the chair. They then forced my other hand over the back of the chair and then handcuffed the two hands together, with the cuffs on very tight. I knew right away from the feeling that the cuffs were restricting my circulation. They then shackled my feet and handcuffs together by a length of shackle and then anchored them to a hook in the floor. In this position, no movement whatever was possible. It was as though my body was a statue in this position. They then put another sack over my head, except this one had a very bad smell to it, like urine or vomit. It was very hard to breathe.

21. Judging from when I later learned what date it was, I believe that I remained in this chair, in this position, for almost three days, with no food or water and with one trip to the bathroom to relieve myself. I learned later that this treatment was called "shabeh." As anyone might imagine, remaining in this position for minutes at a time is painful. To stay in this position for hours or even days is excruciatingly painful.

22. On the first day, when I had been in this position for some time - hours I think - the door opened and someone came in and removed the sack. There was a desk in front of me and he sat at it, on the other side from me. There was a computer on the desk. He said "my name is Shawke." I later learned, from a sketch made of him from my description, that he is a man named Cohen who has supposedly worked at this jail for twenty years or so.

23. I asked the man what I was doing here. He replied, "No, you are going to tell us what you're doing here" and asked if I had ever heard of the emergency law. I said yes, I had read

6

about it.  I told him that I had done nothing to be there, and repeated my request to speak to

someone from the U.S. embassy.  He had my passport in his hand.  He said, "Let me tell you

something.  We are America.  So this passport means nothing to us.  We will do whatever we

want. You are going to die in here."  I was terrified.  I said, "What do you want from me?"  He

said, that he thought maybe somebody was using me; that maybe I had done something.  Then, to

my absolute shock, he said, "Tell me about this fund-raising you did in your restaurant."

      24.  The reason I was so shocked was this.  My brother had a restaurant in Miami called

"Lums."  I worked for my brother as the restaurant manager.  It had two sections, one large and

one smaller.  Sometime in 1996 or 1997, representatives of a group of African-American

Muslims came to Lums and told me that they wanted to rent the whole restaurant to have a

benefit to raise funds to build a mosque.  I told them that we would let them use the bigger of our

two sections, but not the whole restaurant.  We agreed that we would serve a certain set lunch to

their guests and charge $10 each and that they could keep whatever else they charged.  I

remember that when the event took place, there was a black woman state legislator who came

and spoke.  The group called itself "Walieldeen Muhammed."  There was nothing about this

event that suggested these people were in any way connected to any terrorist or radical group.

They held their fundraiser at our restaurant and that was the last I saw of them, and the last I

heard of them until this Israeli investigator confronted me about it.  I was just shocked that he

knew about it and that it was something that the Israelis thought was in some way criminal.

      25.  To compound my shock, the next thing this man asked me was about my charitable

contributions to Islamic charities.  He obviously knew that I had made some donations.  I asked

him if he meant the Holy Land Foundation and he demanded to know about the Holy Land

Foundation and what the charity was all about. I told him that since 1996 or 1997, I had been giving $25/month to sponsor an orphan from Silwad, where my family came from. I had received something in the mail from the Holy Land Foundation asking if I would sponsor an orphan and I felt it was my religious obligation as a Muslim to do so. It is part of the faith of Islam that we must give to charity to help the unfortunate and it is particularly important in our religion to support orphans. I was given the opportunity to select a particular orphan to sponsor, and I remember that this one appealed to me because he was from Silwad and he had some sort of physical disability as I recall. Since I began sponsoring this child, he has written to me and sent me photographs, about twice per year, faithfully. I have no reason to believe that the $25/month which is deducted automatically from my checking account is going to anything other than the support of this child, whom I believe is now about 15 or 16. Since the Holy Land Foundation has been shut down, I believe this child must be in a very bad way and I am very concerned that this boy who has been writing to me for so long and sending me his pictures no longer has the little bit of support I've been sending him.

26. My interrogator pestered me about Holy Land Foundation. He wanted to know how Holy Land contacted me and I told him that, like any charity, they wrote to me and I replied. He asked if I knew the president of the Holy Land Fund. I said that I did not (which was true). I asked Showqi if he thought I was hiding something or was in a terrorist organization. He said, "No, not really, but maybe somebody used you." We were speaking to each other in English and he had no accent. He kept saying, "Talk. Tell us the story. Are you gonna talk?" I kept saying, "What story? What do you want me to talk about?" He said, "You know." I told him that my life was an open book and that I had no idea what he wanted. He finally said that if I wasn't

going to talk that day, he would bring someone the next day who would tell him everything about me. He got up. I asked him to please let me out of the chair or at least untighten the handcuffs. He just walked out of the room. Someone put the sack back on my head.

27.   After "Showqi" left and the sack was back on my head, someone turned the air conditioner in the room on full blast. There were two vents. One to my side and one above me. The air conditioning chilled me to the bone. I cannot describe how cold I got. The closest I can say is that it was like being in the snow without clothes. I spent the three days just like that. In the chair with the air conditioner blasting. Once they took me to the bathroom. When I got to the bathroom, it was a hole in the floor in a small room, but there was a mattress in the room. I threw myself on the mattress because I was exhausted. Immediately the guard barged in, dragged me up and dragged me back to the room I'd been in, and shackled me back into the same position which was excruciating for me.

28.   By the end of the third day, I had no feeling whatever in my hands. I shouted from the bottom of my being to beg them to loosen my cuffs. I felt that my hands were not there, that I was losing them. "I'm losing my hands!" I shouted over and over. A man came in and finally unshackled me. I saw my hands for the first time in almost three days. They were like balloons. They had no feeling whatever. I couldn't recognize them as my hands. Shortly thereafter, they brought in a plastic bag and gave me the first food I'd had since I got there. I remember it very well. It was a tomato, a hard-cooked egg and four slices of rye bread. They gave me nothing to drink. They left me in the interrogation room, unshackled, but with the air conditioner blasting. I shivered and shook.

29.  On what I believe must have been the fourth day, another interrogator came in.  He said, "What's your name?  What are you doing here."  I gave him the same answers I'd been giving all along: I had no idea what I was doing there.  He said, "Okay, we're going to let you rest now."  They took me to a cell.  There was another guy there.  I've forgotten what he told me his name was.  He had long hair and beard and was wearing something like a jalaba.  He started quizzing me in Arabic.  He said, "I've been here for three months.  They took me out of my house.  We have to kill all the Jews."  I said, "no, you can't do that, you can't kill everybody."  He kept at it, and I said "Okay, everybody is entitled to his own opinion."  After about four hours, the jailers came and took him away.  I stayed for one more day in that cell.

30.  After that day, they took me outside and took me to another room and brought me before a woman judge.  That is when I learned what the date was and how long I'd been in this jail.  I told the judge my story.  She spoke through a translator, and I didn't understand a lot of what he was saying, but I understood that she had said I would be held for another 15 days.  I said, "Why?  What did I do?  What's the charge?"  She made no reply and they took me away, back to a cell.

31.  Shortly later, they took me out of the cell to another room and there were two people from the American consulate to visit me.  I sat down with them.  One said he was the vice consul and his name was Abdelnoor and he was there with an assistant named Majed.  Abdelnoor said "We were notified today that you are in this place.  A human rights group found your name on a list of some sort."  I explained myself and what had happened.  I have no doubt that the signs of torture were quite obvious, particularly my swollen hands and red wrists.  He said, "There is nothing we can do."  I said, "Just get them to stop the torture."  Again, he said "There is nothing

10

we can do." They gave me a list of lawyers I could call. I asked "What good will this do me? I can't even call my family." They told me if I signed a "privacy waiver" that they could tell people I was in there. I said I would and they gave me one to sign and I signed it. They said they could notify the State Department and that they could visit me twice a month and that there was nothing else to be done. I said, "So my government can't help me even if there are no charges against me?" They replied "yes." The meeting lasted about half an hour. I was then returned to my cell.

    32. About 15 days after my arrest, the guard came into my prison cell and said I was free to go. I couldn't believe my ears. I walked out with him but it turned out it was just a joke. I was just to meet with someone from the Red Cross. I remember the woman's name being something like "Marielourdes." She said that she didn't understand why, if I was an American, I was in this prison. "What is your embassy doing for you?" It was about a half hour visit. I told her my embassy is doing nothing for me.

    33. Over the next days, I received very small portions of food. I was put into a smaller cell by myself. It was about six feet by four feet, with a hole in the corner. There was just enough room to lie down and to stand up. There was a mattress on the floor. The walls were dirty and the overhead light was on 24 hours. It was winter, and there was no heat in the cell, so it was cold. There was nothing in the cell besides me and the mattress, the hole, the overhead light and a vent. I still remember that the vent had 249 holes.

    34. I was taken back to interrogation, this time by "Ahed." He was "nice" to me. I learned later from my description of him and his name that he is the Shin Bet agent in charge of Silwad, my family's town. Again: "What are you doing here?" I said that I really didn't know.

He showed me an aerial view map of Silwad and asked me to point out my family's various houses, which I did. Then he started asking me about others who lived in Silwad. I didn't know them and told him I hadn't lived there for a long time. He said, "I know all of your brothers." I said, "So you know I'm okay.?" He said "Yes, I know you're okay." He said "You look like one of your brothers. I put him in prison during the intifada. How is he?" I said, "He's fine. He's working." He then said, "Well, they'll probably let you out of their own accord." I had no idea what he meant by this.

35. I was taken back to my cell. The next interrogation was by a man who called himself "Uri." Again, he played the "good cop." He had paper and pen. He said, "Tell me the story. Talk." I said, "What story?" He said, "You know." At this point, I had been in isolation, interrupted only by interrogation, for about 19 days. Every day was like a whole year. I lay there and wondered what they could possibly want of me.

36. During the 19 days, a lawyer came. His name is Busam Alarouri, a Palestinian. He says "I've made an appeal for you." He tells me that the Israelis call what I'm going through "fishing." "If you are Palestinian, they take you, torture you, get something or not. If they don't get anything, they fake something against you." He said "this appeal may help." At the point of this conversation, I've been in jail about 12 days.

37. The trip to the appeals hearing was torture itself. They shackled me and forced me to run to the vehicle. Because I was being forced to run, the shackles cut into my ankles and they started to bleed. The truck they put me in had a pipe to sit on in back to which they shackled me. The driver sped, swerved, accelerated and stopped violently so I was thrown around in the back of the truck. I was crashing around but couldn't see to avoid hitting things because they had the

12

hood back on me.  After about an hour, I was taken into Bet Il, the military court.  I saw members of my family for the first time.  They were weeping.  I was terrible-looking.

38.  Before my case was called, another family's case was called.  They simply wanted to be able to see their son; to know that he was alive.  Tears were flowing everywhere.  It was unbelievable. They brought in a prisoner and told him that this was their son; that he was alive, but he had a hood on so the family couldn't see his face.  They took him out.

39.  My case was called.  My lawyer told the judge that from his investigation, the only issue was fund-raising to build a mosque and $25 to an orphan child.  He pointed out that this was not a crime.  No crime had been committed in Israel or Palestine.  The prosecutor told the judge that he had secret evidence against me.  The Judge looked at the file the prosecutor handed to her and said to send me back to prison.  So back I went.  I went the whole day of my appeal without food or water.  I was sent back to isolation.  I felt I was starting to go insane.  I started talking to the walls.  What I ended up focusing my mind on was a recipe for rye bread which was on the plastic bag that one of the portions of food was in when they threw it into my cell.  I read it over and over, backwards and forwards.  I yelled and begged for water.  They finally put in a bucket with water but no cup.  I poured some into the plastic bag and stuck my head into it.

40.  Some days later, my lawyer filed another appeal.  This time my appeal was heard inside the prison itself.  The Judge spoke English and told me that my lawyer could argue my case and that he might free me or he could keep me here for another month.  On the other hand, I could make a bargain with her, she said.  If I agreed to one more week and if Shin Bet found nothing, I'd be freed.  I agreed to the bargain because I knew they would find nothing and it

meant that at least my time was limited. As it turned out, whoever was keeping me there ignored this agreement and kept me there longer.

41. By this time, I'd had no sugar and I was feeling quite sick and feverish. I could barely stand. Luckily, my lawyer had brought some chocolate that I ate on the way out of the courtroom. I think this chocolate saved me, because it gave me a little strength. Back in the cell, I was sick and the guard brought me some cough medicine, which also helped. At this point, I'd been locked up for 23 days. I was able to count the days, even though I had no outside light, because each day one of my meals came in a plastic bag that the guard would throw in through the window in the door. I was able to keep track of the days by keeping track of the number of times a plastic bag was thrown in.

42. I was taken into another room. "Uri" and four others were there. They were talking among themselves. Then they told me: "We have explosives. We have Hamas. Confess! If you don't confess right now, I'm going to sentence you to three months." I asked about the "one week" agreement. Uri then told me, "We are the army. We do what we want." I told him that I couldn't confess to something I hadn't done. I was then surrounded by men shouting at me.

43. Sometime later, I was taken back to the original interrogation room and there were two policemen. They told me that I was going to jail for three months. They had papers with them that have my picture on them. They had the pictures because during my imprisonment, the interrogators or guards would take me out to photograph me periodically. The pictures I saw of me make me look like a wild man. They said, "This is your file. Here is the order." The "order" was written in Hebrew, which I can't read. They told me to sign it, that it was a formality. But on the first page I recognized from a date written in English on the upper left hand corner that it was

14

the same papers that I had refused to sign many days earlier. They were dated in February of the following year (1999), so I was suspicious about them when they first showed them to me right after my arrest and I was suspicious of them on this later occasion. They insisted: "These papers are just something you have to sign. It's part of the process for transferring you." I refused. I said "Go ahead and kill me."

44. On the same day, they put me in a different cell with another prisoner. He told me about a man he called "the prince of the jail" who he said was the only prisoner I was supposed to talk to about why I was there or what my problems were. He was, according to this prisoner, the only one I could trust. The implication was that he was somehow the leader of all the other prisoners. I assumed this meant he was with Hamas. After a few hours, they sent me into a new cell that had six prisoners in it. These prisoners told me that they were going to kill me. "We are Hamas and you are a traitor." So Israel was torturing me, America was ignoring me and Hamas was going to kill me. They tried to extract information from me so that I could prove to them that I was really okay and not an Isreali agent. After awhile, the guards brought in another man who introduced himself as the "prince of the jail." He had on a brown jacked that had printing on it in Israeli, and he explained that the Israelis allowed him to travel from cell to cell because otherwise there would be trouble if they didn't. Supposedly, because this man could call a hunger strike or other uprising, the Israelis had to allow him to move around the jail and talk to other prisoners. This is what he and the other prisoners told me, anyway. At first, I believed him. He grilled me, supposedly trying to figure out why I was there. Later, I learned that these people are called "the birds" and are there to try to get confessions on behalf of the interrogators. I noticed that he was wearing a watch, which I thought was kind of strange, because prisoners

aren't allowed such things, and this was kind of a strange looking watch that had odd-looking knobs on it. He noticed that I was staring at it and he moved his sleeve to cover it up.

45. This "prince of the jail" told me to write my name on a piece of paper and to put down where I'm from so they can check me out. He asked me, are you from Fatah? Hamas? What group?" I told him I'm from no group. He expressed disbelief.

46. At some point during this period, one of the guards led me down a hallway, pulling me by the hood. When you come to steps, the guards would say "steps" so you know they are coming. On this day, he is pulled me along, and I stumbled along and he gave me no warning when we came to the steps, so I tumbled down a couple of steps and almost broke my leg and elbow. My leg was okay, but my elbow was cut deeply. The guard cursed me and took me into another area where I sat in my hood, bleeding. While there, I was placed directly in front of a loudspeaker that is blasting music into my face at an incredible volume. The song, played over and over and over for hours, is Paul Simon singing "You Could Be My Body Guard." While this was being played, I was shackled to a pipe with my hands behind me, the air conditioner on full blast and I sat there and shook.

47. Shortly thereafter, I had another "lawyer visit." Afterwards, I was put back in the chair shackled into the torture position. Uri is there. He tells me, "Now we've got you!" I asked him what he meant. At this point, he pulled out a green pepper from a plastic bag. He opens the pepper and pulled out the paper on which I'd written my name and address. He said "With this paper, I can give you life." I said, "You are disgusting. All of you are a bunch of cowards and you can only do what God wants you to do with me." As I was sitting there, I told them that my hands were really hurting. "Please untie my hands." One of the men with Uri came over and

started pushing on my elbow where it had been injured, which was very painful. I told him that he was hurting my elbow, and he replied, "That's good. Now you're gonna talk." They put me back in the chair in the "position." Uri said, "If you aren't going to confess, I'm going to go home to sleep with my wife and come back tomorrow." I had been given no food or water and get none. He left me in the chair. This, I believe, was my lowest point.

47.     I complained about my elbow and they said that they would take me to the doctor. The doctor just sprayed something on my elbow and they took me back to the chair, to the "Shabeh" position. I spent one or two more days in the chair with no food, water or relief. It had been more than seven days after the "bargain" the judge made with me.

48.     On the 26th day, they took me back to the first judge I'd seen and I was really in bad shape. I couldn't stand, was having trouble breathing. This is the judge who gave me "15 days." I said to her, "Please let me out. I'm dying." She looked me right in the eye and gave me 15 more days.

49.     After this sentence, they put me in cells with other Palestinian prisoners, and they would move us around from cell to cell. One of the prisoners I saw was on a hunger strike and looked like a skeleton. Others talked of the terrible things that had happened to them. I met one man named Ibrahim Al Abassy, who had been tortured so badly that it looked like he would lose his leg. It had ballooned up and he couldn't move it. He said they used the "shaking" technique on him which involves violently shaking people by their shoulders while they are shackled. I have heard that people have often died from this treatment. He also described how the interrogators would pull his hands up behind his back and hold them until he lost all feeling in his hands. On other occasions, when Abassy was sitting in the chair, one interrogator would pull

17

his hands behind him while the other would put his foot on Al Abassy's testicles and press down on them.  Once when I went to Bet Il on an appeal, I met Hashem Mufleh in a van I was being held in.  He was 17 or 18 years old.  He said he had been taken from his mother at the Ben Gurian airport, and was put in shabeh for two days and was told that he had to admit he was from Hamas.  He told me that he could not take the torture and told his captors that he would sign anything.  He was an American citizen.  Another prisoner, Amjed El Katib, was only 18 and I saw him lose his mind.  He just made noises like animals.  He would shout and shout until he fainted.  The guards would take him out and bring him back and his shouting would start again after a while.  There were awful things going on in there.

50.  I learned that there had been another appeal filed for me.  They took me to Bet Il again, the appeal was denied and I was sent back to prison. After this point, I was mostly in the cells with other prisoners.  There was no more interrogation except once with Uri.  I told him that I knew I was going to die, but that I thought we would meet on judgment day.  He replied, "Oh, that's your problem, you're religious. You aren't going to talk?"  I told him I had nothing to say.

51.  While in the cells, I heard screaming during the night which I believe came from other people being tortured.  Once, I was placed in a single cell which is was filthy and full of roaches and other insects.  In this cell I thought to myself, "that's it, I'm going to die."

52.  Three or four days before my release, the two men from the American consulate returned.  I told them that they had done nothing for me.  They had not even come to my court appearances.  I certainly got the impression from my experience and conversations with them that they were working with the Israelis against Americans.  I told them that they should just come back in a couple of days and pick up my body.

18

53. On the 39th night in jail, I prayed to god. "I'm ready to meet you. Just take my soul or set me free. Just don't leave me here."

54. On the 40th day, a guard came in and put the sack on my head. He took me outside. There was shouting at me. They took the sack off and I saw my suitcases. The guard said, "They let you out." One of the interrogators was there and he said to me, "Now you're out. Don't cause us any trouble." I demanded my wallet, my money and my passport. They gave them to me. They wrote something on my passport. I asked what they had written. They said it meant that I was Palestinian and could not leave Palestine without a travel document or passport of some sort.

55. I stood outside the jail and was terrified that this was going to be a joke; that they were going to grab me and put me back in. But I found a cab and he took me. I noticed as we drove away that the American consulate was only a few blocks away from the torture place. I found this absolutely amazing and disheartening.

56. I walked into my brother's house in Silwad. The family wept when they saw me. I couldn't walk properly and I couldn't sleep for three days because I lay awake worrying that the Israeli police were going to come for me.

57. I called Majel at the consulate and asked him what this was all about, about having to get permission to leave. I wanted to just leave on the first plane and go home to see my son. He said, "Oh, you'd better comply. You have to get a permit from the Israeli government to leave." I said, "Even if I'm an American citizen with an American passport?" He said "Yes." I couldn't believe my ears. It took me about a month and a half to get the document allowing me to leave.

19

58.  I got back to the United States in late January 1999.  I had arrived in Palestine for a two or three week vacation in October.  I weighed 182 pounds when I arrived and 140 when I left.  I am 5'10" tall.  My hands are now fine, but I still have back pain, depression, and stomach problems.

59.  As a result of giving interviews about my experience and talking to people who Jerri Bird introduced me to, I ended up speaking with Patricia Hickey, who is with the State Department and had the job of looking into situations like the one I was in in Israel.  She told me that the man she had replaced, who was on the job when I was being tortured, had "put your case aside" for reasons she couldn't explain.  I also met with undersecretary of state Maura Harty.  I told her my story and she said, "I promise you that things will change."  I told her, "Please, at least stop the torture."

60.  I often think of the boy I was sending the money to.  I have attached to this declaration some of the letters I've received from him and two of the pictures he sent me.  I feel so bad for him.  He sees death every day.  There are no jobs.  What do these people eat?  What do they drink?  Why can't I send him the money I've promised?  Isn't there a way to do this?

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this _29_ day of _MARCH_, 2002.

_Anwar Mohamed_

Anwar Mohamed

20



# HOLY LAND FOUNDATION
# FOR RELIEF AND DEVELOPMENT

## Exhibit 50



FILED

JUN 2 8 ....

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



EXHIBIT

tabbies

18

**1:02CV00442(GK)**

משטרת ישראל
شرطة اسرائيل

**הודעת חשוד**
إفادة مشتبه

(נא להפיד)

משטרת ישראל

169340 (12.97) 15,000×50×2

97/169340 (12.971 15.000×50×2

מ-3007

משטרת ישראל

הודעה מס' ___ גליון מספר 3 ___ 1
اعلان رقم ___ نسخة رقم ___

הודעתו של ___
اعلان ___

| מס' וזהות רقם الهوية | שם באותיות לטיניות شم بالاحيات للتعبير الاسم في حروف انكليزية | שם משפחה اسم العائلة | שם פרטי الاسم الشخصي |
|---|---|---|---|
| שם קודם رقم الهوية | | | |

| | דת الدين | מין الجنس | אלמן ارمل □ גרוש مطلق □ נשוי متزوج □ רווק اعزب □ מצב משפחתי الحالة الاجتماعية |
|---|---|---|---|

| | טל' בעבודה التلفون مكان العمل | טל' בבית التلفون | מקום לידה مكان الولادة | תאריך לידה تاريخ الولادة |

| | שם ומקום מקום העבודה ع;وان مكان العمل | | מען מגורים العنوان |

| | כתובת הדואר العنوان | | מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب |

החוקר المحقق

| שם משפחה اسم العائلة | שם פרטי الاسم الشخصي | דרגה الرتبة | מס' אישי الرقم الشخصي | | מקום המקום مكان | שעה الساعة | תאריך التاريخ |

1. ____
2. ____
3. ____
4. ____
5. ____
6. ____
7. ____
8. ____
9. ____
10. ____
11. ____
12. ____
13. ____
14. ____
15. ____
16. ____
17. ____
18. ____
19. ____
20. ____
21. ____
22. ____
23. ____
24. ____
25. ____
26. ____
27. ____
28. ____

97/169340 (12.97) 15,000 × 50 × 2
ר.ב.::־
מ־3007

משטרת ישראל

הודעה מס' _____ גליון מספר / 1
اعلان رقم _____ نسخة رقم

הרשָאתו של
اعلان نح

| שם באותיות לטיניות | שם משפחה | שם פרטי האישי | | מס' זהות רקם הוية |
| שם פרטי لاتينية حروف في الاسم | اسم العائلة | الاسم الشخصي | | מس زهوت رقم الهوية |

| דת الدين | מין הجنس | אלمن ארמل | רווק נشור نروש | נשוי נ متزوج | מצב משפחתי | | שם קודם רקם הוية |
| | | رويק معزب מطלق | | | الحالة الاجتماعية | | سم قدم رقم الهوية |

| טל. בעבודה التلفون بمكان العمل | | טל. בבית التلفون | מקום לידה مكان الولادة | | תاريخ לידה تاريخ الولادة |

| | שם ומען מקום העבודה عنوان مكان العمل | | | | מען מגורים العنوان |

| | כתובת ההורים العنوان | שם האب اسم الاب | | מס' טלפון נייד رقم الهاتف اللاسلكي |

---

| מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | החוקר المحقق | | מקום הمكان | שעה الساعة | תاريخ التاريخ |

(رقم)

السؤال (الأسئلة) والأجوبة — handwritten interrogation (questions and answers), largely illegible:

1. ...
2. ...
3. ...
4. ...
5. ...
6. ...
7. ...
8. ...
9. ... 1993- ...
10. ...
11. 1994- ...
12. ...
13. ...
14. ...
15. ...
16. ...
17. ...
18. ...
19. ...
20. ...
21. ...
22. ...
23. ...
24. ...
25. ...
26. ...
27. ...
28. ...

**משטרת ישראל**

הודעה מס' 1 اعلان رقم — גליון מספר 5 نسخة رقم

הודעתו של
اعلان تبع

| מס' זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | | | |
| שם קודם رقم الهوية | מצב משפחתי الحالة الاجتماعية: נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل ☐ | מין الجنس | דת الدين |
| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל. בבית التلفون | טל. בעבודה التلفون بمكان العمل |
| מען מגורים العنوان | שם ומען מקום העבודה عنوان مكان العمل | | |
| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق: מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| | | | | | | |

תשובה: דעתי היתה שלם בית אלמאל יסגר בגלל זה בסגר. אני הכרתי
כי קורבנות גם על הבנק האיסלאמי. אני שלחתי מכתב לבנק אלאיסלאמי.
שאלה: האם סופרי אלפו. באותה זכר עמך קשר לפני הפשיטה בנושא בית אלמאל?
תשובה: הוא לא דיבר עמי לפני על בית אלמאל. אחרי הפשיטה התקשרתי אליו
וסיפרתי לו שהיתה הפשיטה שלוחה מכתבים גם לבנק האיסלאמי וגם לבית אלמאל
ומה קרה. הוא שאל על בית אלמאל ואמר שאשלח מכתב.
שאלה: מה ידוע לך על בית אלמאל עוד לפני הפשיטה?
תשובה: שהם חברה שלוי לוקחת רבית ועוד דברים דרך העיתון.
שאלה: האם סופרי אבל בוטר יצר עמך בהמשך קשר ושאל על פשיטת בית אלמאל?
תשובה: לא. הוא התקשר ושאל באופן כללי על התרומות ואני מסרתי
לו אבל קיבלתי תשובה. זה היה יום לפני שליחת המכתב
שאלה: האם בנוסף לבית אלמאל נשלח מכתב גם למקום אחר, היכן מהמכתב?
תשובה: שלחתי גם לבנק האיסלאמי. אני לא זוכר אם נשלח לאמריקה.
שאלה: מי פנה למשרד בעזה על קרן הסולידריות הקדושה בנושא בית אלמאל ומה היו צריכים
לעשות במשרד בנושא?
תשובה: בקשר למשרד בעזה היה להם תפקיד משלהם אין אחד לא פנה
אליהם בנושא בית אלמאל.
שאלה: מה היכן הכותם ספקים לשם העבודה בנושא בית אלמאל?
תשובה: אני לא הייתי בריביות להביא ספקים לשום מטרה.
שאלה: האם יש למשרד בעזה פקידים וכמה אנשים לעבודה בסוציאלים?
תשובה: עד היום שנעצרתי לא יודע. אם יש להם תורנים שלושה
הם ובאגל פקידים.
שאלה: אם כך מקבל המשרד בעזה לא טיפל ישירות בנושא היתומים
והמשפחות הנזקקות?
תשובה: הם עובדים ומולם. כאת העבודה שלהם בנפרד.
שאלה: מי בקרן הסולידריות החליט דוח לראשונה על בית אלמאל?
תשובה: לא יודע. היתה ישיבה ולא זוכר מי הציע השם.
(בהנהלה) בהנהלה ישנם 4 רולף אותי.

משטרת ישראל ✡

הודעה מס' ___ | נליון מספר 6
اعلان رقم ___ | نسخة رقم

הקריאתם של
اعلان تبع

| שם באותיות לטיניות | שם משפחה | שם פרטי הَ الاسم الشخصي | מס' וזהת רقم الهوية |
| الاسم في حروف انكليزية | اسم العائلة | | |
| | | | שם קודם رقم الهوية |
| מצב משפחתי | נשוי □ רווק □ נרוש □ אלמן □ | מין الجنس | דח الدין |
| الحالة الاجتماعية | متزوج □ اعزب □ مطلق □ ارمل □ | | |
| טל. בעבודה הטלפון بكان العمل | טל. בבית الهاتف | מקום לידה مكان الولادة | תاريخ לידה تاريخ الولادة |
| שם וזמן מקום העבודة عنوان مكان العمل | | | מען מגורים العنوان |
| כתובת ההורים العنوان | | שם האب اسم الأب | מס' טלפון נייد رقم الهاتف الاسلكي |

החוקד المحقق

| מס' אישי | דרגה | שם פרטי | שם משפחה | מקום السكان | שעה الساعة | תاريך التاريخ |
| الرقم الشخصي | الرتبة | الاسم الشخصي | اسم العائلة | | | |

1 שאלה: ...
2 תשובה: ...
3 שאלה: ...
4 תשובה: ...
5 ...
6 ...
7 תשובה: ...
8 שאלה: ...
9 שאלה: ...
10 תשובה: ...
11 ...
12 שאלה: ...
13 תשובה: ...
14 שאלה: ...
15 תשובה: ...
16 שאלה: ...
17 תשובה: ...
18 שאלה: ...
19 תשובה: ...
20 שאלה: ...
21 תשובה: ...
22 שאלה: ...
23 תשובה: ...
24 שאלה: ...
25 תשובה: ...
26 שאלה: ...
27 תשובה: ...
28 שאלה: ...

משטרת ישראל ✡ إسرائيل

| הודעה מס' | | |
|---|---|---|
| اعلان رقم | | |

| שם משפחה اسم العائلة | שם באותיות לטיניות, الأسم في | |
|---|---|---|

| רווק נשוי אלמן גרוש | | |
| أعزب متزوج أرمل مطلق | | |

| טל. בעבודה التلفون بمكان العمل | טל. בבית التلفون | |
|---|---|---|

| שם ומען מקום העבודה عنوان مكان العمل | | |

| כתובת ההודים العنوان | | |

החוקר المحقق

| שם משפחה | שם פרטי | דרגה | מס' אישי | מקום الكان |
|---|---|---|---|---|
| اسم العائلة | الاسم الشخصي | الرتبة | الرقم الشخصي | |

23
24
25
26
27
28



# ISRAEL POLICE
## Suspect Notice

Notice no. 1, page no. 1                                   77573/9806
The notice of:                                            719137

| I.D. no.:<br>029189172 | First name:<br>Mohammed | Last name:<br>Anati | Name in Latin letters: (blank) | |
|---|---|---|---|---|
| Old name:<br>(blank) | Marital status:<br>Married | Sex:<br>Male | Religion:<br>Muslim | |
| Date of birth:<br>09/25/1972 | Place of birth:<br>Israel | Home telephone:<br>5323545 | Work telephone:<br>(blank) | Personal IDF<br>no.: (blank) |
| Address:<br>Shuafat, Jerusalem | | | Name and address of work place:<br>The Holy Land Foundation | |
| Father's name: Atman Abd El Rahaman | | | Parents address: Shuafat, Jerusalem | |

On 06/02/1998 at 6:10 PM in the Minority Department I met with the abovementioned and said to him: I am a police officer 1034396 Second Lieutenant Ronen Avraham, and inform you that you are a suspect (describe the attributed action to the suspect).
- Belonging to and operating as part of an illegal operation, which is against the law.

You do not have to say anything unless you want to. I will write anything you say and it can serve as proof. Refraining from answering questions may reinforce the evidence against you. After I have read the information above to the abovementioned, he confirmed with his signature that he understood the suspicion against him and the content of the warning.

Signature of the suspect            Signature of the notice collector

And then he said: I worked for the Holy Land Foundation until the day of my arrest on 12/10/1997. The Foundation was legitimate and we have not been told that it was illegal.
Question: What was your role at the Holy Land Foundation?
Answer: I was the office manager in Jerusalem. I was in charge of providing the instructions.
Question: For what purpose did you contact the Beit Almal Company and how did you contact them?
Answer: The Holy Land Foundation used to pay money to needy families every month, and later the Foundation thought that it would make sense to take some of the money, approximately $100 a month, and invest it in a program. We, the Foundation, thought about taking an amount of approximately $3000 and give it to families, and this way we would not give them more money. There were about 50 families, meaning a total of $150,000. This money came from the Holy Land Foundation in America. Regarding Beit Almal, I sent them the fax in order to ask them how they could assist us but they did not respond to the letter. This is our only connection to them and nothing more.
Question: Why did you turn to the Beit Almal Company specifically?
Answer: I turned to the Beit Almal Company after our office meeting in Jerusalem in August 1997. The following people were present in the meeting: 1) Myself, Mohammed Anati,

FILED
JUN 2 8 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1        1:02CV00442(GK)

EXHIBIT
19
tabbies

Notice no. 1, page no. 2

*Continues…*

2) Fuaz Hamad, 3) Akram Harubi, 4) Salah Uda and that is it. In the meeting it was decided to turn to the Beit Almal Company from all the following companies: The Islamic Bank in Ramallah and the Beit Almal Company. We turned to Beit Almal because they did not charge interest, and in addition they understand the subject of loans. This way they would receive about $3000 from us for every family, multiplied by 50 families, meaning a total of $150,000. The Beit Almal Company would pay this money, $3000 to each family. We have a problem to pay this way to a family because many people work in this program, and Beit Almal would do the work for us.

Question: Who are the families that you paid this money to?

Answer: We paid the money to any family that sent us a request for assistance. After checking that they needed the money, we paid the family.

Question: How did the families know that they needed to turn to you, the Holy Land Foundation Company?

Answer: First of all, it is not directly to us but through " Aljamit Alkheiri" and "Ligan Alzaka" in the West Bank. The requests came to us from them.

Question: Why this way and not directly to you? What prevented you?

Answer: The reason was that the Foundation did not have clerks to work directly with the families.

Question: Whom did you contact from the Beit Almal Company and why him specifically?

Answer: I did not know anyone from Beit Almal and for this reason I sent the letter on behalf of the company management.

Question: Do you know anyone from the Beit Almal Company?

Answer: I know Mazan Sonokrut from the newspaper.

Question: What do you know about Mazan Sonokrut?

Answer: I know that he is a businessman and that he owns a factory of sweets in Ramallah.

Question: Where are the other offices of the Holy Land Foundation in addition to the office in Jerusalem?

Answer: In Gaza and in America.

Question: Do you know Suliman Agabria?

Answer: Yes, but not personally. I know that he is in an Islamic organization in the North (Nazareth).

Notice no. 1, page no. 3

*Continues…*

I know that he works for the City of Um Elfahem.

Question: Did Suliman Agabria have any connections with the Holy Land Foundation?

Answer: No.

Question: Who is the manager of the Holy Land Foundation office in America and where is the office?

Answer: The office is in Dallas, Texas and the manager is Shukri Abu Bakhar.

Question: Is there any connection between Shukri Abu Bakhar and Dr. Suliman Agabria?

Answer: I do not know.

Question: Who is Munir Abu Haiga?

Answer: He was the manager of the relief office in Nazareth in the North. My connection to him was that we talked about our common work. We paid money to orphans from all over the country.

Question: How did you know who are the orphans that needed help?

Answer: First of all, there is a large group of orphans that received help from the Holy Land Foundation in back in 1993, even before I started working there. The new orphans would arrive through "Jamit Alhiria" from the West Bank.

Question: Who are these orphans?

Answer: Sons of people who died in every way, including the Antifada, Hamas, Fatah, "Meshihi", and also sons of those who cooperate with Israel.

Question: Where did the money that you gave those receiving assistance come from?

Answer: From the Holy Land Foundation in America.

Question: Who asked you to contact Suliman Agabria and what for?

Answer: I met with him twice. Once at the El Aksa Mosque and I told him about the problems between the Holy Land Foundation and the "Irasa" organization, which is the "Jamit Alhiria". They were late in submitting reports of the orphans and the needy families. The second time was around 1996. We met again in El Aksa, talked about life, and we each asked about the other's well being.

Question: How did you meet the first and second time? Did you call each other to set up a meeting?

Answer: We did not call each other. We simply met there.

Notice no. 1, page no. 4

*Continues…*

Question: How many people were in El Aksa when you met Suliman Agabria?
Answer: We met on Fridays and there were thousands of people there.
Question: When did you hear of Suliman Agabria for the first time?
Answer: While I was looking for work at the Holy Land Foundation. I heard that he was one of the managers in the Islamic organization. I heard about it from the employees.
Question: What did Shukri Abu Bakhar tell you about Suliman Agabria?
Answer: Nothing.
Question: Where did you meet Shukri Abu Bakhar and when?
Answer: I saw him for the first time in 1993 at Haj Amin Shawiki's place in Jerusalem. He owns a glass shop. I do not know what he was doing there. I met him and we talked about the Holy Land Foundation. The second time was when I traveled to America in 1994 to participate in a computers course of the company.
Question: Why did you not meet at the office of the Holy Land Foundation in Jerusalem?
Answer: Because the Holy Land Foundation did not have an office there yet. I do not know what the connection is between Shawiki and Shukri Abu Bakhar. My friend Ziad Abu Ramila called me and said that Shukri was looking for a clerk and that he was at Shawiki's shop.
Question: Who was there during the meeting between the two of you?
Answer: Shukri, Ziad Abu Ramila and myself.
Question: What is the role of Ziad Abu Ramila?
Answer: He works for Amin Shawiki with glass.
Question: Who brought up the idea to contact Beit Almal?
Answer: The management of the Holy Land Foundation decided that the Foundation would ask Beit Almal to cooperate with us in the program and then we sent them a letter in the meeting. I do not remember exactly who decided to turn to Beit Almal.
Question: Why did the idea of contacting Beit Almal come up?
Answer: For two reasons: 1) Beit Almal understands the discussed subject. 2) Beit Almal does not charge interest.
Question: What was your idea about contacting Beit Almal?

4

Notice no. 1, page no. 5

*Continues…*

<u>Answer:</u> My idea was that if Beit Almal agrees, then it is fine. I agreed because we also discussed the Islamic Bank. We also sent a letter to the Bank Al Islami.

<u>Question:</u> Did Shukri Abu Bakhar contact you prior to the meeting regarding Beit Almal?

<u>Answer:</u> He did not talk to me about Beit Almal prior to the meeting. After the meeting I called him and told him about the decision that was made to send letters to the Islamic Bank and to Beit Almal, and asked for his opinion. He inquired about Beit Almal and said that I should send them a letter.

<u>Question:</u> What did you know about Beit Almal prior to the meeting?

<u>Answer:</u> That they are a company that does not charge interest and other things from the newspaper.

<u>Question:</u> Did Shukri Abu Bakhar contact you later to ask about the response of Beit Almal?

<u>Answer:</u> No. He called and asked about the plan in general and I told him that I did not receive an answer. This was a month after the letter was sent.

<u>Question:</u> In addition to Beit Almal, was a letter sent to any other place? A copy of the letter?

<u>Answer:</u> I sent a letter to the Islamic Bank as well. I cannot remember if it was sent to America.

<u>Question:</u> Who turned to the Holy Land Foundation office in Gaza regarding Beit Almal and what was the office supposed to do about it?

<u>Answer:</u> The office in Gaza had its own role. No one turned to them regarding Beit Almal.

<u>Question:</u> From where did you bring clerks for the work related to Beit Almal?

<u>Answer:</u> We did not have to bring in clerks for any purpose.

<u>Question:</u> Does the Gaza office have clerks and manpower to work on projects?

<u>Answer:</u> Up to the day when I was arrested, I do not know. If they have some kind of a program, they will bring in clerks.

<u>Question:</u> If so, then why did the Gaza office not handle the subject of orphans and needy families directly?

<u>Answer:</u> It operates opposite of them. This is their separate job.

<u>Question:</u> What Holy Land Foundation member reported about Beit Almal initially?

<u>Answer:</u> I do not know. There was a meeting and I do not remember who mentioned the name. There are four people in the management, including myself.

Notice no. 1, page no. 6

*Continues…*

Question: Who is Mohammed Basam?
Answer: He is a clerk at the Holy Land Foundation in America and is in charge of small offices.
Question: What is the connection between the Islamic Bank in Ramallah and the Holy Land Foundation?
Answer: We sent them the same letter as to Beit Almal and they never responded. We did not turn to them because we did not know anyone from Beit Almal that we could turn to.
Question: If so, then how did you know the fax number of Beit Almal?
Answer: From the newspaper.
Question: To whom did you report about the meeting of the Holy Land Foundation from August 1997, and what did you report?
Answer: I reported to Shukri in America and notified him of our decisions and what was discussed. He told me to send a letter to Beit Almal and see how they will respond.
Question: How was reporting conducted regarding Beit Almal between America, Gaza and Jerusalem?
Answer: First of all, Gaza is not connected to Beit Almal. We reported to America.
Question: Was there any copy of a letter regarding Beit Almal in Gaza?
Answer: No.
Question: When you were in America, did you meet people from Beit Almal?
Answer: No.
Question: Did Suliman Agabria talk to you about Beit Almal?
Answer: No.
Question: When and how many times did you make decisions with regards to Beit Almal?
Answer: Only once in the meeting we made a decision with regards to Beit Almal?
Question: How long has Shukri Abu Bakhar known Suliman Agabria?
Answer: I do not know what the connection is between them.
Question: Could it be that Suliman Agabria asked Shukri Abu Bakhar to choose Beit Almal?
Answer: No, because when I spoke to Shukri about this subject, it was the first time he has heard of Beit Almal?
Question: What was your role in Hamas and when?
Answer: It was from 1990 until 1991 and I participated in 3 activities.
Question: Did Beit Almal transfer funds to Hamas?

Notice no. 1, page no. 7

*Continues…*

<u>Answer:</u> I do not know what the activities of Beit Almal are.

<u>Question:</u> Do you know that the Gaza office of the Holy Land Foundation sent a letter to Beit Almal and what the letter was about?

<u>Answer:</u> The letter was sent to us in Jerusalem with regards to needy families. Shukri Abu Bakhar talked to us and asked us to request the letter from them.

<u>Question:</u> Who is (illegible)?

<u>Answer:</u> He prepares programs in his office in Gaza. He does so for any one who asks.

<u>Question:</u> Did the Holy Land Foundation in the United States ask you to contact Beit Almal with a request?

<u>Answer:</u> No. After I spoke to Shukri Abu Bakhar, he asked to send the letter and see what happens.

<u>Question:</u> Did you ever talk to Shukri Abu Bakhar about Beit Almal in the past?

<u>Answer:</u> Only after the meeting we talked about the work that we want them to do for us with the money. I talked to him and asked him for his opinion on the subject.

<u>Question:</u> Who is the manager of the Holy Land Foundation in Gaza?

<u>Answer:</u> (illegible), six months ago.

<u>Question:</u> Do you have anything else to add?

<u>Answer:</u> Yes. First of all, regarding Beit Almal, we sent them (illegible) and they did not respond yet (illegible).

*(Signatures)*

*This document was translated from Hebrew into English by Certified Languages International, a professional translation company. The translation is a true and concise translation from a copy of a document (purported to be the) original Israel Police Suspect Notice, an interview between the Israel Police department and Mohammed Anati. Signed this 1st day of April, 2002.*

*Notarization:*

*My Commission Expires:*

September 14, 2002





IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:02CV00442 (Judge Kessler) |
| JOHN ASHCROFT, in his official capacity as Attorney General of the United States, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF AMMAR IMREISH**

1. My name is Ammar Imreish.  I am a partner/owner of Ideaz For Art and Technology, a web-site design and graphic design business in California.  My business address is 2111 West Crescent Ave., Suite E, Anaheim, California 92801.  I have been a resident of the United States since 1992.  I am not a citizen, but am a legal, permanent resident of the United States. I have applied for citizenship.

2. I have known about Holy Land Foundation's charitable activities since the Foundation began in 1989.  Over the years since then, I have contributed small amounts to the Foundation in order to fulfill my religious obligation of zakat, which is one of the "five pillars" of the Islamic religion.  I have given to the Foundation because I know the Foundation and its principals well enough to know that its administrative costs are low and that the money I give actually goes to the needy.  As a result of my familiarity with the Foundation's work, I know that the foundation has helped the needy in Palestine, Lebanon, Bosnia, Jordan and other places, including the

1

**1:02CV00442(GK)**

FILED
JUN 2 8 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EXHIBIT
20

United States. I have volunteered and worked for the Foundation in the past. I organized fund-raising activities and distributed flyers and newsletters for the Foundation.

3. I am totally opposed to Hamas, its tactics and its goals. I am opposed to terrorism in any form, by anybody, for any purpose. If I thought that the Foundation supported Hamas, was allowing itself to be used by Hamas, or that its funds were going to support terrorist activities of any sort, I would not give the Foundation a penny.

4. I helped to organize a fund-raising event for the Foundation in September, 1997, at the Sequoia Convention Center in Orange County. I understand from a lawyer for the Foundation that someone has alleged that at that fund-raiser Shukri Abu Baker, the Foundation's director, stated that HLF's funds were to support the formation of an Islamic state, that the goal of Hamas to create such a state could not be thwarted, and that Hamas would throw out Arafat and establish an Islamic state.

5. Shukri Abu Baker did not say anything like this. The meeting was conducted in English, it had many people attending, was open and not secret in any sense. I do not recall any discussion of the formation of an Islamic state and there was nothing said that could be characterized as advocating HLF support for Hamas.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 3 day of April, 2002.

Ammar Imreish

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April, 2002, copies of the foregoing were served by Federal Express upon:

John Ashcroft, Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Room B-103
Washington, DC 20530-0001

Colin L. Powell
Secretary of State
US Department of State
2201 C Street N.W.
Washington, DC 20520

The United States Department
    of Justice
Attn: The Office of Attorney
General
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

The United States Department of
State
Attn: The Office of Legal
Advisor
2201 C Street NW
Washington, D.C. 20520

Paul H. O'Neill
Secretary of the Treasury
US Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C. 20220

Roscoe C. Howard, Jr.
United States Attorney
US Attorney's Office, District
of Columbia
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C. 20530

The United States Department of
Treasury
Attn: The Office of General
Counsel
1500 Pennsylvania Avenue NW
Washington, D.C. 20220

_____
John D. Cline