UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                )
HOLY LAND FOUNDATION FOR        )
    RELIEF AND DEVELOPMENT      )
                                )
         Plaintiff,             )
                                )
         v.                     )    Civil Action No. 02-442 (GK)
                                )
JOHN ASHCROFT, in his           )
    official capacity as        )
    Attorney General of the     )
    United States, et al.       )
                                )
         Defendants.            )
                                )
```

**FILED**

AUG 0 8 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

<u>MEMORANDUM OPINION</u>

Plaintiff, Holy Land Foundation for Relief and Development ("HLF"), the largest Muslim charitable foundation in the country, brings this action challenging its designation as a terrorist organization and the resulting blocking of its assets as arbitrary, capricious and unconstitutional.

On December 4, 2001, the Office of Foreign Asset Control ("OFAC") of the United States Department of Treasury designated HLF as a specially designated terrorist ("SDT"), as a specially designated global terrorist ("SDGT"), and blocked all of its assets pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 <u>et seq</u>. ("IEEPA"), and Executive Orders 13224 and 12947.

Defendants are John Ashcroft, Attorney General; the United

(N)

45

States Department of Justice; Paul O'Neill, Secretary of the Treasury; the United States Department of the Treasury; Colin Powell, Secretary of State; and the United States Department of State (collectively the "Government").

In this action, HLF seeks to enjoin Defendants from continuing to block or otherwise interfere with access to or disposition of its assets. Plaintiff alleges that the blocking order violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq; the First, Fourth and Fifth Amendments of the United States Constitution; and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA").

The matters now before the Court are Plaintiff's Motion for a Preliminary Injunction [#3], Defendants' Motion to Dismiss and For Summary Judgment [#17], and Defendants' Motion In Limine and to Strike [#31]. Upon consideration of the motions, oppositions, replies, the arguments presented at the lengthy motions hearing on July 18, 2002, and the entire record herein, for the reasons stated below, the Court **denies** Plaintiff's Motion for a Preliminary Injunction, **grants in part and denies in part** Defendants' Motion to Dismiss and for Summary Judgment, and **grants** Defendants' Motion In Limine and to Strike.

I.    **STATUTORY FRAMEWORK**

A.    **The International Emergency Economic Powers Act**

In 1917, Congress enacted the Trading With the Enemy Act

("TWEA"), which granted the President "broad authority" to "investigate, regulate, . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. 50 U.S.C. app. § 5(b).

In 1977, Congress amended the TWEA and enacted the IEEPA to delineate the President's exercise of emergency economic powers in response to both wartime and peacetime crises under the TWEA and the IEEPA respectively. The 1977 legislation granted the President broad emergency economic power in wartime under the TWEA, and granted him similar, but not identical, emergency economic power in peacetime national emergencies under the IEEPA.

The IEEPA authorizes the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Upon declaration of a national emergency, the IEEPA further authorizes the President to

> investigate, block during the pendency of an
> investigation, regulate, direct and compel, nullify,
> void, prevent or prohibit, any acquisition, holding,
> withholding, use, transfer, withdrawal, transportation,
> importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect
> to, or transactions involving, any property in which any
> foreign country or a national thereof has any interest by
> any person, or with respect to any property, subject to
> the jurisdiction of the United States.

Id. § 1702(a)(1)(B).

3

### B.    Executive Order 12947

Pursuant to his authority under the IEEPA, President Clinton issued Executive Order 12947 on January 23, 1995.    President Clinton found that "grave acts of violence committed by foreign terrorists who threaten to disrupt the Middle East peace process" constitute an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  E.O. 12947.

The Executive Order blocks all property and interests in property of the terrorist organizations and persons designated in the Order, known as specially designated terrorists, or SDTs.  Id. § 1.  The Islamic Resistance movement (commonly known as "Hamas"), a Palestinian military and political organization, is one of the SDTs identified in the Order.  The Executive Order also permits the Secretary of the Treasury to designate additional SDTs if they are found, inter alia, to be "owned or controlled by, or to act for or on behalf of" an entity designated in that Order.  Id. § 1(a)(iii).

### C.    Executive Order 13224

After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States."  E.O. 13224.

As with the Executive Order issued by President Clinton, Executive Order 13224 blocks all property and interests in property of the designated terrorist organizations, known as specially designated global terrorists, or SDGTs.  On October 31, 2001, the President designated Hamas as one of the SDGTs subject to the Order.

The Executive Order also authorizes the Secretary of the Treasury to designate additional SDGTs whose property or interests in property should be blocked because they "act for or on behalf of" or are "owned or controlled by" designated terrorists, or they "assist in, sponsor, or provide . . . support for," or are "otherwise associated" with them.  Id. § 1(c)-(d).

## II.  PROCEDURAL BACKGROUND

HLF is a non-profit corporation organized in 1989, with its headquarters in Richardson, Texas.  It was originally incorporated under the name Occupied Land Fund ("OLF"), and changed its corporate name to Holy Land Foundation for Relief and Development on September 16, 1991.  Shukri Abu Baker is HLF's co-founder and has been Chief Executive Officer from its founding to the present.[1]

HLF alleges in its Complaint, that it is a § 501(c)(3) charitable organization that provides humanitarian aid throughout the world, although its primary focus has been to provide aid to

---

[1]  As addressed below, the administrative record contains evidence that Baker is involved with Hamas and raises funds on its behalf.  HLF vigorously contests the accuracy of this evidence.

the Palestinian population in the West Bank and Gaza.

On December 4, 2001, the Secretary of Treasury determined that HLF was subject to Executive Orders 12947 and 13224 because HLF "acts for or on behalf of" Hamas.[2]  Accordingly, HLF was designated as an SDT under Executive Order 12947 and as an SDGT under Executive Order 13224.  Pursuant to the designation, OFAC issued a "Blocking Notice" freezing all of HLF's funds, accounts and real property.  At that time, OFAC also removed from HLF headquarters, all documents, computers, and furniture.  Pursuant to the Blocking Notice, all transactions involving property in which HLF has any interest are prohibited without specific authorization from OFAC.

Plaintiff filed this action on March 11, 2002, seeking to enjoin Defendants from continuing to block or freeze its assets. Plaintiff alleges that the designation of HLF as an SDT and SDGT and attendant blocking violates (1) the APA; (2) the Due Process Clause of the Fifth Amendment; (3) the Takings Clause of the Fifth Amendment; (4) the Fourth Amendment; (5) First Amendment rights to freedom of speech and association; and (6) the Religious Freedom Restoration Act.

On May 31, 2002, the Government moved for summary judgment on the APA claim and moved to dismiss the remaining constitutional and RFRA claims.  On June 24, 2002, the Government filed a Motion In

---

[2]    The parties do not dispute that Hamas is a terrorist organization.  As noted above, Hamas was designated as an SDT and SDGT on January 23, 1995, and on October 31, 2001, respectively.

6

<u>Limine</u> and To Strike, seeking to exclude evidence beyond the administrative record, to preclude the taking of evidence in an evidentiary hearing, and to strike the exhibits attached to Plaintiff's Opposition and Reply brief.[3]

## III. ANALYSIS

### A.    Motion <u>In Limine</u> and to Strike

HLF contends that the Court should supplement the administrative record with the exhibits attached to its Opposition to Defendants' Motion to Dismiss and for Summary Judgment and Reply in Support of Plaintiff's Motion for a Preliminary Injunction, and that the Court should permit Rule 56(f) discovery and supplement the administrative record accordingly.[4]  The Government has filed a Motion <u>In Limine</u> and to Strike in response.  For the reasons discussed below, the Court grants the Government's Motion.

It is well-established that the scope of review under the APA is narrow and must ordinarily be confined to the administrative record.  <u>See Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the

---

[3]  On May 1, 2002, the Government filed a Motion to Submit Classified Evidence <u>In Camera</u> and <u>Ex Parte</u>.  The Court has determined that it is not necessary to reach the merits of that issue in order to rule on the pending motions.

[4]  HLF also argues that the Court should conduct an evidentiary hearing, which evidence would be added to the administrative record.  The Court denied that request during the motions hearing conducted on July 18, 2002.

reviewing court").    HLF  contends  that  courts  have  recognized
circumstances under which the reviewing court may consider extra-
record evidence, and that such circumstances are present here.

First, the heart of HLF's argument is that the Government must
furnish "[t]he 'whole' administrative record," which includes "'all
documents and materials directly or indirectly considered by agency
decision-makers and includ[ing] evidence contrary to the agency's
position.'"  Thompson v. Dep't of Labor, 885 F.2d 551, 555 (9th Cir.
1989) (citations omitted).  HLF reasons that the administrative
record in this case is incomplete because OFAC likely considered
evidence that it did not include in the record.

HLF's contention is entirely speculative, and it has failed to
identify any documents that OFAC directly or indirectly considered
and excluded from the 3130 page administrative record.[5]  OFAC has
certified that the administrative record on file is "complete and
accurate."  See Certification signed by James W. McCament (May 31,
2002).    That  certification  is  entitled  to  "a  presumption  of
administrative regularity and good faith." Federal Trade Commission
v. Invention Submission Corp., 965 F.2d 1086, 1091 (D.C. Cir.
1992). Accordingly, HLF's speculative statements are insufficient
to overcome this presumption and the well-settled principle that

---

[5]  Indeed, the Government specifically asserted at the motions
hearing  that  the  main  documents  HLF  contends  were  improperly
excluded  from  the  record---Mohammad Anati's police interrogation
statements and the transcript of his plea hearing---were not before
OFAC when it made its determination.

judicial review is confined to the administrative record.

Second, HLF contends that the Court should consider evidence outside the administrative record because OFAC has demonstrated bias and bad faith, and inadequacy of factfinding procedures, thereby warranting de novo review under 5 U.S.C. § 706(2)(F). Specifically, HLF contends that OFAC's redesignation of HLF as a terrorist[6] was a "sham," because that process had a predetermined outcome, and because the agency failed to consider virtually all of the evidence HLF submitted, and continued to rely on evidence that HLF had discredited.

HLF has made only conclusory allegations of bad faith and inadequate procedures. It has failed to provide any factual basis for its charges. The fact that OFAC redesignated HLF based, in part, on evidence that HLF contends is flawed is insufficient to suggest bias or inadequate procedures. OFAC did include in the record a significant portion of HLF's evidence challenging OFAC's factual determinations.[7] As addressed infra Part III.B.5.d., it was reasonable for OFAC to determine that the main declaration submitted by HLF was not credible, and that determination does not

---

[6] On May 31, 2002, the Government redesignated HLF as an SDT and SDGT based on the record of the first designation, additional unclassified and classified information, and a second evidentiary memorandum from the FBI to OFAC. See Newcomb Decl. ¶ 42.

[7] The exhibits attached to HLF's Motion for a Preliminary Injunction were considered by OFAC and incorporated into the administrative record. See Defs.' Reply Mem. in Supp. of Mot. In Limine and to Strike at 11.

9

evidence bias or inadequacy in OFAC's procedures.  Moreover, HLF was afforded an opportunity to submit further evidence to the agency, but failed to do so.[8]

In sum, HLF has not demonstrated that the Court should depart from traditional record review analysis in this case.[9] Accordingly, the Court will not permit discovery on the APA claim,[10] and the exhibits attached to Plaintiff's Motion to Dismiss and for Summary Judgment and Reply in Support of Plaintiff's Motion for a Preliminary Injunction will not be considered by the Court.  The

---

[8]  On April 30, 2002, OFAC sent HLF formal notification that it was considering redesignating HLF as an SDT and SDGT.  At that time, HLF was afforded a 15-day period in which to respond to the administrative proceeding.  On May 14, 2002, Plaintiff responded by requesting an additional thirty days to respond.  OFAC did not agree to the extension, but committed to consider any information that Plaintiff submitted prior to the agency's action on the redesignation, and that it would also accept any information submitted after the redesignation decision was made.  Plaintiff did not submit any further materials to OFAC and, on May 31, 2002, OFAC redesignated HLF.

[9]  HLF also contends that the Court should consider extra-record evidence pursuant to Esch v. Yeutter because (1) OFAC did not adequately explain its decision in the record before the Court; (2) it failed to consider factors that are relevant to its final decision; (3) the case is so complex that the Court needs more evidence; and (4) evidence arising after the agency action shows that OFAC's decision was not correct.  876 F.2d 976, 991 (D.C. Cir. 1989).  Again, HLF has made only conclusory allegations and has failed to demonstrate that any of these exceptions applies in this case.

[10]  The Government has moved to dismiss, not for summary judgment, on the remaining constitutional and RFRA claims.  Because the Court has not converted the motion to dismiss to one for summary judgment, HLF's request for Rule 56(f) discovery is inapplicable to those claims.

10

Court's review of the APA claim is therefore limited to the administrative record.

**B.    Administrative Procedure Act**

As noted above, Plaintiff contends that OFAC's designation of HLF as an SDT and SDGT, resulting in the blocking of its assets, violates the APA.    HLF makes three major arguments: (1) OFAC exceeded its statutory authority under the IEEPA because Hamas does not have a legally enforceable interest in HLF's property; (2) the blocking order violates the statute's humanitarian aid exception; and (3) the OFAC action was arbitrary, capricious, and without substantial evidence in the record.    The Government has moved for summary judgment on the entire APA claim.

**1.    Summary Judgment Standard of Review**

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.    See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**2.    APA Standard of Review**

An agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).    In making this determination, the Court "must consider whether the decision was based on a

11

consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld," Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 521 (D.C.Cir. 1983) (citation omitted), even though the Court itself might have made different choices.

As noted above, under arbitrary and capricious review, the Court does not undertake its own fact-finding. Instead, the Court must review the administrative record assembled by the agency to determine whether its decision was supported by a rational basis. See Camp v. Pitts, 411 U.S. 138, 142 (1973).

### 3.    The IEEPA Does Not Require a Legally Enforceable Interest

The IEEPA provides, in relevant part, that the President may block "property in which any foreign country or a national thereof has any interest." IEEPA, 50 U.S.C. § 1702(a)(1)(B). HLF contends that this "interest" must constitute a "legally enforceable interest." Accordingly, HLF reasons that OFAC exceeded its statutory authority because it cannot establish that Hamas had any such interest in HLF's property. The Government argues that the IEEPA does not impose any such requirement of a legally enforceable interest on the President's authority. It reasons that OFAC need only determine that Hamas has "any interest" in HLF's property,

12

which it reasonably did in this case.  It is clear that both the text of the statute and the cases interpreting it support the Government's position.

First, the plain text of the IEEPA authorizes the blocking of property in which the designated foreign national or country has "any interest."  IEEPA, 50 U.S.C. § 1702(a)(1)(B) (emphasis added). The language imposes no constraints on that term.  Moreover, Congress explicitly authorized the Executive to define the statutory terms of the IEEPA.  See id. § 1704.[11]  OFAC carried out that mandate and defined "interest" to mean "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. 500.311-.312 (emphasis added).  It is clear, then, that the plain text of the statute, as well as its implementing regulations, broadly define the term "interest," and do not impose the limitation advanced by Plaintiff.

Second, courts have repeatedly upheld OFAC's authority to interpret broadly the term "any interest" in the identical provisions of the IEEPA, and its predecessor statute, the TWEA. See Regan v. Wald, 468 U.S. 222, 224, 225-26, 233-34 (1984) (repeatedly stating that the phrase "any interest" must be construed in the broadest possible sense); Consarc Corp. v. Iraqi

_____

[11]  "The President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter." 50 U.S.C. 1704.

Ministry, 27 F.3d 695, 701-02 (D.C. Cir. 1994) ("Consarc I") (finding that OFAC may choose and apply its own definition of property interests, subject to deferential judicial review, and that OFAC's application of its own regulations, "receives an even greater degree of deference than the Chevron standard, and must prevail unless plainly inconsistent with that regulation"); Consarc v. OFAC, 71 F.3d 909 (D.C. Cir. 1995) ("Consarc II") (referring to the expansive statutory grant of power under the IEEPA, and finding that a challenge to OFAC's interpretation of its own regulation must either demonstrate that the statute clearly forbids the agency's interpretation or that the interpretation is unreasonable).

Third, in those cases where courts have found that a foreign nation or national had an interest in property under the IEEPA, they have not based that ruling on any statutory requirement that the interest be "legally enforceable." See, e.g., Consarc II, 71 F.3d at 909; Consarc I, 27 F.3d at 695; Milena Ship Management Co. v. Newcomb, 995 F.2d 620 (5th Cir. 1993).[12]

In sum, in light of the plain text of the IEEPA and OFAC's

---

[12]    HLF relies heavily on Centrifugal Casting Mach. Co. v. American Bank & Trust Co., 966 F.2d 1348 (10th Cir. 1992), which is the only IEEPA case requiring a "legally enforceable interest." To the extent that the Centrifugal Casting court imposed such a requirement under the IEEPA, it did so against the weight of judicial authority to the contrary. Not only is this Court not persuaded by its reasoning, but it is not bound by a decision from the Tenth Circuit, especially in light of Consarc I and Consarc II from this Circuit.

regulations broadly defining the term "interest," the deference that must be afforded to OFAC's interpretation of its own regulations, and the relevant case law, the Court concludes that the IEEPA does not limit the President's blocking authority to the existence of a legally enforceable interest.

### 4. The Humanitarian Aid Exception Authorizes Donations of "Articles," But Not of Money

The humanitarian aid exception under the IEEPA provides, in relevant part, that "[t]he authority granted to the President by [the IEEPA] does not include the authority to regulate or prohibit, directly or indirectly . . . donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering."  IEEPA, 50 U.S.C. § 1702(b)(2).  HLF contends that OFAC's blocking order violates this exception because HLF is prohibited from  making any humanitarian aid contributions.  The Government advances two arguments in response.

First, the Government contends that the humanitarian aid exception does not apply to blocked entities such as HLF.  It reasons that this conclusion is compelled by the thrust of the statute, which prohibits a blocked entity such as HLF from using its funds for any purpose (including provision of humanitarian aid) without a license from OFAC.

In fact, the plain text of the statute compels the contrary conclusion.  The statute explicitly states that the President's

authority to <u>issue</u> the blocking order does not include the authority to prohibit humanitarian aid.[13] Accordingly, it is clear that the humanitarian aid exception applies to blocked entities such as HLF, and that the blocking itself cannot prohibit HLF from providing humanitarian aid to non-blocked entities.

Second, the Government contends that, even if the humanitarian aid exception applies to blocked entities, the exception does not cover transfers of money. Both the text of the statute and case law do support this conclusion.

The statute explicitly refers to donations "of articles, such as food, clothing, and medicine," without any reference to monetary donations. <u>See</u> 50 U.S.C. 1702(b)(2). Moreover, the legislative history of the humanitarian aid exception makes it clear that Congress specifically chose to exclude monetary contributions from the exception. <u>Veterans Peace Convoy Inc. v. Schultz</u>, 722 F.Supp. 1425, 1431 (S.D. Tex. 1988) (determining after review of legislative history that statute "authorized donations of articles, but not monetary funds, thereby 'increasing the likelihood that the donation would be used for the intended purpose.'") (quoting testimony from Senate hearing).

---

[13]    The main case the Government relies on, <u>American Airways Charters, Inc. v. Regan</u>, 746 F.2d 865, 866 (D.C. Cir. 1984), merely states the general rule that a designated entity must obtain an OFAC license prior to engaging in any transaction involving its assets. <u>American Airways</u> does not address the applicability of the humanitarian aid exception to blocked entities, and is therefore inapplicable to this case.

Accordingly, the Court concludes that OFAC exceeded its statutory authority to the extent that it has prohibited HLF from providing humanitarian donations "of articles, such as food, clothing, and medicine."[14]    OFAC did not, however, exceed its statutory authority by prohibiting HLF from making monetary contributions for humanitarian purposes.

### 5.    Designation of HLF as a Terrorist and Seizure of Its Assets Do Not Constitute Arbitrary and Capricious Agency Action

The seven volume, 3130 page administrative record in this case provides substantial support for OFAC's determination that HLF acts for or on behalf of Hamas.  Specifically, as the following analysis demonstrates, the administrative record contains ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas.[15]

---

[14]    The Court realizes that, in reality, this may be a distinction without a difference.  If HLF cannot access its bank accounts, it cannot purchase food, clothing, and medicine.  HLF counsel acknowledged as much at oral argument.

[15] HLF vigorously contests the accuracy, interpretation and context of this evidence, as well as the sufficiency of the record. These challenges are addressed infra.

### a.   HLF Had Early Financial Connections to Hamas

First, the administrative record demonstrates that HLF's financial connections to Hamas began as far back as 1988. Specifically, there is evidence that HLF raised funds for Hamas, that Hamas provided financial support to HLF, and that HLF paid for Hamas leaders to travel to the United States on fund-raising trips.

With respect to HLF's fund-raising on Hamas' behalf, the record contains a December 1988 and a December 1989 publication issued by Hamas. Both publications request that tax deductible donations be sent to OLF, HLF's former corporate name. See A.R. 1499-1500, 1511, 1529, 1531-35.

With respect to Hamas' funding of HLF, the evidence establishes that, in 1992, Hamas leaders and activists contributed $210,000 to HLF. The checks were from Hamas political leader Mousa Abu Marzook,[16] Hamas activist and Marzook associate Ismail Elbarrase, and from Marzook's associate and personal secretary Nasser Alkhatib. See A.R. 74, 684-87, 1926-27, 700. Indeed, HLF's 1993 tax return reflected that it received $210,000 from Marzook. See A.R. 700.

Further, there is evidence in the record that, at the same

---

[16] The record contains evidence that Marzook has been the leader of the political wing of Hamas since at least 1991. See A.R. 73-74, 639-78. In 1996, a federal court determined that Marzook should be extradited to Israel to face murder charges resulting from his alleged terrorist activity. See A.R. 269-91, 324-32; see also Marzook v. Christopher, 924 F.Supp. 565 (S.D.N.Y. 1996).

time Hamas was funding HLF, it was also funding a network of organizations connected to HLF.  There is evidence that at least one of these organizations, Islamic Association for Palestine ("IAP"), has acted in support of Hamas.[17]  The Government contends that HLF knew of Hamas' funding of these organizations because HLF's leaders were associated with or related on a familial basis to the leaders of the other funded organizations.

Finally, with respect to HLF's support of Hamas' fund-raising trips, between September 20, 1990 and March 9, 1994, HLF paid for senior Hamas leaders Sheikh Jamil Hamami and Dr. Mohammed Siyam to make eleven trips to the United States.[18]  Each of the trips was charged to OLF or HLF's corporate credit card.  See A.R. 73, 635-38.

### b.    HLF Officials Met With Hamas Leaders

Second, the administrative record contains evidence of two meetings between Hamas and HLF leaders---a 1993 Philadelphia, Pennsylvania meeting and a 1994 Oxford, Mississippi meeting.

The three-day Philadelphia conference was observed and recorded by the FBI.  Five senior Hamas officials and three senior

---

[17]    There is evidence in the record that IAP distributes information on behalf of Hamas.  See AR 1499-1535.

[18]  The record contains evidence that Hamami is a co-founder of Hamas, and that Siyam is a Hamas leader.  See A.R. 72, 609-39.

19

HLF leaders were in attendance.[19]   Moreover, senior HLF official Shukri Abu Baker not only attended the conference, but also assisted in planning the meeting and made a presentation to the participants.

With respect to the Oxford, Mississippi meeting, FBI surveillance disclosed that Al-Aqsa Educational Fund (which was run by senior Hamas activist Abdelhaleem Ashqar) and HLF---the two major Muslim charities operating in the United States---had been in conflict over which organization would raise funds in the United States.  See A.R. 1478, 1482-86.  On March 14, 1994, Baker spoke with Hamami, who was in Oxford, Mississippi as part of an Al-Aqsa fund-raising tour.  At that time, Hamami read a letter from Marzook to Ashqar directing Ashqar to stop his fund-raising activities in the U.S. until Marzook arrived in the country.  See id.  Baker replied that he had no objection to Marzook resolving HLF's conflict with Al-Aqsa.  See id.

### c.    HLF Funds Hamas-Controlled Entities

Third, the administrative record establishes that, since 1992, HLF has made significant contributions to charitable organizations that the Government identifies as controlled or operated by Hamas.

---

[19]    The following Hamas leaders and activists were at the meeting: Abdelhaleem Ashqar, Akram Kharroubi, Mohammad Al-Hanooti, Ismail Elbarasse, and Muin Kamel Mohammed Shabib.  The HLF leaders in attendance were HLF co-founders Shukri Abu Baker and Ghassan Elashi, and HLF employee Haitham Maghawri.  See A.R. 68, 251-65, 1400-11.

Specifically, HLF grant lists reveal that, between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees. See A.R. 1435-36, 86-87, 939-41, 1267. HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza. See A.R. 87-91, 97-98, 100-05, 304-05, 307, 609-29, 732, 815, 843, 856, 858-60, 1127-40, 1143, 1162, 1165-68, 1204, 1209-11, 1253-55, 1796-2000.[20]

In many instances, the Israeli Government provided the information that the charitable organizations HLF funds are controlled by Hamas. HLF contests OFAC's reliance on this information from the Israeli government.

However, agency designations can be based on a broad range of evidence including news reports, intelligence data, and hearsay

---

[20] The record contains evidence that the political, as opposed to military, activities of Hamas include a broad network of charitable organizations including zakat committees, hospitals, schools, and institutions. This charitable component is an effective way for Hamas to maintain its influence with the public, indoctrinate children and recruit suicide bombers. Moreover, there is evidence that Hamas' charitable organizations "serve[] as a screen for its covert" component, thereby permitting the transfer of funds to its terrorist activities. See A.R. 1916-17. Accordingly, "it is not always possible to distinguish between the 'innocent' activity of the charity associations and the funding of covert, subversive and terrorist activity." See A.R. 1916-17, 1502. To that end, both President Bush and President Clinton have designated all of Hamas as a terrorist organization, and determined that even charitable contributions to Hamas impair the "ability to deal with the national emergency." E.O. 13224 § 4; E.O. 12947 § 3.

declarations.    See National Council of Resistance of Iran v. Department of State, 251 F.3d 192, 196 (D.C. Cir. 2001).  Moreover, the D.C. Circuit has very recently upheld an agency decision based primarily on foreign governments' intelligence reports.   In 32 County Sovereignty Comm. v. Dep't of State, the Court of Appeals found that the administrative record supported the Secretary of State's determination that petitioners were "foreign terrorist organizations" under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), even though the Secretary relied primarily on intelligence reports provided by the British and Irish governments. 2002 WL 1300020 (D.C. Cir. June 14, 2002).   Accordingly, it was reasonable for OFAC to rely on the intelligence information provided by the Israeli government.

### d.    HLF Provides Financial Support to Orphans and Families of Hamas Martyrs and Prisoners

Fourth, the administrative record contains evidence that HLF has provided financial support to the orphans and families of martyred[21] or imprisoned Hamas activists.   The majority of this evidence consists of documents recovered from HLF's offices and reports compiled by the Israeli government concerning the recovered documents.   Specifically, the administrative record contains the following HLF documents: a binder entitled "Orphans Sponsorship Program, Gaza in July 1999;" 1992 sponsorship forms for needy

---

[21]    As addressed below, HLF vigorously contests OFAC's interpretation of the term "martyr."

22

families; and two letters written by HLF employees.  The record also contains two reports prepared by the Israeli government, dated September 20, 1995 and June 5, 1995.[22]

The 1999 Orphans Sponsorship Program binder lists the cause of death of each of the orphan's fathers, specifically distinguishing between "killing," "martyr," "sickness," and other causes of death. See A.R. 1501, 1801-1911.  Approximately seventy-seven of the four hundred and forty four orphans in the binder are represented to be children of "martyrs."  See A.R. 1801-1911.

With respect to HLF's 1992 sponsorship forms for needy families, a space on the form for social worker comments indicates that, in nearly every case, the applicant's parent or guardian was either jailed by the Israeli government for security reasons or martyred.  See A.R. 1536-1790.

The two letters from HLF employees request the nomination of children and families of martyrs.  Specifically, the August 13, 1992 letter from HLF employee Haitham Maghawri states "please nominate a few names of the Martyr's children with a summary on each childs [sic] situation, and how cooperative they are."  A.R. 1501, 1791.  The second letter, which is not dated, from HLF employee Ibrahim Khalil states: "We asked you for 40 applications forms for needy families from several regions to be sent ASAP,

---

[22]  HLF vigorously objects to OFAC's reliance on the Israeli government's reports.  However, as addressed in supra Part III.B.5.c., it was reasonable for OFAC to rely on such information.

families of the martyrs, if possible would be good." A.R. 1501, 1793-94.

The September 20, 1995 report prepared by the Israeli government is based on that government's analysis of documents it recovered from HLF's Jerusalem office. The recovered documents show funds transferred from HLF to the Islamic Relief Agency[23] for distribution and includes the list of people supported by those funds. The report indicates that people who were not demonstrably connected to Hamas activists received lower payments when compared to those with known Hamas connections. See A.R. 78-79, 1285-1396.

Finally, the Israeli government's June 5, 1995 report indicates that "some hundred orphans receiving support have been checked" and the "families of several orphans are directly connected with Hamas." A.R. 739.

Plaintiff vigorously contests OFAC's interpretation of the term "martyr" ("shaheed" in Arabic) in its fund solicitations. To that end, Baker, HLF's Chief Executive Officer, submitted a declaration to OFAC contending that HLF's use of that term was not intended to refer to terrorists or suicide bombers. Rather, Baker contends that "martyr" refers to "[a]nyone who died an 'innocent' death under a variety of circumstances. . . . it is hard to imagine

---

[23]    The Islamic Relief Agency was closed by the Israeli government in 1996 for providing support to the families of Hamas activists involved in terrorist attacks in Israel. See A.R. 101-02, 1127-40.

a person who has died in Palestine other than by natural causes, that I would not consider to be 'shaheed.'"  Baker Decl. ¶ 22, Pl. Ex. 1.[24]

In light of all of the evidence before OFAC regarding the relationship between HLF and Hamas, it was reasonable for the agency to determine that Baker's explanation was not credible. OFAC's rejection of HLF's definition of "martyr" is further supported by the fact that the 1999 Orphans Sponsorship Program binder does not differentiate between "innocent" and "natural death," as one would expect given HLF's definition of "martyr." Instead, the binder differentiates between a variety of causes of death, including "martyr," "natural death," "illness," "accident," "killing," and "electric shock."[25]

### e.    HLF's Jerusalem Office Supported Hamas

Fifth, there is evidence in the record that HLF's Jerusalem office supported Hamas.  The Israeli government closed the office in May 1995, because it was "used for overseeing the channeling of funds to families of Hamas activists who had committed terrorist

---

[24]    Although HLF also submitted a declaration by an investigator who investigated the causes of death of the fathers listed as "martyrs" in the 1999 Orphans Sponsorship Program binder, that declaration was not before the agency when it made its determination, is not part of the administrative record, and therefore cannot be considered by the Court.

[25] HLF also contests OFAC's determination on the ground that, according to the Government's own evidence, only a very small portion of HLF's donations was made to families of martyrs.  This argument is addressed infra.

attacks and for families of Hamas prisoners." A.R. 1305, 1337.  The

closing was later upheld by the Israeli Supreme Court.  <u>See</u> A.R.

1360-96.

Moreover, in 1997, the Israeli government arrested Mohammad

Anati, the former head of HLF's Jerusalem office, because of his

Hamas activities.  <u>See</u> A.R. 82, 1263.  The administrative record

contains an Israeli intelligence report summarizing Anati's police

interrogations subsequent to his arrest.  The report indicates that

Anati admitted to being a Hamas activist, and stated that, although

HLF provided aid to the needy, some of that money was channeled to

Hamas.  <u>See</u> A.R. 1261, 1266-67, 1278.[26]

---

[26]   HLF vigorously opposes OFAC's reliance on Anati's
confession because (1) the statements were likely given after he
had been tortured by the Israeli police; and (2) the Israeli
summary of his statements is incomplete, misleading, and does not
contain the exculpatory statements that are included in the
translations of his statements.
First, it was reasonable for OFAC to rely on information
derived from Israeli police interrogations, despite HLF's
contention about the prevalence of torture by the Israeli police.
In determining whether to consider factual statements made to a
foreign police officer, courts consider the totality of
circumstances to determine whether the statements are reliable.
<u>See</u> <u>United States v. Welch</u>, 455 F.2d 211, 213 (2d Cir. 1972)
(courts must consider totality of the circumstances to determine
whether a statement was voluntary); <u>In re. Extradition of Atta</u>, 706
F.Supp. 1032, 1052 (E.D.N.Y. 1989) (in extradition proceeding,
accomplices' statements supported probable cause finding, despite
allegations that statements were the product of torture, because
there was no evidence the statements were coerced or unreliable,
the statements had factual detail, were not recanted, and were
corroborated).  In this case, Anati's statements are corroborated
by other evidence in the record.
Second, as addressed in <u>supra</u> Part III.A., the translations of
Anati's statements were not before OFAC when it made its
determination, and are therefore not part of the administrative

**f.  Unidentified FBI Informants Reported That HLF Funds Hamas**

Sixth and finally, the administrative record contains reports from eight unidentified FBI informants. The informants' statements generally recount instances in which HLF leaders stated that HLF funds and supports Hamas.[27]

---

record. Moreover, as addressed in supra Part III.B.5.c., it was reasonable for OFAC to rely on the Israeli intelligence report.

Third, even if the translations of Anati's statements were part of the administrative record, they would not advance Plaintiff's argument. HLF not only failed to provide any evidence that Anati was tortured, but Anati's lawyer, an eminent civil rights attorney, did not elicit testimony from him at his plea hearing that he was tortured. Indeed, Anati testified during that hearing that his confessions to the police were "generally true." See Pl. Ex. R-1 at 1. Accordingly, it was reasonable for OFAC to rely on the police interrogations to inform its administrative decision.

[27]  HLF contests OFAC's reliance on these statements because the Government did not provide any basis to believe they are reliable, did not describe the basis for the informants' knowledge, and did not include any versions of their statements in the unclassified administrative record.

However, courts have recognized the usefulness of information from confidential sources when presented in combination with corroborating evidence. See United States v. Bruner, 657 F.2d 1278, 1297 (D.C. Cir. 1981) (finding that magistrate judge properly concluded that informants' credibility was sufficiently established because informants' statements were corroborated and they had provided reliable information in the past). Here, there are eight corroborating and independent sources, in addition to the corroborating evidence detailed above. Further, the FBI indicated that the sources had been reliable in the past (admitting that one source had been both reliable and unreliable), and provision of such information supports OFAC's consideration of their statements. See id. at 1297.

###### g.   The Administrative Record As A Whole Supports OFAC's Action

As noted above, the scope of judicial review under the APA "arbitrary and capricious" standard is deferential, and the Court must affirm the agency's decision as long as it is supported by a rational basis.

In this case, the evidence in the administrative record provides ample support for OFAC's conclusion that HLF acts for or on behalf of Hamas.  Specifically, there is evidence that HLF had financial connections to Hamas; that HLF and Hamas leaders not only had substantial involvement with one another, but also that an HLF officer agreed to take direction from a senior Hamas activist; and that HLF has provided financial support to Hamas-controlled organizations and to Hamas martyrs and prisoners.

When the Court reviews all of the evidence in the administrative record as a whole, as it must, it is clear that OFAC's decision meets the "minimal standards of rationality," and therefore must be upheld.  Small Refiner Lead Phase-Down Task Force, 705 F.2d at 521.  Plaintiff's arguments challenging the reasonableness of OFAC's determination do not alter the Court's analysis for the following reasons.

First, the heart of HLF's argument is that much of the evidence in the record involves HLF's association with Hamas prior to its designation as a terrorist organization in 1995.  HLF reasons that, because the pre-1995 activities were legal, and

28

because the record contains substantially less post-1995 evidence, the administrative record does not support OFAC's determination that HLF acts for or on behalf of Hamas.

Even if HLF were correct that the majority of evidence in the record directly connecting HLF to Hamas involves pre-1995 activities---and the Court is not making that finding---the outcome would not change.  HLF does not contend that the pre-1995 evidence may not be considered in evaluating the reasonableness of the agency's action.  Certainly, the agency itself may consider the genesis of HLF and the totality of its history.  Upon review of the entire administrative record, it is clear that the agency's reliance on pre-1995 evidence does not render its final determination arbitrary and capricious.

Finally, when the pre-1995 evidence is combined with the post-1995 evidence that HLF continued to be controlled by the same individuals who were directly affiliated with Hamas prior to 1995, that HLF continued to fund Hamas-controlled entities and the orphans and families of Hamas martyrs and prisoners, that HLF's Jerusalem office was closely allied with Hamas, and that FBI informants confirmed the funding connection between HLF and Hamas, it was eminently reasonable for OFAC to conclude that HLF continued to act on behalf of Hamas.[28]

---

[28]    HLF also contests OFAC's determination because the Government knew about HLF's alleged connection to Hamas since it was designated as a terrorist in 1995 and failed to take any action

Second, HLF contends that much of the post-1995 evidence does not support OFAC's determination. Specifically, HLF argues that, according to the Government's own evidence, only a very small portion of HLF's donations was made to families of martyrs. HLF also contends that numerous other organizations, including official government entities, contribute to the same zakat committees that HLF funds. What differentiates these organizations from HLF is that they do not have the same connections and association with Hamas that HLF has.

Moreover, the purpose of the Court's inquiry is not to determine whether each and every piece of evidence in the record independently supports OFAC's determination. Nor is it to second-guess the agency on credibility issues or issues involving the Executive Branch's expertise in the area of foreign affairs. <u>See</u> <u>Regan v. Wald</u>, 468 U.S. 222, 242 (1984). Rather, its function is to conduct a careful review of the entire administrative record and assess whether it demonstrates a reasonable basis for the agency's action. In this case, the administrative record as a whole supports OFAC's determination.

In summary, for all the forgoing reasons, the Court concludes

---

against HLF for nearly six years. However, the duration of the Government's knowledge is irrelevant to the Court's determination of whether the agency's action was reasonable. Executive Branch decisions to designate an entity as a terrorist are complex and involve significant political ramifications. Accordingly, the Court must defer to the Executive's discretion on the timing of those foreign policy and national security decisions.

that OFAC's determination that HLF acts for or on behalf of Hamas is supported by substantial evidence in the administrative record and was not arbitrary and capricious.  In short, Defendants have not violated the APA.

### C.  The Constitutional and RFRA Claims

In addition to challenging agency action under the APA, HLF also contends that its designation as a terrorist and the attendant blocking order violate (1) the Due Process Clause of the Fifth Amendment; (2) the Takings Clause of the Fifth Amendment; (3) the Fourth Amendment; (4) First Amendment rights to freedom of speech and association; and (5) the Religious Freedom Restoration Act. The Government has moved to dismiss each of these claims.

For the reasons stated below, the Court concludes that Plaintiff has failed to state a claim under the Fifth and First Amendments and under the Religious Freedom Restoration Act. Plaintiff has, however, sufficiently stated a claim for violation of its Fourth Amendment rights.

### 1.  Motion to Dismiss Standard of Review

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it need only provide a short and plain statement of the claim and the grounds on which it rests.  Fed.R.Civ.P. 8(a)(2); <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957).  A motion to dismiss under Rule 12(b)(6) tests whether the plaintiff has properly stated a claim, not whether the plaintiff will prevail on the merits.  Fed.R.Civ.P.

31

12(b)(6); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). Thus, the court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984). In deciding such a motion, the court must accept all of the Complaint's well-pled factual allegations as true and draw all reasonable inferences in the nonmovant's favor. <u>Scheuer</u>, 416 U.S. at 236.

### 2. Due Process

Plaintiff argues that OFAC's designation of HLF as an SDT and SDGT, resulting in the blocking of its assets, violates the Due Process Clause of the Fifth Amendment. First, HLF contends that OFAC failed to provide pre-designation notice and a hearing in violation of its procedural due process rights. Second, HLF argues that OFAC violated its substantive due process rights by acting arbitrarily and capriciously. For the reasons discussed below, both of these arguments fail.

### a. Procedural Due Process

The due process clause generally requires the Government to afford notice and a meaningful opportunity to be heard before depriving a person of certain property interests. <u>See</u> <u>United States v. James Daniel Good Real Property</u>, 510 U.S. 43, 62 (1993); <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976). In this case, it is undisputed that the Government failed to provide HLF any notice or

hearing prior to designating it as a terrorist and blocking its assets.[29]  For the following reasons, the Government's actions did not, however, violate HLF's right to due process.

HLF relies principally on <u>National Council of Resistance of Iran v. Department of State</u>, 251 F.3d 192 (D.C. Cir. 2001) ("NCRI"), in which the D.C. Circuit held that notice and an opportunity to be heard must be afforded prior to designating an entity as a "foreign terrorist organization" under the AEDPA. However, <u>NCRI</u> does not control this case.  Here, the agency action was taken pursuant to the IEEPA-based sanctions program.  Action under that program flows from a Presidentially declared national emergency.  Thus, this case differs significantly from <u>NCRI</u> where neither a declaration of war (as required by the TWEA) nor a Presidentially declared national emergency (as required by the IEEPA) existed to justify the absence of notice and an opportunity to be heard.

The Supreme Court has outlined what circumstances "present[] an 'extraordinary' situation in which postponement of notice and hearing until after seizure d[oes] not deny due process." <u>Calero-Toledo v. Pearson Yacht Leasing Co.</u>, 416 U.S. 663, 679-80 (1974). To that end, the Government must satisfy the following

---

[29]  As noted above, on May 31, 2002, the Government redesignated HLF as an SDT and SDGT.  The Government did provide HLF notice and an opportunity to be heard prior to the redesignation, and that procedure is therefore not the subject of the procedural due process claim.

requirements: (1) the deprivation was necessary to secure an important governmental interest; (2) there has been a special need for very prompt action; and (3) the party initiating the deprivation was a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Id. at 678.

First, the OFAC designation and blocking order served the important government interest, set forth in the Executive Orders issued by President Bush and President Clinton, of combating terrorism by cutting off its funding. See Haig v. Agee, 453 U.S. 280, 307 (1981). At the time of HLF's designation, less than three months had passed since the September 11, 2001 terrorist attacks on United States soil; President Bush had recently declared a national emergency in Executive Order 13224 to deal with the threat of future attacks and the need to curtail the flow of terrorist financing; President Clinton had issued Executive Order 12947 finding that the acts of violence committed by terrorists disrupting the Middle East peace process constituted an extraordinary threat to the United States; and the violence in the Middle East was escalating.

Second, prompt action by the Government was necessary to protect against the transfer of assets subject to the blocking order. Money is fungible, and any delay or pre-blocking notice would afford a designated entity the opportunity to transfer,

34

spend, or conceal its assets, thereby making the IEEPA sanctions
program virtually meaningless.  Indeed, in issuing the Executive
Order, President Bush explicitly determined that, "because of the
ability to transfer funds or assets instantaneously, prior notice
to such [designated] persons of measures to be taken pursuant to
this order would render these measures ineffectual." E.O. 13224
§ 10; see Global Relief Foundation, Inc. v. O'Neill, 2002 WL
1285829, at *22 (N.D. Ill. June 11, 2002) ("[p]re-deprivation
notice would, in fact be antithetical to the objectives of [the
IEEPA] sanctions program[]"); Milena Ship Mgmt. Co. Ltd. v.
Newcomb, 804 F.Supp. 846, 854 (E.D. La. 1992) (finding that OFAC
had to act quickly because "delay would have allowed the assets to
leave the United States, thereby thwarting the purpose of the
[Executive] Orders").

Third and finally, government officials, and not private
parties, initiated the blocking action.  OFAC did so pursuant to
the IEEPA and two Executive Orders that specifically authorize such
action in limited circumstances.

In sum, for the foregoing reasons, the Court concludes that,
accepting all of Plaintiff's factual allegations as true, it has
not stated a claim for violation of its procedural due process
rights.

### b.   Substantive Due Process

As noted above, HLF also argues that OFAC violated its right

to substantive due process by acting arbitrarily and capriciously in designating it as a terrorist and blocking its assets.[30]

This due process challenge must also fail. The Court has determined that OFAC's designation of HLF and blocking of its assets was not arbitrary and capricious under the APA. See supra Part III.B. Accordingly, it clear that the agency action did not rise to the level of a constitutional violation.

### 3. Taking Without Just Compensation

Plaintiff next argues that the blocking of its assets constitutes an uncompensated taking, in violation of the Takings Clause of the Fifth Amendment.[31] The Government argues, first, that the Court lacks jurisdiction to consider this claim, and second, that a blocking order does not, as a matter of law, constitute a taking.

While it is very doubtful that the Court has jurisdiction,[32] even if it did, the takings claim would fail. The case law is clear that blockings under Executive Orders are temporary

---

[30] The parties devoted little attention to this claim in their briefs.

[31] The Takings Clause forbids the Government from taking private property for public use without just compensation. U.S. Const. amend. V.

[32] Pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1),"[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department. . . ."

deprivations that do not vest the assets in the Government. Therefore, blockings do not, as a matter of law, constitute takings within the meaning of the Fifth Amendment. Accordingly, courts have consistently rejected these claims in the IEEPA and TWEA context. See Propper v. Clark, 337 U.S. 472 (1949) (blocking is not a taking because it is a temporary action); Tran Qui Than v. Regan, 658 F.2d 1296, 1301 (9th Cir. 1981) (rejecting takings claim because blocking under TWEA is not equivalent to vesting); Global Relief Foundation, Inc. v. O'Neill, 2002 WL 1285829, at *19 (N.D. Ill. June 11, 2002)(finding plaintiff unlikely to succeed on merits of takings claim because IEEPA blocking is temporary); IPT Co., Inc. v. Dep't of Treasury, 1994 WL 613371, at *5-6 (S.D.N.Y. Nov. 4, 1994), Def. Ex. E (denying takings claim for IEEPA blocking because blocking is a temporary deprivation). Accordingly, it is clear that, as a matter of law, the blocking order in this case is a temporary deprivation that does not constitute a constitutionally cognizable taking.

Plaintiff may, however, some day have a credible argument that the long-term blocking order has ripened into a vesting of property in the United States. At this stage, HLF's assets have only been blocked for eight months, and it is premature to determine that the temporary deprivation is equivalent to a vesting. It is clear, then, that the current deprivation has not "go[ne] too far," so as to constitute a taking, even though Plaintiff may some day have a

37

more viable claim.    Tahoe-Sierra Preservation Council v. Tahoe
Regional Planning Agency, 122 S.Ct. 1465, 1480 (2002); E-Systems,
Inc. v. U.S., 2 Cl. Ct. 271, 274-78 (Cl. Ct. 1983) (denying motion
for summary judgment on takings claim).

Accordingly, the Court concludes that, as a matter of law, the
blocking order does not presently constitute an actionable Fifth
Amendment taking.

### 4.    Fourth Amendment

HLF further argues that the Government violated its Fourth
Amendment rights.[33] Specifically, HLF contends that OFAC's freezing
of its bank accounts constitutes an unlawful seizure.    Plaintiff
also alleges that the Government conducted an unlawful search and
seizure by entering its offices, searching them, and removing its
documents, office equipment, and other assets without a warrant.
It is undisputed that the Government did not obtain a warrant prior
to initiating these actions.    For the following reasons, the Court
concludes that HLF has not stated a Fourth Amendment claim with
respect to the freezing of its accounts.    However, HLF has stated
a claim based on the Government's entry onto its corporate premises
and removal of its property without a warrant.

With respect to the freezing of HLF's accounts, the Government

_____

[33] The Fourth Amendment provides that "the right of the people
to be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures, shall not be violated." U.S.
Const. amend. IV.

contends that its actions do not constitute a seizure within the meaning of the Fourth Amendment.  The Government plainly had the authority to issue the blocking order pursuant to the IEEPA and the Executive Orders and the Court has determined that its actions were not arbitrary and capricious.  Further, the case law is clear that a blocking of this nature does not constitute a seizure.  See Tran Qui Than, 658 F.2d at 1301 (blocking under TWEA is not equivalent to vesting); D.C. Precision Inc. v US, 73 F.Supp.2d 338, 343 n.1 (S.D.N.Y. 1999) (assets blocked by the government are not seized); Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb, Civ. No. 98-0949, slip op. at 13-14 (D.D.C. Mar 29, 1999), Def. Ex. F (blocking bars transactions but does not confiscate property and is not tantamount to a forfeiture); IPT Co., 1994 WL 613371, at *5-6 (IEEPA blocking is a temporary freezing and title does not vest in the government); Can v. US, 820 F.Supp. 106, 109 (S.D.N.Y. 1993) (TWEA blocking does not constitute a vesting merely because it remained in place for a lengthy period of time). Accordingly, the freezing of HLF's accounts is not a seizure entitled to Fourth Amendment protection.

However, the Government's entry into HLF's offices, search of its property, and seizure of its documents and office equipment without a warrant, do raise significant Fourth Amendment concerns. Indeed, these allegations state a classic Fourth Amendment violation.  See G.M. Leasing Corp. V. United States, 429 U.S. 338,

353-59 (1977) (holding that government entry into business premises without a warrant violated the Fourth Amendment).

The Government's arguments to the contrary are not persuasive. First, the Government relies heavily on the nature of its authority pursuant to the IEEPA and the Executive Orders. It reasons that, because the IEEPA expressly allows the freezing of assets, a warrant requirement does not comport with the statutory framework. In support of this contention, the Government argues that OFAC has never sought a search and seizure warrant to effect a blocking, and that procedure has never been required under the IEEPA. The argument is unpersuasive, however, because no court has ever directly addressed the issue.

Moreover, the Government relies on a case that supports the contrary conclusion. In <u>Global Relief Foundation, Inc. v. O'Neill</u>, 2002 WL 1285829, at *25 (N.D. Ill. June 11, 2002), the Court evaluated the constitutionality of a similar search and seizure under the IEEPA. The court concluded that the government did not violate the Fourth Amendment precisely because it had obtained a warrant pursuant to the Foreign Intelligence Surveillance Act ("FISA")[34] and because FISA's safeguards provided sufficient

---

[34] FISA was enacted in 1978 to create a "secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights." S. Rep. No. 95-604, at 15 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 3904, 3916. To oversee the Executive's exercise of powers granted by FISA, the statute established the Foreign Intelligence Surveillance

protection for the rights guaranteed by the Fourth Amendment.[35]  In this case, the Government has offered no excuse for failing to follow the same procedure by obtaining a warrant from the Foreign Intelligence Surveillance Court to establish the requisite probable cause to enter HLF's corporate premises and remove its property. Its failure to do so, or to otherwise establish the necessary probable cause, states a claim for violation of HLF's Fourth Amendment rights.

Second, the Government contends that a warrant was not necessary because statutory authorization to search or seize supported by an important government interest and adequate safeguards of fairness, may substitute for a warrant or probable cause determination.  See Donovan v. Dewey, 452 U.S. 594, 599 (1981); New York v. Burger, 482 U.S. 691, 702 (1987); United States v. Biswell, 406 U.S. 311, 315-16 (1972).  The Government is correct

---

Court to review applications for authorization of electronic surveillance aimed at obtaining intelligence information.  See 50 U.S.C. § 1803.  In 1994, FISA was amended to give the Foreign Intelligence Surveillance Court jurisdiction to hear applications for physical searches as well as electronic searches.  See id. § 1804(a).

[35]  It is true that the government in Global Relief did not obtain the warrant prior to entering plaintiff's premises and seizing its property.  However, FISA permits a warrantless search in emergency situations, and authorizes the government to submit a warrant application to the Foreign Intelligence Surveillance Court within 72 hours of the warrantless search.  In Global Relief, the government submitted the warrant application within the requisite time period, and it was approved by the Foreign Intelligence Surveillance Court.

that the Supreme Court has delineated this narrow exception in the context of administrative inspections in regulated industries.

However, even if the administrative search exception for commercial entities was analogous to the present factual context, which it is not, a fundamental component of the exception cannot be met in this case.  In upholding the warrantless searches, the Supreme Court specifically concluded that the regulatory inspection statutes in question provide a "sufficiently comprehensive and predictable inspection scheme. . . . that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."  Donovan, 452 U.S. at 600.  In this case, neither the IEEPA nor the two Executive Orders provides these essential safeguards of predictability and implicit notice that satisfy the requirements of the Fourth Amendment.

In sum, the Court concludes that HLF has sufficiently stated a Fourth Amendment violation based on the Government's physical entry onto its premises and removal of its property without a warrant.  HLF has not, however, stated a claim as to the freezing of its assets, which does not constitute a Fourth Amendment seizure.

### 5.    First Amendment

HLF next argues that the Government has violated the First Amendment by prohibiting it from making any humanitarian

42

contributions.[36]  Specifically, HLF contends that its designation as a terrorist organization and the blocking order violate its First Amendment rights to freedom of association and speech.  For the reasons discussed below, both of these arguments fail.

### a.    Freedom of Association

HLF contends that the designation and blocking order are unconstitutional under NAACP v. Claiborne Hardware Co., because the Government has imposed guilt by association and because it has failed to establish that HLF has a "specific intent to further [Hamas'] illegal aims."  458 U.S. 886, 919 (1982).  Each of these arguments is unpersuasive.

First and foremost, this is simply not a case like Claiborne Hardware, because OFAC's action was not taken against HLF for "reason of association alone." Id. at 920.  In Claiborne Hardware, the Supreme Court reversed a state tort judgment against the National Association for the Advancement of Colored People and members of that organization who had participated in a seven-year boycott of white merchants.  The Supreme Court found that liability had been unconstitutionally imposed "by reason of association alone." Id. at 920.

In this case, the IEEPA, the two Executive Orders, and the blocking order do not prohibit membership in Hamas or endorsement

---

[36]  The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I.

of its views, and therefore do not implicate HLF's associational rights.    Instead, they prohibit HLF from providing financial support to Hamas, "and there is no constitutional right to facilitate terrorism." Humanitarian Law Project v. Reno, 205 F.3d 1130, 1133 (9th Cir. 2000) (AEDPA does not impose guilt by association because the statute does not prohibit membership in the designated groups and merely prohibits financial contributions to those groups).    Accordingly, the Government has not imposed guilt by association and the agency's action is not unconstitutional pursuant to Claiborne Hardware.

Second, the First Amendment does not require the Government to establish that HLF had a "specific intent" to further Hamas' unlawful aims.    The Claiborne Hardware court imposed the specific intent requirement on Government restrictions that impose liability on the basis of association alone---classic First Amendment activity.    Because the Government in this case has not imposed guilt by association, the Claiborne Hardware specific intent requirement is not applicable.

Moreover, imposing a "specific intent" requirement on the Government's authority to issue blocking orders would substantially undermine the purpose of the economic sanctions programs. Regardless of HLF's intent, it can not effectively control whether support given to Hamas is used to promote that organization's unlawful activities.    Humanitarian Law Project, 205 F.3d at 1133

(First Amendment does not require the government to demonstrate a specific intent to aid an organization's illegal aims because "[m]aterial support given to a terrorist organization can be used to promote the organizations's unlawful activities, regardless of donor intent").

In sum, accepting all of HLF's factual allegations as true, it is clear that HLF has not established any interference with its associational rights.

### b.    Freedom of Speech

As noted above, HLF also contends that the Government violated its First Amendment right to freedom of speech by prohibiting it from making any humanitarian donations.    HLF's humanitarian contributions clearly implicate both speech and nonspeech elements. Accordingly, pursuant to United States v. O'Brien, "a sufficiently important government interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." 391 U.S. 367, 376 (1968); see also Global Relief Foundation, Inc. v. O'Neill, 2002 WL 1285829, at *24 (N.D. Ill. June 11, 2002) (applying O'Brien standard to deny preliminary injunction for free speech challenge to IEEPA asset freeze); Humanitarian Law Project, 205 F.3d at 1135-36 (declining to apply strict scrutiny to AEDPA material support restriction because restriction was not aimed at

expressive component of conduct).[37]

Applying the familiar four-part test laid out in O'Brien, the Government's restriction passes intermediate scrutiny if (1) it is within the constitutional power of the Government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. Id. at 376-77.

In this case, the Executive Orders and blocking order clearly meet these requirements. First, President Bush and President Clinton plainly had the power to issue the Executive Orders pursuant to the IEEPA. Moreover, the IEEPA and the Executive Orders provide OFAC with the authority to designate HLF and block its assets.

---

[37] HLF argues that the Government's restriction of HLF's freedom of speech requires strict scrutiny under Buckley v. Valeo, 424 U.S. 1 (1976), and its progeny. However, Buckley involved restrictions on political contributions, which implicate the core First Amendment right of political expression in a democratic society. See Buckley, 424 U.S. at 14 ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression. . . ."). In this case, HLF does not contend that it has made contributions to political organizations or that its contributions are a means of political expression or advocacy. Instead, HLF asserts that its contributions involve "charitable and humanitarian aid." Compl. ¶ 6. Such charitable contributions plainly do not involve political expression, and therefore do not warrant strict scrutiny under Buckley.

Second, as addressed in <u>supra</u> Part III.C.2.a., the Executive Orders and OFAC's actions promote an important and substantial government interest---that of combating terrorism by undermining its financial base.

Third, the Government's interest in preventing terrorist attacks is unrelated to suppressing free expression. As addressed above, the Government has merely restricted HLF's ability to provide financial support to Hamas. It has not restricted HLF's ability to express its viewpoints, even if these views include endorsement of Hamas.

Fourth and finally, this incidental restriction is no greater than necessary to further the Government's interest. Money is fungible, and the Government has no other, narrower, means of ensuring that even charitable contributions to a terrorist organization are actually used for legitimate purposes.[38]  <u>See</u> <u>Humanitarian Law Project</u>, 205 F.3d at 1136 (finding that AEDPA material support restriction is no greater than necessary because money is fungible and even contributions earmarked for peaceful purposes can be used by terrorist organizations for unlawful purposes); <u>Farrakhan v. Reagan</u>, 669 F.Supp. 506, 512 (D.D.C. 1987) (dismissing free speech claim because "[i]n the face of the national security interests lying behind the [IEEPA] sanctions

---

[38]  Even if the contributions could be limited to charitable purposes only, non-HLF contributions would be freed up for funding of terrorist activities.

47

regulations, . . . there is no alternative that would allow organizations to speak through contributions while still allowing the government to effectuate its legitimate and compelling interests in national security"). Accordingly, the Government's restriction in this case is narrowly enough tailored to only further its interest in stopping the flow of American dollars to Hamas.

In sum, OFAC's designation of HLF and attendant blocking order satisfy scrutiny under the O'Brien test, and therefore do not violate HLF's First Amendment right to freedom of speech.

### 6.    Religious Freedom Restoration Act and Free Exercise Clause

Finally, HLF contends that the designation and blocking order substantially burden HLF's exercise of religion in violation of the Religious Freedom Restoration Act ("RFRA"). HLF also invokes the free exercise rights of its Muslim employees and donors. Both arguments fail as a matter of law.

### a.    Substantial Burden on HLF's Exercise of Religion

RFRA prevents the Government from placing a "substantial burden" on the exercise of religion "even if the burden results from a rule of general applicability," unless the Government demonstrates a "compelling government interest" and that it has used the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000bb-1(a),(b). The Court need not address the second

and third steps of this inquiry because, accepting all of HLF's factual allegations as true, it has failed to meet its burden of showing that an exercise of its religion has been substantially burdened.

Other than conclusory statements of burdensomeness, HLF makes only two references in its Complaint to its own actual exercise of religion.  HLF asserts that "Holy Land's work . . . fulfills [its] religious obligations as Muslims to engage in zakat . . . [which] is one of the Five Pillars (fundamental tenets) of the Muslim religion."  Compl. ¶ 53.  HLF also states that "Holy Land's use of . . . donations [from its  Muslim donors and employees] for charitable and humanitarian purposes, constitute the 'exercise of religion' under [RFRA]."  Compl.¶ 58.

Accepting these factual allegations as true, they simply do not describe any exercise of religion that has been burdened. Although charitable activities may constitute religious exercise if performed by religious believers for religious reasons, HLF has not established that, as an organization, it made these charitable contributions as an exercise of its own religious beliefs.  Indeed, nowhere in Plaintiff's Complaint does it contend that it is a religious organization.  Instead, HLF defines itself as a "non-profit charitable corporation," without any reference to its

religious character or purpose.[39]  Compl. ¶ 5.

In sum, Plaintiff's own factual allegations do not identify any exercise of religion that could serve as the basis for a RFRA claim.  Accordingly, HLF does not, as a matter of law, state a viable RFRA claim on its own behalf.  As the following analysis demonstrates, neither does HLF raise a viable free exercise claim on behalf of its Muslim donors or employees.

### b.    Free Exercise Rights of HLF's Muslim Employees and Donors

In addition to arguing that its own right to freedom of religion was violated by the Government's actions, HLF also invokes the free exercise rights of its Muslim donors and employees.  HLF reasons that, pursuant to <u>Hunt v. Washington State Apple Advertising Commission</u>, it has "associational standing" to raise these claims because (1) its donors and employees "would otherwise have standing to sue in their own right;" (2) the interests HLF seeks to protect are "germane to [its] purpose" as a Muslim charity; and (3) "neither the claim asserted nor the relief requested requires the participation of individual [donors and employees] in the lawsuit."  432 U.S. 333, 343 (1977).

It is clear that Plaintiff has failed to meet these <u>Hunt</u> requirements.  With respect to the third inquiry, the Supreme Court

---

[39]    Significantly, in its 501(c)(3) application to the I.R.S. for tax exemption, HLF described itself as a charitable, not a religious or Muslim, organization.

has stated that free exercise claims are precisely the type of claims that require individual participation in order to show the alleged burdensome effect of an enactment on an individual's religious practice. See Harris v. McRae, 448 U.S. 297, 321 (1980) ("[s]ince 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,' the [free exercise claim] is one that ordinarily requires individual participation") (citations omitted). Accordingly, the individual participation of HLF's employees and donors is necessary to establish any burden on their religious practice, and HLF has therefore not met the third Hunt factor.

HLF has further failed to establish that it has associational standing because it does not contend that there is any genuine obstacle preventing its donors or employees from asserting their own free exercise rights. See Singleton v. Wulff, 428 U.S. 106, 116 (1976).

Therefore, as a matter of law, HLF does not have associational standing to invoke the free exercise rights of its Muslim donors and employees.

### E.   Preliminary Injunction

HLF has moved for a preliminary injunction. In order to prevail on this motion, Plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) that it will

be irreparably injured if an injunction is not granted;[40] (3) that an injunction will not substantially injure the Government; and (4) that the public interest will be furthered by the injunction. Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505-06 (D.C. Cir. 1995). HLF has not carried its burden for the following reasons.

First, Plaintiff has not demonstrated a substantial likelihood of success on its claims. Although the Court has ruled that HLF has stated a constitutional claim on its Fourth Amendment claim and will be afforded an opportunity to prove it, the Court is not prepared to determine that HLF has a substantial likelihood of success on those allegations in light of the strong arguments advanced by the Government in support of its position. As to Plaintiff's likelihood of success on the APA, RFRA, and remaining constitutional claims, the Court has already concluded that they have no merit.

Second, it is also clear that the injury to the Government and the public interest weigh against granting the preliminary injunction. Both the Government and the public have a strong interest in curbing the escalating violence in the Middle East and its effects on the security of the United States and the world as a whole. Milena Ship Mgmt. Co. Ltd. v. Newcomb, 804 F.Supp. 846, 854 (E.D. La. 1992) (denying motion for preliminary injunction to

---

[40] The Government concedes irreparable injury, and therefore the Court need not address that factor.

unblock assets, despite showing of irreparable harm, because "[t]he public interest overarches all else because of the world backdrop against which OFAC's action was taken"). Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.

In sum, the Court concludes that HLF does not have a substantial likelihood of success on the merits, and that the balance of harms and public interest weighs in favor of denying HLF's motion for a preliminary injunction.

## IV.    CONCLUSION

For the foregoing reasons, the Court **denies** Plaintiff's Motion for a Preliminary Injunction, **grants in part and denies in part** Defendants' Motion to Dismiss and for Summary Judgment, and **grants** Defendants' Motion In Limine and to Strike. Defendants' Motion to Dismiss and for Summary Judgment is granted with respect to the APA, Fifth Amendment, First Amendment, and Religious Freedom Restoration Act claims. Defendants' Motion is denied with respect to the Fourth Amendment claim.

Aug. 8, 2002
DATE

Gladys Kessler
GLADYS KESSLER
UNITED STATES DISTRICT JUDGE

**Copies to:**

John D. Cline
John W. Boyd
Nancy Hollander
Zachary A. Ives
Freedman Boyd Daniels
  Hollander Goldberg
  &amp; Cline P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87125

Sandra M. Schraibman
Elizabeth J. Shapiro
Susan Demske
U.S. Dep't of Justice
Civil Division
901 E. Street, N.W.,
Room 988
Washington, DC 20004